# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **Right to Life of Michigan** and **Pregnancy Resource Center,** | |
| *Plaintiffs,* | |
| v. | |
| **Dana Nessel,** in her official capacity as Attorney General of Michigan; **John E. Johnson, Jr.,** in his official capacity as Executive Director of the Michigan Department of Civil Rights; **Luke R. Londo, Gloria E. Lara, Richard R. White III, Portia L. Roberson, Zenna Faraj Elhason, Regina Marie Gasco, Rosann L. Barker,** and **Skot Welch,** in their official capacities as members of the Michigan Civil Rights Commission, | Case No.   1:26-cv-390 |
| | **Verified Complaint** |
| *Defendants.* | |

## Introduction

Recent changes to Michigan's employment law force religious and pro-life groups to employ and associate with persons who do not share or live by—and may even oppose—the organizations' beliefs on human life. This violates the First Amendment. Plaintiffs Right to Life of Michigan (Right to Life) and Pregnancy Resource Center (PRC) recruit, hire, and retain only employees who adhere to, agree to abide by, and can effectively communicate their pro-life views. This employment policy puts them at odds with Michigan's new law. Right to Life and PRC bring this suit to ensure they can continue to serve Michiganders without diluting their pro-life views through the lukewarm or hostile hires Michigan's law demands.

Right to Life has advocated for pro-life policies in Michigan for decades. It offers educational resources to women and families in Michigan, partners with pregnancy help centers, advances pro-life legislation, and much more to protect human life, including unborn children. Right to Life accomplishes these goals through its staff experts and employees who promote its values to the public.

PRC provides proactive education, responsive medical care, and compassionate support services related to the gift of human life. It teaches students about sexual risk avoidance. It helps women and families facing unexpected pregnancies by offering free medical care and accurate information about pregnancy, abortion, adoption, and other topics. And it walks alongside pregnant women and new moms by giving them formula, food, diapers, bedding, cribs, and other practical necessities. PRC offers these services as an extension of its Christian beliefs—that all people matter to God. PRC relies on its employees as its hands and feet to fulfill its mission.

Michigan's new employment law threatens these organizations. It redefined "sex" discrimination to include "the termination of a pregnancy." MCL 37.2201(d). This amendment filters through every mention of "sex" in Michigan's employment law. Now, it is illegal to "refuse to hire or recruit," "discriminate," or "deprive" applicants of an "employment opportunity" because of their support for, or decision to have, an abortion. MCL 37.2202(1)(a)–(b), (d). Employers cannot post job openings indicating a "preference, limitation, [or] specification" for employees with specific views on abortion or ask applicants about their views. MCL 37.2206(1)–(2). And employers must cover abortions as an employee "benefit" if they offer pregnancy coverage. MCL 37.2202(1)(c).

Right to Life and PRC are employers under Michigan's law. Michigan's law thus requires them to recruit and hire those with pro-abortion views, restricts these groups from explaining their pro-life requirements to applicants, and requires these groups to offer abortion coverage in their insurance plans because they generally offer insurance to their employees. Because they won't, they risk severe penalties, like five-figure fines, loss of state-issued licenses, and more.

Right to Life and PRC face that risk every day. Their employment policies and practices violate the law now. They make employment decisions based on applicants' views on abortion and their decisions "to terminat[e] … a pregnancy." Adding risk, they have open positions that need to be filled and often receive dozens of applications for each position. They also intend to exclude abortion as an employee health "benefit." Elsewhere, Right to Life and PRC chill their expression in job postings and other materials to avoid liability. They shouldn't have to. The First Amendment protects Right to Life's and PRC's First Amendment freedoms to join with others to further a common cause and to refrain from participating in activities that contradict their beliefs. Michigan's law infringes on these bedrock freedoms. For that reason, it is unconstitutional as applied here.

## Jurisdiction and Venue

1.      This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

4.      Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Western District of Michigan; the effects of the challenged laws are felt here; Defendants can and do perform official duties here; and Defendants reside here.

## Plaintiffs

5.      Right to Life is a 501(c)(4) nonpartisan, nonsectarian, domestic nonprofit organization organized on a non-stock, directorship basis under Michigan law with its principal place of business in Grand Rapids, Michigan and governed by a board of directors.

6.      Right to Life is dedicated to protecting the gift of human life from fertilization to natural death and proposes, lobbies for, and supports legislation that protects human life, including unborn children.

7.      PRC is a 501(c)(3) faith-based non-profit pregnancy resource center organized on a non-stock, directorship basis under Michigan law with its principal place of business in Grand Rapids, Michigan and governed by a board of directors.

8.      PRC serves women and families experiencing unplanned pregnancies by providing education, counseling, medical services, and practical support.

4

## Defendants

9.      Dana Nessel is Attorney General of Michigan. The Attorney General has authority to administer, enforce, and prosecute the Elliott-Larsen Civil Rights Act (ELCRA). MCL 14.29–30, MCL 14.101.

10.     The Attorney General has the power to enforce ELCRA settlements, enforce orders to produce documents, and participate in ELCRA hearings.

11.     The Attorney General represents the Michigan Department of Civil Rights (Department) and Michigan Civil Rights Commission (Commission) in any lawsuit filed under ELCRA. MCL 37.2602(b).

12.     John E. Johnson, Jr., is the Executive Director of the Department. The Executive Director executes the Commission's policies and has the power to receive, initiate, investigate, and file complaints alleging violations of Michigan's employment law and administer, enforce, and prosecute the law. *See* MCL 37.2602, MCL 37.2603; MDCR Rules 37.4(2), 37.12, 37.16.

13.     Luke R. Londo, Gloria E. Lara, Richard R. White III, Portia L. Roberson, Zenna Faraj Elhason, Regina Marie Gasco, Rosann L. Barker, and Skot Welch, are members of the Commission. They have authority to initiate and file complaints alleging violations of Michigan's employment law and administer, enforce, and prosecute the law. *See* MCL 37.2601; MDCR Rules 37.4(2), 37.12, 37.16.

14.     The Attorney General, Department, and Commission have offices in Grand Rapids.

15.     All defendants are named in their official capacities.

5

## Factual Background

Right to Life

16.    Right to Life was incorporated as a non-profit corporation in 1974 as Michigan Citizens for Life before adopting its present name in 1979.

17.    Right to Life exists to protect the precious gift of human life from fertilization to natural death.

18.    Right to Life encourages community participation in programs that respect and protect human life; works on behalf of defenseless or vulnerable human beings, born and unborn, within its identified life issues of abortion, infanticide, euthanasia, and assisted suicide; educates people on these issues; and promotes legislation that protects human life.

19.    Right to Life is unalterably opposed to abortion and believes abortion is a grave act of injustice toward the unborn child.

20.    Right to Life defines abortion as any act or procedure performed with the willful intent to cause the death of an unborn child which is between fertilization and birth when the life of the mother is not at risk.

21.    Since its founding, Right to Life has engaged in political action and has been at the forefront of many important pieces of pro-life legislation and social causes in Michigan and throughout the United States.

22.    For example, Right to Life promoted, lobbied for, and helped to pass legislation and initiatives that ended state-funded Medicaid abortions in Michigan, required women to receive complete information about abortion before having an abortion, required parental consent for minor teen abortions, banned assisted suicide, improved pain management for patients suffering from terminal illnesses, gave adoptive families a state tax credit, protected employers from being forced to

cover abortion in their health insurance policies, prohibited partial-birth abortions, required screening for coercion before an abortion is performed, and much more.

23.     Right to Life also educates the public on its pro-life mission.

24.     Right to Life runs a frequently visited website with resources for pregnant women and information about the pro-life movement, publishes newsletters with an audience that peaks at approximately 250,000 people, hosts dinners and events throughout Michigan to educate people on its pro-life priorities, educates students and youth through grassroot efforts, and engages in major media advertising through television, radio, and the internet.

25.      Right to Life also provides educational resources such as books and videos to any member of the public.

26.     Right to Life facilitates access to pregnancy care centers for women facing unplanned pregnancies and women struggling with whether to have an abortion.

27.     Right to Life utilizes digital advertising to provide individuals with essential pro-life information, including resources on pro-life pregnancy resource centers and pro-life pregnancy options.

28.     Right to Life also works with and supports numerous local "Right to Life" affiliates throughout the state. The affiliates coordinate local pro-life efforts to protect human life from fertilization to natural death.

29.     Some of Right to Life's operations require state issued licenses.

<u>Right to Life requires all employees to agree with its message</u>

30.     Right to Life fulfills its pro-life mission and expresses its views through its employees who operationalize its mission, communicate its views, and advocate those views to the public.

31.     Right to Life's pro-life mission influences all aspects of the organization, including its employment decisions, and it is critical that every employee agrees with, personally adheres to, and can effectively communicate its pro-life views.

32.     Right to Life's employees must refrain from engaging in conduct antithetical to Right to Life's pro-life mission and values for Right to Life to be successful.

33.     Right to Life's employees must agree to abide by the organization's pro-life philosophy and be educated on the life issues defined by the organization for Right to Life to be successful.

34.     Right to Life's employees must be able to effectively communicate its pro-life philosophy and remain loyal to the mission, organization, and fellow staff of the organization for Right to Life to be successful.

35.     Right to Life expects each employee to conduct their professional and personal lives in a manner that provides clear evidence of their commitment to the organization's pro-life values.

36.     Right to Life also requires its employees to refrain from behavior that conflicts or appears inconsistent with its pro-life mission because it relies on its employees to fulfill and effectively communicate its pro-life values.

37.     Any such behavior has the potential to reflect poorly on the organization, undermine its pro-life advocacy, and affect its ability to convey its pro-life message and accomplish its pro-life mission.

38.     Right to Life has these requirements for its employees regardless of position because a commitment to life drives everything the organization does.

39.     Throughout the year, Right to Life organizes several public events that employees are expected to attend regardless of position.

40.     For example, Right to Life hosts an annual conference and a separate annual Legislative Day where pro-life advocates from around the state gather for workshops, seminars, meetings, and speakers.

41.     Right to Life also co-hosts a biennial March for Life where pro-life advocates march in Lansing, Michigan with one voice on behalf of women and children, including unborn children.

42.     Right to Life employees also regularly associate with each other during casual office interactions, monthly meetings, and social gatherings.

43.     During these interactions and more, Right to Life employees discuss Right to Life's pro-life mission, values, advocacy, and goals with other employees.

44.     For that reason, Right to Life requires that each employee remain faithful to its pro-life mission to ensure that employees can serve as a positive influence on other employees, perpetuate the organization's culture and mission, and maintain internal consistency.

45.     Every employee at Right to Life has the potential to interact with the broader public, supporters, and other employees, and often does.

46.     For that reason, Right to Life views each employee as an ambassador of its pro-life mission and expects and requires them to be able to truthfully and persuasively answer a question from a member of the public, a supporter, or a co-worker about Right to Life's issues in a way that is consistent with its mission.

47.     Right to Life would not be able to promote its pro-life mission if every employee did not conform to the organization's pro-life views.

48.     Employing someone who promotes or encourages abortion, assists someone in having an abortion, advocates contrary to Right to Life's pro-life position, or cannot honestly promote or advocate Right to Life's pro-life position would severely undermine its pro-life mission by contradicting its core mission and burden its ability to convey that message to the public and to other employees.

<u>Right to Life's positions.</u>

49.    Right to Life has many employment positions, all dedicated to accomplishing and promoting its mission.

50.    Each position interacts with members of the public or with other employees at Right to Life.

51.     As described below, each position participates in and promotes Right to Life's expressive activities to the public and to other employees by performing their job duties, interacting with the public and other employees, and conveying the organization's pro-life messaging.

<u>Right to Life Managers</u>

52.    Right to Life employs a President and a Senior Director of Operations.

53.    The President leads and manages the organization, implements the Board's directives to promote pro-life policies, develops procedures and practices that carry out the organization's mission, communicates the organization's goals and vision to other employees and volunteers, affiliates, the media, churches, unaffiliated pro-life groups, and the general public, and reviews, edits, and approves all of Right to Life's major external communications to ensure comportment with the organization's values and mission.

54.    The Senior Director of Operations reports to the President of the organization and assists in managing the day-to-day operations of Right to Life's staff and deliverables, ensures that materials are consistent with the President's vision and submitted in a timely manner, provides input on educational material, and represents the President at various events.

<u>Community Engagement and Fundraising</u>

55.    Right to Life employs professionals who specialize in community outreach, public education, and fundraising, including the following positions.

56.    The Director of Education oversees the planning, production, and distribution of educational materials to the public and develops and implements advertising campaigns and social networking outreach.

57.    The Communications Director develops organization-wide communication plans to deliver clear, compelling, and consistent messaging across all Right to Life's platforms. This role collaborates with other Right to Life Directors to shape public opinion by producing persuasive, on-brand communications and strengthening engagement with media, affiliates, supporters, and the public.

58.    The Content Contributor & Events Coordinator develops educational material for the public, affiliates, churches, and staff, manages social networking outreach, and coordinates public events such as the annual pro-life conference.

