# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**Right to Life of Michigan** and
**Pregnancy Resource Center,**

                               Plaintiffs,

v.

**Dana Nessel,** in her official capacity as
Attorney General of Michigan; **John E.
Johnson, Jr.,** in his official capacity as
Executive Director of the Michigan
Department of Civil Rights; **Luke R.
Londo, Gloria E. Lara, Richard R.
White III, Portia L. Roberson, Zenna
Faraj Elhason, Regina Marie Gasco,
Rosann L. Barker,** and **Skot Welch,** in
their official capacities as members of the
Michigan Civil Rights Commission,

                               Defendants.

Case No.  1:26-cv-390

**Plaintiffs' Brief in Support of
Their Preliminary Injunction
Motion**

*Oral Argument Requested*

# TABLE OF CONTENTS

Table of Authorities ................................................................................... iii

Introduction ................................................................................................ 1

Statement of Facts ....................................................................................... 3

I.    Right to Life is a secular nonprofit organization that promotes the dignity of human life. ........................................................................ 3

II.    PRC is a religious nonprofit organization that champions God's gift of human life. ......................................................................................... 4

III.    Michigan's law burdens Right to Life and PRC. ................................. 7

IV.    Right to Life and PRC self-censor their speech to avoid being prosecuted under Michigan's law. ......................................................... 10

Argument ................................................................................................... 11

I.    The Employment and Accommodation Clauses violate Right to Life's and PRC's expressive-association rights. ............................................. 12

    A.    Right to Life and PRC join with others to speak. ................................ 12

    B.    The clauses undermine Right to Life's and PRC's speech. .................... 13

II.    The Employment and Accommodation Clauses violate Right to Life's and PRC's rights to assembly. .............................................................. 16

III.    The Employment and Accommodation Clauses invade PRC's religious autonomy. ......................................................................................... 19

IV.    The Benefits Clause violates Right to Life's and PRC's right to refrain from taking human life. .................................................................... 21

V.    The Benefits Clause forces PRC to violate its religious beliefs by facilitating abortions. ........................................................................ 24

    A.    The clause substantially interferes with PRC's internal management decisions. ......................................................................................... 24

    B.    The clause's exemptions discriminate based on religious denomination. ................................................................................... 26

VI.    Michigan's Employment, Benefits, and Accommodation Clauses violate PRC's free-exercise rights. ................................................................ 27

    A.    Michigan offers individualized exemptions. ........................... 27

    B.    Michigan treats religious exercise worse than comparable secular conduct. ................................................................................... 29

VII.   The Notice and Accommodation Publication Clauses restrict Right's to Life's and PRC's speech based on content and viewpoint. ....................................... 30

VIII.  Michigan's law fails scrutiny as applied to Right to Life and PRC. .............. 32

    A.    Michigan's law does not advance a compelling interest here. ............... 32

    B.    Michigan's law is not narrowly tailored here. ........................................ 34

IX.    The remaining preliminary-injunction factors favor an injunction. ............... 35

Conclusion ................................................................................................................ 36

# Table of Authorities

## <u>Cases</u>

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................................ 14

*A.C.L.U. Fund of Michigan v. Livingston County,*
    796 F.3d 636 (6th Cir. 2015) ........................................................... 35

*American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation,*
    978 F.3d 481 (6th Cir. 2020) ........................................................... 31

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021) ........................................................................ 17

*Billard v. Charlotte Catholic High School,*
    101 F.4th 316 (4th Cir. 2024) ......................................................... 20

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) .................................................... 12, 13, 14, 33

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) .................................................................. 25, 34

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industries Review Commission,*
    605 U.S. 238 (2025) .................................................................. 24, 26

*Christian Legal Society v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ........................................................... 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) .................................................................. 29, 33

*CompassCare v. Hochul,*
    125 F.4th 49 (2d Cir. 2025) ........................................................ 12, 15

*Dahl v. Board of Trustees of Western Michigan University,*
    15 F.4th 728 (6th Cir. 2021) ........................................................... 27

*De Jonge v. State of Oregon,*
    299 U.S. 353 (1937) ........................................................................ 18

*Defending Education v. Olentangy Local School District Board of Education,*
    158 F.4th 732 (6th Cir. 2025) ............................................... 11, 31, 32

*Department of State v. Muñoz,*
    602 U.S. 899 (2024) ............................................................................. 22, 23

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022) ...................................................................... 21, 22, 23

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ................................................................................... 24

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ........................................................... 27, 28, 32, 33

*Hague v. Committee for Industrial Organization,*
    307 U.S. 496 (1939) ................................................................................... 19

*Hall v. Baptist Memorial Health Care Corporation,*
    215 F.3d 618 (6th Cir. 2000) ................................................................. 20

*Haynes v. Neshewat,*
    729 N.W.2d 488 (Mich. 2007) ........................................................... 9, 10

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,*
    565 U.S. 171 (2012) ............................................................................. 24, 32

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ............................................................................. 31, 32

*Johnson v. City of Cincinnati,*
    310 F.3d 484 (6th Cir. 2002) ................................................................. 24

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ............................................................................. 16, 24

*Leavitt v. Truair,*
    30 Mass. 111 (1832) ................................................................................. 17

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ............................................................................. 24, 35

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................................... 35

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ................................................................................... 22

*Monclova Christian Academy v. Toledo-Lucas County Health Department,*
    984 F.3d 477 (6th Cir. 2020) ............................................................. 29, 30

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ........................................................................ 12

*NAACP v. Button*,
    371 U.S. 415 (1963) ........................................................................ 12

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. 1 (2022) ................................................ 16, 17, 19, 32

*Oregon Right to Life v. Stolfi*,
    158 F.4th 1013 (9th Cir. 2025) ...................................... 25

*Our Lady of Guadalupe School v. Morrissey-Berru*,
    591 U.S. 732 (2020) .............................................. 19, 24

*Our Lady's Inn v. City of St. Louis*,
    349 F. Supp. 3d 805 (E.D. Mo. 2018) ........................ 13, 15

*People ex rel. Rice v. Board of Trade of Chicago*,
    80 Ill. 134 (1875) ........................................................ 18

*Planet Aid v. City of St. Johns*,
    782 F.3d 318 (6th Cir. 2015) .................................... 24, 31

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................... 30

*Religious Sisters of Mercy v. Becerra*,
    55 F.4th 583 (8th Cir. 2022) .......................................... 25

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...................................................... 12

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995) ...................................................... 31

*Rouch World, LLC v. Department of Civil Rights*,
    987 N.W.2d 501 (Mich. 2022) .................................... 20

*Seattle's Union Gospel Mission v. Woods*,
    142 S. Ct. 1094 (2022) .................................................. 19

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ...................................*passim*

*State ex rel. Poulson v. Grand Lodge of Missouri I.O.O.F.*,
    8 Mo. App. 148 (1879) .................................................. 18

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ................................................................. 27, 29

*Union Gospel Mission of Yakima Washington v. Brown,*
    162 F.4th 1190 (9th Cir. 2026) ............................................. 19, 20, 21

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ............................................................. 32, 34, 35

*United States v. Stevens,*
    559 U.S. 460 (2010) ....................................................................... 19

*Vidal v. Elster,*
    602 U.S. 286 (2024) ....................................................................... 16

## Constitutional Provisions

U.S. Const. amend. I ............................................................................ 16

U.S. Const. amend. XIV, § 1 ............................................................... 21

## Statutes and Regulations

18 U.S.C. § 3597 .................................................................................. 22

29 C.F.R. § 1604.2 ............................................................................... 34

42 U.S.C.A. § 2000e ............................................................................ 23

42 U.S.C.A. § 2000e-1 ......................................................................... 34

Ark. Code Ann. § 17-80-504 .............................................................. 23

D.C. Code Ann. § 2-1402.11 ............................................................... 23

Iowa Code Ann. § 216.6 ...................................................................... 23

Kan. Stat. Ann. § 40-2,190 ................................................................. 23

MCL 333.20181 ............................................................................. 23, 34

MCL 333.20182 ............................................................................. 23, 34

MCL 333.20183 .................................................................................. 23

MCL 37.1202 ....................................................................................... 33

MCL 37.1206 ................................................................................................ 33

MCL 37.2103 .................................................................................................. 7

MCL 37.2201 ............................................................................................... 7, 10

MCL 37.2202 ............................................................................ 8, 9, 20, 23, 24

MCL 37.2206 ........................................................................... 8, 20, 30, 31

MCL 37.2208 ...................................................................................... 8, 27, 28

MCL 37.2301 ............................................................................... 10, 29, 34

MCL 37.2302 ......................................................................................... *passim*

MCL 37.2303 .................................................................................................. 34

MCL 37.2403 .................................................................................................. 34

MCL 37.2404 .................................................................................................. 29

MCL 37.2503 ............................................................................................. 29, 34

MCL 37.2602 .................................................................................................... 7

MCL 37.2605 .................................................................................................... 7

MCL 550.541 .................................................................................................. 23

MDCR Rule 37.12 .......................................................................................... 7

MDCR Rule 37.16 .......................................................................................... 7

