UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIGHT TO LIFE OF MICHIGAN and
PREGNANCY RESOURCE CENTER,

    Plaintiffs,

v

Dana Nessel, in her official capacity as
Attorney General of Michigan; John E.
Johnson, Jr., in his official capacity as
Executive Director of the Michigan
Department of Civil Rights; Luke R. Londo,
Gloria E. Lara, Richard R. White III, Portia L.
Roberson, Zenna Faraj Elhason, Regina Marie
Gasco, Rosann L. Barker, and Skot Welch, in
their official capacities as members of the
Michigan Civil Rights Commission,

    Defendants.

No. 1:26-cv-00390

HON. ROBERT J. JONKER

MAG. SALLY J. BERENS

---

## <u>BRIEF IN SUPPORT OF MDCR AND MCRC DEFENDANTS'<br>MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

<u>Page</u>

Table of Contents..................................................................................................i

Index of Authorities ..........................................................................................iv

Introduction ....................................................................................................... 1

Statement of Facts.............................................................................................2

I.     Michigan's administration of civil rights laws....................................2

       A.     Michigan's Civil Rights Commission and Department of Civil
              Rights.............................................................................................2

       B.     The BFOQ process..........................................................................2

       C.     Complaints of discrimination........................................................3

       D.     "Sex" discriminations incorporation of "termination of a
              pregnancy."....................................................................................5

II.    Plaintiffs and their claims. .................................................................6

Standard of Review............................................................................................7

Argument ............................................................................................................8

I.     Plaintiffs lack pre-enforcement standing and fail to state a claim...................8

       A.     Plaintiffs have not alleged that enforcement is certainly
              impending and the evidence makes clear it is not................................9

              1.     The BFOQ process precludes establishing a credible
                     threat of enforcement. ............................................... 10

              2.     Notwithstanding Plaintiffs' failure to apply for a BFOQ,
                     there is no credible threat of enforcement under the
                     *McKay* factors. ...................................................... 16

                     a.     No history of past enforcement against Plaintiffs or
                            others, and no warnings to Plaintiffs regarding
                            their specific conduct. ........................................ 16

       b.     Procedural safeguards insulate Plaintiffs against wanton enforcement............................................................. 18

       c.     Defendants cannot legally "refuse" to disavow enforcement. ....................................................................... 19

       d.     Considering these non-exhaustive factors together demonstrates that Plaintiffs have failed to establish pre-enforcement standing. ............................... 20

    B.     Most of Plaintiffs' intended conduct does not violate ELCRA.............. 21

       1.     Screening employees for their opinions about abortion does not violate ELCRA's "Employment Clause."...................... 22

       2.     Plaintiffs fail to plead an injury-in-fact or state a claim regarding a policy of terminating employees who obtain abortions. ............................................................................... 25

           a.     Terms of employment relating to abortion as a medical procedure do not state a claim under ELCRA's expanded definition of "sex." ............................ 26

           b.     Plaintiffs do not plausibly allege that terminating one's pregnancy will be the but-for cause of any adverse employment decision............................................ 27

           c.     Plaintiffs do not state a claim under ELCRA's "Notice Clause."............................................................... 29

       3.     Plaintiffs have not established standing with respect to ELCRA's "Benefits Clause." ......................................................... 30

       4.     Plaintiff PRC has not established standing or stated a claim regarding volunteers. ...................................................... 32

II.    Plaintiffs' claim are barred by immunity........................................................ 34

    A.     Eleventh Amendment immunity. ........................................................ 34

    B.     Quasi-judicial immunity bars the injunctive claims against the MCRC Defendants........................................................................... 35

III.   In the alternative, this Court should abstain from exercising jurisdiction or certify the question to the Michigan Supreme Court.............. 38

    A.     *Pullman* abstention should apply...................................................... 38

B.      *Burford* abstention should apply. ........................................................... 39

C.      This Court should certify the question. .................................................. 41

Conclusion and Relief Requested ............................................................................... 42

Certificate of Compliance ........................................................................................... 42

Certificate of Service................................................................................................... 43

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.,*
720 F.2d 897 (6th Cir. 1983) ................................................................... 40

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................. 8

*Babbitt v. UFW Nat'l Union,*
442 U.S. 289 (1979) ................................................................................. 9

*Beech Grove Inv. Co. v. Civ. Rights Comm'n,*
157 N.W. 213 (Mich. 1968) ..................................................................... 2

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ............................................................................... 28

*Buckley v. Fitzimmons,*
509 U.S. 259 (1993) ............................................................................... 35

*Burford v. Sun Oil Corp,*
319 U.S. 315 (1943) ......................................................................... 39, 40

Butz v. Economou,
438 U.S. 478 (1978) ......................................................................... 35, 36

*Derungs v. Wal-Mart Stores, Inc.,*
374 F.3d 428 (6th Cir. 2004) ................................................................. 29

*Christian Healthcare Centers, Inc. v. Nessel,*
117 F.4th 826 (6th Cir. 2024) .......................................................... passim

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................................... 10

*Cleavinger v. Saxner,*
474 U.S. 193 (1985) ............................................................................... 36

*Cooperrider v. Woods,*
127 F.4th 1019 (6th Cir. 2025) .............................................................. 37

iv

*Crawford v. Treasury,*
   868 F.3d 438 (6th Cir. 2017) ................................................................. 9, 10

*Crenshaw v. Baynerd,*
   180 F.3d 866 (7th Cir. 1999) ..................................................................... 36

*Dahl v. Bd. of Trustees of W. Mich. Univ.,*
   15 F.4th 728 (6th Cir. 2021) ............................................................... 14, 21

*Davis v. FEC,*
   554 U.S. 724 (2008) .................................................................................... 9

*Dep't of Civil Rights v. Horizon Tube Fabricating, Inc.,*
   385 N.W.2d 685 (Mich. Ct. App. 1986) ...................................................... 36

*Ex parte Young,*
   209 U.S. 123 (1908) .............................................................................. 34, 35

*FEC v. Cruz,*
   596 U.S. 289 (2022) .................................................................................... 9

*Figgins v. Adv. Am. Cash Adv. Centers of Mich., Inc.,*
   476 F. Supp. 2d 675 (E.D. Mich. 2007)...................................................... 28

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) .............................................................................. 14, 21

*G.C. Timmis & Co. v. Guardian Alarm Co.,*
   662 N.W.2d 710 (Mich. 2003)..................................................................... 22

*Garlitz v. Alpena Regl. Med. Ctr.,*
   834 F. Supp. 2d 668 (E.D. Mich. 2011)...................................................... 26

*Gentek Bldg. Prods. v. Sherwin-Williams Co.,*
   491 F.3d 320 (6th Cir. 2007) ....................................................................... 7

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) .................................................................................... 37

*Gurley v. Rhoden,*
   421 U.S. 200 (1975) .................................................................................... 41

*Haw. Hous. Auth. v. Midkiff,*
   467 U.S. 229 (1984) .................................................................................... 38

*Hecht v. Nat'l Heritage Academies, Inc,*
   886 N.W.2d 135 (Mich. 2016)...................................................................... 27

v

*Hensley v. Boddie-Noell Enterps., Inc.*,
No. 98-6125, 2000 WL 799781 (6th Cir. June 14, 2000).........................................28

*Ikerd v. Lapworth*,
435 F.2d 197 (7th Cir. 1970).................................................................................24

*In re Certified Questions from U.S. Dist. Ct., W. Dist. of Mich.*,
958 N.W.2d 1 (Mich. 2020)...................................................................................41

*Johnson v. Univ. of Cincinnati*,
215 F.3d 561 (6th Cir. 2000) .................................................................................24

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .................................................................................14

*King v. Trans World Airlines*,
738 F.2d 255 (8th Cir. 1984) .................................................................................26

*Ladd v. Marchbanks*,
971 F.3d 574 (6th Cir. 2020) .................................................................................34

*Lawson v. Shelby Cnty.*,
211 F.3d 331 (6th Cir. 2000) .................................................................................34

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................................................9

*Lyshe v. Levy*,
854 F.3d 855 (6th Cir. 2017) ...................................................................................7

*Matras v. Amoco Oil Co.*,
385 N.W.2d 586 (Mich. 1986).................................................................................27

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016) ............................................................. 10, 18, 20, 21

*Metcalf v. McLaren Health Care Corp.*,
No. 24-246-AA (Ingham Cir. Ct. Feb. 2, 2025),.....................................................33

*Mich. Civil Rights Comm'n v. Clark*,
212 N.W.2d 912 (Mich. 1973)................................................................................37

*Mich. Farm Bureau v. Dept. of Env., Great Lakes, and Energy*,
28 N.W.3d 629 (Mich. 2024)..................................................................................19

*Mich. S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n Inc.*,
287 F.3d 568 (6th Cir. 2002).....................................................................................7

*Miller v. City of Wickliffe*,
  852 F.3d 497 (6th Cir. 2017) .................................................................... passim

*Milne v. Robinson*,
  6 N.W.2d 40 (Mich. 2024) ................................................................................. 23

*Moir v. Greater Cleveland Reg'l Transit Auth.*,
  895 F.2d 266 (6th Cir. 1990) ............................................................................. 7

*Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*,
  155 F.4th 499 (6th Cir. 2025) ......................................................................... 20

