# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN HEALTHCARE CENTERS, INC.

     Plaintiff,

v

DANA NESSEL, in her official capacity as
Attorney General of Michigan; *et al.*,

     Defendants.

_____/

Case No. 1:22-cv-000787

HON. JANE M. BECKERING

MAG. PHILLIP J. GREEN

**ORAL ARGUMENT
REQUESTED**

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR CROSS MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Kimberly K. Pendrick
Assistant Attorney General
Attorney for Defendants
Civil Rights and Election Division
3030 W. Grand Blvd., 10th Floor
Detroit, MI  48202
(313) 456-0067
pendrickk@michigan.gov
P60348

Heather S. Meingast
Assistant Attorney General
Attorney for Defendants
Civil Rights and Election Division
P.O. Box 30736
Lansing, Michigan 48909
(517) 335-7659
meingasth@michigan.gov
P55439

Dated:  January 13, 2026

Attorney General would be a proper defendant in the hundreds of cases in which her office appears as counsel for state agencies.  That is not the law.

### C.    CHC has effectively conceded it has no viable claim against the Attorney General.

After this Court's dismissal and the Sixth Circuit's affirmance, Defendants requested that CHC voluntarily dismiss the Attorney General from the remaining claims.  CHC refused.  Yet CHC conducted no discovery specifically directed at the Attorney General outside of obtaining a list of cases where representation was provided and advanced no arguments against her in its summary judgment motion.  CHC's silence speaks volumes: it has no evidence that would establish standing against the Attorney General.

CHC bears the burden of demonstrating standing.  Because it has not carried that burden, summary judgement should be granted in favor of the Attorney General, and this Court should dismiss her from this action.

To be clear, the Attorney General does not join the merits arguments advanced by the Commission and Department in this brief.  Indeed, the Attorney General has concerns about some concessions made by the other defendants regarding the breadth of the ministerial exception, including its application to licensed professionals bound by a standard of care.  But, because CHC lacks standing to sue her, the Attorney General takes no position at this time on the constitutional questions presented.  The Court need not—and should not—enter

## C.    There is no broader "co-religionist" exception.

Dissatisfied with the ministerial exception's protections, CHC seeks more. It wants to hire *only* employees who share its Christian faith and adhere to its beliefs. (Pl's MSJ, ECF No. 146, PageID.3213, 3218–3221.) But CHC's argument for a blanket exemption covering all employees, not just ministerial employees, is unsupported by law and would render the ministerial exception nugatory.

CHC claims that First Amendment religious autonomy protections permit it to hire only "co-religionists." But the ministerial exception already incorporates both free exercise and church autonomy principles. *See Pulsifer*, 142 F.4th at 863–65 (discussing development of the exception). *See also Hosanna-Tabor*, 565 U.S. at 182–88 (same). In other words, the ministerial exception, as formulated by the Supreme Court, already considers employers religious autonomy in the employment context. CHC does not seek application of existing doctrine; it seeks an expansion that would cover all positions regardless of function. No decision supports such an expansion. Indeed, this Court has already held that the church autonomy doctrine "does not afford [a religious institution] . . . an affirmative right to hire only Christians without being penalized in any way for doing so." (*Bethany Christian Servs. v. Corbin*, 1:15-cv-9999, ECF No. 52, PageID.950.)

The decisions CHC cites do not support its position. CHC invokes, for example, Justice Alito's concurrence in the denial of certiorari in *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1904 (2022), but that opinion decided nothing concerning the ability to hire co-religionists. Justice Alito merely observed that the "day may soon come" when the Court must decide whether the First Amendment

24

protects religious organizations' freedom to hire co-religionists. *Id.* at 1094. That day has not yet arrived.

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979), addressed whether the NLRB had jurisdiction to bring an unfair labor practice charge against a religious school regarding negotiations related to its teaching staff—not whether any particular employment position was exempt from anti-discrimination laws.[2] *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 330 (1987), upheld Title VII's express statutory exemption for religious organizations who discriminate based on religion, 42 U.S.C. § 2000e-1, as "rationally related to a legitimate purpose," *id.* 329–30, 339. The Court did not hold that the First Amendment requires such an exemption, nor did it analyze whether a narrower exemption would pass constitutional muster. It recognized only that Congress had made a particular choice regarding the scope of the exemption, but it did not suggest that a state could not draw a narrower exemption to its own statutes without running afoul of the First Amendment. And *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 621 (6th Cir. 2000), addressed only whether a terminated employee stated a prima facie case of religious discrimination under Title VII—not the scope of religious autonomy protections.

CHC's remaining authorities fare no better. CHC claims *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648 (10th Cir. 2002), establishes that

---

[2] In any event, that case "recognized the *critical and unique* role of the teacher in fulfilling the mission of a church-operated school." *Id.* at 501.

