# EXHIBIT C

TRANSCRIPTION FROM VIDEO


"MICHIGAN CIVIL RIGHTS COMMISSION MEETING

1/26/2026"


JANUARY 26, 2026


Transcribed by Jessica Ross


TAYLOR COURT REPORTING

January 28, 2026

2

(BEGINNING OF BFOQ DISCISSION)

MR. LONDO:  The next item on the agenda is the application for Bona Fide Occupational Qualifications exemption submitted by Seniors Helping Seniors Greater Livingston.

For members of the Commission, this is the first BFOQ that we have entertained since 2003, so I'm actually very excited to -- to bring this back up.

The company has requested a BFOQ that would allow it to hire senior caregivers who are 50 years of age and older.  The informational packet regarding -- containing this application, related documents, and proposed opinion has been provided to commissioners prior to today's meeting.

We have invited the applicant to speak as to its request for a BFOQ exemption and provide any additional relevant information for our consideration.  Seniors Helping Seniors Greater Livingston will be given five minutes to make its presentation, followed by any question

commissioners may have, and then a vote on the BFOQ exemption request.

Will the representative for the applicant please come forward, state your name, relationship to the applicant?  And then you may proceed with your presentation.

MR. SATCHEL:  Mr. Chair?

MR. LONDO:  Attorney Satchel?

MR. SATCHEL:  Thank you.  If I may, for the benefit of the public, provide some context and background before --

MR. LONDO:  Please.

MR. SATCHEL:  -- Mr. Kesto?

Seniors Helping Seniors Greater Livingston has applied to the Michigan Civil Rights Commission for Bona Fide Occupational Qualification or BFOQ exemption based on age in accordance with the Elliott-Larson Civil Rights Act, Section 208.  Specifically, the company requested a BFOQ exemption that would allow it to preferentially hire -- preferentially hire individuals age 50 and over.

For the benefit of the public, a BFOQ is basically a legal exception that allows employers to make hiring decisions based on

certain prohibited classifications, in this case, age, when that classification or trait is generally essential for the job's normal operations.

SH- -- Seniors Helping Seniors is a franchise of Seniors Helping Seniors, which is the Delaware limited liability company headquartered in Pennsylvania -- Wyo- -- Wyomissing Hills, Pennsylvania.

The company provides senior care services in Genesee County, Livingston County, and Oakland County.  The position for which it seeks an exemption is a senior caregiver position, and there are approximately 21 such positions in the company.  The services provided by the company include light tasks such as light housekeeping, medication reminders, and meal preparation.

In addition, it offers companionship services in the form of sharing stories, reading to seniors, and engaging in hobbies with seniors.  The company employees also provide transportation services to appointments and errand runs for seniors.

And if the employees are

experienced, they can provide personal care, incontinence care, and standby shower assistance.  The company's business model is based on hiring seniors to provide these services to its senior clients.

I would note that the Elliott-Larsen Civil Rights Act allows this Commission to grant an exemption from this prohibition or any prohibition against discrimination, in this case age discrimination, upon an employer sufficient showing that age is a bona fide occupational qualification reasonably necessary to the normal operation of the business enterprise.

Thank you, Mr. Chair.

MR. LONDO:  Thank you, Attorney Satchel.

Your name, relationship to the applicant, and then go ahead and proceed with your presentation.

MR. KESTO:  Thank you, Chair Londo.

And thank you, Commissioners, for this opportunity.

Thank you, Mr. Satchel, for that.

My name is Klint Kesto.  I'm an

attorney, and I represent Anna Attard, who is a franchisee of Seniors Helping Seniors, who, additionally, is a nationwide franchisor, and there are other franchisees here in Michigan. However, we -- my client, for her franchise, is applying for this.

Of course, there are two kind of pathways to this when we look at what is protected. One is the ADEA, which is the federal standard. And we also, in Michigan, have a little bit more stringent standard -- standard with the Elliott-Larsen Act.

