UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIGHT TO LIFE OF MICHIGAN and
PREGNANCY RESOURCE CENTER,

      Plaintiffs,

v

DANA NESSEL, in her official capacity as
Attorney General of Michigan; JOHN E.
JOHNSON, JR., in his official capacity as
Executive Director of the Michigan
Department of Civil Rights; LUKE R. LONDO,
GLORIA E. LARA, RICHARD R. WHITE III,
PORTIA L. ROBERSON, ZENNA FARAJ
ELHASON, REGINA MARIE GASCO,
ROSANN L. BARKER, and SKOT WELCH, in
their official capacities as members of the
Michigan Civil Rights Commission,

      Defendants.

No. 1:26-cv-00390

HON. ROBERT J. JONKER

MAG. SALLY J. BERENS

---

**REPLY IN SUPPORT OF MDCR AND MCRC DEFENDANTS'
MOTION TO DISMISS (ECF No. 25)**

Daniel Ping (P81482)
Neil Giovanatti (P82305)
Marla Linderman Richelew (P55759)
Assistant Attorneys General
Attorneys for MDCR/MCRC Defendants
Civil Rights & Special Initiatives Division
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov
LindermanRichelewM@michigan.gov

Dated:  May 8, 2026

**TABLE OF CONTENTS**

Page

Table of Contents ..... i

Index of Authorities ..... ii

Argument ..... 1

I. ELCRA does not prohibit discriminating based on opinions. ..... 1

A. Case law on “associational discrimination” does not apply to Plaintiffs’ allegations ..... 2

B. Plaintiffs overextend case law regarding causation and employees who actually obtain abortions. ..... 4

C. Opinion-based screening does not violate the Notice Clause. ..... 6

II. There is no credible threat of enforcement regarding any of Plaintiffs’ conduct. ..... 7

A. Plaintiffs’ allegations do not establish that enforcement is credible. ..... 7

B. Michigan’s BFOQ process, if utilized, would either function as a disavowal of enforcement or establish Plaintiffs’ pre-enforcement standing. ..... 12

III. PRC still fails to establish standing for its public-accommodations law claims. ..... 15

IV. Quasi-judicial immunity bars injunctive relief against the MCRC Defendants, and Plaintiffs’ conception of Defendants’ “refusal to disavow” fails for the same reason. ..... 16

Conclusion and Relief Requested ..... 18

Certificate of Compliance ..... 18

Certificate of Service ..... 19

## INDEX OF AUTHORITIES

Page

**Cases**

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) .......... 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 (1979) .......... 9, 10

*Barrett v. Whirlpool Corp.*,
556 F.3d 502 (6th Cir. 2009) .......... 2, 3

*Bd. of Directors of Rotary Internat'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) .......... 14

*Block v. Canepa*,
74 F.4th 400 (6th Cir. 2023) .......... 9

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) .......... 5

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) .......... 13, 14

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 7

*Christian Healthcare Ctrs. v. Nessel*,
117 F.4th 826 (6th Cir. 2024) .......... passim

*Cooper v. Rapp*,
702 F. App'x 328 (6th Cir. 2017) .......... 16

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 11

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 7

EEOC v. Hosanna-Tabor Evangelical Lutheran Church & School, 597 F.3d 769 (6th Cir. 2010) .......... 13

Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, 565 U.S. 171 (2012) .......... 13

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) .......... 3

*Mirabelli v. Bonta*, 146 S. Ct. 797 (2026) .......... 7

*Our Lady of Guadalupe Sch v. Morrissey-Berru,* 591 US 732 (2020) .......... 14

*Rouch World, LLC v. Department of Civil Rights*, 987 N.W.2d 501 (Mich. 2022) .......... 9

*Speech First v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) .......... 9

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) .......... 17

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......... 8

*Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211 (6th Cir. 1996) .......... 3, 4, 12