59.    The Director of Multicultural Outreach builds and maintains relationships within diverse multicultural settings and communities to promote Right to Life's pro-life messaging; oversees and manages the Pregnancy Services Grant Program; organizes public presentations and meetings to educate on the value and dignity of human life; and oversees the Multicultural Outreach Advisory Committee, the Black Leadership Committee, the Chaldean Leadership Committee, the Hispanic Leadership Committee, other departmental fundraising dinner committees and special project committees.

60.    The MiGen Leads Coordinator networks with students and young professionals, develops outreach materials, partners with affiliates to create contests and programs for young people, and speaks at public events to engage young professionals and students in the organization's mission.

61.    The Field Staff Director and the Field Representatives organize new affiliates, develop and train existing affiliates, serve as a resource to assist local leaders as they organize and educate within their own communities, and ensure

that existing affiliates are operating consistently with Right to Life's mission and objectives.

62.    The Senior Director of Development creates, manages, and evaluates fundraising programs and materials for Right to Life and its affiliates. This position requires the Director to proactively seek and cultivate individual, community, corporate, and foundation donor relationships.

63.    The Executive Assistant to the Senior Director of Development, and the Development Coordinators assist the Senior Director of Development to fundraise by maintaining personalized correspondence with major gift donors, interfacing with donors or trustees in the planning and/or distribution of planned gifts, providing gift planning materials to interested parties, and cultivating corporate, individual, community, and foundation donor relationships.

<u>Legislative Engagement and Politics</u>

64.    Right to Life employs professionals who specialize in legislative and political advocacy, including the following positions.

65.    The Legislative Director & Senior Policy Advisor develops and maintains relationships with Michigan state legislators to advocate pro-life legislation and defend against legislation contrary to the organization's mission. The Legislative Director also provides legislative updates to Right to Life staff and affiliates.

66.    In addition to building relationships, the Legislative Director & Senior Policy Advisor participates in educational conferences, training sessions, and public meetings to promote Right to Life's objectives.

67.    The Legislative Assistant reports to the Legislative Director & Senior Policy Advisor and is responsible for aiding the organization's lobbying efforts by researching, tracking legislation, providing correspondence to legislative offices, and event planning.

68.     Finally, the Political Director is responsible for the Political Action Department and conducts PAC training; educates staff, members, candidates, the media, and the public on PAC issues; and oversees the Member Management System program.

### Marketing and Media

69.     Right to Life employs staff responsible for the organization's marketing, branding, and product development, including the following positions.

70.      The Art and Marketing Director and the Graphic Designer design and create the organization's websites, film and edit in-house video projects for public and educational outreach, create promotional logos, write and design advertising, and create educational and fundraising presentations and grant requests.

71.     The Media Relations and Digital Director manages Right to Life's social media platforms, plans and directs media campaigns, establishes relationships with key members of the media, represents Right to Life as a spokesperson, and relays the organization's messaging through press releases.

### Accounting and Finance

72.     To manage and accurately represent Right to Life's finances, the organization employs the Director of Finance, the Accounts Payable & Receivable Specialist, and the Accounting Assistant.

73.     These positions develop and maintain an accounting system, create and manage budgets, conduct audits and financial reporting, process payroll, train field staff and Right to Life affiliates regarding federal and state requirements, track donation forms, engage with donors to address any questions or concerns, communicate the organization's messaging to third parties and the public, report on the financial health of Right to Life to the President and other employees, and provide financial data to the Board, federal and state agencies, auditors, and department managers.

<u>Other Positions</u>

74.    To handle the office's day-to-day administrative needs, Right to Life employs an Office Manager/Receptionist, an Officer Manager for Macomb County Resource Center, an Officer Manager for Wayne County Resource Center, and a Director of Human Resources (Administrators).

75.    Additionally, Right to Life employs staff in other office support roles, including an Administrative Assistant, a Support Service Manager & Volunteer Coordinator, a Data Management & Office Support Specialist, and a Facilities Manager (Support Roles).

76.    Administrators and Support Roles greet guests, welcome members of the public, answer questions about the mission and work of Right to Life, network with and educate the public at community events, represent Right to Life at fairs through its educational booths, answer phone calls, enter and manage data, maintain the facilities, manage the mail, review and organize employee applications and documents, manage employee benefits, and work with and maintain volunteer schedules, amongst other duties.

<u>Right to Life's hiring practices.</u>

77.    Right to Life currently employs about 40 employees.

78.    Over the past five years, Right to Life has hired four new employees each year on average.

79.    Right to Life actively recruits and hires new employees and reasonably anticipates that it will continue to do so in the near future and the long term.

80.    Right to Life posts its open positions on its website, Indeed.com, and often on Catholicjobs.com.

81.    Right to Life's posts typically include a link to the job description, attach a job description, or provide the job description.

82.     Right to Life regularly receives between 15 and 75 applications for a single open position.

83.     When Right to Life receives applications from an online source, it sends an automatic email to the candidate.

84.     In the past, Right to Life's automated email directed candidates to its website and asked for the candidate's thoughts on Right to Life's mission and values.

85.     Right to Life's automated email no longer asks the candidate to inform Right to Life about his or her thoughts on its pro-life mission and values.

86.     Right to Life made that change recently due to Michigan's new law. *See infra* ¶¶ 102, 374–376.

87.     Approximately ten percent of applicants typically responded to Right to Life's automated email asking for the candidate's position on Right to Life's mission.

88.     The purpose of this screening step was to ensure the applicant was familiar with Right to Life and could articulate his or her support for Right to Life's mission and values.

89.     Some candidates responded to this email voicing disagreement with Right to Life's pro-life positions, or an adverse view, and were screened from the application process at that time.

90.     After the initial email, Right to Life attempts to schedule an in-person or remote interview with the candidate.

91.     If the candidate passes the first interview, Right to Life schedules a follow-up in-person interview with the candidate's direct supervisor.

92.     During the second in-person interview, Right to Life's representative typically asks the candidate questions like: What is your position on abortion? What

shaped your position on abortion? What's your position on abortion due to rape or incest? What's your position on assisted suicide?

93.     If Right to Life offers the candidate a position, Right to Life provides the candidate with its Employee Handbook, which includes an acknowledgement of Right to Life's pro-life stance, and the candidate is required to sign Right to Life's Guiding Principles and Code of Ethics.

94.     Based on its experience with interviewing candidates and reviewing applications, Right to Life receives applications for open positions from applicants who apply out of need for employment without first evaluating Right to Life's mission to ensure the applicant aligns with that mission.

95.     For example, Right to Life received an application for its legislative assistant position from one candidate who listed Planned Parenthood advocacy as one of her work experiences.

96.     Right to Life received an application for its field representative position from a candidate who had an outstanding resume, but the candidate ignored additional correspondence from Right to Life to schedule an interview.

97.     Right to Life has taken (and wishes to continue to take) these steps listed in paragraphs 83–93 to ensure employees comply with its mission and values.

98.     These steps form an integral part of Right to Life's hiring process because they provide Right to Life with several ways to verify the candidate's commitment to Right to Life's mission and values and reduce the likelihood that Right to Life would hire a candidate who adopted a contrary view or who might engage in conduct antithetical to Right to Life's mission while employed by Right to Life.

99.     For example, during one recent in-person interview of an otherwise qualified candidate, the candidate revealed that she believed that whether to have

an abortion is a choice that each woman should decide for herself and even described her views as "pro-abortion."

100.    Right to Life did not hire that candidate.

101.    But Right to Life would also like to make its mission and values even more explicit in its employment requirements to unequivocally state its position and expectations with future employees, to allow it to further vet candidates, and to save its hiring employees the time from processing resumes and interviewing candidates who may not agree with Right to Life's mission and values.

102.    For example, Right to Life's previously automated email to prospective candidates is attached as Exhibit 1.

103.    Right to Life would like to amend that automated email, and its desired amended email is attached as Exhibit 2.

104.    Right to Life's current Guiding Principles and Code of Ethics that employees must sign before starting with Right to Life is attached as Exhibit 3.

105.    Right to Life would like to add amended language to its Guiding Principles and Code of Ethics, and the desired amended language is attached as Exhibit 4.

106.    Right to Life would also like to add amended language to its employee handbook, and the new desired amended language is attached as Exhibit 5.

107.    Currently, Right to Life seeks to fill an open position for the Communications Director and the Content Contributor & Event Coordinator.

108.    Right to Life has current expectations that it will need to fill 1–2 more positions within the next six months.

109.    The Content Contributor & Event Coordinator will report to the Director of Education, and the Communications Director will report to Right to Life's President.

110.    The Communications Director develops and leads an integrated, public-facing communications strategy across print, digital, and broadcast platforms to shape public opinion and raise Right to Life's profile.

111.    The Communications Director produces and publishes outward-facing content (video podcasts, press releases, website material, social media postings, and email), proactively pitches "good news" stories, and builds relationships with reporters and media outlets to secure interviews for leadership.

112.    The Communications Director also manages time-sensitive public messaging and prepares spokespeople with talking points and media training while coordinating media responses during high-profile or policy-related events.

113.    The Communications Director will also be expected to attend office meetings in person, attend office events in person, and interact with other Right to Life employees throughout the workweek.

114.    The Content Contributor & Event Coordinator facilitates Right to Life's special events, outreach, and education projects.

115.    The Content Contributor & Event Coordinator drafts new and updated educational materials, news articles, and web content, while providing educational information to Right to Life's directors, affiliates, churches, staff, resource center visitors, and the public.

116.    The Content Contributor & Event Coordinator helps plan Right to Life's public events, including the Annual Conference and Legislative Day, and participates in state and national conferences/events by staffing Right to Life's booths.

117.    The Content Contributor & Event Coordinator also regularly interacts with Right to Life employees by participating in Right to Life state events, attending office meetings and events in person, and regularly coordinating and communicating with other Right to Life employees throughout the workweek.

118.    Right to Life's current job description for the Communications Director is attached as Exhibit 6.

119.    Right to Life's current job description for the Content Contributor & Event Coordinator is attached as Exhibit 7.

120.    In addition to the general expectations for Right to Life employees, the job descriptions accurately describe the Communications Director's and the Content Contributor & Event Coordinator's responsibilities.

121.    But Right to Life would like to amend both job descriptions to include additional information on the need for applicants to agree with and abide by Right to Life's pro-life stance and Right to Life's decision to not include elective abortion in its health-insurance plans.

122.    Right to Life's desired amended language to the job descriptions is attached as Exhibit 8.

123.    Right to Life desires to provide links to its Guiding Principles and Code of Ethics in its amended job descriptions.

124.    Right to Life desires to publish these amended job descriptions on its website, Indeed.com, and Catholicjobs.com.

125.    Right to Life would like to adopt and implement a materially similar description of its pro-life requirements in all future job descriptions.

Right to Life's employment benefits.

126.    Right to Life also provides the candidate with a summary of its health insurance benefits.

127.    During the interview process, including during the initial phone screening, Right to Life often explains its health insurance package to prospective employees.

128.    Right to Life's health insurance plan is fully insured.

129.   Right to Life's employees can elect one of two kinds of comprehensive health plans.

130.   Right to Life offers employees a health reimbursement arrangement combined with a preferred provider organization.

131.   Right to Life also offers employees a high-deductible health plan.

132.   Those policies include coverage for preventative services, physician office services, emergency medical care, diagnostic services, maternity services, hospital care, alternatives to hospital care, surgical services, behavioral health services, prescription drugs, and other services.

133.   Right to Life's coverage includes infertility counseling and treatment but excludes in-vitro fertilization.

134.   Right to Life's maternity care coverage includes prenatal and post-natal visits and delivery and post-delivery care.

135.   Right to Life's moral and ethical pro-life convictions prohibit it from intentionally providing insurance coverage for abortion-causing drugs, devices, or procedures, or any other medical services inconsistent with its values.

136.   Providing employee health insurance that facilitates access to such drugs, devices, or procedures would violate Right to Life's moral beliefs and values, even if those items were paid for by an insurer or a plan administrator and not by Right to Life itself.

137.   For that reason, Right to Life's comprehensive health plan does not cover elective abortions, and its provider has allowed Right to Life to exempt elective abortions from coverage.

PRC's religious beliefs motivate its services to women and their families.

138.   PRC is a religious ministry that exists to affirm God's gift of human life by providing information, education, and services to women, men, and families

in its community related to family, pregnancy, and abortion consistent with its religious beliefs on those topics.

139.    Members of the public often find out about PRC's services through word-of-mouth referrals, grassroots movements, and advertising.

140.    With many interactions PRC has with members of the public and its staff, PRC often seeks to share the truth that all people—including unborn children—matter to God, that God loves them, and that lives can be transformed and renewed through belief in Jesus Christ.

141.    PRC serves women, men, and their families consistent with its religious beliefs outlined in its Mission, Vision, Doctrinal, and Stated Positions and its Driving Convictions (collectively, PRC's Positions).