Ohio Rev. Code Ann. § 4112.01 ................................................................ 23

Ohio Rev. Code Ann. § 4743.10 ................................................................ 23

Tex. Labor Code Ann. § 21.107 ................................................................ 23

U.S.C. § 300a-7 ............................................................................................ 23

## **Other Authorities**

Helen M. Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319 (2021) ................... 14

John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tul. L. Rev. 565 (2010). ................................................................................. 17, 18

Mark L. Rienzi, *The Constitutional Right Not to Participate in Abortions: Roe, Casey, and the Fourteenth Amendment Rights of Healthcare Providers*, 87 Notre Dame L. Rev. 1 (2011) ...................................................... 22

Mark Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012)... 22, 23

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ........................... 24, 25

*Michigan Civil Rights Commission meeting 1/26/2026*, https://bit.ly/4kfj4Ie......... 28

*Michigan's Take Control of Your Birth Control campaign provided more than 460,000 free contraceptives and resources* (Nov. 12, 2025), https://bit.ly/49uJUIK ........................................................... 34, 35

Nathan J. Ristuccia, *"Dangerous to the Liberties of A Free People": Secret Societies and the Right to Assemble*, 4 J. Free Speech L. 139 (2023) ....................... 17

*Webster's Complete Dictionary of the English Language* 83 (1886), https://bit.ly/4pSAlbQ ............................................................. 18

William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185 (2024)............................... 22

## Introduction

Plaintiffs Right to Life of Michigan (Right to Life) and Pregnancy Resource Center (PRC) are Michigan nonprofit, pro-life organizations. Right to Life is a non-sectarian organization dedicated to protecting and promoting the gift of human life from fertilization to natural death. PRC is a faith-based Christian ministry that serves women and families experiencing unplanned pregnancies by providing education, counseling, medical services, and practical support. Because both organizations accomplish their goals through their staff and volunteers, they hire only employees and accept only volunteers who believe and can effectively communicate the groups' pro-life views.

Michigan's new employment law now prohibits this. It redefines "sex" discrimination to include "termination of a pregnancy." So it is illegal for Right to Life and PRC to refuse to hire an applicant based on their support for, or decision to have, an abortion. This law also prevents them from posting job openings that indicate a pro-life requirement or asking applicants about their beliefs. Right to Life and PRC must also cover abortions in their insurance plans as an employee "benefit" since they generally offer insurance to their employees. And Michigan interprets its public-accommodations law to regulate PRC's volunteer program as a "service." This interpretation forces PRC to accept volunteers who disagree with its beliefs and bans it from explaining those beliefs to prospective volunteers.

The First Amendment protects Right to Life's and PRC's right to associate and assemble only with those who share their mission. They have the freedom to be transparent about that mission in employment posts, in discussions with prospective employees, and in volunteer opportunities. And Michigan has no interest in forcing pro-life organizations to violate their pro-life beliefs by carrying insurance plans that facilitate abortions.

1

In short, Michigan's law invades these organizations' employment and volunteer practices. The preliminary-injunction motion includes a chart detailing the challenged clauses and how those clauses violate Right to Life's and PRC's constitutional rights. The summary below complements that chart.

1. The Employment Clause forbids the organizations from making employment decisions based on "sex," including "termination of a pregnancy." This clause violates their expressive association and assembly and PRC's religious autonomy and free exercise.

2. The Benefits Clause requires the organizations to cover abortions in their insurance plans. This clause violates their privileges or immunities and due process rights and PRC's religious autonomy and free exercise.

3. The Notice Clause prohibits the organizations from explaining their employment practices on "sex." This clause violates their freedom of speech.

4. The Accommodation Clause bars PRC from selecting volunteers based on their religious beliefs. This clause violates PRC's expressive association, assembly, religious autonomy, and free exercise.

5. The Accommodation Publication Clause bans PRC from explaining its volunteer practices on religious and sexual orientation. This clause violates PRC's freedom of speech.

Because Right to Life and PRC refuse to violate their beliefs, they risk huge fines, loss of state licenses, and other penalties. This threat has caused them to chill their speech and alter their practices to reduce these risks. They shouldn't have to. Accordingly, Right to Life and PRC request a preliminary injunction to stop this ongoing threat to their First Amendment rights so that they can continue to serve the public, engage in advocacy, help women in need, and operate without the credible threat of government punishment.

### Statement of Facts

I. **Right to Life is a secular nonprofit organization that promotes the dignity of human life.**

Right to Life promotes the dignity and value of human life from fertilization to natural death. Verified Complaint (VC) ¶¶ 16–29. Right to Life advocates its pro-life views by educating the public, organizing events, supporting like-minded grassroots affiliates, promoting pro-life legislation and candidates, and taking part in other forms of political activism. *Id.* Right to Life opposes abortion, which it defines as any act intended to cause the death of an unborn child when the mother's life is not at risk. VC ¶¶ 19–20.

Right to Life depends on its employees to promote its mission, communicate its values, and ensure the organization operates consistently with its beliefs. VC ¶¶ 30–48. Right to Life's employees reflect the organization because every employee could be in a position to express its mission to the public, employees, or volunteers. *Id.* Right to Life must hire employees who agree with and live out its values to persuasively express its message publicly and to maintain cohesion internally. VC ¶ 30. By contrast, being required to hire employees who disagree with, oppose, actively dissent from, act contrary to, or even just don't care much about Right to Life's beliefs on the dignity of life would burden its ability to communicate its views and its ability to operate as an organization. VC ¶ 48.

To ensure consistency, Right to Life requires its employees to sign and agree with the organization's Guiding Principles and Code of Ethics and to conduct their professional and personal lives in a manner consistent with the organization's pro-life values. VC ¶¶ 31–34, 93. Right to Life prohibits its employees, while employed by the organization, from engaging in conduct inconsistent with its pro-life views, helping others obtain an abortion, promoting abortion, or speaking messages contrary to Right to Life's pro-life position. VC ¶ 48. Any of these activities would

contradict Right to Life's mission and undermine its credibility. VC ¶¶ 32, 37, 47. Right to Life would like to communicate these expectations to prospective employees by amending its job descriptions, automated emails, employee handbook, and guiding principles. VC ¶¶ 101–06, 121–23; VC Exs. 2, 4–5, 8. Right to Life also desires to offer employee benefits that align with its mission—including benefits that exclude abortion coverage. VC ¶¶ 135–37.

Right to Life regularly hires new employees. Over the past five years, Right to Life has averaged hiring four new employees per year and expects that trend to continue. VC ¶¶ 78–79. Right to Life currently needs to hire a Communications Director and a Content Contributor & Event Coordinator. VC ¶ 107.

The Communications Director develops and oversees strategic communications across Right to Life's platforms, including podcasts, websites, and social media. VC Ex. 6. The Content Contributor & Event Coordinator organizes events, outreach, and educational projects. VC Ex. 7. Both positions often interact with the public and other Right to Life staff. VC Exs. 6–7.

## II.    PRC is a religious nonprofit organization that champions God's gift of human life.

PRC is a Christian ministry that exists to affirm God's gift of human life. VC ¶ 138. PRC believes that life begins at conception, that all human life is inherently valuable, and that abortion destroys innocent human life. VC ¶¶ 143–44. PRC also believes that God designed sex "to be enjoyed by men and women in the context of marriage." VC Ex. 9 at 6. As long as sexual relationships exist outside that context, PRC recognizes that "there will continue to be great numbers of crisis pregnancies." *Id.* So PRC "communicate[s] Biblical truths of what it means to be healthy, self-assured and loved by God." *Id.*

PRC expresses these beliefs by educating the public on these topics, providing medical care to pregnant women, and informing pregnant women facing unplanned

pregnancies about prenatal development, pregnancy, childbirth, abortion procedures, and alternatives to abortion. VC ¶¶ 146–58. PRC hopes to empower women to choose life and decline to have an abortion. VC ¶ 147. PRC also offers support services for pregnant women and new mothers. VC ¶¶ 154–55. As an extension of its belief that all humans have inherent dignity, PRC serves everyone. VC ¶ 158.

To effectively communicate its faith to the public, and to maintain a work environment that encourages employees to grow in their faith, PRC hires employees and seeks volunteers who share its faith. VC ¶¶ 160–77. PRC takes interactions with the public as opportunities to share the truth that God loves all people— including unborn children. VC ¶ 140. For example, PRC's employees and volunteers provide spiritual and prayer support for patients and the public as appropriate. VC ¶¶ 153–55, 175.

PRC reflects its religious beliefs in its day-to-day operations. PRC staff gather for prayer each workday. VC ¶¶ 164–68. PRC incorporates prayer, Bible study, and other spiritual disciplines in meetings, employee retreats, and other employment-related functions. *Id.* PRC employees exchange prayer requests, encourage each other with Bible reflections, and pray with each other. *Id.*

PRC requires employees to affirm and personally adhere to its Mission, Vision, Doctrinal, and Stated Positions and its Driving Convictions (PRC's Positions), including its beliefs on the sanctity of life. VC ¶¶ 141–42, 162. PRC also screens volunteer applicants to ensure they agree with PRC's mission. VC ¶ 276. Prospective volunteers affirm a version of PRC's Positions. VC Ex. 15. Hiring employees who disagree with PRC's stance on abortion and accepting volunteers who cannot agree with PRC's Positions would severely compromise their public mission and internal cohesion. VC ¶¶ 164, 174–77, 372. PRC desires to more clearly communicate these expectations to prospective employees and volunteers by

amending its job descriptions, employee handbook, and volunteer application. VC ¶¶ 242, 244, 258, 286–87; VC Exs. 10, 14, 16.