*Nemeth v. Citizens Fin. Grp., Inc.*,
  No. 2:08-CV-15326, 2011 WL 2531200 (E.D. Mich. June 24, 2011) ...................... 24

*New Orleans Public Service, Inc. v. Council of the City of New Orleans*,
  491 U.S. 350 (1989) ........................................................................................ 40

*Ohio Civ. Rights Comm'n v. Dayton Christian Schs., Inc.*,
  477 U.S. 619 (1986) .............................................................................. 12, 13, 38

*Phillips v. Martin Marietta Corp.*,
  400 U.S. 542 (1971) ........................................................................................ 29

*Plunderbund Media, LLC v. DeWine*,
  753 F. App'x 362 (6th Cir. 2018) ..................................................................... 16

*Quern v. Jordan*,
  440 U.S. 332 (1979) ........................................................................................ 34

*Railroad Commission of Texas v. Pullman Co.*,
  312 U.S. 496 (1941) ................................................................................... 38, 39

*Renne v. Geary*,
  501 U.S. 312 (1991) ........................................................................................ 26

*Rouch World, LLC v. Dep't of Civ. Rights*,
  987 N.W.2d 510 (Mich. 2022) ............................................................. 2, 16, 27, 28

*Russell v. Lundergan-Grimes*,
  784 F.3d 1037 (6th Cir. 2015) ......................................................................... 34

*Sands Appliance Services, Inc. v. Wilson*,
  615 N.W.2d 241 (Mich. 2000) .......................................................................... 23

*Sniecinski v. Blue Cross & Blue Shield of Mich.*,
  666 N.W.2d 186 (Mich. 2003) .......................................................................... 27

*Stanley v. Ind. Civ. Rights Comm'n,*
   557 F. Supp. 330 (N.D. Ind. 1983), *aff'd,* 740 F.2d 972 (7th Cir. 1983) ................ 37

*Stein v. Thomas,*
   672 F. App'x 565 (6th Cir. 2016) ................................................................... 39

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ................................................................................ 9, 14

*Troupe v. May Dep't Stores Co.,*
   20 F.3d 734 (7th Cir. 1994) ............................................................................ 28

*Turic v. Holland Hospitality,*
   85 F.3d 1211 (6th Cir. 1996) ............................................................................ 5

*UPS v. Bureau of Safety & Regulation,*
   745 N.W.2d 125 (Mich. Ct. App. 2007) ............................................................. 19

*White v. Martin,*
   26 F. Supp. 2d 385 (D. Conn. 1998) ................................................................. 37

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ....................................................................................... 35

*Will v. Mich. Dep't of State Police,*
   491 U.S. 58 (1989) ....................................................................................... 34

*Winston v. Lear–Siegler, Inc.,*
   558 F.2d 1266 (6th Cir. 1977) ......................................................................... 24

*Younger v. Harris,*
   401 U.S. 37 (1971) ....................................................................................... 11

*Zwickler v. Koota,*
   389 U.S. 241 (1967) ..................................................................................... 39

**Statutes**

42 U.S.C. § 1981 .............................................................................................. 24

42 U.S.C. § 1983 ........................................................................................ 34, 35

42 U.S.C. § 2000e(k) .................................................................................... 5, 31

42 U.S.C. § 2000e-3(b) ...................................................................................... 6

Mich. Comp. L. § 15.263(2) ................................................................................ 19

Mich. Comp. L. § 16.576 ..................................................................................... 2

Mich. Comp. L. § 37.2201(d) ...................................................................... 5, 22, 23

Mich. Comp. L. § 37.2202(1)(a) ......................................................................... 22

Mich. Comp. L. § 37.2202(1)(c) ......................................................................... 31

Mich. Comp. L. § 37.2202(1)(d) ........................................................................ 22

Mich. Comp. L. § 37.2206(1) .............................................................................. 29

Mich. Comp. L. § 37.2206(2)(c) ......................................................................... 29

Mich. Comp. L. § 37.2208 ................................................................... 3, 10, 11, 19

Mich. Comp. L. § 37.2302(a) .............................................................................. 32

Mich. Comp. L. § 37.2601 ............................................................................... 2, 19

Mich. Comp. L. § 37.2606(1) ............................................................................... 5

Mich. Comp. L. § 37.2605 ............................................................................... 4, 36

Mich. Comp. L. § 37.2606 .................................................................................... 3

Mich. Comp. L. § 37.2801 .................................................................................... 3

Mich. Comp. L. § 500.2236 ................................................................................ 31

## Constitutional Provisions

Mich. Const. art. V, § 29; ..................................................................... 2, 5, 36, 37

## Rules

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 7

Mich. Admin. Code R. 37.2(c) ............................................................................ 18

Mich. Admin. Code R. 37.4(1) .............................................................................. 3

Mich. Admin. Code R. 37.16 ................................................................................. 4

Mich. Admin. Code R. 37.18 ................................................................................. 3

Mich. Admin. Code R. 37.20 ................................................................................ 19

Mich. Admin. Code R. 37.25 .................................................................................. 3

Mich. Ct. Rules 7.308(A)(2)(a) ............................................................................ 41

W.D. Lcl. Civ. R. 83.1.......................................................................................... 41

**Other Authorities**

H.R. Conf. Rep. No. 95-1786, at 4 (1978), reprinted in 1978 U.S.C.C.A.N. 4749........ 5

x

**INTRODUCTION**

Plaintiffs are two pro-life organizations who want to make sure they are staffed by individuals who share their pro-life views.  They think Michigan's civil rights law makes that illegal.  By and large, they are wrong.  The law prohibits employment discrimination because an employee's medical history includes an abortion; personal beliefs are irrelevant.

Plaintiffs' misreading of the law highlights a bigger problem with their complaint:  They are not just asking a federal court to interpret laws recently enacted before the state courts; they are asking this Court to cast aside Michigan's statutes and regulations that—if the Michigan Department of Civil Rights (MDCR) and Michigan Commission for Civil Rights (MCRC) had a chance to do their jobs— easily could moot out this illusory "controversy."  Michigan's bona fide occupational qualification (BFOQ) statute is a well-established mechanism, whose purpose is to ensure anti-discrimination laws do not tread on constitutional rights.  Plaintiffs say the thirteen-question BFOQ application is too burdensome.  But the Supreme Court has rejected attacks on procedures like these.

That means Plaintiffs cannot show a credible threat of enforcement, which is a necessary part of pre-enforcement standing.  There are simply too many "ifs" between Plaintiffs' claimed violations of law and the kind of enforcement that would confer jurisdiction on this Court.  For these reasons, and a handful of others, this Court should dismiss the complaint.

1

## STATEMENT OF FACTS

**I.     Michigan's administration of civil rights laws.**

**A.     Michigan's Civil Rights Commission and Department of Civil Rights.**

The People of the State of Michigan created the MCRC as a constitutional body, empowering it to investigate and secure the guarantees against discrimination articulated in article I, § 2 of the Michigan Constitution.  Its self-executing duties and powers are described in article V, § 29, and the "manner" of its executing these powers "may be prescribed by law[.]"  Mich. Const. art. V, § 29; *Beech Grove Inv. Co. v. Civ. Rights Comm'n*, 157 N.W. 213, 219 (Mich. 1968).  The MCRC has broad quasi-judicial authority to secure Michigan citizens' rights to equal protection by holding hearings, taking testimony, and issuing opinions appealable through Michigan court system.  Mich. Const. art. V, § 29; Mich. Comp. L. § 37.2601.  MDCR is MCRC's operational and investigative arm.  *Rouch World, LLC v. Dep't of Civ. Rights*, 987 N.W.2d 510, 504 (Mich. 2022); *see also* Mich. Comp. L. § 16.576.

**B.     The BFOQ process.**

Because the U.S. Constitution is the supreme law of the land, and in keeping with its quasi-judicial role, the MCRC is authorized to consider an employer's constitutional justifications for prima facie discrimination under the Elliot Larsen Civil Rights Act (ELCRA) pursuant to the same law as circuit courts or this Court (where any complainant can raise an ELCRA claim in lieu of asking the MCRC for

its help).  *See* Mich. Comp. L. § 37.2208; Mich. Comp. L. § 37.2801.  Such exceptions are known as "bona fide occupational qualification" (BFOQ).  Mich. Comp. L. § 37.2208.

ELCRA explains that a BFOQ is available "without obtaining prior exemption" from the MCRC.  *Id.*  In other words, ELCRA automatically provides all legally required exemptions without the need to apply.  However, for those who wish to avoid uncertainty and obtain confirmation of their entitlement to a BFOQ, the statute and rules provide such a process.  *Id.*; Mich. Admin. Code R. 37.25.

An employer may apply for a BFOQ from MCRC, through MDCR.  Mich. Admin. Code R. 37.25(1)–(2).  The MDCR reviews the application and conducts an investigation.  *Id.* at R. 37.25(2).  Upon sufficient showing, MCRC may grant the BFOQ.  *Id.* at R. 37.25(3); *see also* Mich. Comp. L. § 37.2208.  If the BFOQ is denied, the applicant can appeal to circuit court.  Mich. Comp. L. § 37.2606; Mich. Admin. Code R. 37.18.

## C.    Complaints of discrimination.

Under current MCRC Rules, someone "claiming to be aggrieved by unlawful discrimination" may file a complaint with the MDCR.  Mich. Admin. Code R. 37.4(1).[1]  For the MDCR to have jurisdiction under ELCRA, the complaint must describe discrimination that occurred or ceased within the past 180 days.  *Id.* at R.