25

church autonomy protects personnel decisions based on religious doctrine.  (Pl's MSJ, PageID.3220).  But *Bryce* involved sexual harassment claims, and courts have rejected the broad reading that CHC advances, i.e., that *Bryce* permits a religious institution to discriminate in the hiring of non-ministerial positions.  *See*, e.g., *Gen. Conference of Seventh-Day Adventists v. Horton*, 787 F. Supp. 3d 99, 113 (D. Md. 2025) ("Plaintiffs' citation to . . . [*Bryce*] does not alter the Court's conclusion. Although Plaintiffs have identified cases illustrating that the principle of church autonomy may in some instances prevent a court from adjudicating claims that require evaluation of religious doctrine and beliefs, none apply the principle as a basis upon which to conclude that the First Amendment requires that a religious institution be allowed to hire only members of its own religion for all positions.").  Further, CHC claims that church autonomy is "at least co-extensive with Title VII" under *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), (Pl's MJS, PageID.3320), but *Korte* held that Title VII is a "legislative application of the church-autonomy doctrine"—not that the two are coextensive.  Finally, *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988), did not involve religious autonomy; it concerned whether a religious employer failed to accommodate staff who refused to attend mandatory religious services.

To the extent CHC might rely on the Ninth Circuit's recent decision in *Union Gospel Mission of Yakima v. Brown*, No. 24-7246 (9th Cir. Jan. 6, 2026), that reliance would be misplaced.  *Union Gospel* held that the church autonomy doctrine may protect religious organizations' hiring of co-religionists for non-ministerial

positions when rooted in sincerely held religious beliefs. But that decision is not binding here, and it is distinguishable in several respects.

First, *Union Gospel* addressed a preliminary injunction, applying the likelihood-of-success standard rather than reaching a final merits determination. *Id.*; slip op at 14. Second, the decision arose from Washington's unique circumstance: its state supreme court had narrowed the statutory religious exemption to cover only ministerial employees, creating what the Ninth Circuit called an "outlier status." *Id.*; slip op. at 36. Michigan's ELCRA, by contrast, already incorporates constitutional protections through its BFOQ provision.

Third, the Ninth Circuit expressly reserved the question of whether "businesses or hospitals" would receive similar protection—a question directly relevant to CHC. *Id.*; slip op at 26. Union Gospel operated homeless shelters, soup kitchens, and faith-based recovery programs as an evangelical ministry that shared the Gospel with "everyone at all times" and explicitly prioritized "spiritual welfare" over "physical assistance." *Id.*; slip op at 38–39. CHC's medical facilities, while informed by religious values, provide clinical care where the primary purpose is medical treatment—a fundamentally different enterprise. As the Ninth Circuit recognized, "the church autonomy doctrine has its limits. It 'does not mean that religious institutions enjoy a general immunity from secular laws.'" *Id.*; slip op at 29. Finally, the Ninth Circuit itself acknowledged that its holding "breaks no new ground" precisely because Title VII and most state laws already provide statutory

27

exemptions for religious employers." *Id.*; slip op at 36. Michigan is among those states. CHC is asking this Court to go further than the Ninth Circuit went.

In sum, CHC has identified no precedent compelling this Court to expand the ministerial exception into a blanket "co-religionist exception" that would insulate all hiring decisions by religious organizations from the ELCRA's nondiscrimination provisions.

### D.    CHC's expressive association claim fails.

CHC invokes the freedom of expressive association to support its claimed right to hire only co-religionists for all positions. But expressive association doctrine applies to group membership, not employment. Even on its own terms, however, CHC's claim fails.

Expressive association claims are analyzed under a three-step test: "(1)whether the group is entitled to protection by engaging in expressive activity that could be impaired, (2) whether the challenged government action significantly burdens the group's expression (affording deference to an association's view of what would impair its expression), and (3) whether the government's interest in any restriction outweighs the plaintiff's right of expressive association. *Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 840 (6th Cir. 2016). The test itself does not reference its applicability in the employment context, but rather "groups." *Id.*

CHC's expressive association claim relies principally on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), but that case is inapposite. (Pl's MSJ, ECF

28

No. 146, PageID.3227-3228.)  *Dale* concerned a private organization's *membership* decisions—specifically, the Boy Scouts' revocation of an adult's membership and his volunteer assistant scoutmaster position after learning that he was gay.  530 U.S. at 651.  The question in the case was whether applying a state antidiscrimination law to the Boy Scouts' membership decision violated their "freedom not to associate"; the Court held that it did.  *Id.* at 644; *see id.* at 648 (holding that governmental enforcement of a "'regulation that forces the group to accept members it does not desire'" may unconstitutionally burden expressive associational rights (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)).  But notably, the Boy Scouts acknowledged that "'it would be necessary for the Boy Scouts of America to obey'" any law "'prohibit[ing] discrimination against individual's employment upon the basis of homosexuality.'"  *Id.* at 672 (Stevens, J., dissenting) (quoting Boy Scouts' position statement in the record appendix).  In other words, even the Boy Scouts recognized the distinction between membership and employment.  *Id.*