If we were to look at this simply under the ADEA, what my client is intending to do in the necessary and normal business operation would be allowed. And the reason is to protect seniors or those that are higher in age from being discriminated against to substitute for someone who's younger, perhaps cheaper or less costly.

So I think that is kind of the sense that I'm -- I would like to have this commission take it into consideration. But again, when we look at the BFOQ for this body, the standard is reasonable and necessary to the

normal business operation.

So what is the normal business operation?  We're not your traditional home healthcare that goes in, replaces bandages, assist in your, you know, common idea of healthcare.

This is more peer-to-peer companionship, a friend, if you will, someone who you would share stories with, life experiences that you have, and the person that is coming -- you're coming into contact with and companionship and care with also shares.  So with that kind of being said, it's a peer-to-peer support system.

Of course, in the realm of possibility, a 25-year-old can relate to a 70-year-old.  But from a practical standpoint, a 60 or 70-year-old individual would want to share stories, experiences, play cards, go to the senior center, go shopping, whatever it might be, with someone their age.

The added benefit of this is not a traditional healthcare, but more of assistance. Let's go to the grocery store.  I'm going to help you pick up items.  We'll share stories on

the way there.

We're at home.  I'm going to, you know, maybe make a meal for you.  Do you remember, you know, the 1980s Tigers World Series?  Things of this nature are what the concept of the business is.  And it goes a step further because the point is that as people do age, certain family members perhaps pass away.  Children may be in other states.

Albeit they are independent and can do it on their own, perhaps this is an opportunity to hire Seniors Helping Seniors to get a friend, to get a caregiver to help with the certain things while these seniors are living in an independent capacity.

I also want to mention that my client's business model has other positions.  And for those positions, we take whoever qualifies in the administration, in accounting, in management.

But when we're sending individuals to the homes to be caregivers, but really they're peer-to-peer support individuals, the idea is that the individual is requesting the person of that certain need.  And I know it

can't just be based on what the clients want, but in order for this business model to work, it is necessary and reasonable to the normal business operation.

I could get into case law if you would like.  It's -- there's only a few out there.  There are more on the national side and federal side, but with the ADEA standard.  In Michigan, though, there is a predominant case having to do -- and it's not age-related because, again, these cases are few and far between.  This has to do with sex, and it has to do with male versus female Michigan Department of Corrections officers.

And it has to do with the female prison hiring predominantly women there, and there was a suit made by males.  It may have been part of the union, but there were multiple individuals.

And the court said, look, because of the duty, because of the role, because of the safety aspect, you can hire men and women in other areas, but when it comes to these particular corrections officers, the Department of Corrections does have a BFOQ to only hire

women for these roles.

I believe it was out of 1986.  I'll provide it for you.  It was Nowacki versus Department of Corrections.  And I forget the year, but if my memory serves me right, it was -- I can't remember, but I think it was around that time.

And they said, look, is there a basis, in fact, to the normal operation of business?  In this case, we do.  In -- in our application, we do.  We've provided peer reviews.  We've provided empirical data from the national company that indicates that seniors, when they're with their peers, are living better lives.

They are happier.  There's a less chance of depression, and they're still getting their entertainment, if you will, which this is a form of entertainment.  Just like if you, you know, sent a clown to a kid's birthday party.  Maybe not like that, but in that sense.

The second thing was that the job qualification relates to -- sorry, relates to the essence or to the central mission of the employer's business.  In this case, it would.

And the last kind of element is whether there are reasonable alternatives that exist to do this.  So I can't imagine a scenario where you'd train a 25 or 35-year-old to gain life experiences that a 60 or 70-year-old had because these are individual, they're personal. And that's the ability to share that experience with the client.

Again, for the other positions, we -- we hire at any age group so long as the individual qualifies.  But with this particular position, and -- and I think that there's a benefit.  I think Commissioner Elhasan even stated even in this environment where people are retiring or -- or going to a different direction of jobs, getting to a certain age, they still want to be busy, they still want to work, and this provides that opportunity.