*United States v. Martin*, 438 F.3d 621 (6th Cir. 2006) .......... 13

*Ward v. City of Norwalk*, 640 F. App'x 462 (6th Cir. 2016) .......... 16

**Statutes**

42 U.S.C. § 1983 .......... 16

Mich. Comp. Laws § 37.2202(1)(d) .......... 5

Mich. Comp. Laws § 37.2206(2)(a) .......... 6

Mich. Comp. Laws § 37.2208 .......... 14, 17

**Rules**

Mich. Admin. Code R. 37.20 .......... 10

Mich. Admin. Code R. 37.4 .......... 17

## ARGUMENT

As a matter of law, there is no potential for enforcement—let alone certainly impending enforcement—as to Plaintiffs' efforts to screen employees for certain opinions, because that conduct isn't discriminatory under any reasonable reading of ELCRA. Standing is lacking as to these claims, and the answer to this legal question supersedes any disavowal of enforcement or lack thereof. Other aspects of Plaintiffs' conduct, such as their intent to withhold certain procedures from their employer-provided health insurance plans, don't translate to injuries-in-fact because of the factual circumstances surrounding potential complainants, as well as the totality of ELCRA's exemption and enforcement schemes. These processes are aligned with, and designed to vindicate, the rights Plaintiffs think are threatened now. Finally, PRC has not established standing regarding its volunteers, and quasi-judicial immunity bars injunctive relief as to both Plaintiffs.

### I. ELCRA does not prohibit discriminating based on opinions.

Notwithstanding the plain language of ELCRA, Plaintiffs insist that staffing their organizations exclusively with pro-life individuals comprises discrimination based on sex. For the reasons that follow, most of Plaintiffs' conduct does not violate ELCRA.

### A. Case law on "associational discrimination" does not apply to Plaintiffs' allegations.

Plaintiffs do not want to hire people who cannot agree that elective abortions are morally wrong. As explained previously, ELCRA permits this conduct because it does not discriminate on the basis of sex. Plaintiffs, however, try shoehorning their claim into the principle that one cannot discriminate based on one's association with, or their advocacy on behalf of, protected class members. (PageID.703 (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513–14 (6th Cir. 2009)).) In short, they claim that a candidate's opinions about abortion equates to "association with a member of a recognized protected class," *i.e.*, someone who terminates a pregnancy. (PageID.703.) There are several fatal flaws with this expansion of the law.

First, Plaintiffs never allege an intent to discriminate against pro-choice *advocates*, in particular. Rather, they want their payrolls to comprise only those who agree to affirmatively support Plaintiffs' missions. Accordingly, they decline to hire anyone, regardless of their sex, who is unwilling or unable to make that agreement—no matter whether the candidate actively advocates for an opposing view, passively favors an opposing view, or simply cannot make up his or her mind sufficient to agree to Plaintiffs' terms. Nothing in Plaintiffs' complaint alleges that a candidate's "advocacy" or "association" has any significance.

Nor could it. *Barrett* explains that these potential bases for liability begin and end with *actual association or advocacy* regarding an identifiable member or members of a protected class. 556 F.3d at 513 (listing examples). Although "the

degree of the association is irrelevant," the degree of association still has to be greater than zero. A person bringing a claim under *Barrett* must show that discrimination occurred "because she associated with members of a protected class," or because she, personally, was injured by "discriminatory animus toward protected third persons." *Id.* (brackets omitted); *see also id.* at 514 (applying same standard to advocacy discrimination). Plaintiffs want to be able to hire or fire an employee based on their employee's stance on reproductive rights. Holding a belief about abortion requires neither association with nor advocacy for a protected individual, and this Court should decline to endorse this novel interpretation of one Title VII case—which, notably, no Michigan court has cited.

The limits of the associational- and advocacy-discrimination doctrines dispense with Plaintiffs' case law, which acknowledge claims held by one who suffers discrimination "on the basis of his association with a member of a recognized protected class." (PageID.702 (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000).) These cases' facts are starkly distinguishable, regardless of whether Title VII's "standard of review" applies. Plaintiffs haven't offered a single instance in which a complainant stated a sex-discrimination claim simply because of his or her beliefs.