142.    A true and accurate copy of PRC's Positions are attached to this complaint as Exhibit 9.

143.    PRC believes that every life begins at conception.

144.    PRC believes all human life is equally valuable and deserving of blessing and protection, from conception to natural death; that every abortion claims an innocent life and that life should not be destroyed; that every life is inherently valuable because God creates human life in His image; that abortion compounds actual and perceived problems and difficulties for a woman, rather than resolving them; and that the purpose of medical care is to heal and maintain the health of the individual and that abortion does neither for the woman or the baby.

145.    As a result, PRC does not recommend, provide, or refer for abortions or abortifacient drugs, devices, or procedures and believes it is immoral for anyone to participate in these services.

146.    PRC aims to help pregnant women and their families facing unplanned pregnancies evaluate their alternatives which enables them to make informed

decisions concerning the outcome of their pregnancies through information, medical and counseling services, and practical resources.

147.    PRC coaches women (and sometimes their support structures if applicable) experiencing unplanned or unwanted pregnancies to help them cope and take control of their lives and empower them to decline to have an abortion.

148.    PRC believes that the Bible explains that sexual intercourse should only take place in the context of marriages between one man and one woman and that sexual activity outside of this context is harmful and increases the risk of unintended pregnancy, sexually transmitted infections, and abortion.

149.    PRC serves women (and sometimes their support structures if applicable) facing unplanned pregnancies and the public by providing counseling, medical services, and practical support through (i) proactive education, (ii) responsive medical care, and (iii) compassionate support services.

150.    PRC's proactive education includes providing sexual risk avoidance instruction to students and parents in schools, churches, and community organizations.

151.    PRC's responsive medical care includes clinical pregnancy testing to confirm a pregnancy; ultrasound exams; gestational age determinations; consultations for pregnancy and adoption options; limited STD testing and treatment for female patients; information for abortion pill reversal services; referrals for post abortion care; and medical and behavioral and mental health referrals.

152.    PRC provides accurate and comprehensive information concerning prenatal development, pregnancy and childbirth, abortion procedures and risks, and alternatives to abortion. In addition to its treatment, referral, and coaching protocols, PRC offers its patients a wealth of informational resources covering pregnancy, abortion, and STDs.

153.    Finally, PRC's compassionate support services include providing pregnant women who continue to consider having an abortion with guidance, advice, and counsel. PRC supports adoption as an excellent alternative to abortion for women experiencing unplanned and unwanted pregnancies, and provides referrals to adoption agencies, Legal Aid of Western Michigan, and other resources for those who want such assistance. PRC provides situational support and community referrals that help women escape from domestic violence, offer shelter, provide transportation, and refer women and their families to many other resources.

154.    PRC's compassionate support services include providing practical assistance to new mothers and their children.

155.    For example, PRC often provides expectant and new mothers with prayer support, Bible classes, online parenting classes, formula, food, diapers, baby and maternity clothes, toys, bedding, and cribs.

156.    PRC currently receives no government funding or government grant funding.

157.    PRC provides limited STD testing and treatment for a minimal fee and offers the rest of its services free of charge.

158.    PRC does not discriminate in providing its services based on race, religion, national origin, age, sexual orientation, or gender identity.

159.    PRC operates by virtue of licenses issued by the state.

<u>PRC hires employees who share its religious beliefs to fulfill its religious mission</u>

160.    PRC's Christian faith and religious beliefs on abortion motivate and permeate its mission and its activities, including its requirements for employees and volunteers.

161.    PRC fulfills its religious mission and expresses its religious beliefs through its employees and volunteers who operationalize its mission by communicating its religious views and advocating those views to clients and the public.

162.    To fulfill its religious mission, PRC requires its employees and volunteers to agree with, personally adhere to, and be able to effectively communicate PRC's Positions, including its beliefs about the sanctity of life.

163.    In accordance with PRC's Positions, employees and volunteers must themselves refrain from having, and helping others procure, abortions and from promoting abortion and refrain from using, or helping others procure, abortifacient drugs or devices while employed with or volunteering with PRC.

164.    PRC's ability to care for its community and carry out its religious mission would be severely compromised if it were forced to employ someone (or partner with a volunteer) who encouraged or promoted abortion, had an abortion while employed by PRC, or openly lived contrary to PRC's Positions and religious beliefs while employed by PRC.

165.    PRC provides training to staff members and volunteers on the ministry's religious beliefs and convictions.

166.    For example, PRC typically starts each workday with a prayer with all staff working that day.

167.    PRC begins and ends many meetings with prayer and often prays for a significant length of time during meetings.

168.    PRC employees regularly discuss prayer requests with each other, encourage each other based on their reflections on the Bible, and pray with each other.

169.    Similarly, PRC begins each calendar year with a Prayer Summit which is a multi-day retreat where PRC employees assemble to review the year's theme

verse from the Bible, pray with each other, listen to speakers discuss topics from the Bible, and pray for the upcoming year.

170.    PRC employees are required to attend the Prayer Summit and are rarely granted exemptions.

171.    PRC awards each employee one paid day each calendar year to spend time in prayer, reflection, or Bible study to celebrate their work anniversary outside of the office.

172.    It is critical to PRC's mission that PRC staff be prepared to communicate the ministry's message concerning its religious beliefs and its pro-life positions so that any client, family member, or member of the public who asks receives a consistent message when interacting with staff.

173.    It is critical to the exercise of PRC's religious faith that the ministry be permitted to build a staff who understand and live out the ministry's mission effectively.

174.    PRC further desires to build a work environment where staff members will grow together in their faith, support each other in their faith, and work together to build a cohesive mission-focused religious ministry.

175.    PRC employees and volunteers are expected to be able to convey the ministry's religious beliefs with other employees and the public, if asked, including its position on abortion, to provide spiritual and prayer support for patients and the public as needed, and to provide services consistent with those beliefs, including PRC's Positions, as needed.

176.    Requiring employees and volunteers to affirm PRC's Positions ensures that PRC can effectively communicate its religious beliefs to its employees, patients, and the public, including on the topic of abortion.

177.   Employees and volunteers could not effectively communicate PRC's religious beliefs or provide services consistent with those beliefs if they disagreed with, did not understand, or engaged in activities that conflicted with those beliefs.

PRC's positions.

178.   PRC has many employment and volunteer positions, all dedicated to accomplishing and promoting its mission.

179.   Each employment position regularly interacts with members of the public or with other employees at PRC.

180.   As described below, each position participates in and promotes PRC's religious beliefs and expressive activities to the public or to other employees by performing their job duties, interacting with the public or other employees, and conveying the ministry's pro-life messaging.

181.   The below descriptions describe the core functions of each position, but do not provide an exhaustive description.

PRC Leadership

182.   PRC employs a Chief Executive Officer (CEO), a Chief Operations Officer (COO), a Chief Development Officer, and a Community Engagement Director (PRC Leadership).

183.   The CEO leads and manages the ministry, supervises the ministry's employees, implements the board's vision for PRC as a religious ministry, develops and implements policies, procedures, and practices that carry out PRC's religious mission, conveys PRC's mission to the public, and reviews, edits, and approves all of PRC's major external communications to ensure comportment with the ministry's religious beliefs and message.

184.   The CEO also acts as a spokesperson on behalf of the ministry, meets with potential donors, interacts with the media, and leads public events, all of

which require the CEO to speak and communicate in accordance with the ministry's religious beliefs, including PRC's Positions.

185.  The COO reports to the CEO and manages the daily operations of PRC offices. The COO ensures that PRC's Positions and religious beliefs are consistently applied and upheld across the ministry, including in public outreach initiatives and in all medical services PRC provides.

186.  The Chief Development Officer creates, manages, and evaluates fundraising events and materials for PRC, proactively seeks and cultivates donor relationships, and communicates PRC's Positions and religious beliefs to the public.

187.  The Development Manager and Graphic Designer report to the Chief Development Officer. These positions execute event logistics, including communicating with the venue, making menu decisions and providing technological support, advertising and marketing for public events, and providing administrative support for the day-to-day operations.

188.  The Community Engagement Director increases PRC's visibility in the community by promoting PRC's religious beliefs in the media, the general public, potential partner organizations, and amongst the business community; developing materials or presentations to educate staff and the public; launching PRC's podcast; and developing effective marketing campaigns.

189.  The PRC Leadership has primarily religious duties in that they ensure the ministry operates consistently with its religious beliefs and PRC's Positions, develop religious doctrine, enforce and develop policies consistent with those beliefs, and communicate PRC's religious message to members, the general public, prospective hires, employees, and potential donors and ministry partners.

190.  These duties can only be effectively performed consistent with PRC's beliefs and desired expression by PRC Leadership who share the ministry's faith.

191.    The PRC Leadership is expected to and often do provide spiritual guidance to, and offer prayer for, employees who ask for it.

192.    By doing these activities and conveying these messages, the PRC Leadership performs important religious functions for the ministry.

Education Services Director and Instructors

193.    PRC employs an Education Services Director, a Lead Education Instructor, Education Instructors, a Seasonal Education Instructor, a Community Education Instructor, and a Cradles of Grace Coordinator, who operate as the proactive prevention arm of PRC (PRC Instructors).

194.    The Education Services Director manages the Education Department staff, oversees the creation, implementation, and promotion of biblically based sexual risk avoidance (SRA) programming, and ensures that all educational outreach comports with PRC's Positions and is consistent with PRC's mission and vision to encourage and equip individuals to live a life of sexual integrity.

195.    The Lead Education Instructor, the Education Instructors, the Seasonal Education Instructor, and the Community Education Instructor teach PRC curriculum to students, churches, PRC staff, and members of the public. The curriculum promotes a biblically influenced sexual ethic and includes courses such as Health Me, Healthy Relationships, Willing to Wait® Middle School, Willing to Wait® High School, and The Whole Sex Talk.

196.    The Cradles of Grace Coordinator leads and teaches the biblically based program, Cradles of Grace, to group classes and church partners.

197.    The Cradles of Grace program involves group Bible study with practical applications for parents, connections with other moms, access to diapers, formula, food, and clothing, and guidance for parenting questions.

198.   The PRC Instructors have a primarily religious duty that is coextensive with their educational responsibilities, and these duties can only be performed by instructors who share the ministry's faith and pro-life vision.

199.   By doing these activities and conveying these messages, the PRC Instructors perform important religious functions for PRC.

<u>Medical Services Director</u>

200.   PRC employs a Medical Services Director who oversees the Medical Services Department and manages all on-site services.

201.   All members of the clinical staff report to the Medical Services Director.

202.   The Medical Services Director ensures that the Clinical Staff adhere to PRC's Positions and religious beliefs when providing medical care, assumes responsibility for the required training and ongoing development of all Clinical Staff, assists in the development of medical services-related policies and leads policy implementation within the department, and approves, evaluates, and revises all materials used for staff and patient education.

203.   The Medical Services Department provides medical services and community referrals directly to patients and supervises the patient discharge process.

204.   The Medical Services Director creates and nurtures relationships within the medical field, representing PRC and its interests within the broader medical community.

205.   The Medical Services Director has a primarily religious duty which is coextensive with his or her medical responsibilities, and these duties can only be performed by a Medical Director who shares the ministry's faith and pro-life vision.

206.   By doing these activities and conveying these messages, the Medical Director performs important religious functions for PRC.

<u>Clinical Staff</u>

207.    PRC employs a Medical Service Lead Nurse, Medical Service Nurses, Sonographer/Ultrasound Technicians, and Medical Service Patient Advocates.

208.    These positions are responsible for performing pregnancy tests; recording health history; educating clients on the effects of sexually transmitted diseases; administering treatment for sexually transmitted diseases; performing transabdominal and transvaginal ultrasounds for the purpose of confirming intrauterine pregnancy, assessing fetal cardiac activity, and determining gestational age; and guiding at-risk women through the patient process in both Spanish and English, while offering spiritual guidance.

209.    Because these positions regularly interact with patients, and patients seek advice and spiritual guidance, it is essential that the positions be able to pray with those who ask for it, share the gospel with those interested, and effectively communicate PRC's biblically-based Positions when patients ask for advice.

<u>Finance and HR</u>

210.    To manage PRC's finances and human resources, the ministry employs the Chief Finance Officer, the Finance and HR Coordinator, and an HR Consultant.

211.    These positions are responsible for processing revenue, managing accounts payable, maintaining donor records, creating and managing budgets, conducting audits, financial reporting, processing employee payroll, providing financial data to the PRC Board, federal and state agencies, auditors, and department Directors, assisting with PRC's public events such as the Walk for Life, acting as the point person for greeting and directing PRC callers and guests, assisting with the onboarding process by educating new employees on the ministry's policies, and proofreading development materials such as the monthly prayer calendar.

<u>Other Positions</u>

212.    To handle the ministry's scheduling and administrative needs, PRC employs support staff including a Compassionate Support Services Director, an Executive Assistant to the CEO, an Executive Assistant to the COO, an Administration Department Assistant, a Bilingual Client Services Assistant, a Development Assistant, Medical Services Scheduling Specialists, an Education Department Scheduling Coordinator, a Data Entry Specialist, a Lead First Steps Coordinator, Medical Services Receptionists, an Advocate Coordinator, a Bilingual Receptionist, an Office Coordinator, and a Compliance Consultant (PRC Support Staff).