PRC's religious beliefs affect its employee benefits. It violates PRC's religious beliefs to provide health insurance that facilitates access to abortion-causing drugs, devices, or procedures. VC ¶¶ 260–62. In PRC's view, this facilitates an activity it considers to be immoral and harmful to innocent human life. *Id.* PRC objects to providing this coverage even if a third party directly reimburses for those procedures, rather than PRC itself. *Id.* PRC currently covers abortion in its plan in compliance with state law. VC ¶¶ 267–71. But PRC has initiated efforts to remove that coverage. VC ¶ 269.

PRC actively recruits and hires multiple new employees each year. VC ¶¶ 221–25. PRC also onboards volunteers throughout the year. VC ¶ 273. PRC expects these trends to continue. VC ¶¶ 223, 273.

PRC has several open staff positions. VC ¶¶ 245–59. The CEO Executive Assistant provides administrative, communicative, and strategic support to the CEO, interacts with staff, donors, and other partners, and communicates with the board. VC Ex. 13. The Advocate Coordinator and the Lead First Steps Coordinator work with volunteers and coordinate services for clients. VC Exs. 11–12. These positions interact with the public and other PRC staff. *Id.*

PRC also has seven volunteer openings. VC ¶ 277. PRC is also looking for (1) an administrative assistant volunteer; (2) a special project volunteer; (3) a support services volunteer; (4) a baby bottle volunteer; (5) a cleaning volunteer; (6) small group volunteers; and (7) prayer team volunteers. VC ¶ 277. Each volunteer will interact with PRC staff, and, depending on the position, may also interact with the public through fundraising, answering office calls, talking with and assisting new moms, and other tasks. VC ¶¶ 272–84.

### III.    Michigan's law burdens Right to Life and PRC.

Michigan's Elliott-Larsen Civil Rights Act (ELCRA) forbids Right to Life's and PRC's desired employment and volunteer practices. ELCRA prohibits employers from refusing to recruit or hire employees based on "sex," including an employee's "termination of a pregnancy." MCL 37.2201(d). ELCRA prohibits public accommodations—that is, businesses that provide services to the public—from denying their services based on sexual orientation and religion. MCL 37.2301(a); MCL 37.2302. Right to Life and PRC qualify as employers under ELCRA. VC ¶ 305. PRC arguably counts as a public accommodation. VC ¶ 341.

Michigan actively enforces ELCRA. In 2024, Michigan reviewed about 1,400 employment discrimination complaints. VC ¶ 424. Michigan makes it easy to file complaints. Anyone "claiming to be aggrieved" can file a complaint—government officials, testers, private associations, and individuals. VC ¶¶ 415–18; MCL 37.2103(h) (defining "person"). And complainants can file complaints based on just *seeing* an allegedly discriminatory publication. VC ¶ 417. Claimants don't need to be members of a protected class to file. *Id.* The investigation process is burdensome, and can include interrogatories, site visits, interviews, and administrative hearings. *See* MCL 37.2602; MCL 37.2602(d); MDCR Rule 37.12; MDCR Rule 37.16.

Penalties for violations include potential loss of state-issued licenses, fines, damages, attorney fees, orders to hire the employee, and more. MCL 37.2605(1)–(3). The Attorney General enforces compliance with any orders issued by the Department or the Commission. MCL 37.2602(b), (d).

Michigan's law burdens Right to Life's and PRC's constitutional rights through the (1) Employment Clause; (2) Notice Clause; and (3) Benefits Clause. Michigan's law also violates PRC's constitutional rights through the (4) Accommodation Clause and (5) Accommodation Publication Clause.

**1. Employment Clause.** This clause prohibits employers from failing to recruit or hire "an individual" because of "sex"—including a "termination of a pregnancy." MCL 37.2202(1)(a)–(d).

Right to Life and PRC violate this clause because they require employees to agree with and abide by their views on abortion while employed. *E.g.*, VC ¶¶ 32–37; 160–63. They forbid employees from supporting an abortion, helping others obtain an abortion, promoting abortion, or engaging in conduct or speaking messages contrary to their pro-life positions during their employment with the organizations. *Id.* As Michigan sees it, these practices violate the law. VC ¶¶ 308–22.

Employers may apply for a bona fide occupational qualification (BFOQ) if a discriminatory qualification is "reasonably necessary to the normal operation of the business." MCL 37.2208. Applicants must fill out a thirteen-question form. VC Ex. 22. Michigan applies its discretion to grant or deny BFOQs case-by-case. *Id.* The State has approved BFOQ requests from secular employers like public health departments, a spa, and a probate court. VC Ex. 24. Michigan has denied BFOQ requests from religious employers for "support staff," "office personnel," and "janitorial staff." VC Ex. 23.

Neither Right to Life nor PRC intends to apply for a BFOQ. The process is too burdensome, and Michigan has unfettered discretion to deny their requests. Roseboom Decl. ¶¶ 58–82; Sprague Decl. ¶¶ 83–116. And the process itself violates their First Amendment rights and imposes its own punishment. *Id.*

**2. Notice Clause.** This clause restricts employers from "indicat[ing]" a "preference" for prospective employees "based on" personal traits like "sex" and from "elicit[ing] or attempt[ing] to elicit" that information. MCL 37.2206(1)–(2).

Right to Life's desired job description for its open positions, automated email, and amendments to its employee handbook and Guiding Principles and Code of Ethics violate this clause. VC Exs. 2, 4–5, 8. PRC's desired job description for its

open positions and amendments to PRC's Positions violate this clause too. VC Exs. 10, 14. Right to Life and PRC intend to use similar job descriptions for future openings too. VC ¶¶ 121–22, 387. These publications indicate that Right to Life and PRC will not hire employees who would promote messages contrary to the organizations' values or who would pursue (or help anyone else pursue) an elective abortion while employed. Right to Life's publication also indicates that its insurance plan does not cover abortion.

**3. Benefits Clause.** This clause prohibits employers from distinguishing between employees "on the basis of sex [including the termination of a pregnancy] with respect to … a benefit plan." MCL 37.2202(1)(c). Michigan interprets this clause to require employers to cover abortion if they offer otherwise comprehensive health plans. VC ¶ 334.

Right to Life and PRC offer healthcare insurance to their employees. VC ¶¶ 126–34, 263–65. But Right to Life's policy excludes abortion coverage, and PRC intends to exclude that coverage. VC ¶¶ 135–37, 267–71. So Right to Life and PRC arguably violate this clause. *See* VC ¶¶ 327–36.

Michigan exempts "religious employers" from this requirement. VC Ex. 20 at 7. To qualify as a "religious employer," an employer must meet "all" of a four-factor test. *Id.* PRC does not qualify for this exemption because it serves "the general public." *Id.*

**4. Accommodation Clause.** This clause prohibits public accommodations from denying someone "full and equal" privileges or advantages "because of" sexual orientation or religion. MCL 37.2302(a). Michigan recently interpreted a nearly identical law to apply to volunteer opportunities offered by public accommodations. VC ¶¶ 344–346; VC Ex. 21. The Accommodation Clause applies to volunteers like the Employment Clause applies to employees. *See Haynes v. Neshewat*, 729 N.W.2d

488, 490, 494 (Mich. 2007) (holding a hospital violated this clause by allegedly revoking a physician's staff privileges based on his race).

PRC requires volunteers to agree with its views on marriage and religion. VC ¶¶ 162, 275. PRC will decline to accept a volunteer who cannot agree with these views. *Id.* ¶ 276. And Michigan interprets the phrase "public accommodation" broad enough to cover PRC. MCL 37.2301(a). So PRC arguably qualifies as a public accommodation, and its volunteer practices arguably violate this clause.

**5. Accommodation Publication Clause.** This clause prohibits public accommodations from posting statements suggesting that they will deny "the full and equal enjoyment" of their services *or* that someone is "objectionable, unwelcome, unacceptable, or undesirable" based on sexual orientation and religion. MCL 37.2302(b). PRC's volunteer application asks volunteers to agree with its views on marriage and religion including that there "is one God, eternally existent in three persons," and that marriage is the "union between one man and one woman." VC Ex. 15. Volunteers who cannot affirm agreement with these beliefs may be unable to serve. VC ¶¶ 162, 275–76. PRC's volunteer application arguably violates this clause.