---

[1] There is no requirement that a complainant file with MDCR before invoking ELCRA; a complainant may file a civil action directly in circuit court.  Mich. Comp. L. § 37.2801(1); *see also* Mich. Const. art. V, § 29.

3

37.4(6).  The MDCR evaluates the complaint and determines whether it has jurisdiction and, if it does, prepares a certified complaint.  *Id.* at R. 37.4(4).  If the MDCR prepares a certified complaint and the complainant signs it, the employer is notified by mail and requested to response within twenty-one days.  *Id.* at R. 37.4(8)–(9).

Once a response is received, the MDCR often engages in a "conciliation conference," which is a mediation-like proceeding that can result in dismissal; additional investigation, including discovery; referral for legal review to evaluate whether a charge of discrimination is appropriate; and negotiates a consent or settlement agreement.  *Id.* at R. 37.5.  Every part of this established process is flexible and non-adversarial, working toward the goal of identifying and eliminating discrimination within the confines of the law.  *Id.*

After investigation, if the MDCR determines there are sufficient grounds, it issues a "charge" of discrimination.  *Id.* at R. 37.6(1).  If there is insufficient evidence, the MDCR dismisses the complaint.  *Id.* at R. 37.6(2).  When a charge is issued, an administrative hearing may be held.  *Id.* at R. 37.12.  The Michigan Office of Administrative Hearing and Rules (MOAHR) conducts such hearings on behalf of MCRC.  *See id.* at R. 37.12(3).  If the administrative law judge (ALJ) finds an ELCRA violation, the matter is referred to MCRC who, functioning through its quasi-judicial role, issues a final decision.  Mich. Comp. L. § 37.2605(1); Mich. Admin. Code R. 37.16.  Final orders of the MCRC are appealable to the Michigan

4

Circuit Court for *de novo* review.  Mich. Const. art. V, § 29; Mich. Comp. L. § 37.2606(1).

> **D.     "Sex" discriminations incorporation of "termination of a pregnancy."**

Since 1978, Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 (PDA), has prohibited employers from discharging, refusing to hire, or otherwise discriminating against an employee or applicant because she has terminated a pregnancy.  42 U.S.C. § 2000e(k); *Turic v. Holland Hospitality*, 85 F.3d 1211, 1214 (6th Cir. 1996).  The joint House-Senate Conference Report accompanying the PDA expressly addressed abortion, providing that because the PDA "applies to all situations in which women are 'affected by pregnancy, childbirth, and related medical conditions,' its basic language covers women who chose to terminate their pregnancies" and that "no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion."  H.R. Conf. Rep. No. 95-1786, at 4 (1978), reprinted in 1978 U.S.C.C.A.N. 4749, 4765–66.  Title VII also prohibits the publication of any notice or advertisement listing a preference for a candidate who has never terminated a pregnancy absent a BFOQ.  *See* 42 U.S.C. §§ 2000e(k), 2000e-3(b).

In 2024, Michigan amended the employment article in ELCRA to mirror the protections Title VII provided since 1978, adding "the termination of a pregnancy" within the definition of "sex."  Mich. Comp. L. § 37.2201(d).  However, as Michigan's designated Fair Employment Practices agency under Title VII, the MDCR and MCRC have had authority to investigate and process charges of employment

5

discrimination—including discrimination based on termination of pregnancy in hiring, firing, and job notices and advertisements—for approximately 47 years. 42 U.S.C. §§ 2000e-3(b), 2000e-5(c), 2000e-8(b).

## II.    Plaintiffs and their claims.

Plaintiffs are private, non-profit organizations who share similar public-facing pro-life missions.  Plaintiff Right to Life of Michigan (RTL) is a nonsectarian organization, whereas Plaintiff Pregnancy Resource Center (PRC) is a faith-based, Christian organization.  (Compl. ¶¶ 5, 7, 160, PageID.4, 23.)  Each says their pro-life mission requires employing only individuals who agree with their pro-life values and who agree to abide by those values (*i.e.*, not to obtain an "elective abortion" "while employed" at either organization).  (*Id.* ¶¶ 31–36, 160–163, PageID.8, 23–24.) To effectuate these goals, Plaintiffs require prospective employees to agree with these positions as a condition of employment.  (*Id.* ¶¶ 33, 93, 162, 236–237, PageID.8, 16, 24, 34.)  For example, RTL alleges that it "recent[ly]" declined to hire a pro-choice candidate who was "otherwise qualified."  (*Id.* ¶¶ 99–100, PageID.16–17.)

In addition, neither Plaintiff wants to include coverage for abortion in its employees' health insurance policies.  (*Id.* ¶¶ 135–136, 261–262, PageID.20, 36–37.) RTL's insurance already excludes coverage for abortions, while PRC's carrier erroneously added abortion coverage in December 2025 and PRC is actively working to remove it.  (*Id.* ¶¶ 137, 268–267, PageID.20, 37.)

6

Plaintiffs allege they want to make their "mission and values even more explicit," (*id.* ¶¶ 101, 242, PageID.17, 34), which entails repeating or cross-referencing their policies in additional documents, such as job description and emails to applicants. (*E.g.*, *id.* ¶¶ 103, 105–106, 243–244, PageID.17, 35.)

PRC also alleges it requires volunteers to meet the same basic standards as employees, which it contends Michigan's public accommodations law prohibits. (*Id.* ¶¶ 347–350, 359, PageID.48–49, 51.)

Based on these allegations, Plaintiffs raise seven constitutional claims, alleging violations of their First and Fourteenth Amendment rights. Plaintiffs sue the Executive Director of the MDCR and the eight commissioners of the MCRC, all in their official capacities only.

### STANDARD OF REVIEW

Rule 12(b)(1) provides for dismissal for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The plaintiff has the burden of proving jurisdiction to survive a 12(b)(1) motion. *Mich. S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n Inc.*, 287 F.3d 568, 573 (6th Cir. 2002). "Whether a party has standing is an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). When considering a 12(b)(1) motion, there is "no presumptive truthfulness applie[d] to allegations" in the complaint and, instead, the Court may consider evidence outside of the pleadings. *Gentek Bldg. Prods. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This "plausibility" review is "a context-specific task" that requires the reviewing court to determine whether the plaintiff has not just "alleged," but pleaded facts sufficient to "show[]," an entitlement to relief that is actually plausible, and not merely "conceivable" or "possible."  *Id.* at 679, 680.  "[F]acts that are merely consistent with a defendant's liability" are not enough.  *Id.* at 678.  And in making this assessment, courts are only to consider facts that are truly well pleaded:  they are not to take as true "legal conclusions," including when "couched as a factual allegation," nor "mere conclusory statements" or "naked assertions devoid of further factual enhancement."  *Id.* at 678–79.

## ARGUMENT

I.    **Plaintiffs lack pre-enforcement standing and fail to state a claim.**

Plaintiffs can establish neither factual nor facial standing.  Plaintiffs fall far short of establishing that enforcement is "certainly impending" and declaratory evidence contradicts any allegations suggesting otherwise.  And there may not be any enforcement to had as the bulk of Plaintiffs' alleged conduct does not violate ELCRA (even if BFOQs did not exist).  The conduct that ELCRA *might* proscribe could be permitted by a BFOQ, pre-complaint or otherwise.  These shortcomings are fatal to establishing pre-enforcement standing.

8

But even if Plaintiffs clear the pre-enforcement standing hurdle, they cannot survive Rule 12(b)(6) for the same basic reasons.  Conduct that does not violate ELCRA obviously fails to state a claim.  Even for the conduct that might implicate the need for a BFOQ exemption (or defense), caselaw permits those kinds of procedures to proceed; when strict scrutiny applies, for example, it turns on the decisions those procedures produce.  To take their claims further, Plaintiffs need to either unsuccessfully apply for a BFOQ or await an actual certified complaint (or a pattern of enforcement that does not exist here).  As it stands, they are requesting an advisory opinion on an incomplete set of facts.

### A.  Plaintiffs have not alleged that enforcement is certainly impending and the evidence makes clear it is not.

To establish Article III standing, a "plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In some circumstances, standing "can derive from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'" *Crawford v. Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  Thus, pre-enforcement judicial review is sometimes permitted—but *only* when the plaintiff (1) "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest,' " (2) which the challenged statute proscribes, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979)), and (3) the

9

plaintiff's intention generates a "certainly impending" threat of prosecution, *Crawford*, 868 F.3d at 454 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Plaintiffs fail to make this showing.  For several reasons, Plaintiffs have not established a credible threat of enforcement.  A major break in the causal chain between "violation" and "enforcement" is Michigan's BFOQ process, which very well could render moot Plaintiffs' concerns about ELCRA liability—if only they would avail themselves of it.  Acknowledging this, Plaintiffs criticize the process itself, but those criticisms are unpersuasive.  And the non-exhaustive factors set out in *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016), point in the same direction: Plaintiffs' insistence on a "certainly impending" threat of prosecution is too attenuated to confer pre-enforcement standing and the evidence provide in support of this motion verifies enforcement is not impending.