The Supreme Court has rejected expressive association defenses in the employment context.  In *Hishon v. King & Spalding,* the Court unanimously rejected an employer's claim that holding it liable for sex discrimination in partnership decisions "would infringe constitutional rights of expression or association."  467 U.S. 69, 78 (1984).  And in *Christian Legal Society v. Martinez*, the Court emphasized that "[t]he expressive-association precedents . . . involved regulations that compelled a group to include *unwanted members*, with no choice to opt out."  561 U.S. 661, 682 (2010) (citing *Dale*, 530 U.S. at 648) (emphasis added)).

Lower courts have recognized this distinction as well. "The freedom of association cases relied upon in *Dale* reveal the doctrine's applicability to parade groups, political parties, and other non-employment contexts." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1209 (S.D. Ind. 2020) ("*Dale* did not arise from the employment context. The plaintiff sought membership in a private organization."), app. dism'd, No. 20-3265, 2021 WL 9181051 (7th Cir. Jul. 22, 2021). Similarly, "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." *EEOC v. Roman Cath. Diocese of Raleigh*, *N.C.*, 213 F.3d 795, 801 (4th Cir. 2000); *see also Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (noting that religious entities "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions").[3]

Even if expressive association doctrine applied in the employment context, CHC's claim would fail the three-part test for associational discrimination claims. CHC cannot demonstrate that hiring a non-Christian medical assistant or receptionist would burden its ability to provide healthcare services consistent with its religious mission. Even in the membership context, *Dale* squarely rejected the notion that "an expressive association can erect a shield against antidiscrimination

---

[3] The case that coined the phrase "freedom not to associate," upon which CHC also relies, *Roberts*, 468 U.S. at 623, concerned "members of a private organization," and held that a law "requiring the [organization] to admit women as full voting members" did not infringe that freedom. *Id.* at 612, 626–27.

30

laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  530 U.S. at 653.

Finally, CHC's theory of expressive association, if accepted, would hamstring Defendants' ability to ensure equal employment opportunities within their jurisdiction.  "The right to freedom of association is a right enjoyed by religious and secular groups alike."  *Hosanna-Tabor*, 565 U.S. at 189.  If any employer with an expressive purpose could invoke "freedom not to associate" to claim exemption from antidiscrimination laws, those laws would be gutted.  The First Amendment does not compel such results.

**III.  Article 3 of the ELCRA is not unconstitutional because it permits CHC to exercise its First Amendment religious freedoms consistent with existing precedent.**

CHC argues that the ELCRA's public accommodation provisions violate its First Amendment rights by (1) prohibiting it policy of declining to use patients' preferred pronouns, and (2) requiring it to provide gender affirming care.  These are difficult issues of first impression.  Article 3 does not specifically address pronoun usage or gender affirming care, no Michigan court has confronted these questions, and the Commission has not addressed them in the context of administrative proceedings or interpretive statements or declaratory rulings.

Article 3 advances Michigan's compelling interest in eradicating discrimination in public accommodations.  Even so, the ELCRA recognizes that in limited circumstances discrimination may be permitted by law.  The Commission and the Department have concluded—reluctantly—that CHC's pronoun and gender-

31

Finally, CHC argues that § 302(b) is superfluous because § 302(a) already bans discriminatory conduct.  This argument misunderstands the statutory scheme.  The two provisions serve complementary purposes: § 302(a) prohibits the denial or unequal provision of services, while § 302(b) prohibits publishing statements that services will be denied or provided unequally.  A business might comply with § 302(a) by serving all customers equally while still violating § 302(b) by posting a sign that deters protected individuals from entering in the first place.  *Corley v United States*, 556 U.S. 303 (2009) (statutes should be construed to give effect to all provisions).  Because the ELCRA is "readily susceptible" to a narrowing construction that renders it constitutional, it must be upheld.  *Virginia v Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988).

## CONCLUSION AND RELIEF REQUESTED

For all these reasons, Defendants Attorney General Nessel, the Commission members, and the Department respectfully ask this Court to grant summary judgment in their favor and deny Plaintiff's motion for summary judgment.

Respectfully submitted,

*/s/Kimberly K. Pendrick*
Kimberly K. Pendrick
Heather S. Meingast
Assistant Attorneys General
Attorney for Defendants
Civil Rights and Elections Division
3030 W. Grand Blvd., 10th Floor
Detroit, Michigan 48202
313.456.0067
pendrickk@michigan.gov
P60348

Dated:  January 13, 2026

48

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2026, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/Kimberly K. Pendrick
Kimberly K. Pendrick
Assistant Attorney General