And it situates them with other individuals of the same age, their peers, allows them to get paid and help others.  And I think there's satisfaction, gratification out of giving that compassion.  And certainly, the reception of it through empirical evidence and empirical data shows that the client, that

individual receiving that care, is also having a substantial benefit.

The last thing is these are not reimbursable items through -- through -- and I'm probably short on time, but through Medicare or any health insurance.  It is a private situation.  And I think in this particular situation, because it is narrow, because it is for this kind of select group and select position, it does embody kind of the -- the spirit of what the BFOQ is.

MR. LONDO:  Thank you, Mr. Kesto.

MR. KESTO:  Thank you, Chairman.

MR. LONDO:  Are there any questions for Mr. Kesto?

Commissioner Elhasan?

MS. ELHASAN:  First of all, I'll take speaker privilege to say that the name of the entity, Seniors Helping Seniors, and then your request for 50 plus really makes me feel old today.  I'm a senior citizen, apparently.  So -- but thank you for your presentation.

I don't want to delve too deeply into your hiring practices, but what qualifications would be necessary other than 50

plus?  What are you looking for in -- in applicants?

MR. KESTO:  So just by virtue of example of the job application, who we're looking for, we're seeking friendly, caring individuals aged 50 plus, especially those who are retired or semiretired, who want to make a difference by offering companionship and a helping hand.

Fellow seniors, what you'll do, offer companionship, share stories, read or engage in hobbies like puzzles, assist with light tasks, help with meal preparation, medication reminders, and light housekeeping. Provide transportation, if necessary.

MS. ELHASAN:  Yeah.  So I know what the job description is.  But if you're looking at -- if somebody applies, and you're looking at a resume, what stands out to you as this person is qualified to -- to do these things for this individual?

MR. KESTO:  My client puts them through a vetting process.  She wanted to be here today, but she, I think, was ill.  And she looks at what their experiences are in terms of

their prior work experience, what their relationships are, does a background check, and does a thorough interview.

MS. ELHASAN:  Yeah.  Yeah.  That was my next question about background check. But, you know, there's something to be said about also having -- so if -- if someone was 32-years-old, and they applied for this position, would they be considered?

MR. KESTO:  I think --

MS. ELHASAN:  And they can meet all the qualifications.  They can drive this person around.  They can take them grocery shopping. They can do household chores.  Sometimes, actually, senior citizens may prefer to have somebody younger.  I know a lot of high school students go read to senior citizens, and they really enjoy that.

So I'm just trying to say, like, where do you draw the line between, like -- is 49 still not acceptable?  They have to be, you know -- where -- where does that come into play?

MR. KESTO:  Yeah.  That's a -- that's a good question.  I -- I think it's more of a preference.  And when we're -- when clients

come to us, they're also seeking a preference. So it's -- and -- and they seek -- they seek preferences in different areas, whether they be 70 or 60 or 50, male, female, sports lovers, book lovers.  So we try to put those individuals to make them compatible with the -- with the client based on their shared experiences, shared hobbies, and shared interests.

MS. ELHASAN:  So I'm going to ask a controversial question just based on what you just said, okay?  Because this came to mind when I read, And thus closer in age to their clients.

This is a franchise, and I'm sure there have been situations where you've paired up a caretaker with an individual senior.  Has there ever been a -- I don't want this to serve almost like a dating platform, right?

Like, someone says, oh, yeah, I want someone to come in as a caregiver.  My preference is this age.  This male patient says I want a female to come in and -- and drive me around and do these things for me.  I -- I suspect there have been situations where these relationships may have become more romantic in nature.

Is that -- is that the case?  Has that happened before?

MR. KESTO:  I don't have any from my client.  I can't speak to it nationally because I don't know --

MS. ELHASAN:  Yeah, but that is a risk.

MR. KESTO:  -- overall.