Plaintiffs also say ELCRA's protections must encompass one's beliefs about abortion to be consistent with *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211 (6th Cir. 1996). (PageID.705) That case, which no Michigan court has ever cited, recognized Title VII's protections extended to an employee's *plan* to exercise her

right to terminate a pregnancy. *Id.* at 1214. This makes sense; a plan to do something is part and parcel of doing the thing itself. But it has no bearing on whether it is unlawful to decline to hire someone because of his or her abstract opinions, untethered from any plan to exercise rights consistent with those opinions.

### B. Plaintiffs overextend case law regarding causation and employees who actually obtain abortions.

Related, Plaintiffs say that (1) receiving an elective abortion (or planning to do so) and (2) being "morally pro-choice" both "turn[] on the employee's relationship with the 'termination of a pregnancy.'" (PageID.706). Of course, if you zoom out far enough, any two things can look comparable. In reality, however, someone who claims to be morally pro-choice has no "relationship with" the termination of a pregnancy akin to someone who is *personally* contemplating this significant life choice. This evokes the same reason Plaintiffs cannot invoke associational or advocacy discrimination: An individual comfortable with abortion as a concept has no real-world plan, act, identity, or status against which discrimination can be measured. At bottom, neither *Turic* nor ELCRA's text indicates that the statute's reference to termination of a pregnancy covers anything not immediately related to the procedure. Plaintiffs' intentions include conduct on both sides of this line. Asking a candidate for her opinions about abortion implicates no law; asking her to agree not to obtain an abortion *herself* requires a BFOQ.

Plaintiffs float the idea that, in such instance, they are relying "in part" on the protected conduct and therefore violating ELCRA. (PageID.706 (quoting *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 659–60 (2020)).) But the case law is more nuanced. An employer's decision is based "in part" on sex only "if changing the employee's sex would have yielded a different choice by the employer." *Bostock*, 590 U.S. at 659–60. Here, the analogous comparators are (1) one who obtains an abortion and (2) one who didn't, but who is similar in all other material respects—including the fact that the comparator employee, too, laid bare his or her opinion that elective abortions are morally permissible. Both employees would be fired under Plaintiffs' policies. This is proved by Plaintiffs' specification that only "elective" abortions are actionable. *See also* Mich. Comp. Laws § 37.2202(1)(d) (proscribing treatment based on sex different "from another individual who is not so affected *but similar in ability or inability to work*[.]" (emphasis added)).

Plaintiffs' briefing certainly does not assign any special significance to obtaining an abortion. They don't disagree that an employee who obtains an abortion will be terminated because it reveals her moral comfort with the decision, and they don't retreat from their allegations that staff-wide ideological coherence motivates their policies regarding employees who actually terminate their pregnancies. (*Accord* Compl. ¶ 98, PageID.16.)

For these reasons, Plaintiffs have established neither that their particular policies' prohibition on elective abortions is arguably proscribed by ELCRA, nor a credible threat of enforcement under an as-applied framework.

### C. Opinion-based screening does not violate the Notice Clause.

Next, Plaintiffs say that screening for opinions, in particular, violates the Notice Clause, which requires a BFOQ in order to conduct a "written or oral inquiry . . . that elicits or attempts to elicit information concerning" a prospective employee's sex. (PageID.709 (quoting Mich. Comp. Laws § 37.2206(2)(a)).) Again, Plaintiffs never ask about a candidate's medical history. Rather, they speculate that questions about a candidate's opinions about abortion "could 'elicit'—or be considered an 'attempt to elicit'—information about conduct related to abortion." (PageID.709.)

This is speculation, not an analysis. The Notice clause regulates an inquiry "that elicits or attempts to elicit information concerning" the sex of a prospective employee." *See* Mich. Comp. Laws § 37.2206(2)(a). Asking someone if they are pro-life is not the same as asking someone if they have ever terminated a pregnancy. Plus, Plaintiffs' reading collapses routine interview questions into Notice Clause violations. "Why are you interested in this position?" could elicit religious motivation, disability, or any number of topics touching protected characteristics. However, the Notice Clause is not as broad as Plaintiffs claim; it does not require a BFOQ for every question that might prompt a candidate to volunteer information that the employer did not elicit.[1]

[1] Each of Plaintiffs' examples of other proscribed questions, such as those eliciting a candidate's marital status or intent to become pregnant, is unambiguously proscribed by the Notice Clause and therefore irrelevant.