213.    The PRC Support Staff are responsible for welcoming clients, answering phone calls, answering questions about PRC's values and mission, data entry and management, assisting the CEO and COO with administrative needs, processing patient medical records, managing the mail, maintaining the facilities and office equipment, processing curriculum material requests, scheduling events and client services, tracking license requirements, and ensuring all records and documentation are in compliance with state and federal law, amongst other support-related duties.

<u>Volunteers</u>

214.    PRC also employs a Volunteer Services Director and a Warehouse/Volunteer Coordinator.

215.    These positions manage the ministry's overall volunteerism, including recruitment strategies, screening, interviewing, orientation, training systems, retention, and volunteer data management.

216.    PRC provides opportunities for members of the public to be involved in the pro-life movement through volunteer opportunities.

217.    PRC volunteers perform multiple outward-facing tasks such as staffing the reception desk; assisting PRC staff with incoming calls; assisting in social media and video content creation for PRC's Willing to Wait® educational program; meeting one-on-one with moms, assessing their needs, assisting them with their shopping experience, and providing information and referrals to area agencies; and praying in person at the center, for clients, staff, and other volunteers, amongst many other duties.

218.    PRC volunteers also interact with PRC employees.

219.    PRC looks to engage more volunteers on an ongoing basis.

220.    Because volunteers reflect on PRC and interact with clients and the public on the ministry's behalf, PRC requires volunteers to agree with and abide by its religious beliefs and positions on abortion.

<u>PRC's hiring practices.</u>

221.    PRC currently employs over 40 employees.

222.    Over the past three years, PRC has hired 8 to 12 new employees each year.

223.    PRC actively recruits and hires new employees and anticipates that it will continue to do so soon and in the long-term.

224.    PRC typically receives 20 to 70 applications for a single open position.

225.    PRC typically posts its open positions on its website and on Indeed.com and sends the open positions to its community and church partners for posting.

226.    PRC's HR Consultant collects the resumes and reviews them for experience and credentials.

227.    PRC's HR Consultant invites the most qualified applicants for a phone interview.

228.    In the email inviting the applicant to interview, PRC includes a copy of its Stated Doctrines (Mission, Vision, Doctrinal, and Stated Positions) contained within PRC's Positions for the candidate to review and requests the candidate to acknowledge those positions.

229.    PRC receives applications for open positions from applicants who apply out of need for employment without first evaluating PRC's mission to ensure the applicant aligns with that mission.

230.    Once PRC reviews a resume displaying the skills and competencies necessary for the position, PRC sends the applicant its Stated Doctrines and invites the applicant to participate in a phone interview.

231.    After receiving the Stated Doctrines, applicants frequently decline to respond to the email or respond by stating that they are no longer interested in the position or cannot affirm PRC's Stated Doctrines.

232.    For those candidates who reply that they remain interested, PRC's HR Consultant schedules a phone interview with the candidate to ensure that the candidate can affirm the Stated Doctrines and speaks with the applicant through a thorough phone interview.

233.    If the candidate can affirm the Stated Doctrines and meets the primary skills and competencies PRC requires for the role and PRC decides to move forward, the candidate comes in for an in-person interview where PRC leadership and management thoroughly review each candidate's religious background, confirm again that the candidate can affirm the Stated Doctrines, and explain PRC's religious beliefs, mission, and vision.

234.    As part of the hiring process, PRC's CEO meets with each finalist prior to the extension of a formal employment offer. During this meeting, the CEO reinforces the importance of PRC's Positions, mission, vision, values, and ministry culture, ensuring the candidate has a clear and thorough understanding of

organizational expectations. At the conclusion of the meeting, the CEO encourages the candidate to take 24–48 hours to prayerfully consider the opportunity and confirm full alignment with PRC's culture and ministry before proceeding with an employment offer.

235.    If the candidate and PRC desire to move forward with employment, PRC provides the candidate with a copy of its Employee Handbook during the onboarding process. The Employee Handbook contains the entirety of PRC's Positions, including its Driving Convictions.

236.    The candidate must sign the Employee Handbook and confirm he or she will abide by its policies during the on-boarding process.

237.    The candidate must also sign PRC's Positions and confirm he or she will abide by them prior to official employment.

238.    PRC provides eligible employees with a summary of its health insurance benefits.

239.    PRC has taken (and wishes to continue to take) the steps described in paragraphs 225–238 to ensure employees comply with its mission and values.

240.    These steps form an integral part of PRC's hiring process because they provide PRC with several ways to verify the candidate's commitment to PRC's mission and values and reduce the likelihood that PRC would hire a candidate who adopted contrary views, including on abortion.

241.    This process has led PRC to decline to hire candidates who could not affirm PRC's Positions and candidates have withdrawn their applications because of PRC's Positions.

242.    But PRC would also like to make its mission and values even more explicit in its employment requirements to unequivocally state its position and expectations with future employees, to allow it to further vet candidates, and to

save its hiring employees the time spent processing resumes and interviewing candidates who may not agree with PRC's mission and values.

243.    For example, PRC would like to amend language to PRC's Positions and send that amended version to candidates and include that amended version in its job descriptions.

244.    PRC's desired amended language to PRC's Positions detailing its position on abortion is attached as Exhibit 10.

245.    PRC currently seeks to fill three open positions: the Lead First Steps Coordinator, the Advocate Coordinator, and the CEO Executive Assistant.

246.    The Lead First Steps Coordinator is responsible for managing and developing PRC's First Steps program, an initiative designed to connect medical patients with holistic support and resources within PRC's Compassionate Support Services program. Throughout the First Steps program, the Lead First Steps Coordinator must frequently interface with clients.

247.    In addition to leading the First Steps program, the Lead First Steps Coordinator also provides training, educational materials, communication scripts, and guides for other staff within the program.

248.    The Advocate Coordinator manages the client intake process; meets with clients to assess their needs, challenges, and goals; and serves as a contact for client questions, concerns, and processes.

249.    The Advocate Coordinator also leads the on-the-job advocate training for staff and volunteers; manages the support volunteer advocates by providing resources, supervision, training, and spiritual support; and provides expertise to staff and volunteers related to community resources, services, and programs.

250.    The CEO Executive Assistant will provide strategic support for PRC's CEO and will regularly interact with the CEO.

251.   The Lead First Steps Coordinator, the Advocate Coordinator, and the CEO Executive Assistant will be expected to work in PRC's office and therefore will regularly interact with other PRC employees and visitors.

252.   PRC's current job description for the Lead First Steps Coordinator is attached as Exhibit 11.

253.   PRC's current job description for the Advocate Coordinator is attached as Exhibit 12.

254.   PRC's current job description for the CEO Executive Assistant is attached as Exhibit 13.

255.   The job descriptions accurately describe the responsibilities of the Lead First Steps Coordinator, the Advocate Coordinator, and the CEO Executive Assistant.

256.   PRC has used these job descriptions in its postings.

257.   But PRC would like to amend both job descriptions to include additional information on the need for applicants to agree with and abide by its pro-life stance.

258.   PRC's desired amended language to the job descriptions is attached as Exhibit 14.

259.   PRC would like to adopt and implement materially similar statements of its position on abortion in all future job descriptions for any position.

PRC's employment benefits.

260.   PRC's religious beliefs also affect its stewardship and employee benefits and forbid it from facilitating activities it considers immoral or harmful.

261.   PRC's religious beliefs prohibit it from deliberately providing insurance coverage for prescription drugs, devices, or procedures inconsistent with its faith, in particular abortion-causing drugs, devices, or procedures.

262.    PRC believes that it would violate its religious beliefs to deliberately provide employee health insurance that would facilitate access to abortion-causing drugs, devices, or procedures, even if those items were paid for by an insurer or a plan administrator and not by PRC itself.

263.    PRC offers its eligible employees comprehensive health insurance in the form of a Health Maintenance Organization plan.

264.    PRC's plan is fully insured.

265.    PRC's comprehensive health insurance covers preventative services, physician office services, emergency medical care, diagnostic services, maternity services, hospital care, surgical services, behavioral health services, prescription drugs, and other services.

266.    PRC's maternity coverage includes prenatal and postnatal visits and other medically necessary maternity services.

267.    Before December 2025, PRC's health insurance policy excluded coverage for drugs, devices, or procedures that cause an abortion.

268.    But PRC's insurance carrier wrongly added coverage for surgical, non-surgical, and drug-induced interventions that PRC considers to constitute an abortion in violation of PRC's religious beliefs in December 2025.

269.    To remain consistent with its religious beliefs, PRC has initiated efforts to remove the abortion coverage either through an amendment to its current plan or by purchasing a different plan offered by another insurer.

270.    But PRC cannot remove the abortion coverage without violating Michigan law. *See infra* ¶¶ 327–336.

271.    Michigan law thus forces PRC to choose between complying with Michigan law and acting in accordance with its religious beliefs.

<u>PRC's volunteer opportunities.</u>

272.  PRC currently has approximately 200 volunteers.

273.  PRC actively seeks new volunteers on a regular basis.

274.  Most volunteer positions require an application, two references, a criminal background check, and a personal interview.

275.  The application currently requires volunteers to affirm that they have read and agreed with summaries of PRC's Positions, including on abortion. PRC emails prospective volunteers the volunteer application.

276.  PRC screens volunteers in this way to ensure they agree with PRC's messages on the value of life.

277.  PRC currently has volunteer openings for the following categories: (1) administrative assistant; (2) special projects volunteer; (3) support services volunteer; (4) baby bottle volunteer; (5) cleaning volunteers; (6) small group volunteers; and (7) prayer team volunteers.

278.  The administrative volunteer will help with development by performing special projects, stuffing receipt mailings, and performing tasks related to annual events.

279.  The special projects volunteer will help with education by preparing classroom materials, assisting in social media and video content creation, and performing other tasks as needed.

280.  The support services volunteer opportunities include (i) the client advocate who will meet one-on-one with moms, assess their needs, assist them with shopping, and provide them with information and referrals; (ii) the receptionist assistant who will help staff with incoming calls and clerical duties; (iii) the sorter, who will organize and sort donations of clothing and other miscellaneous baby items; (iv) the warehouse assistant who will organize, clean, assemble, and assist with other projects; (v) the boutique and book organizer who will sort, organize, and

restock the boutique shop and assist moms with shopping; and (vi) the general volunteer who may be assigned to any tasks as needed such as stocking the boutique, cleaning the facility, or providing administrative assistance.

281.  The baby bottle volunteer will support PRC's campaign to fundraise through spare change in baby bottles.

282.  The cleaning volunteer will help to maintain cleanliness and professionalism in PRC's offices.

283.  The small group volunteers offer help in a variety of ways, depending on the size of the group.

284.  The prayer volunteer will sign up to pray at specific times or come to the offices for prayer.

285.  A true and correct copy of PRC's volunteer application is attached as Exhibit 15.

286.  But PRC would like to amend the volunteer application to include additional information on the need for applicants to agree with and abide by PRC's pro-life stance.

287.  PRC's desired amended language to the volunteer application is attached as Exhibit 16.

288.  PRC desires to publish the volunteer application with the amended language by emailing it to prospective volunteer applicants.

289.  PRC would like to adopt and implement a materially similar description of its pro-life requirements in all future volunteer applications.

<u>Michigan actively expands and redefines "sex" in its employment law to include abortion without any exemptions.</u>

290.  Michigan has dramatically expanded abortion coverage and eliminated safeguards for employers who have moral, philosophical, or religious objections to abortion, associating with abortion, or facilitating abortion.

39

291.    Michigan amended its employment law to redefine "sex" to include "termination of a pregnancy, or a related medical condition." MCL 37.2201(d).

292.    Michigan's amendment makes it illegal to treat an employee "affected by … the termination of a pregnancy … differently for any employment-related purpose from another individual who is not so affected …." MCL 37.2202(1)(d).

293.    Before the amendment to its employment law, Michigan's employment law exempted abortion from these provisions.

294.    For example, amended MCL 37.2201(d) added the **bold** language below and removed the ~~stricken~~ language.[1]

> (d) "Sex" includes, but is not limited to, pregnancy, childbirth, **the termination of a pregnancy**, or a **related** medical condition. ~~related to pregnancy or childbirth that does not include nontherapeutic abortion not intended to save the life of the mother.~~

295.    Amended MCL 37.2202(1)(d) also added the **bold** language below and removed the ~~stricken~~ language.[2]

> (d) Treat an individual affected by pregnancy, childbirth, **the termination of a pregnancy**, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work, without regard to the source of any condition affecting the other individual's ability or inability to work. ~~For purposes of this subdivision, a medical condition related to pregnancy or childbirth does not include nontherapeutic abortion not intended to save the life of the mother.~~

---

[1] P.A.1980, No. 202, § 1, Imd. Eff. July 18; Michigan House Substitute for Senate Bill No. 147, https://bit.ly/4a20ose.