## IV. Right to Life and PRC self-censor their speech to avoid being prosecuted under Michigan's law.

Right to Life and PRC face a credible threat of prosecution under Michigan's law. They receive applications from prospective employees who oppose their mission. VC ¶¶ 94–96, 99, 229, 241. They recruit and hire applicants based on their views on abortion and their commitment to refrain from "terminat[ing] … a pregnancy" during their employment. MCL 37.2201(d). PRC recruits and accepts volunteers who agree with its religious beliefs. VC ¶ 275. And neither desire to cover abortions in their insurance plans. VC ¶¶ 135–37, 267–71.

Based on recent changes to Michigan's laws on abortion, Right to Life and PRC would like to be unequivocal about their pro-life views with the public, their staff, and prospective employees. VC ¶¶ 368–412.

Right to Life would like to amend its (1) job descriptions for open and future positions to explain that employees may not "advocate for or support elective abortion" while employed and that it does not cover abortion in its health-insurance plans; (2) Guiding Principles and Code of Ethics; (3) automated email to employment inquiries; and (4) employee handbook. VC ¶¶ 101–06, 121–25.

PRC would like to amend its (1) job descriptions for open and future positions to be more explicit about employee's "elective abortions" and (2) PRC's Positions and then link to those positions in future job posts. VC ¶¶ 243–44, 257–59, 385. And PRC would like to email its amended volunteer application to applicants. VC ¶ 288.

But Right to Life and PRC have refrained from adopting and publishing these amendments because Michigan's law prohibits them. VC ¶¶ 368–412. If they published these amendments, they would risk severe penalties. To stop this chill and eliminate their threat, they request a preliminary injunction.

## Argument

Right to Life and PRC deserve a preliminary injunction because they are likely to succeed on their First and Fourteenth Amendment claims. Michigan's law violates their rights to expressive association, assembly, religious autonomy, due process, religious exercise, and speech as applied to all the organizations' employees. And Michigan's law cannot survive strict scrutiny. Right to Life's and PRC's likelihood of success "looms large over the other[]" injunctive factors. *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 760 (6th Cir. 2025) (en banc). They suffer irreparable harm without the injunction, and their requested relief serves the public's interests without harming third parties.

# I.    The Employment and Accommodation Clauses violate Right to Life's and PRC's expressive-association rights.

Right to Life and PRC are expressive associations, and the Employment and Accommodation Clauses alter their expression.

The First Amendment protects "expressive association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). This right protects the freedom to associate with those who have "shared goals" and the corollary freedom to *not associate* with those who "impair" the group's "ability" to express its "views." *Id.* at 622–23. Protecting a group's association supercharges the freedom of speech by amplifying individuals' voices through a collective chorus. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). The right of association applies to "members" and "staff." *NAACP v. Button*, 371 U.S. 415, 434, 437 (1963); *CompassCare v. Hochul*, 125 F.4th 49, 62 (2d Cir. 2025) (applying expressive association right to "specific employment decisions").

The Supreme Court asks three questions to decide whether a law stifles this freedom. First, does the group "engage[] in expressive association"? *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000). Second, does the law "significantly burden" that expression? *Id.* at 653. Third, does the law fail strict scrutiny? *Id.* at 648.

Right to Life and PRC easily satisfy *Dale*'s test. They engage in expressive association by advocating pro-life views. Michigan's law significantly burdens their expression. And this application fails strict scrutiny. A similar analysis applies regardless of position, and the injunction should cover future openings.

## A.    Right to Life and PRC join with others to speak.

Right to Life and PRC engage in expressive association. Courts defer "to an association's assertions regarding the nature of its expression." *Dale*, 530 U.S. at 653. Under that standard, Right to Life's and PRC's expression is straightforward. They join with employees, volunteers, and others "to advocate" pro-life "viewpoints." *Id.* at 648. They exist for that reason. Roseboom Decl. Ex. A; Sprague Decl. Ex. A.

Pro-life organizations engage in expressive activity. They "shar[e] with []
women their message concerning abortion." *Slattery v. Hochul*, 61 F.4th 278, 286–
89 (2d Cir. 2023). They provide "information" during a woman's "decision-making
processes in an untimely pregnancy." *Id.* at 288. And they "rais[e] awareness of the
dignity of life," *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 820–23
(E.D. Mo. 2018) (citation modified). So too here.

Right to Life's and PRC's expression is external. Right to Life publicly
advocates, writes and publishes content, speaks with students, engages in political
activities, petitions the government, and advances its pro-life mission. VC ¶¶ 16–29;
Roseboom Decl. ¶¶ 8–24. PRC's employees and volunteers meets with clients,
provides pregnancy advice, encourages mothers to choose life for their unborn child,
supports families, speaks to the public, publishes content, and shares its religious
beliefs. VC ¶¶ 138–59, 272–89; Sprague Decl. ¶¶ 7–37. Right to Life and PRC also
engage in expression by opposing and discouraging abortion. VC ¶¶ 19, 144.

Their expression is also internal. Right to Life and PRC rely on their employ-
ees to encourage one another, keep morale high, and ensure everyone is marching to
the same missional drum. VC ¶¶ 42–44, 165–174. Throughout the year—whether
passing in hallways, attending meetings, or working on projects—their employees
are expected to cultivate the organizations' pro-life commitments one to another. VC
¶¶ 42–44, 173–74.

Right to Life's and PRC's employees—including their open positions—and
volunteers convey their messages. VC ¶¶ 30–125, 160–259, 272–89. So Right to Life
and PRC meet *Dale*'s first prong.

## B.    The clauses undermine Right to Life's and PRC's speech.

Right to Life and PRC also meet *Dale*'s second prong. The Employment and
Accommodation Clauses "significantly affect" their pro-life and religious views.

*Dale*, 530 U.S. at 650. Approaching this question, courts "defer[] to an association's view of what would impair its expression." *Id.* at 653.

Right to Life and PRC join with others to value human life, including unborn children, and to oppose abortion. VC ¶¶ 30–125, 160–259, 272–89. To maintain consistent, authentic messaging—and to prevent contrary ideas from invading their organizations—Right to Life and PRC need all employees and volunteers to share their beliefs in word and deed. VC ¶¶ 35–38, 44–48, 160–64, 172–77.

Together, the Employment and Accommodation Clauses compel Right to Life and PRC to join with employees and volunteers who disagree with or outright reject their views or who act contrary to their mission. So Michigan's law "alter[s] the expressive content of" Right to Life's and PRC's "expression." *303 Creative LLC v. Elenis*, 600 U.S. 570, 585 (2023). And it "interfere[s] with" their "choice not to propound a point of view contrary to" their "beliefs." *Dale*, 600 U.S. at 654.

An organization cannot "effectively convey a message of disapproval of certain types of conduct, if, at the same time, [it] must accept members who engage in that conduct." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006). Aphorisms—"You are the company you keep"—capture this insight. So do social science theories. Social-influence theory, for example, holds that an organization preserves its "[b]eliefs and norms" by employing those who convey *and* model "the desired beliefs and norms." Helen M. Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319, 354–65 (2021) (summarizing social-science articles). Unsurprisingly, people within an organization shape it.

Relying on similar principles, the Second Circuit held that a state law burdened a pro-life organization's expressive association by "foreclosing" its "ability to reject employees" who may "believe the opposite" of the organization's "message." *Slattery*, 61 F.4th at 288. Channeling social-influence theory, the court observed

that "an expressive association's membership and leadership is integral to its ability to play an important role in nurturing the 'freedom of speech.'" *Id.* at 290. Another court held that a local law altered a pro-life organization's association by forcing it to include "individuals who do not share [its] commitment against abortion." *Our Lady's Inn*, 349 F. Supp. 3d at 821. That analysis applies here—employees and volunteers who may "act" or speak against the organizations' "*very mission*" alters their expression. *CompassCare*, 125 F.4th at 62 (citation modified).

Michigan's law thwarts this principle. The Employment Clause forces Right to Life and PRC to recruit and retain employees who act against their pro-life mission by having an abortion. VC ¶¶ 308–22, 358, 368–412. Going further, the law forces them to associate with employees and volunteers contemplating an abortion, assisting others obtaining abortions, or actively promoting that decision with co-workers, co-volunteers, or acquaintances outside the office. *Id.* The Accommodation Clause has the same effect on PRC's volunteer program. VC ¶¶ 343–50, 359. So Michigan's law compels Right to Life and PRC to communicate to the public and to other employees through team members who insist on personally choosing abortion or advocating positions contrary to these organizations' beliefs. VC ¶¶ 308–22, 343–50, 358–59, 368–412.

These demands burden these organizations' hiring decisions for all employees, including Right to Life's and PRC's open positions and PRC's open volunteer spots. *See* VC Exs. 6–7, 11–13. Right to Life's Communications Director creates messaging for time-sensitive issues, drafts content, and develops communication strategies for Right to Life. Roseboom Decl. ¶¶ 25–50. Its Content Contributor and Event Coordinator organize special events and educational projects, drafts content, and coordinates pregnancy help and related outreaches. *Id.*

PRC's CEO Executive Assistant works lockstep with its CEO and regularly communicates on his behalf. VC Ex. 13. PRC's Advocate Coordinator and Lead First

Steps Coordinator serve volunteers and new and expectant moms seeking PRC's services. VC Exs. 11–12. And PRC's volunteers interact with other staff, expectant moms, and new moms. VC ¶¶ 272–89. A dissenter in any of these roles could make a life-or-death difference—literally. In one year alone, PRC helped hundreds of women choose to continue their pregnancy over an abortion. Sprague Decl. ¶ 36.