### 1.    The BFOQ process precludes establishing a credible threat of enforcement.

First, "[a] threat is credible . . . if a person must censor herself to avoid violating the law in question."  *Miller v. City of Wickliffe*, 852 F.3d 497, 506 (6th Cir. 2017).  When a state-law process exists that will confirm whether a threat is credible, a plaintiff must avail itself of that process before jumping to conclusions about what that very process would reveal.  *See id.*

Plaintiffs' claims arise exclusively in relation to ELCRA.  And ELCRA contains a relevant exemption at Mich. Comp. L. § 37.2208, which could obviate every one of Plaintiffs' claims.  It provides in full:

> A person subject to [ELCRA] may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise.  Upon sufficient showing, the commission may grant an exemption to the appropriate section of this article.  An employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.  [Mich. Comp. L. § 37.2208.]
>
> Notably, the statute explicitly provides that one *need not apply* for a BFOQ.

*Id.*  Rather, applications for BFOQs are preemptive and available to entities subject to ELCRA who, for example, might be unsure about whether a particular activity qualifies.  (Ex. A, Trevino Decl. ¶¶ 34–36.)

> Evaluating a process analogous to the BFOQ, the Sixth Circuit has stated:
>
> Here, plaintiffs were not required to censor themselves, at this point, to avoid violating the Ordinance.  Instead, plaintiffs needed only to apply for a license to discover whether they could open their businesses.  This not only would have solved their facial-standing problem, but would have given them standing for a bevy of as-applied challenges as well.  And merely applying for a license, as opposed to engaging in some allegedly protected conduct and fearfully waiting for potential prosecution, does not carry the same risk that is normally seen in facial-challenge cases.  In fact, here, it carried no risk.  The City's denial of plaintiffs' license would have acted as a de facto "warning letter" that plaintiffs' conduct was potentially subject to prosecution.  [*Miller*, 852 F.3d at 506.]

So too here.  Plaintiffs could have applied for a BFOQ, or a declaratory ruling under Michigan Administrative Code Rule 37.20, in the same manner as the *Miller* plaintiff could have applied for a permit or license.

Notably, this process has the Supreme Court's approval.  In a case involving the abstention doctrine originating in *Younger v. Harris*, 401 U.S. 37 (1971), the

11

Supreme Court held that a pending investigation into an instance of sex discrimination by a religious school was sufficient basis to abstain from exercising jurisdiction. *Ohio Civ. Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619 (1986). The plaintiff alleged that the Ohio Civil Rights Commission's investigative process was itself a burden on the plaintiff's Free Exercise rights. *Id.* at 624–25. The unanimous Court noted that, "however [respondent school]'s constitutional claim should be decided on the merits, the Commission violates no constitutional rights by merely investigating the circumstances of [the employee]'s discharge in this case." *Id.* at 628. The Court further observed that (1) Ohio's Commission routinely credits "religious justifications for otherwise illegal conduct," and (2) Commission decisions are subject to judicial review, guaranteeing consideration of constitutional claims. *Id.* at 629.

None of Plaintiffs' objections to engaging in the BFOQ process hold water. For instance, Plaintiffs claim that the MCRC "requires employers to make requests on a position-by-position basis." (Compl. ¶ 432, PageID.61.) In fact, the application facially permits that the applicant may address multiple "position(s)." (Compl. Ex. 22, PageID.214; Trevino Decl. ¶ 36; *see also* Compl. Ex. 23, PageID.225 ("The exemption would also apply to future classroom teaching *positions* . . . .").)

Also unpersuasive: Plaintiffs' claim that the MCRC "limits religious BFOQs to positions that are directly and exclusively responsible for teaching religious doctrine and denies exemptions to support positions such as 'janitorial staff, physical education teacher[s], or office personnel.'" (Compl. ¶ 439, PageID.62.) In

12

support, Plaintiffs attach two decisions from the MCRC.  (Compl. Ex. 23, PageID.216–227.)  Neither of these decisions supports Plaintiffs' claim.  In each case, it was the *applicant*—not the MCRC—who limited the BFOQ requests to individuals responsible for the content of religious instruction.  (*Id.* at PageID.223 (denoting "request for a BFOQ exemption for teachers and administrators" and noting that "positions requested for exemption are already exempt from claims of religious discrimination under Title VII of the U.S. Civil Rights Act"); *id.* at PageID.225 ("[T]he applicant has requested that classroom teachers and the school principal be of the Islamic faith."); *id.* at PageID.227 (describing application as "narrowly focused" to include only those responsible for religious teaching).)

Plaintiffs' claim that the BFOQ application process, which comprises thirteen questions, is "burdensome" is subjective, conclusory, and legally irrelevant besides. (Compl. ¶ 433, PageID.61.)  The Sixth Circuit has held that the requirement to seek approval analogous to a BFOQ is distinct from an exhaustion requirement.  *Miller*, 852 F.3d at 504–05.  The Supreme Court, too, has held that this very process is not, in and of itself, an unduly burdensome forum for constitutional claims—and, in that case and unlike here, the plaintiff claimed that both the underlying claim *and* the process itself were affected by a constitutional interest.  *Dayton Christian Schools*, 477 U.S. at 625.

In a similar recent case, the Sixth Circuit considered Michigan's BFOQ application process in the course of rejecting Defendants' pre-enforcement standing arguments.  *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 847–48 (6th

13

Cir. 2024).  But *Christian Healthcare* did *not* address factual standing or discuss the BFOQ application process in its discussion of a credible threat of enforcement. Rather, the glancing BFOQ discussion arose only in the context of arguable proscription, comprising only an observation that it is impossible to know for certain how Defendants would act on a BFOQ application.  *Id.*  The standard for establishing a threat of enforcement—*i.e.*, that the threat be "substantial," *Driehaus*, 573 U.S. at 164—is much higher than arguable-proscription's mere "plausibility" standard, *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022).

Plaintiffs' objections to the BFOQ process prove too much.  As a matter of common sense, it strains belief to suggest, on the one hand, that one's constitutional rights are "substantially" at risk from application of a set of statutes, while insisting, on the other hand, that one cannot be bothered to avail oneself of a straightforward process within those statutes that is designed to protect these same rights.

In their motion for a preliminary injunction, Plaintiffs assert that the BFOQ process violates the holding of *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021), by allowing a system of individualized exemptions through discretionary decisions.  (PageID.349–350 (also citing *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021).)  But neither *Fulton* nor *Dahl* were decided in a pre-enforcement posture.  In *Fulton*, the defendant City had refused to contract with the plaintiff foster care agency unless it agreed to certify same-sex couples as foster parents.  593 U.S. at 526–28.  In *Dahl*, the defendant university had denied

14

or ignored the sixteen plaintiff students' requests for exemptions from a COVID-19 vaccine mandate.  15 F.4th at 730.  Plaintiffs, by contrast, come to this Court empty-handed.

That fact matters a great deal, because it means the rest of *Fulton*'s analysis of non-neutral laws is unavailable.  A strict-scrutiny analysis applies to the concrete exercise of the discretion that renders a law not generally applicable—not the fact that the discretion exists in the abstract.  *Fulton* held that, "where a state extends discretionary exemptions to a policy, it must grant exemptions for cases of 'religious hardship' or present compelling reasons not to do so."  *Dahl*, 15 F.4th at 733 (quoting *Fulton*, 593 U.S. at 533–34).  *Dahl* thus confirmed that, if an exemption is granted, a plaintiff has no case.  *Id.*

In other words, a state actor is put to the task of explaining his decision under the strict scrutiny standard *only after an exemption is denied*.  *Id.*  This amplifies the reasoning in *Miller*:  Plaintiffs must engage with a process before a federal court can meaningfully entertain challenges to the *results* of that process.  Except for PRC's Free Exercise challenge to the Benefits Clause, enforcement is vanishingly unlikely when the intended conduct likely does not violate ELCRA *and* there is presently no good reason to believe that, if the conduct does violate ELCRA, an application for a BFOQ would be denied.

15

**2. Notwithstanding Plaintiffs' failure to apply for a BFOQ, there is no credible threat of enforcement under the *McKay* factors.**

Complimenting the foregoing, the Sixth Circuit set forth four non-exhaustive factors useful in evaluating whether a threat of enforcement is credible:

> [1] "a history of past enforcement against the plaintiffs or others"; [2] "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." [*McKay*, 823 F.3d at 869.]

None of these factors weighs in favor of a credible threat of enforcement.

**a. No history of past enforcement against Plaintiffs or others, and no warnings to Plaintiffs regarding their specific conduct.**

"A threat of enforcement is most credible 'when the *same conduct* has drawn enforcement actions or threats of enforcement in the past.'" *Christian Healthcare*, 117 F.4th at 848 (quoting *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 367 (6th Cir. 2018)).

To date, Defendants have *never* enforced any of the challenged laws against *any* entity who seeks to engage in the conduct described by Plaintiffs. (Trevino Decl. ¶ 8.) This stands in contrast to *Christian Healthcare*, 117 F.4th at 849, in which the plaintiffs were able to "point to [MDCR]'s actions and litigation in *Rouch World* as a specific example of ELCRA enforcement regarding these categories of discrimination [*i.e.*, gender identity and sexual orientation]." (Emphasis added.) Additionally, *Christian Healthcare* noted that "it is undisputed that [MDCR] has

16

been processing complaints alleging discrimination based on sexual orientation and gender identity since [MCRC] adopted Interpretive Statement 2018-1 in May 2018." *Id.* at 841 n. 1.