MS. ELHASAN:  That's a huge risk when you're putting two people, I mean --

MR. KESTO:  No, certainly.  We have had no romantic relationships with my client's company, but we have had requests for individuals that speak Spanish or Spanish-speaking caregivers, and we try to align them with that.

We also looked for individuals that perhaps had some care giving experience, whether that be professionally through a job, and now they have either retired or -- or slowed down, or also with family members because that kind of aligns to some of our clients' needs.

Again, I don't know about a romantic situation across the board, but as we've been open, we have not had it.  And as I'm

getting some information from my client, she's indicating that most female clients of her clientele, for certain, are preferring a female caregiver to come in.  And I think it's more of that companionship, more shared experiences.

And I know how it seems when you said, well, would -- would a 35-year-old qualify?  I suppose they would qualify for some things, but for the necessary business operation of providing seniors with like seniors as their caregivers, it -- it may --

MS. ELHASAN:  Well, it doesn't fit the business model, Seniors for Seniors -- Seniors Helping Seniors.  I mean, it's in your --

MR. KESTO:  Right.

MS. ELHASAN:  It's in your business model.

MR. KESTO:  You are correct.

MS. ELHASAN:  And so how do you function as a business if you don't get this qualification?  Like, what do you do?

MR. KESTO:  I think it makes it problematic for my client and for other franchisees in Michigan.  We have, you know,

Case 1:26-cv-00390-RJJ-SJB    ECF No. 40-4, PageID.785    Filed 04/24/26    Page 19 of 26

18

from the -- the national parent company, they say you need to go through your state --

MS. ELHASAN:  To get the...

MR. KESTO:  -- approvals.

There was a different option where we don't come before the board, and we take our chances.  However, I think in doing the due diligence and being prudent and being really serious about this business operation, my client has come to me and said, hey, I think that -- how -- how can I do this?  And I understand that through the Department of Michigan Civil Rights Commission that this opportunity is there for these purposes.

MS. ELHASAN:  How have you been operating thus far?

MR. KESTO:  Well, this just came to light to her, but now the advertisements or the job postings don't have the age on it.  But then it gets flooded, and you have to vet these.

MS. ELHASAN:  But your hiring practices have focused on what to date?

MR. KESTO:  As for right now, I believe Ms. Attard is hiring where she -- she finds the need and does not want to run afoul of

Taylor Court Reporting Kentucky
(502) 671-8110  Fax (502) 671-8116

the Elliott-Larson.  And so if someone is qualified, she's placing them.  And, you know, this is fairly new.  We've kind of just been in touch with Mr. Satchel maybe over the past, you know, four months or five months to be able to go through the process.

And she just indicated to me she's frozen hiring for the past six months.  And I think that it could be -- it could create this exact situation where you freeze the process, and it becomes stale.

But with the opportunity to do this, I think we can -- Ms. -- Commissioner Elhasan, you're right that on the face of it, there is discrimination.  Even if you use the federal kind of standard --

MS. ELHASAN:  Uh-huh.  (Responds in the affirmative.)

MR. KESTO:  -- some may qualify it as reverse discrimination.  I want to hire it, which is allowed.  However, the legislature saw fit to put in this opportunity or this exemption for these purposes, and that's why we're here before you.  Thank you.

MS. ELHASAN:  Thank you.

MR. LONDO:  Commissioner Lara?

MS. LARA:  Yes, thank you.  Thank you so much.

I'm bringing up a slightly different aspect of the Elliott-Larsen Civil Rights Act.  Having served on various healthcare organization boards, and it has come to light at certain times that a patient has strongly indicated that they do not want a black caregiver, and they want a white caregiver.

And I am just wondering, how do you -- how do you address that aspect?  Do you really try and match race and ethnicity?

And if that doesn't work out -- say you might send a black caregiver to a white client.  The white client will say, I don't want her, even though according to your qualifications, everything else matches.  They're -- they're book lovers.  They love movies, similar age, grew up in similar areas, but the disqualification for your client is that that person is of a different race or ethnicity.