## II. There is no credible threat of enforcement regarding any of Plaintiffs' conduct.

Plaintiffs haven't carried their burden to establish that enforcement is certainly impending. The facts they leverage in support of enforcement amount to little more than what is present in *every* bid for pre-enforcement standing: a statute on the books that is not a dead letter. Case law consistently holds that something more is required.

On that note, seeking to avoid application of the *McKay* factors, Plaintiffs suggest it's sufficient that they are the "objects of the challenged law." (PageID.712 (citing *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam), and stating "no more is required" under *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026)).) In *Mirabelli*, however, a school had implemented the challenged law by converting it into official policy. 146 S. Ct. at 800. And *Mirabelli*'s reference to one's status as "object" of the law cited *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025), which dealt with a regulation that required no "enforcement" to work its intended effect. And the cited note in *Chiles* in fact applied the *McKay* factors—"no more [was] required" because the defendant "expressly declined to disavow enforcement," and the defendant's brand-new claim that the plaintiff's conduct didn't violate the law was belied by three years of litigation.

### A. Plaintiffs' allegations do not establish that enforcement is credible.

The only way Plaintiffs have been able to argue for a credible threat of enforcement of Michigan's never-enforced amendment of "sex" discrimination is to

borrow from distinguishable facts and circumstances, which establishes nothing probative.

First, Plaintiffs point out that ELCRA is enforced, but Defendants' alleged enforcement of ELCRA *generally* is beside the point.  To move the needle, evidence of past enforcement must be a degree more analogous to what a plaintiff claims to fear.  *E.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 166 (2014) (crediting alleged intent "to engage in the same speech that was the subject of a prior enforcement proceeding").

Hedging, Plaintiffs say a plaintiff "need not always show" enforcement against the same conduct.  (PageID.714 (quoting *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024) ("*CHC*").)  True, to an extent; but their case law—*CHC*, in particular—says they still have to do better than "Defendants enforce ELCRA."  In *CHC*, the plaintiffs cited (1) an Interpretive Statement regarding the specific form of discrimination at issue, which included an affirmative directive of enforcement to MDCR; and (2) proof of post-Interpretive Statement enforcement specifically targeting the categories at issue, including 73 complaints alleging sexual-orientation or gender-identity discrimination in the 18 months following the 2018 Interpretive Statement; and (3) *Rouch World* as a specific example of enforcement of the categories of discrimination those plaintiffs were

challenging.  *CHC*, 117 F.4th at 849.  Even with this "enforcement history" in hand, the question of standing "appear[ed] close." *Id.* at 851.[2]

Here, there is no MCRC interpretative statement, no complaints in the more than two years since ELCRA was amended, no complaints to the MDCR acting in its EEOC agent capacity in the last 50 years, no evidence of enforcement, and no case like *Rouch World* showing enforcement.

An apples-to-apples comparison of conduct is crucial here.  Defendants' position is that most of Plaintiffs' intended conduct doesn't actually violate the statute, which distinguishes this case from *Rouch World, LLC v. Department of Civil Rights*, 987 N.W.2d 501 (Mich. 2022).  Plaintiffs' citation to *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302 (1979), doesn't change this.  That case, like *Speech First v. Schlissel*, 939 F.3d 756 (6th Cir. 2019), involved a facial challenge to a statue, which statute "on its face" criminalized certain inaccurate speech regardless of the speaker's intent.  *Id.*; *see also id.* at 307–08; *Speech First*, 939 F.3d at 766 (as-applied challenges require "some specific action on the part of the defendant" representing "evidence that the rule would be applied to the

---

[2] On this point, Plaintiffs misrepresent *Block v. Canepa*, 74 F.4th 400, 410 (6th Cir. 2023), claiming it credited " 'evidence that Ohio prosecutes violations of the' law generally." (PageID.714.)  *Block*, however, referred explicitly to "violations of the Transportation Limit, which is the statute at issue in this appeal," among other indicia of enforcement's likelihood.  To be helpful to Plaintiffs' claim that enforcing ELCRA is probative, *Block* needed to rest on Ohio's enforcement of its *liquor control laws*.  It didn't.

plaintiff"). Here, most of Plaintiffs' as-applied claims don't describe discriminatory conduct.[3]

*CHC* undermines Plaintiffs' lack of standing for another reason. That case endorsed the use of "judicial experience and common sense" in evaluating whether an aggrieved person might file a complaint—a key question in predicting enforcement. *CHC*, 117 F.4th at 854 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Broadcasting discriminatory speech to the public, for example, doesn't suggest a forthcoming complaint (let alone enforcement) if "factual circumstances otherwise indicate that a complaint is unlikely." *Id.* at 852.