[2] P.A.2009, No. 190, Imd. Eff. Dec. 22, 2009; Michigan House Substitute for Senate Bill No. 147, https://bit.ly/4r2up16.

296.    Throughout the legislative process leading to these amended provisions, Michigan persistently rejected proposals to exempt religious employers or employers who object to abortion on moral grounds.

297.    For example, Michigan legislators smeared religion as a pretext for "racism, slavery, misogyny, and attacks on other religions," claimed that any religious exception amounted to a "get-out-of-jail free card," and argued that religious exemptions amounted to a "free license to discrimination."[3]

298.    Senator Geiss stated the employment law amendments redefining "sex" were necessary because the ELCRA

> [h]a[d] a carve out that would allow employers to fire an employee arbitrarily based on their own opinions, ideas, imaginations—whatever—for having an abortion.… It is necessary to ensure that this loophole is closed so that employers who are hostile to abortion—believe they need to insert themselves in peoples' reproductive healthcare decisions—do not violate the state Constitution."[4]

299.    Separately, Michigan passed House Bill 4949 which, among other things, repealed Michigan's Abortion Insurance Opt-Out Act (MCL 550.541–49).

300.    Michigan's Abortion Insurance Opt-Out Act had previously ensured employers could opt-out of covering abortion as a healthcare benefit under their insurance plans.

301.    By repealing the Abortion Insurance Opt-Out Act, Michigan employers no longer have that choice.

---

[3] Michigan Senate, Civil Rights, Judiciary, and Public Safety, approximately 9:15-10:30, https://tinyurl.com/4erfe7n7; State of Michigan, Journal of the Senate 102nd Legislature Regular Session of 2023, Lansing, (Thurs. Mar. 16, 2023 at 10:00 a.m.), https://tinyurl.com/5e45dets.
[4] Michigan Journal of the Senate, 102nd Legislature, Regular Session of 2023, https://tinyurl.com/4ha3rkvz.

302.    Senator Geiss issued a statement explaining that the purpose of HB 4949 was to "ensure[] all Michiganders have access to reproductive healthcare unencumbered by other people's deeply held beliefs."[5]

<u>Michigan's employment law threatens Right to Life's and PRC's freedom to manage their employment choices consistent with their mission and beliefs.</u>

303.    Michigan actively and aggressively enforces its employment law.

304.    Michigan's employment law defines an employer as any person who employs one or more individuals. MCL 37.2201(a).

305.    Right to Life and PRC are employers under and subject to Michigan's laws because they employ more than one individual.

306.    Michigan's employment law applies to employers' actions and their policies. *E.g.*, MCL 37.2605(1) (prohibiting "pattern or practice of discrimination").

307.    Michigan's employment law prohibits discrimination through the (1) Employment Clause, (2) the Notice Clause, and (3) the Benefits Clause.

## 1. The Employment Clause.

308.    The Employment Clause—MCL 37.2202(1)(a)–(b), (d)—prohibits employers from failing or refusing to hire or recruit, discharging, or otherwise discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment" because of sex, which now includes the termination of a pregnancy. MCL 37.2202(1)(a).

309.    The Employment Clause also prohibits employers from limiting, segregating, or classifying employees or applicants in a way that adversely affects their employment or application status "because of" sex, which now includes the termination of a pregnancy. MCL 37.2202(1)(b).

---

[5] Governor Gretchen Whitmer Signs Reproductive Health Act, Press Release (Nov. 21, 2023), https://tinyurl.com/ynevzesk.

310.    And the Employment Clause now prohibits employers from treating "an individual affected by … the termination of a pregnancy … differently for any employment-related purpose from another individual who is not so affected." MCL 37.2202(1)(d).

311.    The Department and a Commissioner confirmed under oath and in a stipulation that this prohibits employers from making any differentiation in employment practices and policies based on a protected class.

312.    A true and correct copy of the Department's and the Commission's deposition excerpts are attached here respectively as Exhibit 17 and Exhibit 18.

313.    A true and correct copy of Michigan's stipulations are attached here as Exhibit 19.

314.     The Department also confirmed under oath that the Employment Clause would require a mission-focused or religious organization to hire someone who disagrees with their views so long as the applicant could nonetheless explain the organization's views. *See* Exhibit 17.

315.    Michigan's House Fiscal Agency explained that the Employment Clause prohibits "discrimination and adverse employment actions based on whether an individual is considering having an abortion or on their decision to have an abortion" and stated that one purpose of adding "termination of a pregnancy" to Michigan's employment law was to "align" it "with federal law."[6]

316.    Michigan interprets the Employment Clause consistent with Title VII.

317.    The federal Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) of Title VII, prohibits employers from taking adverse action against employees for

---

[6] Michigan House Fiscal Agency, Legislative Analysis, https://bit.ly/3NYnjfp.

having an abortion, contemplating an abortion, or discussing having an abortion with co-workers and others.[7]

318.    So the Employment Clause prohibits employers from taking adverse action against employees for having an abortion, contemplating an abortion, or discussing having an abortion with co-workers and others.

319.    The Employment Clause also prohibits employers from "[c]oerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with a person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act." MCL 37.2701(f).

320.    The Employment Clause prohibits employers from coercing, intimidating, threatening, or interfering with an employee who aided or encouraged any other person to have an abortion.

321.    Under the Employment Clause, employers may not subject an employee contemplating an abortion to communications about that decision which substantially interferes with an employee's employment or creates an offensive work environment.

---

[7] *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1213–15 (6th Cir. 1996); *Turic v. Holland Hosp., Inc.*, 849 F. Supp. 544, 550 (W.D. Mich. 1994), *aff'd in part, rev'd on other grounds in part*, 85 F.3d 1211 (6th Cir. 1996) ("For purposes of Title VII analysis, there is no rational distinction between an employee's communication of the fact that she intends to have an abortion, she is considering having an abortion, or she has had an abortion."); *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 363–64 (3d Cir. 2008); *Ducharme v. Crescent City Deja Vu, L.L.C.*, 406 F. Supp. 3d 548, 554–57 (E.D. La. 2019); *Doe v. First National Bank of Chicago*, 668 F.Supp. 1110, 1112 (N.D.Ill.1987), *aff'd* 865 F.2d 864 (7th Cir. 1989); 29 C.F.R. pt. 1604 App. (1986); 29 C.F.R. Pt. 1604, App.; U.S. EEOC, Enforcement Guidance on Pregnancy Discrimination and Related Issues (June 25, 2015), https://tinyurl.com/4zzkf38t ("Title VII protects women from being fired for having an abortion or contemplating having an abortion").

322.    A person who associates with, or advocates on behalf of, a protected class—here, women choosing abortion—is a member of that protected class for purposes of Title VII and other non-discrimination laws like the Employment Clause.[8]

## 2. The Notice Clause.

323.    The Notice Clause prohibits employers from posting or publishing a statement related to employment "which indicates a preference, limitation, specification, or discrimination, based on … sex," including the termination of a pregnancy. MCL 37.2206(1).

324.    The Notice Clause prohibits employers from making or using a written inquiry or application "that elicits or attempts to elicit information" concerning a prospective employee's sex or that "expresses a preference, limitation, specification, or discrimination based on … sex" (including the termination of a pregnancy) or from keeping records of that information. MCL 37.2206(2).

325.    The Notice Clause prohibits individuals from "publish[ing] or caus[ing] to be published a notice or advertisement that specifies or indicates the individual's … sex" or "express[ing] a preference, specification, limitation or discrimination as to the … sex" or other characteristics of a prospective employer. MCL 37.2207.

---

[8] *See, e.g.*, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 577 (6th Cir. 2000) ("[H]aving found that Plaintiff was indeed a member of protected class, and that he proffered direct evidence that he was discriminated against because of his advocacy, we believe that a question of fact exists for the jury to decide whether Defendants terminated Plaintiff out of a discriminatory animus."); *Winston v. Lear–Siegler, Inc.,* 558 F.2d 1266, 1270 (6th Cir. 1977) (holding a white plaintiff had standing to sue his former employer under 18 U.S.C. § 1981 for terminating him after he protested the alleged discriminatory firing of a black co-worker); *Nemeth v. Citizens Fin. Grp., Inc.*, No. 2:08-CV-15326, 2011 WL 2531200, at *6 (E.D. Mich. June 24, 2011) (plaintiff plausibly alleged she was discriminated against under Title VII because "she is a member of this protected class based on her association with Arab Americans and her advocacy on their behalf").

326.    An employer can violate the Notice Clause by posting a statement for a job opening expressing a preference based on abortion history or position on abortion even if it takes no action towards an employee or prospective employee. *See* Exhibit 17; Exhibit 19 (¶ 27).

**3. The Benefits Clause.**

327.    The Benefits Clause—MCL 37.2202(1)(c)—prohibits employers from segregating, classifying, or otherwise discriminating "against a person on the basis of sex [including the termination of a pregnancy] with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system." MCL 37.2202(1)(c).

328.    The Benefits Clause applies to health insurance, leave, disability benefits, and other benefits provided by employers.

329.    According to the Commission's Declaratory Ruling on Contraceptive Equity, the Benefits Clause applies to "comprehensive health plan[s]" defined as "a plan that provides preventative care, treatment, and prescription drug coverage for the insured."

330.    A true and accurate copy of the Commission's Declaratory Ruling is attached here as Exhibit 20.

331.    The Benefits Clause requires employers to "provide full coverage for all contraceptive drugs and services if the employer's comprehensive health plan covers other drugs and services." *Id.* at 1.

332.    The Benefits Clause applies to all employers, including "religious organization[s]" and "charitable organizations" that "provide services" and "assist" the general public. *Id.* at 7.

333.    The Commission has never disavowed or modified that interpretation from its declaratory ruling, and that interpretation is currently binding on the Commission. MDCR Rule 37.20(3).

334.    A Commissioner confirmed that the Benefits Clause requires employers who offer comprehensive health plans to include coverage for abortion. Exhibit 18.

335.    Michigan's Department of Insurance and Financial Services—the entity in charge of administering and regulating insurance companies in Michigan—takes the position that the ELCRA "prohibits discrimination in the insurance and financial services industries."[9]

336.    Michigan's House Fiscal Agency acknowledged that many who objected to the Benefits Clause "raised concerns" that the amended version "could require certain small employers to provide benefits to employees, such as insurance benefits, that might conflict with the entity's mission or go against its religious beliefs."[10]

Michigan's public accommodations law threatens PRC's volunteer programs.

337.    Michigan's civil-rights law defines public accommodations as any business offering or providing goods, services, privileges or advantages to the public. MCL 37.2301(a).

338.    Michigan's law specifically names "health" and "educational" institutions as a public accommodation. MCL 37.2301(a).

339.    Michigan's law also defines public service to include "a tax exempt private agency established to provide service to the public." MCL 37.2301(b).

---

[9] Michigan Dep't of Insurance and Financial Services, Bulletin 2023-07-BT/CF/CU/INS, https://bit.ly/3Zfu5Qj.
[10] Michigan House Fiscal Agency, Legislative Analysis, https://bit.ly/3NYnjfp.

340.   PRC is a tax-exempt non-profit corporation offering and providing goods, services, privileges, and advantages to the public.

341.   PRC therefore appears to fit within Michigan's definition of a place of public accommodation and a public-service provider.

342.   Michigan's civil-rights law prohibits discrimination in places of public accommodations and by public services through two clauses: the Accommodation Clause and the Accommodation Publication Clause.

343.   The Accommodation Clause prohibits public accommodations and public service providers from denying an individual "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations … because of religion" or sexual orientation. MCL 37.2302(a).

344.   Michigan considers "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" to include volunteer opportunities.

345.   For example, under the Persons With Disabilities Civil Rights Act, MCL 37.1302—which contains language that is nearly identical to the Accommodation Clause—Michigan brought discrimination charges against a medical center for denying the claimant the "service" of its "volunteer opportunities."

346.   A true and accurate redacted copy of the Commission's charge of discrimination is attached here as Exhibit 21.

347.   PRC offers robust "volunteer opportunities" to the public but requires volunteers to adhere to and abide by PRC's Positions.

348.   Under Michigan's reading, the Accommodation Clause prohibits public accommodations or public services from taking adverse action against volunteers for declining to agree with or abide by PRC's Positions.

349.    Doing so would deny a "service" (the volunteer opportunity) offered to the public based on religion and sexual orientation.

350.    As a result, the Accommodation Clause compels PRC to engage with volunteers that do not share and may even oppose PRC's Positions.

351.    Likewise, the Accommodation Publication Clause prohibits PRC from publishing their preference to engage only volunteers that agree with PRC's Positions and share its religious beliefs.

352.    The Accommodation Publication Clause prohibits these things through two sub-clauses: the Denial and Unwelcome Clauses.

353.    The Denial Clause prohibits public accommodations and public service providers from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" will be "refused, withheld from, or denied an individual because of religion, …  [or] sex." MCL 37.2302(b).