That is common sense. Imagine forcing the Democratic National Committee to hire Republicans, PETA to hire hunters, the Drug Free America Foundation to hire pot smokers, and March for our Lives to hire assault-weapon owners—all as strategists or marketers to promote and speak for the groups. There is a word for this: hypocrisy. Their messages would fail.

Michigan's law dooms Right to Life and PRC to this same fate. The First Amendment prevents that outcome because Michigan's law alters their message. Right to Life and PRC satisfy *Dale*'s second prong. And, as explained below, Michigan cannot meet *Dale*'s third prong :strict scrutiny.

## II.    The Employment and Accommodation Clauses violate Right to Life's and PRC's rights to assembly.

Right to Life and PRC have the right to assemble consistent with their goals. Michigan's Employment and Accommodation Clauses interfere with this right too.

The First Amendment prohibits the government from "abridging" the right to "peaceably … assemble." U.S. Const. amend. I. To determine the scope of a right, courts often consider whether the amendment's "plain text covers an individual's conduct." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24–25 (2022). Analyzing the plain text, the Supreme Court follows a history-and-tradition test to evaluate Second Amendment and Establishment Clause claims. *Id.*; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (focusing on "history"). The Court has increasingly looked to history to resolve free speech claims. *E.g.*, *Vidal v. Elster*, 602 U.S. 286, 296–308 (2024). Although the Court has not recently addressed the

Assembly Clause, it would most likely apply this same text-and-history approach today. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 619–620 (2021) (Thomas, J., concurring) (considering "text and history of the Assembly Clause" to analyze "the right to associate anonymously").

Applying that test here, the Assembly Clause's text covers Right to Life's and PRC's desire to associate with like-minded employees and volunteers, and to adopt policies that foster that association. The debates surrounding the Assembly Clause's adoption reveal that the constitutional "text handed down to us … conveys a broad notion of assembly." John D. Inazu, *The Forgotten Freedom of Assembly*, 84 Tul. L. Rev. 565, 571–77 (2010). For example, the founders struck proposed language that would have limited the right. *Id.* at 571–75. Even those who opposed including the Assembly Clause in the First Amendment did so on the belief that the right was so "self-evidence, unalienable" that it didn't need to be mentioned. *Id.* at 575.

History confirms this reading of the Assembly Clause as making "space for a variety of bodies, gatherers, levels of formality, and purposes." Nathan J. Ristuccia, *"Dangerous to the Liberties of A Free People": Secret Societies and the Right to Assemble*, 4 J. Free Speech L. 139, 169 (2023). Assemblies like "informal gatherings," "processions," and "political societies all played a role" during colonial protests. *Id.* at 156. And formal organizations like the Sons of Liberty, the Freemasons, and the Democratic-Republican Societies were common in the late 1700's. *Id.* at 173–82.

Courts drew on this broad right in the mid-to-late 1800's. This period is the most relevant because the Fourteenth Amendment—which made the First Amend-ment applicable to the states—was ratified in 1868. *See Bruen*, 597 U.S. at 37–38. At that time, state courts understood the right of assembly as "a right to assemble" with "those persons who had thus agreed and associated," "*and no others.*" *Leavitt v. Truair*, 30 Mass. 111, 112 (1832) (emphasis added). This right did not cover organ-

izations that were created "for the transaction of business" or "for pecuniary gain." *People ex rel. Rice v. Bd. of Trade of Chicago*, 80 Ill. 134, 136 (1875). But the right protected "voluntary association[s]" who "inculcate[ed]" their values. *Id.*; *State ex rel. Poulson v. Grand Lodge of Missouri I.O.O.F.*, 8 Mo. App. 148, 156 (1879) (protecting organizations with "religious views" or "ethical and social objects").

The common understanding of "assembly" around this time supported this jurisprudence. *Webster's Complete Dictionary of the English Language* 83 (1886), https://bit.ly/4pSAlbQ ("Assembly": "[a] company of persons collected together in one place, and usually for some common purpose; as, religious, political, and social *assemblies*").

As time went on, more groups drew on this text. By the early 20th century, "groups turned to the freedom of assembly as an important guarantee of their ability to dissent and advocate for change" in areas like women's rights, civil rights, and labor rights. Inazu, 84 Tul. L. Rev. at 590–95. Building on this momentum, the Supreme Court held that the Fourteenth Amendment incorporated the right of assembly against the states. *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937).

Right to Life's and PRC's assembly falls within the heartland of this tradition. Right to Life is an ideologically motivated nonprofit. VC ¶¶ 16–29. PRC is a religious organization. VC ¶¶ 138–59. They promote the value of all human life, including unborn children. VC ¶¶ 17, 144. They do this through public advocacy, public service, or political action. VC ¶¶ 16–29, 138–59. They assemble employees and volunteers who support their mission. VC ¶¶ 30–137, 221–289. This assembly amplifies their expression. *Id.*

Michigan's law infringes on Right to Life's and PRC's assembly. Michigan's Employment and Accommodation Clauses require Right to Life and PRC to recruit and associate with employees and volunteers who would undermine their message and disrupt ideological cohesion. VC ¶¶ 358–59, 368–72.

Because Right to Life's and PRC's activities satisfy the text of the Assembly Clause, Michigan must show that its burden on their assembly belongs to a "historic and traditional categor[y]" of constitutionally unprotected assembly. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation modified). To meet that standard, Michigan must "identify a well-established and representative historical *analogue*." *Bruen*, 597 U.S. at 30. Michigan has none. *Cf. Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 516–18 (1939) (finding city ordinance could not prevent labor meetings in public places). Without analogous "historical precursors," Michigan cannot apply its law to interfere with Right to Life's and PRC's freedom of assembly to any of their open or future positions. *Bruen*, 597 U.S. at 30.

## III. The Employment and Accommodation Clauses invade PRC's religious autonomy.

The Employment and Accommodation Clauses intrude on PRC's religious autonomy by restricting its freedom to hire only employees who share its religious beliefs on abortion. This analysis applies to open and all future positions.

Religious autonomy protects religious organizations' employment decisions. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). For leadership "roles," the "'ministerial exception'" applies. *Id.* at 746. For non-leadership roles, the "co-religionist[]" exception applies. *Seattle's Union Gospel Mission v. Woods* (*SUGM*), 142 S. Ct. 1094, 1094 (2022) (Alito, J., concurring in denial of certiorari); *Union Gospel Mission of Yakima Washington v. Brown* (*Yakima*), 162 F.4th 1190, 1203 (9th Cir. 2026).

The co-religionist exception ensures that religious organizations' non-ministerial personnel "advance their religious mission and message," "foster a community and support system" for other employees, provide a "consistent religious message to the public," and "shield employees and the public [they] serve[] from what [they] perceive[] to be sinful habits or behaviors." *Yakima*, 162 F.4th at 1203.

The Ninth Circuit just applied this doctrine to recognize a nonprofit religious organization's freedom to hire only employees who share its faith—including an IT technician. *Id.* at 1199, 1209.

Most of the time, courts need not resort to the co-religionist doctrine because employment laws often exempt religious entities. For example, the co-religionist doctrine animates Title VII's religious exemption, and that exemption is at least co-extensive with the doctrine. *See Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) (noting Title VII's exemption applied "the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions"); *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024) ("Title VII's religious exemptions … are also constitutionally inspired" and "implement[]" the First Amendment)

But Michigan's law is unusual. Unlike Title VII and most state employment laws across the country—except the law at issue in *Yakima*—ELCRA "does not appear" to have any religious-employer exemptions. *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 556 (Mich. 2022) (Viviano, J., dissenting). So PRC has no statutory exemption under Michigan's law. As a result, the Employment Clause prohibits PRC's employment policies and practices as "sex" discrimination. MCL 37.2202(1); MCL 37.2206(1)-(2). And the Accommodation Clause bans PRC's volunteer policies and practices as denying a "privilege" based on sexual orientation or religion. MCL 37.2302(a)-(b).

The co-religious exception covers PRC's non-ministerial hiring decisions. It protects PRC's employment choices, including its decisions over its open CEO Executive Assistant, Advocate Coordinator, Lead First Steps Coordinator, volunteer positions, and future non-ministerial openings. PRC is a religious institution that "exists to affirm God's gift of human life." VC ¶ 138. PRC depends on its employees and volunteers to fulfill that mission. VC ¶ 161. PRC's employees—including its

20

open positions—interact with other employees on a regular basis, participate in prayer and other communal religious activities, interact with the public, and serve as mouthpieces for PRC's beliefs. *Id.* at ¶¶ 178–220. Volunteers do much of the same. They assist in the office, communicate with the public, help moms, create educational material, and pray for PRC. *Id.* at ¶¶ 272–89. PRC believes that its employees and volunteers reflect its religious mission. VC ¶ 161. So hiring employees or accepting volunteers who do not share PRC's religious beliefs would hinder its ability to advance its religious mission. VC ¶ 177; Sprague Decl. ¶¶ 54–59. For that reason, PRC believes that hiring only likeminded believers and volunteers safeguards its religious identity. VC ¶¶ 160–77, 180.