The *Christian Healthcare* panel seemed to think this factor was a close case, but even that situation had a modicum of evidence in Plaintiffs' favor:  a history of Defendants' enforcement of the very law challenged in that case—the proscription on discrimination based on gender identity and sexual orientation—which history of enforcement notably began with an Interpretive Statement that applied to the "same conduct" those plaintiffs intended to engage.

All that is left in Plaintiff's favor is the fact that, in the broadest possible stroke, ELCRA is enforced.  *Id.* at 849.  But, as refuted by the attached declaration (Ex. A), enforcement—a term of art that must be distinguished from merely processing a complaint—is unlikely to follow from a complaint, or even an investigation.  To wit, MDCR filed only four charges from January 1, 2021 to June 30, 2022, and only three charged in 2025.  (Trevino Decl. ¶¶ 11, 13.)  Over the last decade, MDCR has never filed more than four charges in a year.  (*Id.* ¶ 12.)  Regarding complaints, of the 9,003 complaints MDCR processed during an eighteen-month period ending June 30, 2022, only 1,867 (~21%) were assigned for investigation, and MDCR filed only four formal charges in 2022.  (*Id.* ¶ 11.)  And MDCR has not received a complaint against either Plaintiff *ever*—even two months after filing this litigation.  (*Id.* ¶ 7.)

17

Plainly put, ELCRA enforcement against Plaintiffs—even if they were in violation of ELCRA, *infra* Point I.B—is exceedingly unlikely.  There is simply no history of enforcement or evidence that Plaintiffs will be subject to enforcement to support pre-enforcement standing.

### b. Procedural safeguards insulate Plaintiffs against wanton enforcement.

It is also relevant whether there is "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public *to initiate an enforcement action.*"  *McKay*, 823 F.3d at 869 (emphasis added).

Although this factor tips slightly in favor of standing, it does not tip as far as Plaintiffs, or a too-quick reading of *Christian Healthcare*, might suggest.  As the Sixth Circuit correctly observed, Rule 37.4 of Michigan's Administrative Code permits complaints by a person "claiming to be aggrieved by unlawful discrimination."  Obviously, persons "aggrieved" by Plaintiffs conduct is a very small subset of "any member of the public," *McKay*, 823 F.3d at 869. Notwithstanding, filing a complaint does not "initiate an enforcement action."  *Id.* Rather, a contested case hearing is not initiated until the MDCR files a "charge," Mich. Admin. Code R. 37.2(c), which occurs only after sufficient grounds are established, *id.* at R. 37.6(1), and months of procedure (Trevino Decl. ¶¶ 14–15, 19–23).

### c.    Defendants cannot legally "refuse" to disavow enforcement.

*McKay*'s terminology is clear:  Pre-enforcement standing is informed, in part, by a "defendant's *refusal* to disavow enforcement of the challenged statute against a particular plaintiff."  *McKay*, 823 F.3d at 869 (emphasis added).  Its clarity is matched by its intuitive appeal.

But Defendants are not "refusing to disavow" enforcement.  Rather, they are beholden to statutory and regulatory strictures that limit their authority to weigh in on such matters.  In Michigan, the exclusivity of a codified remedy or procedure can be inferred from the context and purpose of the overall regulatory scheme. *Mich. Farm Bureau v. Dept. of Env., Great Lakes, and Energy*, 28 N.W.3d 629, 666 (Mich. 2024) (Welch, J., concurring); *see also UPS v. Bureau of Safety & Regulation*, 745 N.W.2d 125, 131 (Mich. Ct. App. 2007) ("The rules of statutory construction apply to both statutes and administrative rules" in Michigan) (citation omitted). Through ELCRA, the Michigan Legislature authorized MCRC to engage in quasi-judicial determination regarding a BFOQ.  Mich. Comp. L. § 37.2208.  Similarly, the MCRC itself is authorized to take a position on a set of facts only upon an application for a declaratory ruling.  Mich. Admin. Code R. 37.20.  Each of these exclusive processes permit the full and fair consideration of all relevant facts. Furthermore, the MCRC—the entity actually responsible for enforcement of ELCRA—is subject to Michigan's Open Meetings Act, Mich. Comp. L. § 15.261, *et seq*.  *See* Mich. Comp. L. § 37.2601(4); Mich. Comp. L. § 15.263(2) ("All decisions of a public body must be made at a meeting open to the public.").

19

It bears repeating, too, that the burden in establishing standing rests with Plaintiffs, and this facet of pre-enforcement standing is no different. *See Moms for Liberty - Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 511 (6th Cir. 2025) (noting absence of evidence that "any Board member *has ever been asked to— let alone refused to—disavow enforcement* of the challenged statute against any Plaintiff" (emphasis added)).  Plaintiffs do not allege that they asked this question at an MCRC meeting, they have not sought a declaratory ruling, and they disclaim any willingness to apply for a BFOQ.

Accordingly, there is nothing to be inferred from the lack of a disavowal here. Recognizing on whom the burden rests, *McKay* itself stated, "where the record is silent" on one of the factors, it weighs *against* standing.  *McKay*, 823 F.3d at 869 (cleaned up; citation omitted).  The MCRC (1) cannot render a decision outside of a public meeting and (2) is authorized to render decisions akin to a "refusal to disavow enforcement" *only* by way of a declaratory ruling.   A lack of a disavowal is not the same as a "refusal"; only the latter creates an inference of some latent or unspoken intent to enforce.  *Moms for Liberty*, 155 F.4th at 511.

> **d.    Considering these non-exhaustive factors together demonstrates that Plaintiffs have failed to establish pre-enforcement standing.**

Taken together, the non-exhaustive factors articulated in *McKay* and the principles espoused in *Miller* strongly suggest that pre-enforcement standing is lacking.  The MDCR and MCRC have never had a complaint to enforce the relevant portions of ELCRA since enactment.  Plaintiffs are not under investigation—let

20

along facing charges—and there is no foreseeable complaint to initiate an investigation, to then only possibly (in the rarest of circumstances) lead to actual enforcement through the initiation of charges.  Finally, the MCRC's disavowal of an intent to enforce these statutes would be *ultra vires*, and there is nothing to be inferred from their compliance with state law.

Moreover, Plaintiffs could and should have availed themselves of the state-law procedures that would have rendered crystal clear how Michigan interprets its laws and, in turn, whether Plaintiffs' alleged conduct indeed violates ELCRA.  Their decision not to proceed in that forum is relevant to pre-enforcement standing under *Miller*, *McKay*, *Dahl*, and *Fulton*.  It is quite possible Plaintiffs' foray into federal court may be much ado about nothing.

In sum, Plaintiffs failed to make the required showing to establish pre-enforcement standing, evidence demonstrates the unlikelihood of enforcement, and Plaintiffs should proceed to the BFOQ process.

### B.      Most of Plaintiffs' intended conduct does not violate ELCRA.

For the reasons set forth below, Plaintiffs cannot establish that ELCRA's Employment and Notice Clauses proscribe their intended conduct.  In short, screening candidates for beliefs about abortion—whether that happens in a job posting, during an interview, or after years on the job—does not equate to discrimination based on "sex."  One exception is Plaintiffs' intent to terminate someone if they obtain an abortion while employed.  But, in the overall context of Plaintiffs' Complaint, this does not satisfy ELCRA's but-for causation standard.

21

Plaintiffs' claims addressing the Benefits Clause and Plaintiff PRC's claim related to volunteers suffer a similar fate; Plaintiffs fail to plead an injury to support standing and fail to state claim.

### 1. Screening employees for their opinions about abortion does not violate ELCRA's "Employment Clause."

Plaintiffs' core premise is that ELCRA proscribes discrimination based on a person's beliefs about abortion.  But that is not what the law says.  It proscribes only discrimination based on abortion as part of a person's medical history.

Pursuant to what Plaintiffs call the "Employment Clause," an employer may not discharge, refuse to hire, or otherwise single out (*i.e.*, "[l]imit, segregate or classify") an employee "because of . . . sex" without a BFOQ.  Mich. Comp. L. § 37.2202(1)(a)–(b).  Likewise, an employer may not "[t]reat an individual affected by pregnancy, childbirth, the termination of a pregnancy, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work" without a BFOQ. Mich. Comp. L. § 37.2202(1)(d).

Twice over, ELCRA confirms that discriminating against a person based on "termination of a pregnancy" refers exclusively to the objective fact of whether one has obtained, or intends to obtain, an abortion.

"Sex" as defined in ELCRA expressly includes "pregnancy, childbirth, the termination of a pregnancy, *or a related medical condition*."  Mich. Comp. L. § 37.2201(d) (emphasis added).  The phrase "the termination of a pregnancy" refers exclusively to conduct.  The statute's use of the term "related medical condition" is

relevant, too.  Michigan courts interpret the State's statutes using the doctrines of *noscitur a sociis*, *i.e.*, "a word or phrase is given meaning by its context or setting," *G.C. Timmis & Co. v. Guardian Alarm Co.*, 662 N.W.2d 710, 713 (Mich. 2003), and *ejusdem generis*, which counsels that one item in a list of terms should be interested by reference to the other list items, *e.g.*, *Sands Appliance Services, Inc. v. Wilson*, 615 N.W.2d 241, 242 (Mich. 2000).  Applying these doctrines here confirms the Legislature intended "the termination of a pregnancy" to refer to its status as "medical" in nature.