MR. KESTO:  Thank you, Commissioner Lara, and that is a great question.  Because we are a private organization with private pay,

we're also allowed to not accept certain clients. And when those clients come and say, I prefer something based on race, we do not accept that. So we don't accept every client.

This BFOQ is limited only to the age aspect because it is the business model. It's also limited by virtue of, I believe, either the legislature or the administrative policy to five years where we can revisit it, or the Commission can also request how has this been going, and have there been any issues.

So in short, this is just on the age side. We don't have to accept the clients that come in preferring caregivers based on race.

MS. LARA: Thank you. But also, as commissioners, we are always cognizant of all the different aspects of the Elliott-Larsen Civil Rights Act. So excuse me for taking this opportunity to ask about that particular aspect of your business model.

MR. KESTO: No, it's okay. Thank you, Madam Commissioner. I think it's a great question. I'm glad you brought it up because I did want to answer.

MR. LONDO:  Commissioners?

UNKNOWN SPEAKER:  (Inaudible.)

MR. KETSO:  The type of attorney? I'm a mechanic.  People have problems.  I try to fix it.  I'm a general.  I'm a general.

MR. LONDO:  I'm sorry, sir.  You can --

MR. KETSO:  I -- I'm a general.

MR. LONDO:  You guys can chat after the meeting.

Attorney Satchel, do you have any questions?

MR. SATCHEL:  No, I don't at this time.

MR. LONDO:  There being no further questions from the commissioners or from Attorney Satchel, I will entertain a motion regarding the request for a BFOQ exemption.

MS. ELHASAN:  I will make a motion.

MR. LONDO:  Commissioner Elhasan?

MS. ELHASAN:  Before I do, I just want to thank you for your presentation. Certainly, we know that your heart and your mind are in the right place, and you're looking to do the best service for your client, and your

client is trying to make the best service for her clientele as well.

But given some of my inquiries and -- and given the case law, albeit very slim, and given what we're sitting here to do with respect to the Elliott-Larsen Civil Rights Act, I'm going to make a motion to deny the exemption request on that basis.

MR. LONDO:  A motion has been made by Commissioner Elhasan to adopt the opinion denying the request for a BFOQ exemption.

Is there a second?

MS. LARA:  Support.

MR. LONDO:  Support from Commissioner Lara.

Is there any further discussion on the motion?

MS. ELHASAN:  No.

MR. LONDO:  All in favor of the motion to adopt the opinion denying the request for a BFOQ exemption, say aye.

MS. ELHASAN:  Aye.

MS. LARA:  Aye.

COMMISSIONERS SIMULTANEOUSLY: Aye.

MR. LONDO:  Opposed?

Motion carries unanimously, and the opinion denying the request for a BFOQ exemption is adopted.

MS. ELHASAN:  And I believe you'll get a --

MR. SATCHEL:  Mr. Chair?

MS. ELHASAN:  -- copy of that.

MR. LONDO:  Attorney Satchel?

MR. SATCHEL:  Thank you, Ms. Elhasan.

That's correct.  The department will send the request for a copy of your opinion along with an order based on your ruling today.

MR. LONDO:  Thank you, Counselor.

\*      \*      \*

(END OF BFOQ DISCUSSION.)

\*      \*      \*

STATE OF KENTUCKY        )
                         )  SS.
COUNTY OF JEFFERSON      )

           I, JESSICA TAYLOR ROSS, a Notary

Public within and for the State at Large, do

hereby certify that the foregoing video was

transcribed by me; that the foregoing is a full,

true, and correct transcript of said video to

the best of my abilities.


           WITNESS MY SIGNATURE this 20th day of

April, 2026.

           My commission expires July 21, 2026.


           /s/ Jessica Taylor Ross
           JESSICA TAYLOR ROSS
           Court Reporter
           Notary Public, State At Large
           Commission No. KYNP54791


V/st