Common sense dictates that complaints here are unlikely. Start with Plaintiffs' intent to limit health insurance coverage and fire anyone who terminates a pregnancy, both of which affect only current employees. (PageID.16, 24.) As a matter of common sense, it's unlikely that an individual who identifies as pro-life and accepts a position with either plaintiff will (1) seek to obtain an elective abortion, *and* (2) volunteer that information to her employer, *and* (3) file a complaint about the resulting termination, or the lack of insurance coverage for the

[3] As an aside, *Babbitt* supports Defendants' request for abstention. Abstention is appropriate "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt*, 442 U.S. at 306 (quotation and citations omitted). Abstention might nevertheless be inappropriate when "extensive [state-court] adjudications" covering "a variety of factual situations" are required before the federal court has enough information to evaluate a statute's constitutionality. *Id.* at 308. This concern does not implicate as-applied challenges; and if Plaintiffs do not want to wait, they may initiate state-court proceedings by requesting a declaratory ruling "as to the applicability of a statute" to "an actual state of facts." Mich. Admin. Code R. 37.20.

procedure.[4] *See id.* at 853–54. This is especially true when no "no one has ever complained . . . and no employee has suggested discomfort with [the] employment rules[.]" *Id.* at 854. Crediting the possibility of an internal complaint under these circumstances requires "too much 'speculation about third parties' acting contrary to past practice." *Id.* (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (ellipsis omitted)); *see also id.* at 855 n.3.

The same goes for Plaintiffs' intent to publish job postings stating their employment requirements. In *CHC*, it was feasible that a would-be consumer of a category of plaintiffs' services would file a complaint when the services turn out to be discriminatory, or that someone wishing to work at a medical service provider would complain when they learn the provider discriminates in its hiring. *Id.* at 853. Here, however, Plaintiffs' position is premised on the possibility that, but for their "more explicit" postings, a pro-choice individual would want to work at an organization whose raison dêtre is pro-life advocacy. This defies common sense. Indeed, when incompatible candidates learn about Plaintiffs' mission, the candidates do not enlist Defendants in helping them get hired. Rather, they tend to abandon their applications. (*E.g.*, Compl. ¶¶ 94–96, 231, PageID.16, 33.) Only RTL alleges that one pro-choice candidate made it to an in-person interview—but the

[4] Plaintiffs do not disagree that they must rely on an employee's self-reporting to discover whether an employee obtains an elective abortion, nor do they disagree that the policy applies only to elective abortions obtained while currently employed. (PageID.705.)

candidate apparently did not file a complaint when she didn't get the job. (*Id.* ¶¶ 99–100, PageID.16-17.)

Finally—unlike new proscriptions on sexual-orientation and gender-identity discrimination—some of Plaintiffs' conduct has been proscribed by Title VII for nearly fifty years. *See, e.g.*, *Turic*, 85 F.3d at 1214. If one was inclined to file a complaint about Plaintiffs' hiring practices under federal law, they could have done so before ELCRA was amended. Regardless of whether Title VII defeats redressability, it shows that a complaint isn't likely.

### B. Michigan's BFOQ process, if utilized, would either function as a disavowal of enforcement or establish Plaintiffs' pre-enforcement standing.

Plaintiffs' responses regarding the BFOQ process rests upon several misapplications of law or misstatements of Defendants' positions. One striking example: Plaintiffs say that requesting a BFOQ would be "futile" because Defendants agree that a small subset of Plaintiffs' intended conduct described *prima facie* ELCRA violations, which require a BFOQ. (PageID.724.) This makes no sense; a BFOQ creates an exemption to ELCRA violations and would alleviate any purported threat of enforcement.