354.    The Unwelcome Clause prohibits public accommodations and public service providers from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates … that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of … religion, … [or] sex." MCL 37.2302(b).

355.    Michigan law nowhere defines objectionable, unwelcome, not welcome, unacceptable, not acceptable, undesirable, or not desired or solicited.

356.    A representative of the Commission confirmed under oath that the Commission has no definition for any of these terms, and that he himself did not know how to define these terms. Exhibit 18.

Michigan's law burdens Right to Life and PRC

357.    Michigan's law imposes significant pressures and burdens on Right to Life and PRC and how they operate their organizations, manage their employment decisions, and advocate for their causes.

358.    As interpreted by Michigan, the Employment Clause prohibits Right to Life and PRC from:

- asking prospective employees about whether they agree with, follow, and can effectively communicate their mission, message, and values articulating and protecting the right to life of all human beings, including unborn children, in their personal and professional conduct;

- exclusively recruiting and hiring prospective employees who affirm they agree with, follow, and can effectively communicate their pro-life mission, message, and values in their personal and professional conduct and declining to recruit and hire employees who are unable or refuse to do so;

- maintaining a written policy or unwritten practice of only recruiting and hiring prospective employees who affirm, follow, and can effectively communicate their pro-life mission, message, and values in their personal and professional conduct and uniformly declining to hire those who are unable or refuse to do so;

- imposing employment-related qualifications and responsibilities on any position that requires the employee to follow and adopt their pro-life mission, message, and values in their personal and professional conduct;

- treating prospective employees who do not share their pro-life mission, message, and values or who do not agree to abide by their mission, message, and values in their personal and professional conduct differently

from prospective employees who do share these beliefs in any way—for
example, by screening the former applicant's application on that basis;

- maintaining a written policy or unwritten practice of imposing discipline
  up to and including termination of employment on any employee who
  refuses to re-affirm, agree to abide by, and/or sign their pro-life mission,
  message, and values upon request; and

- taking adverse employment actions against any employee who violates or
  engages in conduct that contradicts their mission, message, and values of
  articulating and protecting the right to life of all human beings, including
  unborn children.

359.   Michigan's Accommodation Clause has these same effects on PRC's
volunteer program with respect to religion and sexual orientation.

360.   As interpreted by Michigan, the Notice Clause prohibits Right to Life
and PRC from:

- asking prospective employees in writing about whether they agree with,
  follow, and can effectively communicate their mission, message, and
  values articulating and protecting the right to life of all human beings,
  including unborn children, or other questions sufficient to learn that
  information;

- posting employment opportunities on their websites or other job-hunting
  sites which indicate a desire to exclusively recruit and hire employees who
  share and live consistently with their pro-life mission, message, and
  values;

- displaying or adopting a job description listing employment-related
  qualifications or responsibilities that require the employee to share and
  live consistently with their pro-life mission, message, and values;

- stating in job postings or other publications that they do not provide insurance coverage for elective abortions;
- maintaining and publishing a written policy of only recruiting and hiring prospective employees who affirm, follow, and can effectively communicate their pro-life mission, message, and values, and uniformly declining to hire those who are unable or refuse to do so;
- maintaining and publishing a written policy of only recruiting and hiring prospective employees whose conduct related to abortion is consistent with their pro-life mission, message and values, or imposing discipline, up to and including termination of employment, of any employee whose conduct related to abortion is inconsistent with their pro-life mission, message and values; and
- maintaining and publishing a written policy of imposing discipline, up to and including termination of employment, on any employee who refuses to re-affirm, agreed to abide by, and/or sign their pro-life mission, message, and values upon request.

361.   Michigan's Accommodation Publication Clause has these same effects on PRC's communications about its volunteer program with respect to religion and sexual orientation.

362.   As interpreted by Michigan, the Benefits Clause forces Right to Life and PRC to provide coverage or access to coverage for abortion-causing drugs, devices, and procedures and prohibits them from providing insurance that exempts this coverage because they offer healthcare coverage for their employees generally.

363.   As a result, the Benefits Clause would also force Right to Life and PRC to explain its coverage of elective abortion to prospective employees and would prevent Right to Life and PRC from explicitly stating in job postings or to prospective employees that they do not provide coverage for elective abortions.

364.    The Benefits Clause makes membership and employment in PRC and Right to Life less desirable by undermining their moral credibility and institutional reputation as pro-life advocates.

365.    Effective recruitment depends on public confidence that PRC and Right to Life consistently embody the values they promote.

366.    By compelling PRC and Right to Life to provide abortion coverage, the Benefits Clause requires expressive conduct fundamentally at odds with their core mission.

367.    This conflict would diminish the organizations' integrity and inspirational appeal, deterring prospective members and employees who seek value-aligned association.

368.    By regulating Right to Life's and PRC's employment, employee benefits, and volunteer decisions, Michigan's civil rights laws interfere with their ability to promote their message affirming the value of all human life, including the lives of unborn children, and infringes on their ability to advocate that message to prospective employees, employees, volunteers, beneficiaries of their services, and the public.

369.     By forbidding Right to Life and PRC from managing their employment decisions consistent with their beliefs, the Employment and Notice Clauses interfere with the organizations' ability to select their leaders; restricts their ability to associate with employees who share their beliefs; restricts their ability to associate with employees who act consistent with their beliefs; and interferes with their ability to effectively advocate their beliefs to prospective employees, employees, beneficiaries of their services, and the public.

370.    By forbidding PRC from managing its volunteer decisions consistent with their beliefs, the Accommodation and Accommodation Publication Clauses

interfere with the organization's ability to associate with volunteers who share and act consistently with its beliefs.

371.    As applied to PRC, the Employment, Notice, Accommodation, and Accommodation Publication Clauses also interfere with its autonomy to conduct its internal affairs consistent with its religious beliefs and threaten its ability to operate as a faith-based non-profit.

372.    If Right to Life and PRC were unable to employ only persons who affirmed, followed by their conduct, and could effectively communicate their mission, message, and values, their message would necessarily be changed, they would be unable to communicate those beliefs effectively, they would be prohibited from only associating with employees who share and live consistent with those beliefs, and their ability to provide services consistent with their beliefs would be thwarted.

373.    The Employment and Notice Clauses hinder Right to Life's and PRC's ability to operate their organizations in other ways as well.

374.    For example, Right to Life used to send an automated email to candidates who applied for a position online and in the email asked the candidate to inform Right to Life about the candidate's thoughts on its mission.

375.    The automated message included statements like "Also, please feel free to review our website and let us know your thoughts on our mission and profile," "Also, please feel free to review our website and let us know your thoughts on our mission and the 'Life. The Other Choice' messaging," or something substantially similar.

376.    Right to Life no longer includes that language because of the substantial risk of investigation and prosecution under the Employment and Notice Clauses.

377. Based on the developments in Michigan's law that prioritize protections for abortion, Right to Life and PRC desire to more explicitly explain their expectations for prospective and current employees regarding abortion.

378. To that end, Right to Life would like to add the following language in its automated email to prospective candidates contained in Exhibit 2.

379. Right to Life would also like to amend its employee handbook by adding the following statements contained in Exhibit 5.

380. Right to Life would like to modify its job descriptions for future job postings by adding the following statements contained in Exhibit 8.

381. Right to Life would like to modify the job description for its current positions of Communications Director and Content Contributor & Events Coordinator by adding these statements and then posting the amended job description on its website and other job-search websites.

382. Right to Life would like to post materially similar descriptions for future job openings on its website and on other job-search websites.

383. Right to Life would like to amend its Guiding Principles and Code of Ethics which all prospective employees are required to sign by adding the statements contained in Exhibit 4.

384. PRC is motivated by its religious beliefs to amend its PRC's Positions by adding the language contained in Exhibit 10.

385. PRC is motivated by its religious beliefs to amend its employee handbook to include materially similar statements as those contained in Exhibit 10.

386. PRC is motivated by its religious beliefs to modify the job description for its current CEO Executive Assistant, Advocate Coordinator, and Lead First Steps Coordinator positions by adding the statements contained in Exhibit 14 and then posting the amended job description on its website and other job-search websites.

55

387.    PRC is motivated by its religious beliefs to post materially similar descriptions for future job openings by adding the statements contained in Exhibit 14 and then posting the amended future job descriptions on its website and other job-search websites.

388.    The Accommodation and the Accommodation Publication Clauses also hinder PRC's ability to be transparent about its volunteer program.

389.    PRC would like to amend its volunteer application by adding the following language contained in Exhibit 16.

390.    PRC is not including these changes to its volunteer application because the Accommodation and Accommodation Publication Clauses prohibit them from doing so.

391.    But for the Accommodation and Accommodation Publication Clauses, PRC would immediately modify their volunteer applications to include these statements.

392.    Right to Life and PRC are not including these changes in their employee handbooks, codes of ethics, job postings, or other publications because the Employment and Notice Clauses prohibit them from doing so.

393.    Right to Life and PRC are not including these changes to their employee handbooks, code of ethics, job postings, or other publications because of the substantial risk and credible threat of enforcement under the Employment and Notice Clauses.

394.    But for the Employment and Notice Clauses, Right to Life and PRC would immediately modify their employee handbooks, code of ethics, and the job postings to include these statements.

395.    The Employment and Notice Clauses are currently preventing Right to Life and PRC from pursuing their objectives and advocating their messages by

hindering them from effectively managing their employment decisions and recruiting new employees.

396.    Because of the severely intrusive nature of Michigan's investigatory process (described below), the fear of going through this process has forced PRC and Right to Life to refrain from amending their job posting and reposting amended versions on their websites.

397.    Right to Life and PRC have and continue to refrain from posting their modified employment postings online because they face a credible threat and substantial risk that they will be investigated or prosecuted under Michigan's employment law for posting them.

398.    The Benefits Clause imposes additional burdens that constitute government-imposed pressure and coercion on Right to Life and PRC to change or violate their beliefs.

399.    Right to Life and PRC object to providing coverage or access to coverage for abortion-causing drugs, devices, and procedures on moral, philosophical, or religious grounds.

400.    Right to Life and PRC believe that providing insurance that facilitates access to abortion-causing drugs, devices, and procedures violates their moral, philosophical, or religious beliefs, including by paying the employer portion of the premium for insurance that covers these services and by facilitating access to these services by employees and their covered family members.

401.    Right to Life and PRC believe that by facilitating access to abortion-causing drugs, devices, and procedures by covering those items in their insurance plans, they are facilitating the death of unborn children in direct contradiction to their mission, message, and values that they promote elsewhere.

402.    Providing this coverage is incompatible with and violates Right to Life's and PRC's moral, philosophical, and PRC's religious beliefs, contradicts the

message about the value of unborn life that they wish to and do promote elsewhere amongst their prospective employees, employees, and the public, forces them to facilitate an act that they believe violates their moral, philosophical, or religious beliefs, and forces them to choose between violating their beliefs or terminating or modifying their existing insurance coverage for employees.

403.    Right to Life desires to provide health insurance to its employees to serve them well and to remain competitive as an employer.

404.    PRC is motivated by its religious beliefs to provide health insurance to its full-time employees as an expression of its religious faith, to serve its employees well, and to remain competitive as an employer.

405.    Right to Life and PRC would not currently be able to prudently afford the financial risk associated with a self-funded insurance plan.

406.    Self-funded insurance plans typically provide a stop-loss cap limit for each medical occurrence.

407.    Those limits are typically a high dollar amount.

408.    Self-funded insurance plans are typically most economical for companies with more than 100 hundred employees because those companies have an appropriate census to mitigate unexpectedly high medical costs.

409.    Those companies may also have significant savings on insurance premiums that can be used to cover any medical incident prior to the stop-loss cap.

410.    Based on their current size, budgets, and employee census, it would be financially risky—and risk financial ruin—for Right to Life and PRC to adopt a self-funded insurance plan.

411.    For that reason, Right to Life and PRC must purchase fully-funded plans that remain subject to state regulation.

412.    The ongoing and continual exposure to liability, investigation, and prosecution hinders Right to Life's and PRC's ability to operate their organizations,

retain current employees, attract future employees, and make plans for their
organizations.

Michigan aggressively enforces its employment law with severe penalties.

413.    The Attorney General, the Commission, and the Department are
responsible for investigating, enforcing, and prosecuting alleged violations of
Michigan's employment law.

414.    The Department receives complaints alleging violations of Michigan's
civil-rights law from "[a]ny person claiming to be aggrieved by unlawful
discrimination" and the Department, the Commission, and the Director may initiate
complaints on their own authority. MCL 37.2602(c); MDCR Rule 37.4(1)–(2).

415.    The Department posts its complaint form on its website to facilitate
requests from any person claiming to be aggrieved.

416.    "Person" includes individuals, associations, advocacy organizations,
legal or commercial entities, and Michigan, its subdivisions, and its agencies.
MDCR Rule 37.2(p).

417.    The Department and the Commission have confirmed that an
aggrieved person can include someone who is not a member of a protected class, but
who sees something that may discriminate against someone who is in the protected
class. Exhibit 17; Exhibit 18; Exhibit 19 (¶¶ 24–27).