By making PRC's employment and volunteer policies and practices illegal, Michigan's law interferes with PRC's religious autonomy. For PRC, the "messenger matters," and the co-religionist doctrine protects its right to "define[] itself" by only employing and associating with volunteers who are "committed to its mission." *Yakima*, 162 F.4th at 1204, 1209 (citation modified). Michigan's law contradicts these principles. So it violates the First Amendment.

## IV.    The Benefits Clause violates Right to Life's and PRC's right to refrain from taking human life.

The Benefits Clause violates the Fourteenth Amendment by depriving Right to Life and PRC of the fundamental right to refrain from taking human life by participating in abortion.

According to the Supreme Court, the Fourteenth Amendment protects "substantive rights." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 237 (2022). Its Privileges or Immunities Clause prohibits states from "abridg[ing] the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. And its Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." *Id.* Although jurists and scholars

debate which clause of the Fourteenth Amendment secures these "substantive rights," claims under either clause must be rooted in this Nation's "history and tradition." *Dobbs*, 597 U.S. at 237, 240 n.22 (outlining debate); *McDonald v. City of Chicago*, 561 U.S. 742, 805–50 (2010) (Thomas, J., concurring in part) (explaining history of Privileges or Immunities Clause); William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1252 (2024) (discussing the relationship between the clauses).

Courts follow a two-step process to analyze such claims. First, there must be a "careful description of the asserted fundamental liberty interest." *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (citation modified). Second, the interest must be "objectively, deeply rooted in this Nation's history and tradition." *Id.* (citation modified).

Here, the fundamental liberty interest is the right to refrain from taking human life. The federal government, the states, and the colonies have recognized this right in contexts where the taking of human life has been permitted, including military service, assisted suicide, and capital punishment. *See* Mark Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121, 130–152 (2012) (reviewing history); Ex. B (surveying states); 18 U.S.C. § 3597(b).

The right to refrain from taking human life is equally recognized in the context of abortion—even amidst disagreement over whether abortion constitutes the taking of human life. From the founding until the latter half of the twentieth century, there was hardly any discussion about conscientious objections over performing abortions. *See* Mark L. Rienzi, *The Constitutional Right Not to Participate in Abortions: Roe, Casey, and the Fourteenth Amendment Rights of Healthcare Providers*, 87 Notre Dame L. Rev. 1, 17–35 (2011) (surveying history from early common law through the post-*Roe* era). That is because abortion itself

was "a *crime* in every single State." *Dobbs*, 597 U.S. at 241. In turn, exemptions from participating in abortions were irrelevant.

But right after *Roe v. Wade*—i.e., as soon as exemptions became relevant—federal and state "legislators acted quickly, decisively, and at times nearly unanimously to protect conscience rights." Rienzi, 62 Emory L.J. 121 at 152; 42 U.S.C. § 300a-7(b)-(c)(1); Ex. B (state survey).

Yet the Benefits Clause requires Right to Life and PRC to cover abortion as a "benefit" of employment or else be liable for discriminating "on the basis of sex" against an otherwise available employee benefit. MCL 37.2202(1)(c); VC ¶¶ 327–36 (confirming this outcome). Because Right to Life and PRC insure their employees for medical care related to pregnancy, the Benefits Clause demands that they insure their employees for procedures related to abortion. VC ¶¶ 128–34, 265, 362–63.

Michigan's requirement disturbs the "objectively, deeply rooted" tradition of offering exemptions from the taking of human life—including in the context of abortion. *Muñoz*, 602 U.S. at 910 (citation modified). Michigan bucks the trend of the federal government and many states who exempt employers from including abortion coverage in their health plans.[1] 42 U.S.C.A. § 2000e. Michigan's law even contradicts other Michigan law. For years, Michigan exempted employers from covering abortions. *See* MCL 550.541–551 (repealed). And Michigan statutes still exempt hospitals, clinics, teaching institutions, staff and others from performing an abortion. MCL 333.20181; MCL 333.20182. Physicians may even decline to "give advice concerning" an abortion. MCL 333.20183.

---

[1] *E.g.*, Tex. Labor Code Ann. § 21.107; Iowa Code Ann. § 216.6 (2)(c); Kan. Stat. Ann. § 40-2,190; Ark. Code Ann. § 17-80-504; Ohio Rev. Code Ann. § 4743.10(3)(B); D.C. Code Ann. § 2-1402.11(a)(1)(B); Ohio Rev. Code Ann. § 4112.01(B).

The Benefits Clause compromises this historical right. Right to Life and PRC must choose between participating in taking human life or risk serious penalties for so-called "sex" discrimination. MCL 37.2202(1)(c). Because the Benefits Clause infringes on "a fundamental liberty interest" enjoyed by Right to Life and PRC, it must pass strict scrutiny. *Johnson v. City of Cincinnati*, 310 F.3d 484, 502–04 (6th Cir. 2002). The clause does not, as explained below.

## V.    The Benefits Clause forces PRC to violate its religious beliefs by facilitating abortions.

The Benefits Clause infringes on PRC's religious freedom by coercing it to violate its belief that it cannot directly or indirectly participate in or facilitate an abortion. The test in *Employment Division v. Smith*, 494 U.S. 872 (1990), does not control the analysis. The Benefits Clause "substantially interfer[es]" with PRC's religious exercise, *Mahmoud v. Taylor*, 606 U.S. 522, 565 (2025), by intruding on PRC's "internal management decisions," *Our Lady*, 140 S. Ct. at 2060. And Michigan interprets the Benefits Clause to exempt some religious organizations but not others, which results in denominational discrimination. *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248–51 (2025). For those reasons, the clause triggers at least strict scrutiny here. *See Mahmoud*, 606 U.S. at 566–69 (applying test); *Cath. Charities Bureau, Inc.*, 605 U.S. at 250–52.

### A.    The clause substantially interferes with PRC's internal management decisions.

Courts review history to evaluate how the "Religion Clauses" apply today. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 181–85 (2012) (reviewing history since the Magna Carta for ministerial exception); *Bremerton Sch. Dist.*, 597 U.S. at 535 (collecting cases). As described above, laws authorizing the taking of human life have consistently exempted those who object. The same is true of religiously-motivated objections. *See* Michael W. McConnell, *The*

*Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1468–69 (1990) (detailing history of military-conscription exemptions).

This history applies to PRC's religious objection to covering abortion in its insurance plans. As the Supreme Court recognizes, being forced to "provid[e] health insurance that covers methods of birth control" that violates a religious belief substantially burdens that belief. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719–20 (2014) (having "little trouble" reaching this "conclusion"). Courts have recognized the need for exemptions to avoid that result. *See Oregon Right to Life v. Stolfi*, 158 F.4th 1013, 1019–23 (9th Cir. 2025) (reversing dismissal of free-exercise claim challenging requirement that pro-life organization provide abortion and contraception coverage). *Cf. Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 592 n.5, 609 (8th Cir. 2022) (affirming injunction for employers under RFRA to decline to facilitate gender transitions through insurance coverage).

PRC believes facilitating an abortion makes it complicit in the abortion. VC ¶¶ 261–62. This complicity contradicts its religious belief that all human life is sacred, including the lives of unborn children. VC ¶¶ 141–44. PRC maintains its beliefs and opposition to participating in abortion coverage even if an insurer or third-party provider—and not PRC itself—pays for the abortion. VC ¶¶ 261–62; *see also Hobby Lobby*, 573 U.S. at 724 (acknowledging this burden on religious beliefs).

PRC's desired practice of excluding abortion from its health care plan would violate the Benefits Clause. VC ¶¶ 327–336; 362–63. PRC currently includes a plan that covers abortion in compliance with the Benefits Clause but contrary to its beliefs. VC ¶¶ 263–71. PRC has initiated efforts to remove this wrongly added coverage. VC ¶ 269. But PRC cannot remove the coverage without violating the Benefits Clause. VC ¶ 271. This requirement substantially interferes with PRC's religious exercise and its choices on managing internal polices related to abortion.

### B.    The clause's exemptions discriminate based on religious denomination.

The Benefits Clause requires employers to "provide full coverage for all contraceptive drugs and services," including abortion, if the "health plan covers other drugs and services." VC ¶¶ 327–336; VC Ex. 20 at 1. But the Benefits Clause exempts a narrow class of "religious employers." VC Ex. 20 at 7.

To qualify as a "religious employer," an employer must "serv[e] primarily persons who share the religious tenets of the entity." *Id.* PRC does not meet that requirement because it serves everyone. VC ¶ 158. So it is not exempt.