Michigan Compiled Laws § 37.2202(1)(d) goes a step further, defining protected individuals as those "*affected by*" a list of medical condition[s]" that includes "the termination of a pregnancy."  The foregoing canons of construction apply equally here.  Additionally, Michigan courts interpret two statutes relating to the same statutes *in pari materia*, meaning that they should be "read together" to result in a harmonious reading.  *Milne v. Robinson*, 6 N.W.2d 40, 58 (Mich. 2024) (citation omitted).  The Legislature's clarification that one must be "affected by" the termination of a pregnancy to invoke the Employment Clause confirms that the definition of "sex" added by amendment, Mich. Comp. L. § 37.2201(d), includes only those who have terminated, or intend to terminate, a pregnancy.  One who merely holds a moral position on the topic is not "affected by" it—particularly considering that it is a "medical condition."

Plaintiffs insist that anyone "who associates with, or advocates on behalf of, a protected class—here, women choosing abortion—is a member of that protected

23

class" under ELCRA.  (Compl. ¶ 322, PageID.45.)  But, regardless of what associational claims may be available under ELCRA, Plaintiffs overread the plain text of the statute.  General advocacy for a protected class is not necessarily association with the protected class.  Applied, here, simply being pro-choice does not evidence association with a person who has had an abortion or imminently intends to.  Moreover, the cases cited in support of Plaintiffs' theory all invoke case law under 42 U.S.C. § 1981—not ELCRA.  (*Id.* ¶ 322 n. 8 (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 577 (6th Cir. 2000); *Winston v. Lear–Siegler, Inc.,* 558 F.2d 1266, 1270 (6th Cir. 1977); *Nemeth v. Citizens Fin. Grp., Inc.*, No. 2:08-CV-15326, 2011 WL 2531200, at \*6 (E.D. Mich. June 24, 2011)), PageID.45.)  The plaintiffs' reliance on 42 U.S.C. § 1981's race-based protections in these matters distinguishes their application here.

Finally, Plaintiffs allege MDCR has confirmed that mission-focused or religious organizations must, under the Employment Clause, "hire someone who disagrees with their views so long as the applicant could nonetheless explain the organization's views."  (Compl. ¶ 314, PageID.43.)  But the deposition in question has minimal probative value, if any, as the highlighted testimony was given over objection and regarded either hypotheticals or a job description that is not in the record.  (Compl. Ex. 17, PageID.152-157.)  Moreover, the deposition is irrelevant.  It was part of a lawsuit related to discrimination based on *sexual orientation and gender identity*.  *See Christian Healthcare*, 117 F.4th 826.  Viewpoint discrimination was not at issue, meaning there was not the same motive to cross-examine the

witness as would arise here.  *See Ikerd v. Lapworth,* 435 F.2d 197, 205 (7th Cir. 1970).  The employers in that case sought to treat individuals differently based on those individuals' protected characteristics.  That disparate treatment would have included both (1) declining to hire those with protected characteristics and (2) treating third-party invitees differently based on their gender identity (*e.g.*, using preferred pronouns for only those with certain gender identities).  *See e.g., id.* at 839–41.

In contrast, the state-law nuances of whether "sex" protects moral belief on abortion make up a central issue unique to this case.  And discrimination based on sex does not encompass screening candidates for their moral beliefs on abortion in the abstract.

> **2.      Plaintiffs fail to plead an injury-in-fact or state a claim regarding a policy of terminating employees who obtain abortions.**

Of course, Plaintiffs' claims do not relate *only* to individuals with pro-abortion views.  Each suggest it will terminate someone who obtains an abortion, and each will restate that in public job postings and during candidate interviews. (*E.g.*, Compl. ¶¶ 32, 98, PageID.8, 16 (RTL); *id.* ¶¶ 163–164, PageID.24 (PRC).)  On the flip side, neither seems to say anything about a candidate's pre-employment medical history.  (*See generally id.* (limiting relevant conduct to abortions obtained "while employed")).

For the reasons that follow, (1) Plaintiffs describe a form of male/female discrimination, which precludes redressability because it is unlawful under Title

VII; and (2) a state-law limitation on this kind of discrimination, as applied to Plaintiffs, survives any level of scrutiny because Plaintiffs can still discriminate based on belief (and, as far as the Employment Clause is concerned, adverse action requires an employee to volunteer the information, enhancing the speculative nature of their already speculative harms).

### a.    Terms of employment relating to abortion as a medical procedure do not state a claim under ELCRA's expanded definition of "sex."

Each of Plaintiffs' claims sounding in Article 2 of ELCRA relates to the Michigan Legislature's decision to expand the definition of "sex" to include "termination of a pregnancy."  Their Complaint does not discuss the discrimination that can occur based on the common understanding of "sex" (*i.e.*, men and women), which ELCRA does not define.

But imposing an additional condition of employment on women, which does not apply to men, does not originate from that amendment.  Indeed, it was already "unlawful per se in the absence of a bona fide occupational qualification" under Title VII, too, *King v. Trans World Airlines,* 738 F.2d 255, 258 n. 2 (8th Cir. 1984).  *See, e.g., Garlitz v. Alpena Regl. Med. Ctr.*, 834 F. Supp. 2d 668, 679 (E.D. Mich. 2011) (disapproving of "questions regarding, inter alia, . . . whether she had ever had an abortion, . . . and if so, how many times," and noting "[m]en were not asked to complete these questions").  To the extent this claim is viable, *see infra*, Plaintiffs' failure to challenge those laws is fatal to establishing redressability here.  *See Renne v. Geary*, 501 U.S. 312, 319 (1991).

26

### b.    Plaintiffs do not plausibly allege that terminating one's pregnancy will be the but-for cause of any adverse employment decision.

Plaintiffs' intention to terminate someone for having an abortion raises an important question:  How do they intend to discover whether a current employee has an abortion?  Plaintiffs ask for a prospective employee's continuing agreement not to obtain an abortion "while employed."  (Compl. ¶¶ 98, 164, PageID.16, 24.) Neither the complaint nor its attachments allege they ever ask the question directly.  This is important because, there being no obvious mechanism for Plaintiffs to discover whether a current employee obtains an abortion, it reveals Plaintiffs' true (and perfectly legal) motivation:  to ensure all employees and volunteers *believe* abortion is wrong.  In other words, when a woman has an abortion "while employed," it indicates to Plaintiffs that she does not share their beliefs about abortion.  *This* fact, once known, would justify firing a woman *or* a man.  And when an employer would have made the same decision "even if the impermissible consideration had not played a role in the decision," no liability attaches, even in the presence of direct evidence.  *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003).

The Michigan Supreme Court's interpretation of ELCRA is clear:  "the operative phrase 'because of' in the ELCRA establishes a but-for causation standard."  *Rouch World*, 987 N.W.2d at 512 (citing *Hecht v. Nat'l Heritage Academies, Inc*, 886 N.W.2d 135, 146 (Mich. 2016)).  "In other words, causation is established where the discriminatory action would not have occurred but for the sex

27

of the complainant." *Id.* (citing *Matras v. Amoco Oil Co.*, 385 N.W.2d 586, 589 (Mich. 1986)).

The same result has followed in cases involving pregnancy discrimination. It goes without saying that an employer may be motivated to discriminate against a pregnant employee because it believes the employee's attention will be divided between the workplace and substantial new demands at home. *E.g.*, *Figgins v. Adv. Am. Cash Adv. Centers of Mich., Inc.*, 476 F. Supp. 2d 675, 691 (E.D. Mich. 2007). But if, and only if, that fear is actually borne out (*i.e.*, if a new parent fails to meet the employer's expectations, as applied to all employees equally), termination is not discriminatory because it follows from violation of company policy—not their status as a person affected by pregnancy. *Hensley v. Boddie-Noell Enterps., Inc.*, No. 98-6125, 2000 WL 799781 (6th Cir. June 14, 2000); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 738 (7th Cir. 1994) (observing that "[e]mployers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees").

Plaintiffs might cite the Michigan Supreme Court's statement that "[i]ncorporating an additional consideration . . . and retitling that pair of considerations does not remove the effect of sex from the equation." *Rouch World*, 987 N.W.2d at 515. But the correct analysis is more nuanced and leads back to but-for causation. *Rouch World* found *Bostock v. Clayton County*, 590 U.S. 644 (2020), persuasive, and Justice Gorsuch offered a salient example in that decision:

> Consider an employer with a policy of firing any woman he discovers to be a Yankees fan. Carrying out that rule because an employee is a woman *and* a fan of the Yankees is a firing "because of sex" if the employer would have tolerated the same allegiance in a male

employee. . . .  If an employer would not have discharged an employee but for that individual's sex, the statute's causation standard is met, and liability may attach.  [*Bostock*, 590 U.S. at 661.]

Plaintiffs do not have a policy that maps onto firing someone who is both (1) a woman (2) a Yankees fan.  They claim they want to fire someone who (1) receives an "elective abortion" and (2) is morally pro-choice.  But anyone who receives an elective abortion is "morally pro-choice" to a degree that Plaintiffs would find unacceptable in a woman *or* a man.  *Cf. Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 438 & n.8 (6th Cir. 2004) (citing *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971)).