Similarly, Plaintiffs cannot claim that Defendants would not grant a BFOQ to their employees or volunteers simply because BFOQs were not granted for roles like "janitorial staff" in a completely different context over twenty years ago. (PageID.724-725.) Those decisions predated the Supreme Court's articulation of the ministerial exception in *Hosanna-Tabor Evangelical Lutheran Church & School v.*

*EEOC*, 565 U.S. 171 (2012), and the substantial development of First Amendment doctrine since. According to Plaintiffs, decades-old institutional decisions predict current institutional behavior, and the Sixth Circuit's 2010 decision *denying* the ministerial exception to a religious-school teacher would predict how this Court would rule today. *EEOC v. Hosanna-Tabor Evangelical Lutheran Church & School*, 597 F.3d 769 (6th Cir. 2010). It does not. One cannot fault the MCRC for a decision made five years before the Sixth Circuit reached the same conclusion in *Hosanna-Tabor*—only to be unanimously reversed by the Supreme Court. The Commission applied First Amendment doctrine as it existed over twenty years ago, and this Court should presume that they will again follow the law today as to Plaintiffs absent clear evidence to the contrary. *See, e.g.*, *United States v. Martin*, 438 F.3d 621, 634 (6th Cir. 2006).

Here, each plaintiff engages in expressive association generally, and each says every one of its employees has a role in "conveying [its] pro-life messaging." (Compl. ¶¶ 51 (RTL), 180, PageID.10, 26.) This can, in theory, support a BFOQ for any employee whose opinions could "significantly affect [either plaintiff's] ability to advocate public or private viewpoints." *Boy Scouts of America v. Dale*, 530 U.S. 640, 650 (2000). That requires first examining the particular entity pressing its expressive rights, and the nature and scope of its expressive intent through the BFOQ process. *See id.* Plaintiffs' suggestion that Defendants instead have a one-size-fits-all stance based on an employee's title, disconnected from the employer, is not supported by law or fact.

Plaintiffs also assert that no BFOQ will issue because Defendants explained, in another, unrelated case, "that the First Amendment does not protect religious employers' decisions over non-ministerial employees and rejected the 'co-religionist' exception." (PageID.724.) In the abstract, however, this was an accurate statement of law, as the Supreme Court requires courts to "take all relevant circumstances into account and determine whether each particular position implicated the fundamental purpose of the exception." *Our Lady of Guadalupe Sch v. Morrissey-Berru,* 591 US 732, 758 (2020). But only PRC is a religious organization, and, regardless, both plaintiffs claim an intent to discriminate based on sex, not religion. At bottom, these arguments are not relevant. BFOQs issue when "sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise." Mich. Comp. Laws § 37.2208. This is consistent with the Supreme Court's line-drawing, which acknowledges that states' anti-discrimination laws vindicate a compelling interest—so long as their application will not "affect in any significant way the existing members' ability to carry out their various purposes." *Boy Scouts of America*, 530 U.S. at 658 (quoting *Bd. of Directors of Rotary Internat'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987)).

Finally, this Court should reject Plaintiffs' suggestion that if the Sixth Circuit in *CHC* would have agreed with Defendants' arguments here had they been raised, "it would have said so" sua sponte. (PageID.724.) In fact, "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian Sch.*

*Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). It is improper to infer anything about jurisdiction from *CHC* that was passed on *sub silentio*. In any event, the Sixth Circuit found standing to be a close question even in the presence of stronger evidence of a threat of enforcement, and it found that one plaintiff lacked standing based on facts similar to those alleged here.

## III. PRC still fails to establish standing for its public-accommodations law claims.

Plaintiffs' complaint is characterized by its opposition to the Michigan Legislature's decision to "redefine[] 'sex' discrimination to include 'the termination of a pregnancy.'" (Compl. at 3, PageID.3; *see also* PageID.39-42.) Throughout, the principal discussion of religion consists of PRC's alleged intent to engage in discrimination *based on sex*. Perhaps as a result of this predominant focus on sex-based discrimination, PRC seemingly forgot that its claims about volunteers concern only religious and sexual-orientation discrimination. (*See, e.g.*, Compl. ¶¶ 162–63 (mentioning volunteers alongside employees in allegations regarding sex-based discrimination), PageID.24.)