418.    The Department and the Commission have the authority to use
"testers" to investigate suspected violations of ELCRA and have used testing
evidence to bring enforcement action under ELCRA.

419.    The Department investigates each complaint it receives through a
burdensome and adversarial process. MCL 37.2602(c); MDCR Rule 37.12(6).

420.    According to the Office of the Auditor General's 2023 Report, it takes the Department an average of nineteen months to complete its investigations with ten percent of complaints taking more than thirty-six months to complete.

421.    Penalties for violating the employment law are severe and include paying damages, hiring or reinstating employees, cease-and-desist orders, compliance reports, and license revocation. MCL 37.2605(1)–(3).

422.    Michigan's employment law also permits any person alleging a violation of the law to file a civil action for injunctive relief, damages, and attorney fees and costs in an appropriate circuit court. MCL 37.2801(1)–(3).

423.    The Attorney General, the Department, and the Commission actively receive and prosecute complaints alleging violations of Michigan's employment law.

424.    In fiscal year 2024, the Department reviewed approximately 1,400 complaints of employment discrimination.

425.    Of the 2,487 certified complaints reviewed by the Department in 2024 across all areas of enforcement, approximately fifteen percent—or more than 370— were complaints of sex discrimination.

426.    The Attorney General has declared that she will "defend Michigan as a safe haven in our region for women to access" abortion.[11]

427.    To that end, the Attorney General has consistently been involved with litigation to increase access to abortion and disclaimed any intent to enforce previous Michigan law that prohibited abortions or protected those who do not want to be complicit in abortion.

428.    The Commission also issued a Resolution in Support of Reproductive Rights which expressed its belief that "all reproductive rights" are "a fundamental

---

[11] Michigan Dept' of Att'y Gen., *Attorney General Nessel Issues Statement of Latest Mifepristone Court Opinion*, https://tinyurl.com/maewyjta.

civil right," its commitment to the "duty to assure that public policy that impacts access to reproductive rights, practices, and other laws do so in a manner that does not discriminate against persons based on … sex," and its interest in joining litigation to expand access to abortion.[12]

429.    Michigan has never disavowed enforcing the Employment, Notice, and Benefits Clauses' prohibition against sex discrimination against Right to Life or PRC, nor the Accommodation and Accommodation Publication Clauses application to PRC's volunteers, nor has it disavowed the interpretation of those Clauses described above as applied to Right to Life or PRC.

<u>Michigan's employment law contains many case-by-case exemptions.</u>

430.    The Commission may make individualized exemptions for employers who make a "sufficient showing" "that … sex" "is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise." MCL 37.2208.

431.    The Commission makes these determinations on a case-by-case basis.

432.    The Commission requires employers to make requests on a position-by-position basis.

433.    The application process for a BFOQ exemption is burdensome and would require Right to Life and PRC to hire a lawyer to complete, based on the specific demands of the application.

434.    A true and correct copy of the BFOQ application is attached as Exhibit 22.

435.    Once approved, the employer must renew the BFOQ request for each exempted position every five years. MDCR Rule 37.25(4).

---

[12] Michigan C.R. Comm'n, Resolution in Support of Reproductive Rights (July 25, 2022), https://tinyurl.com/2xmje8pd.

436.    The Commission may revoke the exemption at any time based on its discretionary evaluation of "other or different information." MDCR Rule 37.25(3).

437.    The Commission can initiate investigations upon receipt of a BFOQ request. MDCR Rule 37.25(2).

438.    The Commission has no set deadline within which to respond to a BFOQ request.

439.    The Commission limits religious BFOQs to positions that are directly and exclusively responsible for teaching religious doctrine and denies exemptions to support positions such as "janitorial staff, physical education teacher[s], or office personnel."

440.    True and correct copies of these decisions are attached as Exhibit 23.

441.    The Commission has also granted exemptions for many secular employers.

442.    True and correct copies of charts, opinions, and letters addressing secular employers' BFOQ requests are attached as Exhibit 24.

443.    Neither Right to Life nor PRC has applied for a BFOQ exemption because it forces them to hire a lawyer to draft and submit the application or divert the time and resources of existing staff to draft and submit the application, requires them to submit new applications every five years, requires them to submit new and independent applications for each existing position and for each new job posting, forces them to receive permission from Michigan before promoting new job openings, and would severely burden their ability to hire for new positions by first seeking a BFOQ exemption based on sex.

444.    Right to Life and PRC also face a credible threat and substantial risk that they would be investigated and prosecuted for their decisions to operate their organizations according to their beliefs if they submitted BFOQ applications

because the Commission has authority to independently investigate employers and initiate complaints against them. MDCR Rule 37.4(2); MDCR Rule 37.25(2).

445.    Michigan's employment law has many exemptions related to disability, age, and employment by family members. *See* MCL 37.1202, MCL 37.1206, MCL 37.2202(2)–(3), MCL 37.2211.

446.    Michigan's employment law imposes a greater burden on Right to Life and PRC because of their policies than it does on other advocacy and clinical organizations that do not have these same policies.

447.    For example, employers with less than 50 employees are not required to provide health coverage to employees and their dependents.

448.    According to Michigan's Department of Technology, Management & Budget, over a million employees in Michigan worked for employers with less than 50 employees in 2025.[13]

449.    Employers that choose not to provide healthcare need not cover abortion in any employment healthcare plan.

450.    Employers who provide healthcare to their employees but who do not object to abortion may include abortion in their plans without violating the conscience of those employers.

451.    As another example, Planned Parenthood of Michigan performs abortions in Michigan and actively advocates for access to abortion in Michigan by expressing that view to the public and to the legislature.

452.    Planned Parenthood of Michigan can freely advertise its job openings, making it easier for Planned Parenthood to perform abortions, fulfill its mission,

---

[13] Michigan Dep't of Technology, Management & Budget, Michigan Labor Market Information, https://perma.cc/K3R5-PF8R.

and advocate for its views because it does not hold employment policies regarding abortion that Michigan's law prohibits.

453.    Planned Parenthood of Michigan still requires employees to maintain a commitment to Planned Parenthood's mission, vision, and values.

454.    For example, Planned Parenthood of Michigan's job post for Physician (Abortion Services) requires applicants to focus on "abortion care and contraceptive provision," provide abortions "in both the 1st and 2nd trimesters," demonstrate "commitment to Planned Parenthood's mission, vision and values"; and show a "[c]ommitment to Planned Parenthood's 'In This Together' service ethos, workplace values, and service standards." Planned Parenthood of Michigan also offers "free" abortions to employees and their "immediate family."[14]

455.    By allowing employers like Planned Parenthood to freely hire employees and volunteers who share its mission, vision, and values, but restricting Right to Life and PRC from doing the same, Michigan's law burdens viewpoints like those held by Right to Life's and PRC and prevents them from advocating their views on abortion and the value of unborn children in the public arena on equal terms with employers like Planned Parenthood that promote abortion and take contrary views on the value of unborn children.

456.    Michigan's law also places Right to Life and PRC at a competitive disadvantage to operate their organizations and promote their views and places competitive burdens on them because of their viewpoints and desires to express their viewpoint.

---

[14] Planned Parenthood of Michigan, *Physical (Abortion Services)*, https://perma.cc/Z9WM-QRDY.

**Legal Allegations**

457.    Plaintiffs are subject to and must comply with Michigan's Employment, Notice, and Benefits Clauses and Plaintiff PRC is subject to and must comply with the Accommodation and Accommodation Publication Clauses.

458.    These Clauses violate Plaintiffs' constitutional rights, and chill and deter them from exercising those rights.

459.    As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm, entitling them to declaratory and injunctive relief.

460.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

461.    Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm.

<u>First Cause of Action</u>
<u>Violation of the First Amendment Rights to Expressive Association and Assembly</u>
*All Plaintiffs*

462.    Plaintiffs repeat and reallege all preceding allegations.

463.    The First Amendment protects the freedom to associate and assemble.

464.    Plaintiffs promote and advocate for the dignity and sanctity of human life, including the lives of unborn children, and oppose abortion.

465.    Plaintiffs associate with and peaceably assemble when they associate with employees and volunteers who share their mission, message, and values of articulating and protecting the value of all human life, including unborn children.

466.    Plaintiffs engage in expression, expressive activities, and protected assembly when they associate with their employees, decline to associate with prospective employees, communicate and interact with the public, provide services

to the public, and advocate for their pro-life mission, message, and values with their prospective employees, employees, volunteers, and members of the public.

467.    Plaintiffs desire to associate and peaceably assemble with employees who share their pro-life mission, message, and values, to decline to associate with employees who do not share those beliefs or who act contrary to them, and to follow policies and procedures and to post statements and create other written communications explaining their pro-life mission, message, and values to prospective employees and employees.

468.    The Employment, Notice, Accommodation, and Accommodation Publication Clauses severely burden Plaintiffs' freedoms of expressive association and assembly by forcing them to form associations and assemblies with employees and volunteers who do not share or act contrary to their commitment to the value of all human life, including unborn children; by denying them the right to organize their employees and volunteers to promote their desired message; by restricting their ability to communicate that message to prospective employees, employees, and volunteers; by restricting their ability to require prospective employees, employees, and volunteers to share and speak and act consistent with their commitment to the value of all human life; by restricting their ability to take adverse actions against prospective employees, employees, and volunteers who do not share and speak and act consistent with their mission, message, and values; and by restricting their ability to effectively promote their mission, message, and values articulating and protecting the value of all human life, including unborn children.

469.    The Benefits Clause also severely burdens Plaintiffs' freedom of expressive association and assembly by forcing them to cooperate in and associate with activities through their provision of healthcare insurance that violate their mission, message, and values and provide education and counseling to employees related to the coverage of abortion in their healthcare insurance.

66

470.    The Employment, Notice, Accommodation, and Accommodation Publication Clauses regulate association and assembly based on content, viewpoint, and speaker identity.

471.    Plaintiffs have not and will not engage in certain protected expression because of the Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses.

472.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses are not sufficiently tailored to serve any legitimate or compelling interest as applied to Plaintiffs' freedom of association and assembly.

473.    Accordingly, as applied to Plaintiffs, Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses violate their First Amendment protections for association and assembly.

<u>Second Cause of Action</u>
<u>Violation of the First Amendment Rights to Freedom of Speech and Press</u>
*All Plaintiffs*

474.    Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

475.    The First Amendment protects the freedom of speech and the press.

476.    Plaintiffs engage in protected speech when they communicate with prospective employees, their employees, volunteers, their clients and beneficiaries of their services, and the public to articulate and protect the value of all human life, including unborn children.

477.    Plaintiffs engage in protected speech when they communicate with prospective employees, employees, and volunteers about their policies and practices of requiring them to share and speak and act consistent with their commitment to the value of all human life, including unborn children.

67

478.    Plaintiff PRC engages in protected speech when it engages in religious activity and communicates about its religious beliefs.

479.    The Employment, Notice, Accommodation, and Accommodation Publication Clauses restrict Plaintiffs' speech describing their mission and values to prospective employees, employees, and volunteers; restrict them from requiring prospective employees, employees, and volunteers to share and speak and act consistent with their mission and values; restrict them from speaking with prospective employees, employees, and volunteers to discourage abortions; restrict them from expressing preferences for employees or volunteers who share and agree to speak and act consistent with their mission and values; restrict them from asking prospective employees or volunteers questions related to abortion and their beliefs on that subject; and forbid them from adopting, following, and publishing policies consistent with and explaining their mission and values.

480.    The Employment and Notice Clauses act as a prior and ongoing restraint on Plaintiffs' speech by restricting their speech and forcing them to seek Defendants' approval and risk an investigation through the BFOQ process before publishing future job openings describing their mission, message, values, and preferences for employees who share and speak and act consistent with those beliefs.

481.    The Benefits Clause compels speech by forcing Plaintiffs to explain to prospective employees and employees that their health insurance policies include coverage for abortion and to publish and to distribute those policies to their employees, all contrary to their mission, message, and values.

482.    The Notice and Benefits Clauses also restrict speech by prohibiting Plaintiffs from publishing job postings or explaining to prospective employees that their insurance coverages does not include coverage for elective abortions.

483.    The Accommodation Publication Clause contains vague and overbroad terms that give Michigan unfettered discretion to regulate PRC's volunteer practices.

484.    The Employment, Notice, Benefit, Accommodation and Accommodation Publication Clauses regulate Plaintiffs' speech based on content, viewpoint, and speaker identity.

485.    Plaintiffs have not and will not engage in certain protected expression because of the Employment, Notice, Benefit, Accommodation and Accommodation Publication Clauses.

486.    The Employment, Notice, Benefit, Accommodation and Accommodation Publication Clauses are not sufficiently tailored to serve any legitimate or compelling interest as applied to Plaintiffs' freedom of speech and press.

487.    Accordingly, as applied to Plaintiffs the Employment, Notice, Benefit, Accommodation and Accommodation Publication Clauses violate their First Amendment protections for freedom of speech and press.