This distinction turns on "theological practices" and "inherently religious choices." *Cath. Charities Bureau, Inc.*, 605 U.S. at 250. For example, PRC serves people from all walks of life because of its desire to "affirm God's gift of human life." VC ¶¶ 138, 158. That decision stems from its religious commitment to "reaching the lost," helping women "with uncertainty about their futures," and assisting women feeling "frightened." VC Ex. 9 at 7–8. PRC ultimately hopes to "see each person [it] encounters reconciled to Christ and living out the truths that He has spoken." *Id.* In other words, PRC's religious beliefs compel it to serve all. But those beliefs disqualify it from being a "religious employer."

PRC might qualify as a "religious employer" if it *only* served those who *already* share its faith. But that choice would compromise its religious goals. In that way, Michigan's exemption requires "exclusive service of co-religionists" and "establishes a preference for certain religions based on the commands of their religious doctrine." *Cath. Charities Bureau, Inc.*, 605 U.S. at 250. This requirement "imposes a denominational preference by differentiating between religious based on theological choices." *Id.* So the Benefits Clause must satisfy strict scrutiny. *Id.* at 253. It does not.

## VI.    Michigan's Employment, Benefits, and Accommodation Clauses violate PRC's free-exercise rights.

The Employment, Benefits, and Accommodation Clauses violate PRC's free exercise because these clauses lack general applicability as to all PRC's current and future openings. A law lacks general applicability if it allows "individualized exemptions" through discretionary decisions. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). And a law is not generally applicable if it treats "comparable secular activity" better "than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). These clauses do both and are thus subject to strict scrutiny. *See Fulton*, 593 U.S. at 541–42. (PRC wins under *Smith*. But if *Smith* controls, and if ELCRA satisfies *Smith*, then PRC preserves overruling *Smith* as inconsistent with text, history, and tradition. *See id.* at 544–617 (Alito, J., concurring in the judgment)).

### A.    Michigan offers individualized exemptions.

Two cases prove Michigan's law lacks general applicability. First, the Supreme Court in *Fulton v. City of Philadelphia* said that a law was not generally applicable if it "permitted the government to grant exemptions" based on its "sole discretion" after considering "the circumstances underlying each application." 593 U.S. at 534–35.  Next, in *Dahl v. Board of Trustees of W. Michigan University*, the Sixth Circuit held that a university vaccine policy lacked general applicability because the university would consider "medical or religious exemptions" "on an individual basis." 15 F.4th 728, 733 (6th Cir. 2021). Michigan's law empowers state officials to extend almost identical discretionary exemptions.

Consider first Michigan's BFOQ process. A BFOQ applicant must show that certain traits are "reasonably necessary" to the "normal operation" of a business. MCL 37.2208. Employers must respond to a long list of questions, produce documents, and justify their request. *See* VC Ex. 22. After looking at this information, the Commission decides whether the employer has made a "sufficient

27

showing" to grant the employer an exemption. MCL 37.2208. Michigan never defines "sufficient showing," leaving the Commission with "sole discretion" to grant or deny an application based on Commissioners' personal, subjective perspectives. *Fulton*, 593 U.S. at 535.

For example, Seniors Helping Seniors applied for a limited age-based BFOQ for caretakers. *Michigan Civil Rights Commission meeting 1/26/2026* 1:15:00– 40:28, https://bit.ly/4kfj4Ie (last visited Feb. 4, 2026). Seniors Helping Seniors provides affordable, professional in-home care services and companionship for seniors by providing them with caretakers who are seniors themselves. *Id.* Its business model depends on assigning senior caretakers to their senior clients with similar interests and life experiences. *Id.* During the BFOQ hearing, a Commissioner raised concerns well beyond the Commission's and ELCRA's jurisdiction—like whether the company might function as a "dating platform." *Id.* 1:30:50–31:38. Another Commissioner inquired about race discrimination—a category that was irrelevant to the requested BFOQ—based on her personal background of "serv[ing] on various healthcare organization boards." *Id.* 1:35:38– 36:48. Based on these subjective concerns, which Seniors Helping Seniors debunked at the hearing, the Commission denied the request.

Consider also the Benefits Clause's "religious employer" exemption. Michigan decides whether an employer meets that test. By its nature, Michigan applies the test on a case-by-case, employer-by-employer basis. VC Ex. 20 at 7. What's more, the test is atextual. ELCRA offers no statutory anchor for Michigan's "religious employer" definition. That unmoored definition emphasizes Michigan's subjective authority. Michigan possesses so much discretion that it creates the tests that dictate the discretionary exemptions.

### B.    Michigan treats religious exercise worse than comparable secular conduct.

The Employment, Benefits, and Accommodation Clauses treat secular conduct better than PRC's religious exercise.

To determine whether activities are comparable, courts evaluate whether secular and religious activities pose the same "risk" of undermining the "asserted government interest that justifies the regulation." *Tandon*, 593 U.S. at 62. If a law "fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree," the law is "underinclusive" and not generally applicable. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). Often, laws in *other* statutes render the challenged law underinclusive. *See id.* at 546 (comparing state law to city ordinance); *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480–81 (6th Cir. 2020) (comparing dissimilar "forms of activity" and different "statutes or decrees"). Following this approach, these clauses are not generally applicable.

Michigan claims an interest in ending "discrimination" and ensuring abortion access. Accepting those interests, Michigan's law has many holes.

For example, Michigan allows "sports schools or leagues" to engage in sex discrimination, MCL 37.2302a(4); allows schools to serve members of only one sex, MCL 37.2404; allows some landlords to discriminate on any basis for any reason, MCL 37.2503; and exempts certain "private clubs" from its public-accommodation definition, MCL 37.2301(a).

Employees with fewer than 50 employees need not cover abortion because they need not offer any insurance to their employees. VC ¶ 447.

And Michigan has exercised its discretion to grant BFOQs to probate courts, spas, and governmental entities. Ex. 24. For example, Michigan granted sex-based BFOQs for employment positions at health departments to protect patients'

"privacy." *Id.* at 6, 8. These secular exemptions are comparable because they would be illegal, status-based discrimination absent an exemption. For that reason, the exemptions undermine Michigan's asserted interests. But Michigan refuses to give PRC a similar exemption for its current or future open positions. Michigan has no evidence that an exemption here would disturb its interests more than the secular exemptions. By exempting these discriminatory activities but not PRC's religiously-motivated employment and volunteer decisions, Michigan treats PRC's policies "less favorably than it does comparable secular" actors. *Monclova Christian Acad.*, 984 F.3d at 480.

## VII.  The Notice and Accommodation Publication Clauses restrict Right's to Life's and PRC's speech based on content and viewpoint.

The Notice Clause prohibits Right to Life and PRC from explaining how their mission affects their employment choices. The Accommodation Publication Clause has this effect on PRC's posts about its volunteer opportunities. Both clauses trigger strict scrutiny because they regulate the content and viewpoint of speech facially and as applied here. *Reed v. Town of Gilbert*, 576 U.S. 155, 171–72 (2015).

Facially, the Notice and Accommodation Publication Clauses "draw[] distinctions based on the message a speaker conveys" and apply depending "on the communicative content of the" speech. *Id.* at 163–64. Their text frames the analysis. The Notice Clause isolates certain statements about an applicant's "sex." MCL 37.2206(1)–(2). The Accommodation Publication Clause singles out statements about sexual orientation and religion—including statements "indicat[ing]" that someone is "unwelcome, unacceptable, or undesirable." MCL 37.2302(b).

The laws regulate Right to Life's and PRC's speech based on its content as well. The Notice Clause prohibits Right to Life and PRC from publishing their desired job descriptions or employee requirements because they express a preference on abortion—i.e., "sex." VC ¶¶ 323–26. Right to Life cannot send its desired

email to prospective employees for the same reason. VC ¶ 360. And neither can ask prospective employees about their views or experiences with abortion. *Id.* Likewise, under the Accommodation Publication Clause, PRC cannot post its preferred volunteer application or publish any statement indicating it might deny volunteer opportunities based on sexual orientation and religion. VC ¶¶ 351–56, 361.

Employers can express preferences for, and ask about, employees' and volunteers' education, work experience, and other subjects. But employers cannot do the same for employees' and volunteers' sex or religion. By banning a "subclass" of speech on only those topics, the law is content-based. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 329 (6th Cir. 2015).

Worse, the Notice Clause applies to Right to Life's and PRC's speech based on viewpoint. A viewpoint-based law regulates speech because of the "particular views taken by speakers on a subject." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is "perhaps the greatest of free-speech evils." *Defending Educ.*, 158 F.4th at 744.

Employers like Planned Parenthood can express a favorable opinion on abortion. VC ¶¶ 453–54. But Right to Life and PRC cannot express their opposition to abortion because that would "indicate[] a preference" based on "sex." MCL 37.2206(1)–(2). This is flagrant viewpoint discrimination. It "allows" employers to "convey[] one point of view," but "prohibits" employers from "conveying the opposite point of view." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 499 (6th Cir. 2020).

The Accommodation Publication Clause is also viewpoint-based. It prohibits "unwelcome, unacceptable, or undesirable" speech about sexual orientation or religion. MCL 37.2302(b). Those terms connote a viewpoint. PRC is allowed to make "positive" statements to prospective volunteers about affirming LGBT behavior or whatever religion a person evinces, but not statements someone might deem

31

"offensive." *Iancu v. Brunetti*, 588 U.S. 388, 393–94 (2019) (citation modified). This viewpoint discrimination "doom[s]" the law here. *Id.* at 393.