In the context of the Complaint's allegations, testing an employee's willingness to agree not to have an abortion is not the basis for "discrimination" as Michigan interprets its civil rights laws; rather, it merely provides a direct inference about the employee's belief system.  Without more, such as a real-life example of the sort that an actual adjudication by MDCR/MCRC might entail, Plaintiffs do not plausibly allege that the fact of termination of one's pregnancy is the but-for cause of their decision-making.

### c. Plaintiffs do not state a claim under ELCRA's "Notice Clause."

Pursuant to ELCRA's "Notice Clause," an employer may not publish any statement relating to employment indicating a preference or limitation "based on" sex, among other characteristics.  Mich. Comp. L. § 37.2206(1).  That prohibition extends to job applications and oral inquiries at job interviews.  Mich. Comp. L. § 37.2206(2)(c).  As stated above, Plaintiffs do not intend to elicit information

29

concerning an individual's "sex," as proscribed by § 37.2206(2)(a).  (*E.g.*, Compl. ¶¶ 98, 164, PageID.16, 24.)

Plaintiffs' communication of their policy regarding obtaining abortions is prima facie discriminatory under these laws—even if that is not actually the but-for cause of a later termination.  Accordingly, ELCRA presumptively prohibits an employer from asking a prospective employee to confirm that she has never had an abortion.

As also explained above, however, Plaintiffs are well within their state-law and constitutional rights to ask a prospective employee to confirm that her religious or moral beliefs are aligned with Plaintiffs' regarding the issue of abortion.  And Plaintiffs' Complaint implicitly assumes that applicants and employees will tell the truth.  And, again, Plaintiffs refuse to engage in the non-adversarial BFOQ process that would explore and credit the nuances of their positions.

Considering the causation analysis set forth in the preceding subsection, it seems unlikely that Plaintiffs are harmed either by (1) hewing to ELCRA's rule against public threats to fire any employees or volunteers who obtain abortions or (2) seeking a BFOQ.  Without conducting periodic inquisitions into employees' medical histories, which Plaintiffs do not claim to do, the information they seek can legally be obtained by asking about the individual's moral and/or religious outlook.

### 3.    Plaintiffs have not established standing with respect to ELCRA's "Benefits Clause."

Neither Plaintiff wants to provide any of its employees with health insurance that includes coverage for abortion care.  Plaintiffs claim that, because they provide

30

comprehensive insurance coverage, the "Benefits Clause," Mich. Comp. L. § 37.2202(1)(c), requires each of them to provide all employees with health insurance that pays for abortions. (Compl. ¶ 528, PageID.75.) But Plaintiffs again fail to allege standing to support these claims.

The Benefits Clause—which, unlike Title VII, contains no carve-out automatically exempting employers from providing benefits for the termination of a pregnancy, 42 U.S.C. § 2000e(k)—prohibits an employer who offers comprehensive health benefits from providing less inclusive coverage on the basis of sex, including by explicitly excluding coverage for termination of a pregnancy. Mich. Comp. L. § 37.2202(1)(c). However, Plaintiffs' arguments are rebutted by their own Complaint and reality. Michigan requires all health insurance plans offered in Michigan to be approved by the Department of Insurance and Financial Services. Mich. Comp. L. § 500.2236. Two years after ELCRA's amendment, Michigan continues to approve insurance plans that do not cover abortions as evidences by RTL's own plan that remains approved without abortion coverage. (Compl. ¶ 137, PageID.20.) And PRC admits that its carrier—not Defendants—are the reason that their plan currently offers abortion coverage and they are working to fix the error. (Compl. ¶¶ 268–269, PageID.37.) As a result, since Plaintiffs already have the relief they desire (or, in the case of PRC, do not because of their carrier), there is no active case or controversy as to the Benefits Clause. Accordingly, Plaintiffs fail to establish standing for their claims based on the Benefits Clause.

### 4. Plaintiff PRC has not established standing or stated a claim regarding volunteers.

According to Plaintiff PRC, ELCRA also restricts PRC's recruitment, selection, and retention of volunteers. (*See* Compl. ¶¶ 337–56, PageID.47-50.) In a marked departure from the rest of Plaintiffs' claims, PRC alleges an intent to discriminate based on religion and sexual orientation, rather than sex. (*See, e.g.*, *id.* ¶ 359, PageID.51; *id.* ¶ 361, PageID.52.)

Based on the premise that volunteers are not employees, PRC turns to Article 3 of ELCRA, which addresses public accommodations. The challenged statutes consist of Mich. Comp. L. § 37.2302(a) (the "Accommodations Clause") and § 37.2302(b) (the "Accommodations Publications Clause").

As an initial matter, PRC cannot establish that Article 3 applies. Even if PRC is a place of public accommodation, Article 3 does not say "places of public accommodation may not discriminate, full stop." It says that such entities cannot "[d]eny an individual the full and equal enjoyment of the . . . services" it offers to the public. Mich. Comp. L. § 37.2302(a). And according to PRC, it "does not discriminate in providing its services based on race, religion, national origin, age, sexual orientation, or gender identity." (*Id.* ¶ 158, PageID.23.) Thus, PRC can screen its volunteers based on religion or sexual orientation without denying anyone the full and equal enjoyment of its pregnancy-related services because the volunteers are not seeking the services that render PRC a place of public accommodation.

32

PRC tries to bridge the divide between Article 3's true focus—members of the public who might want to use PRC's services—and its selective group of volunteers by stating it "provides opportunities for members of the public" to obtain "volunteer opportunities." (Compl. ¶ 216, PageID.31.) But that argument has no limiting principle. Full employment, like volunteerism, is also an "opportunity for members of the public." If PRC's construction of Article 3 was correct, there would be no claim under § 202's employment-discrimination clauses that would not also trigger § 302.

Finally, PRC unpersuasively cites to an MCRC charge issued under Michigan's Persons With Disabilities Civil Rights Act (PWDCRA) after a volunteer-services provider failed to attempt to accommodate a quadriplegic individual who sought a volunteer position. (Compl. ¶ 345, PageID.48; Compl. Ex. 21, PageID.205–211.) But that charge is not instructive here. Most important, in 2022, the MDCR *dismissed* this individual's complaint and denied her request for reconsideration. *Metcalf v. McLaren Health Care Corp.*, No. 24-246-AA (Ingham Cir. Ct. Feb. 2, 2025), slip op. at 4 (Exhibit B). The charge issued only after the complainant sued the respondent in the circuit court, resulting in a remand to the MDCR with instructions to hold a formal hearing. *See id.* Crucially, the circuit court's analysis reversing the dismissal relied on Michigan Compiled Laws § 37.1102(2)—a part of the PWDCRA that has no analogue in Section 3 of ELCRA. *Id.* at 7–8.

At bottom, PRC's intention toward its volunteers does not state a claim under Article 3 of ELCRA. Its interpretation would expose every employer at a public-

facing organization to Article 3 claims—an untenable result, as the protective BFOQ process is limited to employment claims.  PRC's claims related to Michigan Compiled Laws § 37.2302 should be dismissed as a matter of law.

## II.     Plaintiffs' claim are barred by immunity.

### A.     Eleventh Amendment immunity.

The Eleventh Amendment provides states and their agencies immunity from suit by private citizens in federal courts.  U.S. Const. amend. XI; *Lawson v. Shelby Cnty.*, 211 F.3d 331, 334 (6th Cir. 2000).  This immunity extends to claims asserted against government officials working in their official capacities.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  The Supreme Court has recognized only three exceptions to this rule:  (1) congressional abrogation, *id.* at 66; (2) express consent or waiver by the State, *id.*; and (3) official capacity suits for prospective equitable relief based on ongoing violations of federal law, *Ex parte Young*, 209 U.S. 123 (1908).  *See also Lawson*, 211 F.3d at 334–35.

Plaintiffs bring their claims against MDCR Director Johnson and the eight members of the MCRC in their official capacities only.  Thus, Eleventh Amendment bars all of Plaintiffs' claims unless an exception applies.  Congress did not abrogate Eleventh Amendment immunity for claims brought under 42 U.S.C. § 1983 and the State did not consent to suit.  *See Quern v. Jordan*, 440 U.S. 332, 345 (1979); *see also Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020) ("42 U.S.C. § 1983 does not abrogate the States' sovereign immunity.").  Accordingly, the only potential exception arises under *Ex parte Young*; but it is not applicable here.  Just as

34

Plaintiffs lack standing and fail to state a claim, there is no ongoing violation of law that could warrant prospective equitable relief.  *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (for a pre-enforcement challenge, "at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex parte Young")*; *see also Childrens' Healthcare is a Legal Duty v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.").

In addition, the *Ex parte Young* exception only permits *prospective* equitable relief.  *Quern*, 440 U.S. at 338.  Plaintiffs' Complaint, at least in part, seeks *retroactive* declaratory relief, i.e., a declaration that Defendants "violated" their constitutional rights.  (Compl., PageID.78 (Prayer for Relief ¶ 2)).  Accordingly, such retroactive relief is barred.

### B.    Quasi-judicial immunity bars the injunctive claims against the MCRC Defendants.

Plaintiffs' claims against the MCRC Defendants fail as a matter of law because absolute quasi-judicial immunity forecloses injunctive relief against MCRC and its members when they act in their adjudicatory capacity.  *See* 42 U.S.C. § 1983.[2]

---

[2] Notably, *Ex Parte Young* is not relevant for quasi-judicial immunity. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

As the Supreme Court has long held, judicial immunity is afforded based on the function performed, not the identity or title of the actor.  *See Butz v. Economou*, 438 U.S. 478, 511–12 (1978); *see also Buckley v. Fitzimmons*, 509 U.S. 259, 269 (1993) (applying functional approach to assessing prosecutorial immunity).  In *Butz*, the Supreme Court held that federal agency officials performing adjudicatory functions are entitled to absolute immunity under the same rationale that protects judges.  438 U.S. at 512–17.