PRC does plausibly allege that it requires its volunteers to agree with doctrinal statements about religion distinct from abortion. (Compl. ¶ 162, PageID.24; *e.g.*, PageID.32; PageID.129.) Nevertheless, ELCRA's "longstanding prohibition on religious discrimination" defeats pre-enforcement standing when, as here, these beliefs "have been communicated in the past without drawing any kind of inquiry, let alone an ELCRA complaint." *See CHC*, 117 F.4th at 856.

*CHC* is instructive on the sexual-orientation claim, too. It was faced with a claim that conditioning employment on agreement with the employer's "moral teachings" in a code of conduct was discriminatory. *Id.* It found standing lacking, however, because "the Code does not reference" prerequisites concerning sexual orientation. So too here. (PageID.130, 134.)

**IV. Quasi-judicial immunity bars injunctive relief against the MCRC Defendants, and Plaintiffs' conception of Defendants' "refusal to disavow" fails for the same reason.**

Plaintiffs' response to MCRC's claim of quasi-judicial immunity focuses exclusively on remedies such immunity precludes, rather than contesting MCRC's claim. (PageID.729-730.) Even this limited response relies on a misapplication of *Ex parte Young*—an exception to Eleventh Amendment immunity, not judicial immunity. Judicial immunity—as the text of § 1983 makes clear—bars injunctive relief in all forms, "unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *see also Cooper v. Rapp*, 702 F. App'x 328, 334 (6th Cir. 2017). If Plaintiffs are entitled to relief at all, declaratory relief is available, so this exception cannot apply and quasi-judicial immunity bars Plaintiffs' claims for injunctive relief. *See, e.g.*, *Ward v. City of Norwalk*, 640 F. App'x 462, 467 (6th Cir. 2016).

These same principles defeat Plaintiffs' theory that MCRC's silence constitutes a "refusal to disavow enforcement." (PageID.716.) The MCRC is fundamentally—indeed, constitutionally—different than an agency under the purview of a state's executive. As an adjudicative body, it acts only on matters

properly before it, and then only through prescribed processes. It obtains jurisdiction through the legal mechanisms that bring matters before it—a complaint, a BFOQ application, a request for a declaratory ruling, etc. Mich. Comp. Laws § 37.2208; Mich. Admin. Code R. 37.4, 37.20. This structural integrity is the very thing *Cooperrider* protects. Just as a court cannot disavow a result in a matter over which it has not yet obtained jurisdiction, *see Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998), so too does the MCRC lack jurisdiction to weigh in here.

## CONCLUSION AND RELIEF REQUESTED

The MDCR and MCRC Defendants respectfully ask this Court to dismiss Plaintiffs' complaint.

Respectfully submitted,

/s/ *Daniel J. Ping*
Daniel Ping (P81482)
Neil Giovanatti (P82305)
Marla Linderman Richelew (P55759)
Assistant Attorneys General
Attorneys for MDCR/MCRC Defendants
Civil Rights & Special Initiatives Division
P.O. Box 30212
Lansing, MI 48909
(517) 241-1050
PingD@michigan.gov
GiovanattiN@michigan.gov
LindermanRichelewM@michigan.gov

Dated: May 8, 2026

## CERTIFICATE OF COMPLIANCE

In compliance with Local Rule 7.2(b)(ii), I certify that this brief complies with Local Rule 7.2(b)(i) as this brief includes 4,075 words. Microsoft Word Office 365 is the word processing software used to generate the word count in the above brief.

/s/ *Daniel Ping*
Daniel Ping (P81482)
Assistant Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2026, I electronically filed the above document using the ECF System which will send notification of such to all represented parties.

/s/ *Daniel Ping*
Daniel Ping (P81482)
Assistant Attorney General

Right to Life of MI v Nessel (CRSI WD 26-cv-390); AG #2026-0450273-A/Reply in Support of MDCR and MCRC Defs' Motion to Dismiss (ECF 25) 5-8-2026