<u>Third Cause of Action</u>
<u>Violation of the First Amendment's Right to Free Exercise</u>
*PRC*

488.    Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

489.    Plaintiff PRC is a Christian ministry that serves its clients and communicates to the public consistent with its religious beliefs and shares those beliefs with prospective employees, employees, its clients, and the public.

490.    Plaintiff PRC exercises its religious beliefs when it employs and seeks to hire employees who share and live consistent with its religious beliefs, adopts policies consistent with its religious beliefs, participates in activities consistent with

its beliefs, and honestly communicates with employees, patients, and the public about its religious beliefs.

491.    Plaintiff PRC's sincerely held religious beliefs prohibit it from providing or facilitating coverage or access to coverage for abortion-causing drugs, devices, or procedures directly or indirectly through third parties (including an insurer or plan administrator) and its compliance with these beliefs is a religious exercise.

492.    The Employment, Notice, Accommodation, and Accommodation Publication Clauses substantially burden Plaintiff PRC's sincerely held religious beliefs by requiring it either to refrain from adopting employee and volunteer policies and practices consistent with its religious beliefs, ignore those beliefs, or close its practice; by preventing it from maintaining and enforcing employment and volunteer policies consistent with its religious views; by preventing it from selecting employees and volunteers who share its religious beliefs; by stopping it from being honest with prospective employees and volunteers; by barring it from inquiring or informing them about its religious beliefs; and by preventing its religiously motivated speech.

493.    The Benefits Clause substantially burdens Plaintiff PRC's sincerely held religious beliefs by forcing it to participate in and provide insurance coverage to its employees that would facilitate access to abortion-causing drugs, devices, and procedures in violation of Plaintiff PRC's religious beliefs.

494.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses are not neutral or generally applicable.

495.    Defendants have created categorical and individualized exemptions to the Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses and treat comparable secular activity more favorably than Plaintiff PRC's religious exercise.

70

496.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses are hostile towards religion, target and show favoritism towards certain religious beliefs, impose special disabilities on Plaintiff PRC because of its religious beliefs, and impose severe coercive pressure on Plaintiff PRC to change or violate its religious beliefs.

497.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses violate Plaintiff PRC's free-exercise rights under the hybrid-rights doctrine because they implicate free-exercise rights in conjunction with other constitutional protections.

498.    Plaintiff PRC has not and will not engage in certain protected religious exercise because of the Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses.

499.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses are not sufficiently tailored to serve any legitimate or compelling interest as applied to Plaintiff PRC's religious exercise.

500.    Accordingly, as applied to Plaintiff PRC, the Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses violate its First Amendment protections for religious exercise.

**Fourth Cause of Action**
**Violation of the First Amendment's Rights to Religious Autonomy, the Ministerial Exception, and the Co-Religionist Doctrine**

*PRC*

501.    Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

502.    Plaintiff PRC is a religious ministry that engages in religious exercise by hiring employees, cultivating its religious beliefs among its employees, advocating for those religious beliefs to the public, communicating its religious

beliefs to the public, and making internal governance and administrative decisions consistent with its religious beliefs.

503.    The PRC Leadership, the PRC Instructors, and the Medical Services Director are ministerial positions that perform important religious functions for the ministry by developing the ministry's core doctrines, advocating and teaching those religious beliefs in the public square, providing spiritual ministry to its employees, clients, and the public, and leading Bible studies and prayers with its employees.

504.    Plaintiff PRC requires each employee and volunteer to agree with and act consistent with its religious beliefs to ensure that they are committed to its mission and are capable of authentically conveying its beliefs to other employees, patients, volunteers, and the public.

505.    All Plaintiff PRC's employees are expected to and when required, do communicate its religious beliefs with other employees, patients, or the public.

506.    Plaintiff PRC must also provide employee-related benefits consistent with its religious beliefs on the sanctity of human life to effectively fulfill and operate consistent with its religious mission.

507.    Plaintiff PRC could not effectively fulfill its religious mission if it was required to hire employees or volunteers who disagreed with or acted inconsistent with its religious beliefs or if it were forced to provide coverage to its employees that would facilitate access to abortion-causing drugs, devices, and procedures in violation of its religious beliefs.

508.    The Employment, Notice, Benefit, Accommodation, and Accommodation Publication Clauses infringe on Plaintiff PRC's First Amendment right to govern itself according to religious principles, frame its policies and doctrine, decline to participate in or facilitate activities such as abortion that violate its religious beliefs, create a ministry that is faithful to its religious beliefs, and

select all of its employees and volunteers according to those religious principles without government interference.

509.    The Employment, Notice, Benefit, Accommodation, and Public Accommodation Clauses grant Defendants unfettered discretion to intrude on the internal employment and governance decisions of Plaintiff PRC as a religious ministry and punish those decisions Defendants view as unorthodox.

510.    Plaintiff PRC has not and will not engage in certain protected religious exercise because of the Employment, Notice, Benefit, Accommodation, and Public Accommodation Clauses.

511.    The Employment, Notice, Benefit, Accommodation, and Public Accommodation Clauses as applied to PRC are per se unconstitutional because they infringe on Plaintiff's religious autonomy by restricting and regulating its internal management.

512.    The Employment, Notice, Benefit, Accommodation, and Public Accommodation Clauses are not sufficiently tailored to serve any legitimate or compelling interest as applied to Plaintiff PRC's religious exercise.

513.    Accordingly, as applied to Plaintiff PRC, Employment, Notice, Benefit, Accommodation, and Public Accommodation Clauses violate its First Amendment protections of church autonomy, the ministerial exception, and the co-religionist doctrine.

<u>Fifth Cause of Action</u>
<u>Violation of the Fourteenth Amendment's Due Process Clause: Vagueness</u>
*PRC*

514.    Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

515.    The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled

discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violate Michigan's law.

516.    The Accommodation Publication Clause's Unwelcome Clause prohibits any public accommodation or public service from publishing a "statement, advertisement, notice, or sign" to the effect that a person's "patronage of or presence at" the public accommodation or public service is "objectionable, unwelcome, unacceptable, or undesirable" because of the person's religion, sex, marital status, sexual orientation, or gender identity. MCL 37.2302(b).

517.    Michigan's law nowhere defines "objectionable, unwelcome, unacceptable, or undesirable."

518.    Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what is prohibited by the Unwelcome clause because they cannot know what communications made on a public accommodation's or public service's website or made directly to prospective clients indicate a person's "patronage of or presence" at a place of public accommodation or public service is "objectionable, unwelcome, unacceptable, or undesirable" because of religion, sex, marital status, sexual orientation, or gender identity.

519.    Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Unwelcome Clause in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

520.    Accordingly, facially and as applied to Plaintiffs, the Accommodation Publication Clause's Unwelcome Clause violates the Fourteenth Amendment's Due Process Clause.

74

<u>Sixth Cause of Action</u>
<u>Violation of the Fourteenth Amendment's Due Process and Privileges and
Immunities Rights to Refrain From Taking Human Life</u>

*All Plaintiffs*

521.    Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

522.    The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," or from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

523.    The Due Process and Privileges or Immunities Clauses protect fundamental rights and liberty interests that are deeply rooted in the Nation's history and tradition.

524.    Among the fundamental rights and liberty interests the Constitution protects is the right to refrain from taking, or participating in taking, human life.

525.    This right is deeply rooted in the Nation's history and tradition, including prior to the Nation's founding, at the time of the Nation's founding, and at the time of the ratification of the Fourteenth Amendment.

526.    In history and tradition, the right to refrain from taking human life is equally recognized in the context of abortion.

527.    The Benefits Clause requires employers to cover abortion as a "benefit" of employment or else be liable for discriminating "on the basis of sex" to an otherwise available employee benefit. MCL 37.2202(1)(c).

528.    Because Right to Life and PRC insure their employees for medical care related to pregnancy, the Benefits Clause demands that they insure their employees for procedures related to abortion.

529.   Providing this insurance coverage violates Right to Life's moral and philosophical beliefs and PRC's religious beliefs and forces them to engage in conduct that facilitates the taking of human life.

530.   By compelling Plaintiffs to cover abortion as a "benefit" of employment, the Benefits Clause disturbs the "objectively, deeply rooted" right to refrain from taking, or participating in taking, human life—including in the context of abortion. *Dep't of State v. Muñoz*, 602 U.S. 899, 909–10 (2024) (citation modified).

531.   The Benefits Clause is not narrowly tailored to any compelling interest, substantially related to any important interest, or rationally related to any legitimate interest as applied to Plaintiffs' fundamental liberty interest.

532.   Accordingly, as applied to Plaintiffs, the Benefits Clause violates the Due Process and Privileges or Immunities Clauses of the Fourteenth Amendment.

<u>Seventh Cause of Action</u>
<u>Violation of the Fourteenth Amendment's Procedural Due Process Clause</u>

*All Plaintiffs*

533.   Plaintiffs repeat and reallege all preceding allegations up to and including paragraph 461.

534.   The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

535.   In general, procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests.

536.   Plaintiffs have a cognizable liberty interest in refraining from taking, or participating in taking, human life.

537.   That liberty interest encompasses decisions about whether to offer abortion coverage in their employee health plans, and thus an infringement of that interest can violate Plaintiffs' rights to procedural due process.

538.    The Benefits Clause deprived Right to Life and PRC of a cognizable liberty interest by requiring Plaintiffs to cover abortion as a "benefit" of employment.

539.    Because Michigan compels Plaintiffs to participate in a practice they were founded to oppose and is antithetical to their very existence, the Benefits Clause is sufficiently invasive to trigger procedural safeguards.

540.    But the Benefits Clause lacks sufficient process.

541.    As noted above, Michigan enacted the Benefits Clause without providing for any exemptions or adequate post-deprivation remedial procedures knowing that there would be ideological, moral, and religious objectors who would be unable to comply in good conscience.

542.    The Benefits Clause violates Plaintiffs' rights to procedural due process.

543.    Accordingly, as applied to Plaintiffs, the Benefits Clause violates the due process clause of the Fourteenth Amendment.

## Prayer for Relief

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.    A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

      a.    enforcing the Employment, Notice, and Benefits Clauses as applied to Plaintiffs' constitutionally protected rights to expressive association and assembly, and to free speech and press as to all those employment positions that are currently open or may become open in the future and as to the future hiring of those positions;

b.      enforcing the Accommodation and Accommodation Publication Clauses as applied to Plaintiff PRC's constitutionally protected rights to expressive association and assembly, and to free speech and press as to all those volunteer opportunities that are currently open or may become open in the future and as to the future hiring of those positions;

c.      enforcing the Employment, Notice, Benefits, Accommodation, and Accommodation Publication Clauses as applied to Plaintiff PRC's constitutionally protected religious exercise and religious autonomy as to all those employment positions and volunteer opportunities that are currently open or may become open in the future;

d.      enforcing the Benefits Clause as applied to Plaintiff PRC's constitutionally protected religious exercise and religious autonomy to refrain from taking life by providing abortion-related services in their employee health plans;

e.      enforcing the Benefits Clause as applied to Plaintiffs' constitutionally protected right to refrain from taking life by providing abortion-related services in their employee health plans; and

f.      enforcing the Accommodation Publication Clause's Unwelcome Clause facially.

2.      A declaration that the Employment, Notice, Benefits, Accommodation, and Accommodation Publication Clauses have violated and continue to violate Plaintiffs' First Amendment rights under the United States Constitution to engage in speech, association, press, and assembly and Plaintiff PRC's First Amendment

rights under the United States Constitution to engage in religious exercise and religious autonomy as applied to Plaintiffs' constitutionally protected activities;

3.    A declaration that the Accommodation Publication Clause's Unwelcome Clause facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.    A declaration that the Benefits Clause violates Plaintiffs' fundamental liberty interest to refrain from taking human life under the Fourteenth Amendment's Due Process and Privileges and Immunities Clauses.

5.    A declaration that the Benefits Clause violates Plaintiffs' procedural due process rights under the Fourteenth Amendment's Due Process Clause.

6.    That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

7.    That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988.

8.    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

9.    That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 6th day of February, 2026.

Henry W. Frampton, IV
South Carolina Bar No. 75314
Bryan D. Neihart
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
hframpton@ADFlegal.org
bneihart@ADFlegal.org

Arie M. Jones
Virginia Bar No. 98248
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
arjones@ADFlegal.org

Suzanne E. Beecher
California Bar No. 329586
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, D.C. 20001
(202) 393–8690
sbeecher@adflegal.org

By: s/ John J. Bursch

John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
jbursch@ADFlegal.org

*Attorneys for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, _Amber Roseboom_, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing allegations as they relate to Right to Life of Michigan and its experiences are true and correct to the best of my personal knowledge or information I have acquired from others.

Executed this _4th_ day of _Feb._, 2026, at _Right to Life_, Michigan.

## Declaration Under Penalty of Perjury

I, James Sprague, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 3rd  day of February 2026, at Grand Rapids, Michigan.

_James Sprague_                                          03/02/2026

James Sprague

16