## VIII.  Michigan's law fails scrutiny as applied to Right to Life and PRC.

In several applications, Michigan's law is per se unconstitutional. If Michigan cannot identify a historical analogue to justify regulating Right to Life's and PRC's assembly, then no amount of "means-end scrutiny" authorizes that infringement. *Bruen*, 597 U.S. at 19. Michigan cannot invade PRC's religious autonomy, period. *See Hosanna-Tabor*, 565 U.S. at 196. And a finding that Michigan's law restricts speech based on viewpoint "suffices—without more—to hold a government action unconstitutional." *Defending Educ.*, 158 F.4th at 756.

At a minimum, Michigan's law must satisfy strict scrutiny because it violates Right to Life's and PRC's First and Fourteenth Amendment rights. To meet that test, Michigan must prove that its law serves a compelling interest in a narrowly tailored way. *E.g.*, *Fulton*, 593 U.S. at 541. Michigan's law fails that test.

### A.    Michigan's law does not advance a compelling interest here.

Michigan's law advances no compelling interest here. A compelling interest must be "of the highest order." *Fulton*, 593 U.S. at 541. Governments only meet this standard when evidence of an actual problem supports the need for the law, and the law regulates all the sources of the problem. Michigan's law does neither.

For starters, Michigan must justify its interests by producing evidence of "an actual problem" in need of solving. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–24 (2000). Michigan may claim an interest in ending discrimination based on someone's abortion views and ensuring abortion access. But Michigan cannot claim a compelling interest by relying on "anecdote and supposition"—it needs evidence of the problem. *Id.* at 822. And Michigan cites no evidence of widespread

employment discrimination based on an employee's decision to terminate a
pregnancy or of a lack-of-access to abortion.

Those general interests fail here anyway. When calibrating its interests,
Michigan must make a "precise analysis." 593 U.S. at 541. "[B]roadly formulated
interests"—like ending discrimination or accessing abortions—do not cut it. *Id.*
(cleaned up). Michigan must "scrutinize the asserted harm of granting specific
exemptions" to Right to Life and PRC. *Id.* (cleaned up). There is no such harm in
protecting Right to Life's and PRC's First Amendment rights.

What's more, if Michigan's interests were truly compelling, Michigan would
apply its law across-the-board. It doesn't. It "leaves appreciable damage" to its
"supposedly vital interest unprohibited" through exemptions. *City of Hialeah*, 508
U.S. at 547. Michigan grants BFOQs to many employers. VC Ex. 24. Employers can
refuse to hire individuals with a disability for job-related reasons and publicize that
policy. MCL 37.1202(1); MCL 37.1206(1). And the Benefits Clause does not apply to
certain "religious employers" and the thousands of employers in Michigan who need
not carry health insurance. Ex. 20 at 7; VC ¶¶ 447–48.

Comparing Michigan's interests with Right to Life's and PRC's sharpens the
distinction between them. Preventing Michigan from enforcing its law against Right
to Life and PRC would only stop some employees who support abortion from
"join[ing] the specific group … that oppos[es] abortion." *Slattery*, 61 F.4th at 289.
But forcing Right to Life and PRC to associate with employees "who engage in the
conduct the organization opposes" would "severely burden" their expression and
undermine their "defining values." *Id.* at 290 (citation modified); *accord Dale*, 530
U.S. at 659 (holding state's anti-discrimination interests did "not justify … a severe
intrusion on the Boy Scouts' rights to freedom of expressive association"). With
those interests at issue, Michigan cannot override Right to Life's and PRC's First
Amendment freedoms.

**B.    Michigan's law is not narrowly tailored here.**

Michigan's law also lacks narrow tailoring, i.e., "the least restrictive means to further" its goal. *Playboy Ent. Grp., Inc.*, 529 U.S. at 813. For that, Michigan must show it cannot achieve its interests with "less restrictive alternative[s]." *Id.* It hasn't made that showing. Many less restrictive alternatives exist.

*First*, Michigan could exempt the narrow subset of employers—like Right to Life and PRC—who exist to "advocate against" the termination of a pregnancy. *Slattery*, 61 F.4th at 289. That would track how Michigan carves out discrete exemptions for specialized entities in other laws. *See* MCL 37.2301(a)(iv) (dining clubs); MCL 37.2303 (private clubs); MCL 37.2403 (religious educational institutions); MCL 37.2503(1) (small housing providers); VC Ex. 20 at 7 (limited "religious employers"). It would also mirror how Michigan allows physicians to decline "medical procedures which will result in abortion" based on "professional, ethical, oral, or religious grounds." MCL 333.20182. And it would reflect federal law, which exempts expressive employers from sex discrimination when applying the law would undermine the "authenticity or genuineness" of the employer. 29 C.F.R. § 1604.2(2).

*Second*, Michigan could exempt religious organizations like PRC. Many other governments already do this. *See* 42 U.S.C.A. § 2000e-1(a); Ex. A (state survey). And Michigan already exempts *some* religious employers, just not all. VC Ex. 23.

*Third*, Michigan has a host of readily available alternatives for expanding abortion coverage besides compelling Right to Life and PRC to comply with the Benefits Clause. Michigan could provide the insurance coverage itself. *See Hobby Lobby*, 573 U.S. at 728 (suggesting this alternative). Michigan could allay the costs of abortions to employees like it did this year by distributing "460,000" birth control "resources," including "60,000 doses of emergency contraception." *Michigan's Take Control of Your Birth Control campaign provided more than 460,000 free contra-*

*ceptives and resources* (Nov. 12, 2025), https://bit.ly/49uJUIK. The State could encourage willing entities who support abortion to provide it for low cost. Or it could sponsor a publicity campaign promoting organizations that help with abortions. Or Michigan could mirror other jurisdictions that exempt employers. *Supra* n.1.

These suggestions are "plausible, less restrictive alternative[s]" to regulating Right to Life's and PRC's constitutional freedoms. *Playboy Ent. Grp., Inc.*, 529 U.S. at 816. Other jurisdictions have applied them without incident. *See McCullen v. Coakley*, 573 U.S. 464, 491–92 (2014) (holding law failed intermediate scrutiny when other jurisdictions adopted less burdensome alternatives). And even Michigan has adopted parallel exemptions in other contexts. Against this background, Michigan must show—again, with evidence—that these alternatives "will be ineffective to achieve its goals." *Playboy Ent. Grp., Inc.*, 529 U.S. at 816. It cannot. So the law lacks narrow tailoring. And it fails strict scrutiny here.

## IX.   The remaining preliminary-injunction factors favor an injunction.

Because Right to Life and PRC are likely to succeed on the merits, "there is no issue as to the existence of the remaining preliminary injunction factors." *A.C.L.U. Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (citation modified). Right to Life's and PRC's losses of "First Amendment freedoms" by refraining from engaging in constitutionally-protected speech "unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569 (citation modified). And because of Right to Life's and PRC's "strong showing" on the merits, "an injunction is both equitable and in the public interest." *Id.* Enjoining Michigan here harms no third parties. The injunction prevents Michigan from applying its law to violate Right to Life's and PRC's constitutional rights but permits Michigan to regulate employment practices that are not constitutionally protected. These factors justify Right to Life's and PRC's need for immediate injunctive relief.

## Conclusion

Michigan's new employment law compels these pro-life organizations to employ people who do not share—and may even oppose—their core convictions on unborn life. Michigan's law irreparably harms Right to Life and PRC by violating their constitutional rights. And the law threatens the continued existence of all pro-life organizations motivated by their fundamental beliefs to serve the public. To stop this violation, Right to Life and PRC ask this Court to grant their preliminary-injunction motion.

Respectfully submitted this 6th day of February 2026.

By: s/John J. Bursch

Arie M. Jones
Virginia Bar No. 98248
**Alliance Defending Freedom**
44180 Riverside Pkwy.
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 Fax
arjones@ADFlegal.org

John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
jbursch@ADFlegal.org

Suzanne E. Beecher
California Bar No. 329586
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, D.C. 20001
(202) 393–8690
sbeecher@adflegal.org

Henry W. Frampton, IV
South Carolina Bar No. 75314
Bryan D. Neihart
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
hframpton@ADFlegal.org
bneihart@ADFlegal.org

*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that on the 6th day of February, 2026, I electronically filed the foregoing document with the Clerk of Court using the ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all defendants.

<u>s/ John J. Bursch</u>
John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC. 20001

*Attorney for Plaintiff*

38

**Certificate of Compliance with Local Civil Rule 7.2(b)(i)**

This brief was produced on Microsoft® Word for Microsoft 365 MSO (Version 2511 Build 16.0.19426.20260) 64-bit.  According to the word count generator within that program, the word count for this brief including headings, footnotes, citations and quotations, but not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, is 10,741.

s/ John J. Bursch
John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC. 20001

*Attorney for Plaintiff*