The same applies to MCRC.  MCRC's constitutional authority specifically grants it quasi-judicial powers, such as holding hearings and issuing remedial orders.  Mich. Const. art. V, § 29; *see also Dep't of Civil Rights v. Horizon Tube Fabricating, Inc.*, 385 N.W.2d 685, 689 (Mich. Ct. App. 1986) (MCRC "operates similarly to a court" and is a "quasi-judicial body").  Its adjudicative process embeds the structural safeguards of a judicial tribunal:  investigative and adjudicatory functions are institutionally separated; respondents receive written notice of charges, discovery rights, and a full evidentiary hearing; commissioners are required to make written findings of fact and conclusions of law; and any final order is subject to de novo circuit court review.  Mich. Const. art. V, § 29; Mich. Comp. L. §§ 37.2605–2606.  This is the exact structure that the Supreme Court, in *Butz*, held warrants absolute quasi-judicial immunity.  438 U.S. at 512–17; *see also Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (analyzing the similar "*Butz* factors" for assessing application of quasi-judicial immunity).

36

The Seventh Circuit has afforded quasi-judicial immunity to a nearly identical body.  In *Crenshaw v. Baynerd*, the Seventh Circuit held the Illinois state civil right commissioners were entitled to quasi-judicial immunity when functioning in their adjudicatory capacity for civil rights claims.  180 F.3d 866, 868 (7th Cir. 1999).  Other district courts have held the same.  *See, e.g.*, *White v. Martin*, 26 F. Supp. 2d 385, 390 (D. Conn. 1998); *Stanley v. Ind. Civ. Rights Comm'n*, 557 F. Supp. 330, 334–35 (N.D. Ind. 1983), *aff'd*, 740 F.2d 972 (7th Cir. 1983).

MCRC—and its commissioners, the defendants herein—is thus entitled to quasi-judicial immunity for its adjudicatory role, namely assessing civil rights violations and the consideration of BFOQs.[3]

Plaintiffs do not nullify this immunity by filing suit before MCRC acted.  A plaintiff who seeks a pre-enforcement injunction restraining a quasi-judicial body from adjudicating claims within its constitutional jurisdiction achieves through timing what immunity doctrine forbids directly:  substituting federal § 1983 litigation for the state adjudicative process.  The pre-enforcement posture does not create jurisdiction where none exists, does not ripen a speculative injury, and does not override immunity.

Michigan has made a deliberate sovereign choice — expressed not in statute but in its Constitution — to vest civil rights enforcement in a constitutionally created quasi-judicial body whose powers derive directly from the people.  Mich.

---

[3] For the same reasons, when investigating complaints or BFOQ applications, the MDCR would similarly be entitled to prosecutorial or quasi-prosecutorial immunity. *See, e.g.*, *Cooperrider v. Woods*, 127 F.4th 1019, 1028–30 (6th Cir. 2025).

Const. art. V, § 29; *Mich. Civil Rights Comm'n v. Clark*, 212 N.W.2d 912, 915 (Mich. 1973).  That sovereign structural choice lies "at the heart of representative self-government" and is among the powers reserved to the states under the Tenth Amendment.  *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991).  Section 1983 contains no clear statement authorizing federal courts to enjoin the operation of a state's constitutionally established civil rights commission before it has taken any action, and, under *Gregory*, such a clear statement would be required before federal law is construed to intrude so deeply into the structure of state government.  *Id.* at 460–64.

As the Supreme Court has stated, it would be "an unusual doctrine . . . to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles."  *Ohio Civil Rights Comm'n,* 477 U.S. at 629 (cleaned up).  It should be enough for MCRC to say that if a complaint is ever filed against Plaintiffs or a BFOQ is ever requested, it intends to follow the U.S. and Michigan constitutions and applicable caselaw—and that any adverse decision will be subject to de novo review in the circuit court, with further appellate review available thereafter.  The pre-enforcement posture thus compounds rather than cures the defects in Plaintiffs' claims.

## III.    In the alternative, this Court should abstain from exercising jurisdiction or certify the question to the Michigan Supreme Court.

### A.    *Pullman* abstention should apply.

*Pullman* abstention, announced in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), dictates that a federal court should abstain from exercising

jurisdiction when "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). *Pullman* abstention can be appropriate when the statute at issue is "fairly subject to an interpretation which will render unnecessary" adjudication of the plaintiff's constitutional claims. *Id.*; *see also Zwickler v. Koota*, 389 U.S. 241, 251 n. 14 (1967) (holding abstention appropriate when statute is "is obviously susceptible of a limiting construction"). Stated differently, "*Pullman* abstention is appropriate where a litigant asks a federal court to reach a constitutional question predicated on the federal court's own, non-binding interpretation of state law." *Stein v. Thomas*, 672 F. App'x 565, 571 (6th Cir. 2016).

Here, Michigan judicial or quasi-judicial bodies could interpret ELCRA in a way that conflicts with Plaintiffs' interpretations. Indeed, they could do so regardless of this Court's construction of the statutes. But they have not yet had a chance to do so (owing in part to the low likelihood of enforcement and Plaintiffs failure to avail themselves of the BFOQ process). Such a plausible interpretation would avoid the need to brand these state statutes with the mark of unconstitutionality.

### B.    *Burford* abstention should apply.

This Court should also abstain from adjudicating Plaintiffs' claims under *Burford v. Sun Oil Corp*, 319 U.S. 315 (1943). The U.S. Supreme Court has explained that *Burford* abstention is appropriate where timely and adequate state-court review is available and (1) a case presents "difficult questions of state law

bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361 (1989) (citation omitted).

Under *Burford*, federal courts dismiss the action in favor of state administrative and judicial review of the issues, with "ultimate review of the federal questions . . . fully preserved" in the Supreme Court. *Burford*, 319 U.S. at 334. The Sixth Circuit has enunciated two situations that can warrant abstention under *Burford*: "the presence of a complex state regulatory scheme which would be disrupted by federal review," or "the existence of a state-created forum with specialized competence in the particular area." *Ada-Cascade Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897, 903 (6th Cir. 1983). Here, the second situation applies.

This Court should abstain in deference to the MCRC and MDCR, each of which has special competence and experience in the area of civil rights—especially here, where MCRC has yet to determine, through the results of investigation or an interpretive statement, how Michigan's civil rights laws interface with constitutional rights involving free exercise, free speech, and free assembly as applied to Plaintiffs. Particularly in light of the foregoing analysis, MCRC and MDCR—and, if necessary, the Michigan judiciary, which sits in review of those

40

decisions and is subject to U.S. Supreme Court review—should have an opportunity to weigh in on whether Michigan law conditions certain actions on the requirement that individuals abandon their constitutional rights.  It would be prudent for this Court to abstain here, where no complaint has been filed against any entity for claims Plaintiffs purport to fear and where Plaintiffs have not sought a BFOQ exception to ELCRA or a declaratory ruling.

**C.     This Court should certify the question.**

If this Court disagrees with the MDCR and MCRC's understanding of Michigan law, or if it believes that their construction is doubtful, the alternative action is to certify the question to the Michigan Supreme Court.  That court, of course, is the final arbiter of Michigan law.  *See, e.g.*, *Gurley v. Rhoden*, 421 U.S. 200, 208 (1975) ("a State's highest court is the final judicial arbiter of the meaning of state statutes").  The local rules for the Western District authorize certification. See W.D. Lcl. Civ. R. 83.1.  The same is true of the state court rules.  See Mich. Ct. Rules 7.308(A)(2)(a).  In fact, the Michigan Supreme Court in the last few years relied on certification from a district court in issuing its watershed decision related to the emergency orders of the Governor based on a certified question.  *In re Certified Questions from U.S. Dist. Ct., W. Dist. of Mich.*, 958 N.W.2d 1 (Mich. 2020).

41

## CONCLUSION AND RELIEF REQUESTED

For the reasons outlined above, the MDCR and MCRC Defendants respectfully request that this Court grant their motion, dismiss all claims raised against MDCR and MCRC Defendants with prejudice, and grant such further relief as the Court sees just and appropriate.

Respectfully submitted,


/s/ Neil Giovanatti
Daniel Ping (P81482)
Neil Giovanatti (P82305)
Marla Linderman Richelew (P55759)
Assistant Attorneys General
Attorneys for MDCR/MCRC Defendants
Civil Rights & Special Initiatives
Division
P.O. Box 30212
Lansing, MI 48909
(517) 335-7603
PingD@michigan.gov
GiovanattiN@michigan.gov
LindermanRichelewM@michigan.gov

Dated:  April 3, 2026


## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.2(b)(ii), I certify that this brief complies with Local Rule 7.2(b)(i) as this brief includes 10,520 words.  Microsoft Word Office 365 is the word processing software used to generate the word count in the above brief.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Assistant Attorney General


42

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I electronically filed the above document using the ECF System which will send notification of such to all represented parties.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Assistant Attorney General

43