UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIGHT TO LIFE OF MICHIGAN,
et al.,

        Plaintiffs,

                                 Case No. 1:26-cv-390

v.

                                 HON. ROBERT J. JONKER

DANA NESSEL, et al.,

        Defendants,

_____ /

## OPINION AND ORDER

Plaintiffs say recent changes to Michigan's Elliott-Larsen Civil Rights Act violate their constitutional rights. Defendants do not directly address the constitutional merits of these claims. Nor do they disavow an intention to enforce the new statutory provisions against Plaintiffs. Instead, they argue the Court should decline pre-enforcement review because Plaintiffs face no realistic enforcement threat for a variety of reasons. The recent statutory changes do, however, at least arguably cover Plaintiffs' constitutionally protected conduct. Moreover, the factors applicable under binding Circuit precedent establish a credible enforcement threat for Plaintiffs from these Defendants. So Plaintiffs have standing to bring their claims. However, because potentially limiting constructions of the new statutory language may avoid or limit the breadth of the constitutional questions, the Court will certify statutory constructions to the Michigan Supreme Court for a binding determination before making any final decisions on the merits. In the meantime, Plaintiffs are entitled to a preliminary injunction because they are likely to prevail on at least some of their claims, either as a matter of limiting statutory construction by the Michigan

1

Supreme Court, or under established principles of constitutional law that would preclude operation of a broader construction of the new amendments.

## BACKGROUND

### A.  Elliot-Larsen Civil Rights Act Framework

Michigan enacted the "Elliot-Larsen Civil Rights Act" (ELCRA) to protect Michiganders from discrimination in various contexts. MICH. COMP. LAWS ("MCL") § 37.2101 *et seq*. Most relevantly here, ELCRA prohibits employers and places of public accommodation from discriminating against individuals "because of religion, . . . sex, [and] sexual orientation." MCL § 37.2202. Under Michigan law, the Michigan Department of Civil Rights ("MDCR"), the Michigan Commission of Civil Rights ("MCRC"), and the Attorney General of Michigan—each a Defendant in this case—are charged with administering ELCRA and carrying out its enforcement procedures.

### 1.  *ELCRA's Employment-Related Provisions*

Three distinct employment-related provisions in ELCRA are at issue in this case. First, ELCRA's Employment Clauses in Article II prohibit employers from discriminating against employees or applicants "because of . . . sex." MCL § 37.2202. More specifically, employers shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex." MCL § 37.2202(1)(a). Nor shall they "[l]imit, segregate, or classify an employee or applicant for employment" in a way that could deprive them of "an employment opportunity" or could "otherwise adversely affect their status . . . because of . . . sex." MCL § 37.2201(1)(b).

ELCRA's Notice Clause—the second relevant provision—bolsters ELCRA's antidiscrimination protection. Under the Notice Clause, employers must not publish statements

and notices that "indicate[]" that the employer will prefer or discriminate "based on . . . sex" in their employment practices. MCL § 37.2206(1).

Finally, ELCRA's Benefits Clause—ELCRA's third relevant employment provision—extends ELCRA's protection to employee benefits, like health care plans. Under this provision, employers shall not "discriminate against an individual on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system." MCL § 37.2202(1)(c). MCRC has interpreted this provision as prohibiting employers from excluding "contraceptives from a health plan that covers other prescription drugs and services." (ECF No. 1-22, PageID.196).

For years, ELCRA clarified that these employment provisions did not prohibit discrimination based on abortion. In particular, it instructed that although " '[s]ex includes, but is not limited to pregnancy, childbirth, or a medical condition related to pregnancy or childbirth," the definition "does *not* include nontherapeutic abortion not intended to save the life of the mother." (ECF No. 1, PageID.40). Similarly, through related legislation, Michigan allowed employers to opt-out of covering abortion as a healthcare benefit. MCL §§ 550.541-49.

However, in May 2023, Michigan amended ELCRA to extend its protection to discrimination based on abortion. Michigan first amended the definition of "sex" to "include . . . pregnancy, childbirth, *the termination of a pregnancy*, or a related medical condition." MCL § 37.2201(d) (emphasis added); (ECF No. 1, PageID.40). And second, to reinforce that this type of discrimination is unlawful, Michigan specifically amended ELCRA to provide that employers may not treat "an individual affected by pregnancy, childbirth, *the termination of a pregnancy*, or a related medical condition differently for any employment-related purpose. MCL § 37.2201(1)(d). Finally, Michigan also repealed the provision that allowed employers to opt-out of covering

abortion in their insurance policies. MCL §§ 550.541-49. According to one Michigan lawmaker, these provisions eliminated a "carve out" under Michigan law that previously allowed employers to treat abortion adversely. (ECF No. 1, PageID.41). So the amendments ensure that "employers who are hostile to abortion . . . do not violate the state Constitution." (*Id.*).

ELCRA provides that some employers may be exempt from these discrimination provisions if they can show a Bona Fide Occupational Qualification (BFOQ).[1] Under ELCRA, any person "may apply" for an exemption on the basis that certain protected characteristics, like sex, are "bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise." MCL § 37.2208. The Michigan Civil Rights Commission (MCRC) reviews that claim and upon a "sufficient showing . . . may grant an exemption." *Id.* An employer also may receive a BFOQ "without obtaining prior exemption." *Id.*

BFOQ exemptions, however, are not absolute. They are valid for no more than 5 years. MICH. ADMIN. CODE R. 37.25(4). The Commission may also revoke an exemption that it already granted. MICH. ADMIN. CODE R. 37.25(3), (5). And, as part of the exemption process, the Commission may "investigate any matter deemed relevant to an application," and the applicant must provide "all records, documents, data, or other information" that the commission requests. MICH. ADMIN. CODE R. 37.25(2). The Plaintiffs allege that they would need to "hire a lawyer" to complete the application, given its specific requirements.[2] (ECF No. 1, PageID.61).

*2.  ELCRA's Accommodations Clauses*

---

[1] Unlike Title VII—ELCRA's federal counterpart—ELCRA does not expressly exempt religious employers from these provisions.

[2] Right to Life and PRC acknowledge that they have not applied for a BFOQ. In their view, the process would burden their ability to hire for new positions. (*Id.* at PageID.62).

ELCRA also prohibits discrimination in places of public accommodation. Two distinct ELCRA provisions are at issue here.

First is ELCRA's Accommodations clause. ELCRA defines a "place of public accommodation" as any "business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind . . . whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public." MCL § 37.2301(a). Under ELCRA, places of public accommodation shall not "[d]eny an individual the full and equal enjoyment" of its "goods, services, facilities, privileges, advantages . . . because of religion, . . . sex, [or] sexual orientation." MCL § 37.2302(a).

Second, ELCRA's Accommodation Publication Clause prohibits employers from publishing any statement or notice indicating that "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service will be" denied to an individual, or that an individual's presence at the place is unwelcome, "because of religion, . . . sex, [or] sexual orientation." MCL § 37.2302(b).

ELCRA's public accommodation provisions in Article III differ from its employment provisions in Article II in notable ways. First, although ELCRA prohibits public accommodators from discriminating because of "sex," ELCRA does *not* define "sex" to include "termination of a pregnancy" in the context of public accommodations, either before or after the 2023 amendments. Unlike Article II of ELCRA, which covers employers, Article III does not include a specific definition of "sex." *See* MCL§ 37.2301. ELCRA's general "definitions" section applies under Title III. And those general definitions do not define sex. *See* MCL § 37.2103. They merely state that "because of sex includes sexual harassment." MCL § 37.2103(k). On the other hand, Article II's definition of "sex," which includes "termination of a pregnancy" after the 2023 amendments, is

limited to "this article." MCL § 37.2201. The new 2023 definition of "sex," then, applies only to employers. These differences suggest that public accommodators may be able to turn away individuals who have had abortions, advocate for abortions, or express pro-choice viewpoints without violating ELRCA. Also, ELCRA's accommodations clauses do not contain an exemption process like the BFOQ. The BFOQ process relates only to the employment provisions. *See* MCL § 37.2208 ("A person subject to *this article* may apply to the commission for an exemption." (emphasis added)).

### B.  Right to Life and Pregnancy Resource Center

Right to Life of Michigan ("Right to Life") and Pregnancy Resource Center ("PRC") are pro-life nonprofit organizations that qualify as employers under Michigan law. Each seek to hire, recruit, and retain employees who agree with their pro-life viewpoint. PRC also uses volunteers, who like employees, must agree with PRC's stated positions. According to both plaintiffs, neither intends to hire or retain someone who has had an abortion, advocates for abortion, associates with people who have received an abortion, or expresses pro-choice viewpoints. And PRC does not intend to hire employees, or use volunteers, who do not agree with its positions on religion and sexual orientation.

### 1.  Right to Life

Right to Life is a "non-partisan, non-sectarian" organization that "exists" to "protect . . . human life from fertilization to natural death." (*Id.* at PageID.6). As part of its mission, Right to Life opposes abortion. Right to Life actively advocates for pro-life legislation in Michigan and throughout the country. It also shares pro-life information with the public through various forms of media, including its website. According to Right to Life, its "pro-life mission influences all aspects of its organization." (*Id.* at PageID.8).

6

Right to Life employs only people who agree with and conform to its pro-life mission. (*Id.*). According to Right to Life, it "would not be able to promote its pro-life mission if every employee did not conform to the organization's pro-life views." (*Id.* at PageID.9). Because Right to Life views each employee as "an ambassador of its pro-life mission," it requires employees to "refrain from engaging in conduct that is antithetical" to, or "inconsistent" with, its "pro-life mission." (*Id.*). It expects employees to adhere to its pro-life mission in both their professional and personal lives. *Id.* In essence, Right to Life employees—in any position—may not advocate for, or obtain, abortions while employed. Nor may they express any pro-choice viewpoint.

Right to Life's hiring practices reflect its commitment to these restrictions. When Right to Life receives an application, it sends an automatic email to the candidate. Before Michigan amended ELCRA, this email asked for the candidates' thoughts on Right to Life's mission and values to ensure that they aligned with Right to Life's viewpoint. (ECF No. 1, PageID.15). At the next stage, Right to Life schedules an in-person interview at which they will ask the candidate "what is your position on abortion?" (*Id.* at PageID.15-16). And, if Right to Life offers the candidate the position, it requires the employee to agree to its Code of Ethics and Guiding Principles. (*Id.*). Right to Life avers it has declined to hire individuals who have shown evidence of pro-choice advocacy throughout the hiring process.[3]

Right to Life wants to update its hiring practices to make its mission more explicit up front. In job descriptions and emails to candidates, Right to Life wants to warn applicants that they must

---

[3] More specifically, Right to Life says that it received an application for its legislative assistant position from one candidate who listed "Planned Parenthood advocacy" as a work experience. (ECF No. 1, PageID.16). And Right to Life further says that during an in-person interview, a candidate described her view as "pro-abortion" and indicated that she thought abortion should be a choice that "each woman should decide for herself." (*Id.* at PageID.17). Right to Life has verified the allegations of its Complaint and submitted additional factual statements in detailed verified declarations and affidavits.

"avoid any conduct that undermines . . . opposes or is inconsistent with" its pro-life mission. (ECF No. 1-10, PageID.103; *see also* ECF No.1-4, PageID.90). Right to Life also wants to update its employees' manuals to state that it will "terminate" any employee who engages in such conduct. (ECF No. 1-7, PageID.96). Right to Life, however, has not implemented these changes because it fears these practices now violate ELCRA.

Right to Life currently employs roughly 40 people and hires for roughly 4 positions per year. (ECF No. 1, PageID.14). Most of Right to Life's positions are in the following areas: Managers, Community Engagement and Fundraising, Legislative Engagement and Politics, Marketing and Media. But it also employs people in Accounting and Finance positions, and various other positions in support roles. (*Id.* at PageID.13-14). Currently, Right to Life has two positions that it hopes to fill: Content Contributor & Event Coordinator (ECF No. 1, PageID.18) and MiGen Leads Coordinator.[4] (ECF No. 51, PageID.965).

Right to Life provides health care as an employee benefit. Although its health plans cover a variety of services and drugs, they do not cover services or drugs related to abortions. According to Right to Life, providing plans that "facilitate access" to abortion-related services and drugs would violate its "moral beliefs and values." (ECF No. 1, PageID.20).

### 2. PRC

PRC is a nonprofit pregnancy center that provides a range of family and pregnancy related information and services to men and women. (ECF No. 1, PageID.20-21).

According to PRC, it is also a "religious ministry" that "exists to affirm God's gift of human life." (*Id.* at PageID.21; ECF No. 1-11, PageID.105). PRC refers to itself as a "Biblically-based

---

[4] The Content Contributor & Event Coordinator "facilitates Right to Life's special events, outreach, and educational projects." (ECF No. 1, PageID.18). And the MiGen Leads Coordinator is responsible for managing youth and young adult outreach programs. (ECF No. 51-2, PageID.969).

organization," and it alleges that its services are motivated by its "Chrisitan faith." (ECF No. 1-11, PageID.106). According to PRC, it "often" engages in full staff prayers, Bible studies, and seeks to share" its religious message with "members of the public." (ECF No. 1, PageID.21).

Like Right to Life, PRC opposes abortion. It believes that every abortion "claims an innocent life" and conflicts with Biblical teachings. (ECF No. 1-11, PageID.106). Because PRC believes that abortion is morally wrong, it "does not recommend, provide, or refer for" abortion-related drugs and services as part of its pregnancy-related services. (ECF No. 1, PageID.21). Rather, it advises women "experiencing unplanned or unwanted pregnancies" that they should "decline to have an abortion." (*Id.* at PageID.22).

PRC's religious views have also caused it to have a position on sexual orientation. PRC believes that "the Bible explains that sexual intercourse should only take place in the context of marriages." (*Id.* at PageID.22). And, in PRC's view, marriage means "a union between one man and one woman as husband and wife." (ECF No. 1-11, PageID.106).

Like Right to Life, PRC only hires those who agree with its stated positions.[5] Because PRC thinks it would not be able to effectively communicate its position if its employees did not share its views, PRC requires employees and volunteers to "agree with, and personally adhere to," PRC's religious and moral beliefs. (ECF No. 1, PageID.24). More specifically, PRC requires all employees "to refrain from having, and helping others procure, abortions and from promoting abortion." (*Id.*). And, more generally, employees must also not "openly live[] contrary to PRC's positions and religious beliefs." (*Id.*).

PRC's hiring practices reflect these goals. After candidates apply to open PRC positions, PRC may send an email inviting the applicant to interview, which includes a copy of PRC's

---

[5] To clarify, PRC does not discriminate in providing its services; it provides its pregnancy and family services to those who do not share its religious views. (ECF No. 1, PageID.23).

positions and requests the candidate to acknowledge these positions. (ECF No. 1, PageID.33). If the candidate affirms PRC's positions during a phone interview, PRC may then conduct an in-person interview at which "PRC leadership and management thoroughly review each candidate's religious background" and again confirm that the candidate affirms its religious and moral positions. (*Id.*). If the candidate is offered the position, they must agree that they will abide by PRC's policies. (*Id.* at PageID.34). PRC alleges[6] that many applicants often do not continue with their application after finding out about PRC's positions. And it alleges that it has not hired candidates who could not affirm PRC's positions.

Like Right to Life, PRC alleges that it would like to update the language in its hiring material to make its message more explicit. PRC would like to amend its Positions statement, which employees must agree to, to state that employees "commit to not undergoing, promoting, or facilitating, anything contrary" to PRC's principles, "including elective abortions." (ECF No. 1-12, PageID.113). PRC also wants to amend its job description to state that all PRC members must "subscribe to, adhere to, and abide by" PRC's religious and moral positions, including its positions on "abortion" and "marriage/human sexuality." (ECF No. 1-16, PageID.125). Like Right to Life, PRC has not implemented these changes because they worry that doing so would violate ELCRA.

PRC currently employs over 40 employees and for the past three years has hired 8 to 12 new employees each year. (ECF No. 1, PageID.32). PRC positions include: leadership positions, educational services director and instructors, medical services director, clinical staff, finance and HR, and other positions. Currently, PRC has four open positions that it wants to fill: Chief

---

[6] Like Right to Life, PRC has verified the allegations in its Complaint and submitted additional factual detail in verified declarations and affidavits.

Operating Officer, Education Instructor, Event Assistant, and the Lead First Steps Coordinator.[7] (ECF No. 1, PageID.35, ECF No. 17, PageID.426, ECF No. 32, PageID.644; ECF No. 58, PageID.1067).

Currently, PRC health care packages cover abortion. But this was a mistake—before December 2025, PRC's health insurance policy excluded coverage for abortion related drugs, but PRC's insurance carrier mistakenly added coverage. (ECF No. 1, PageID.37). PRC has initiated efforts to remove abortion coverage because it "believes that it would violate its religious beliefs to deliberately provide employee health insurance that would facilitate access to abortion-causing" drugs or procedures. (*Id.*).

PRC, unlike Right to Life, uses volunteers to further its mission. PRC requires prospective volunteers to apply for a position. To do so, they must include two references, submit to a criminal background check, and if selected, go through a personal interview. (ECF No. 1, PageID.38). PRC requires volunteers to "affirm" that they agree with PRC's positions on religion, abortion, and marriage. Like its other positions, PRC also wants to update its volunteer application to clarify that volunteers "commit to not undergoing, promoting, or facilitating, anything contrary" to PRC's principles, "including elective abortions." (ECF No. 1-18, PageID.134).

### C.  Michigan Vigilantly Enforces ELCRA

ELCRA's statutory scheme lets Michigan vigilantly police discrimination throughout the state. ELCRA makes enforcement easier by providing that any "person claiming to be aggrieved

---

[7] The Chief Operating Officer "oversee[s] all operation functions across PRC's program area" and ensures that everything the organization does "align[s] with PRC's mission." (ECF No. 58-2, PageID.1072). The Education Instructor provides training and instruction to students in schools, churches, and community setting using PRC's curriculum.  (ECF No. 32-2, PageID.649). The Event Assistant assists with preparation and execution of fundraising events and other initiatives. (ECF No. 17-2, PageID.431). And the Lead First Steps Coordinator manages and develops a program designed to medical patients with holistic support and in that role, frequently interacts with clients. (ECF No. 1, PageID.35).

by unlawful discrimination may" file a complaint to MCRC. MICH. ADMIN. CODE. R. 37.4(1); *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024). Certain public officials and governing bodies—the Michigan Department of Civil Rights (the Department), MCRC, and the Director—may also initiate complaints. MICH. ADMIN. CODE. R. 37.4(2).

ELCRA ensures that Michigan officials thoroughly vet the complaints that the Department receives. After an "aggrieved" person submits a complaint, it is reviewed by the Department and then, if certain administrative requirements are met, is certified. MICH. ADMIN. CODE R. 37.4(4). Notice is given to the party named in the complaint. *Id.* at 37.4(9). Then, the department investigates the complaints, during which time it may "[r]equire" discovery materials, such as "answers to interrogatories" and other records material to the complaint. It may also require witnesses and take testimony. It may require all of these discovery procedures through court order. MCL § 37.2602(d); MICH ADMIN CODE R. 37.4(10). If needed, the Attorney General may be enlisted to enforce those orders. *See* MCL § 37.2602(b); (ECF No. 41-4, PageID.849). After this investigation, the Department may issue a charge. MICH. ADMIN CODE R. 37.6(1). If a charge is issued, the party named in the complaint must respond. *Id.* at 37.11. The commission may also hold a hearing at which both sides may present their case with evidence. *Id.* at 37.12. The Attorney General may represent MCRC at this hearing, and throughout the litigation process. *See* MCL § 37.2602(b). And after a hearing, MCRC issues an order that includes factual findings and the basis for its decision. MICH. ADMIN CODE R. 37.16. If MCRC finds a violation, it may order the violating party to pay damages, hire or reinstate employees, submit to cease-and-desist orders, or have their license revoked. MCL § 37.2605. Again, the Attorney General may be enlisted to enforce those orders, if the subject fails to comply. *See* MCL § 37.2602(b); (ECF No. 1-21, PageID.190).

ELCRA's scheme has led to active enforcement. In 2024, MDCR certified 2,487 total certified complaints for discrimination across all areas of enforcement. Of those 2,487 complaints, roughly 1,400 were for employment discrimination. (ECF No. 1, PageID.60). And 370 were complaints of sex discrimination.[8] (*Id.*). MCRC and MDRC investigate many of these complaints. (*See* ECF No. 26-2, PageID.517). And they file multiple charges per year. (*See id.*). The parties agree that the Department has *not* received a complaint against either of the Plaintiffs. Nor has the Department issued any warning letters to the Plaintiffs. The parties further agree that since Michigan expanded the definition of sex to include termination of a pregnancy, no complaints have been filed against anyone under the specific "termination of a pregnancy" provision at issue here. (ECF No. 26-2, PageID.517).

However, the relevant Michigan officials—including those from the MDRC, MCRC, and the AG—have not disavowed enforcement of ELCRA's provisions against Right to Life or PRC. (ECF No. 1, PageID.61). Rather, Attorney General Nessel has declared that her department's "top priority" is to "defend Michigan as a safe haven in our region for women to access" abortion. (*Id.* at PageID.60); *Attorney General Nessel Issues Statement on Latest Mifepristone Court Opinion*, MICH. DEP'T ATT'Y GEN., https://www.michigan.gov/ag/news/press-releases/2023/08/17/attorney-general-nessel-issues-statement-on-latest-mifepristone-court-opinion. And she has "consistently been involved with litigation to increase access to abortion" and has "disclaimed any intent to enforce previous Michigan law" that "protected those who do not want" to associate with abortion-related activities. (ECF No. 1, PageID.60)**.**

### D.  Procedural Posture

---

[8] It is not clear whether the 370 sex discrimination complaints were all employment claims.

In February 2026, Right to Life and PRC sued multiple Michigan officials, alleging that ELCRA violates the First and Fourteenth Amendments of the United States Constitution. (ECF No. 1). On the same day, they moved for a preliminary injunction. (ECF No. 7).

Both Right to Life and PRC assert that ELCRA violates their First Amendment right to expressive association and right to speech and press (Counts I and II). (ECF No1, PageID.65-69). PRC, alone, asserts that under the First Amendment, ELCRA violates its right to free exercise, religious autonomy, and is unconstitutionally vague (Counts III to V). (*Id.* at PageID.69-74). And both Right to Life and PRC assert that under the Fourteenth Amendment, ELCRA violates both their substantive and procedural due process rights (Counts VI and VII). (*Id.* at PageID.75-77). Right to Life and PRC seek both a declaration that ELCRA violates the Constitution, and a preliminary injunction that enjoins the Michigan officials from enforcing the law against them. (*Id.* at PageID.77-79). The Michigan officials they name in the lawsuit are: Dana Nessel, Michigan's Attorney General; John E. Johnson Jr., the Executive Director of the Michigan Department of Civil Rights, and all eight members of the Michigan Civil Rights Commission. (*Id.* at PageID.1).

Two sets of Defendants filed motions to dismiss this case. First, MDRC and the eight MCRC members filed a joint motion to dismiss. (ECF No. 25). They focus their arguments on standing and immunity issues. (ECF Nos. 26, 27, 47). Second, Attorney General Nessel filed her own motion to dismiss (ECF No. 29), which also focuses on immunity and standing arguments for dismissal. (ECF Nos. 28, 30, 45). Both parties also responded to Right to Life's and PRC's motion for a preliminary injunction at that time, though neither joined issue on the merits of Plaintiffs' constitutional claims. (ECF Nos. 27, 28). And on June 8, 2026, the Court held oral argument to address the pending motions. (ECF No. 55, PageID.985). The motions are ripe for decision.

### DISCUSSION

Because Defendants' Motions to Dismiss focus primarily on procedural reasons for dismissal—namely, standing and immunity—the Court begins with those arguments. Because the Court finds that those arguments fail, the Court will then proceed to address merits-related issues, including Plaintiffs' Motion for a Preliminary Injunction.

### A.  Pre-Enforcement Standing

Standing is a prerequisite to federal jurisdiction. *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 258 (6th Cir. 2026). It requires a plaintiff to show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) that the injury would "likely . . . be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The plaintiff bears the burden of establishing standing "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. So at the pleading stage, a plaintiff need only "plausibly" assert standing. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021).

Here, Defendants primarily argue that Plaintiffs have not alleged a sufficient injury. An alleged injury is sufficient only if it is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560-61. "[H]ypothetical" injuries do not suffice. *Id.* Even so, the mere *threat* of future injury will suffice if the threatened injury is "certainly impending," or there is a " 'substantial risk' that the harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

Consequently, petitioners that intend to violate, or are currently violating, a law may suffer an injury before the law is enforced against them. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). In that instance, the mere "threatened enforcement of a law" causes an injury. *Id.* In this pre-enforcement context, an injury arises where the plaintiff alleges (1) "an intention to engage in conduct arguably affected with a constitutional interest; (2) that conduct is "arguably

15

proscribed by a statute;" and (3) there is a "credible threat" that governing authorities will enforce the statute against the plaintiff. *Driehaus*, 573 U.S. at 158-59; *Christian Healthcare Centers, Inc. v. Nessel (CHC)*, 117 F.4th 826, 843 (6th Cir. 2024). Here, the parties agree that Plaintiffs intend to engage in conduct arguably affected with a constitutional interest. They dispute, however, the last two elements: whether the Plaintiffs' proposed conduct is arguably proscribed by ELCRA, and whether there is a credible threat that Michigan officials will enforce the statue against them.

### 1. Whether Plaintiffs' Alleged Conduct is "Arguably" Proscribed by ELCRA

The parties first dispute whether Right to Life's and PRC's alleged conduct is "arguably proscribed" by ELRCA. For standing purposes, ELCRA need only "arguably" prohibit Plaintiffs' conduct. *Driehaus*, 573 U.S. at 158-59. The specific ELCRA provisions at issue need not, in fact, cover Plaintiffs' alleged conduct. *See CHC*, 117 F.4th at 858 (Murphy, J., concurring) (drawing a distinction between "arguably" proscribed by law for standing purposes and "actually" proscribed by law for merits purposes); *see also Cerame v. Slack*, 123 F.4th 72, 83 (2d Cir. 2024) (drawing the same distinction). The pre-enforcement standing test is satisfied as long as Plaintiffs show that under "a *plausible* interpretation of the statute," their alleged conduct would be forbidden. *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022) (emphasis added); *CHC*, 117 F.4th at 843.[9]

Here, both Right to Life's and PRC's alleged future conduct is, at the very least, "arguably proscribed" by the ELCRA provisions that they argue are unconstitutional.

---

[9] The Defendants' briefing muddles this analysis. Throughout their briefing, Defendants primarily argue that Plaintiffs' conduct is not "proscribed" by ELCRA. But pre-enforcement review standing does not require actual proscription. Proscription need only be arguable. Defendants' "actual proscription" argument is more akin to a 12(b)(6) failure to state a claim defense. *See Fischer v. Thomas*, 176 F.4th 470 (6th Cir. 2026). So the Court should only address that kind of argument once standing is established. *See id.* To the extent Defendants argue that Plaintiffs' conduct is not even "arguably" proscribed by ELCRA, that argument fails. But to the extent Defendants argue that Plaintiffs' proposed conduct is not, in fact, proscribed by ELCRA, the Court will address those questions as part of the merits analysis, after finding that standing is satisfied.

### a.  Employment Clause and Notice Clause

Start with ELCRA's Employment and Notice clauses. Under ELCRA, an employer must not "refuse to hire . . . discharge, or otherwise discriminate against an individual with respect to employment . . . because of . . . sex," which includes "the termination of a pregnancy."[10] MCL § 37.2202(1)(a). Nor may an employer publish any statement that "indicates" it will prefer or discriminate "based on . . . sex," including the "termination of a pregnancy," in its employment practices. MCL § 37.2206(1).

Here, Defendants appear to acknowledge that at least *some* of Plaintiffs' conduct is arguably proscribed by those provisions. Consider the Employment Clause. Both Right to Life and PRC allege that they would discharge, or refuse to hire, employees or applicants who have had abortions. And Defendants state that "Plaintiffs' intent to terminate someone if they obtain an abortion while employed" would amount to discrimination based on sex. (ECF No. 26, PageID.492). So even the defense appears to concede that both Plaintiffs arguably intend to violate ELCRA's Employment discrimination clauses in some way.

Same with the Notice clause. Both Plaintiffs wish to amend their job descriptions, and other materials, to notify applicants and members of the public that their employees must abstain from getting abortions while working for them. Right to Life wants to inform the public that employees must "avoid any conduct that undermines . . . opposes or is inconsistent with" its pro-life mission and that it will "terminate" any employee who engages in such conduct. (ECF No. 1-10, PageID.103; *see also* ECF No.1-4, PageID.90; ECF No. 1-7, PageID.96). Likewise, PRC wants to amend its hiring material to make employees "commit to not undergoing, promoting, or

---

[10] Along those same lines, an employer shall not "[l]imit, segregate, or classify an employee or applicant for employment" in a way that could deprive them of "an employment opportunity" or could "otherwise adversely affect their status . . . because of . . . sex," including the termination of a pregnancy. MCL § 37.2201(1)(b).

17

facilitating, anything contrary" to PRC's principles, "including elective abortions." (ECF No. 1-12, PageID.113). And it also wants to amend its job description to state that all PRC members must "subscribe to, adhere to, and abide by" PRC's religious and moral positions, including its positions on "abortion" and "marriage/human sexuality." All of these practices arguably violate ELCRA because they "indicate[]" that the Right to Life and PRC will prefer or discriminate "based on" religion, sexual orientation, or the "termination of a pregnancy" in their employment practices. MCL § 37.2206(1). Defendants admit as much.[11] So both Plaintiffs also arguably intend to violate ELCRA's Notice clause.

Defendants do not agree, however, that ELCRA arguably prohibits the rest of Plaintiffs' intended conduct—namely, refusing to employ individuals who advocate for abortion, associate with people who get abortions, or hold pro-choice viewpoints. In Defendants' view, ELCRA's "termination of a pregnancy" clause prohibits discrimination based only on "abortion as part of a person's medical history." (ECF No. 36, PageID.493). So discrimination based on advocacy for, or association with, the protected class members—those who have received abortions—would be lawful.

This construction may be plausible. But Michigan's Supreme Court has never endorsed Defendants' narrow interpretation. Rather, as the parties acknowledge, the scope of ELCRA's new amendments remains unsettled. Defendants' proposed interpretation, then, is not conclusive. In fact, Plaintiffs' alternative interpretation—that ELCRA prohibits employers from discriminating against employees or applicants who advocate for abortion or hold pro-choice views—is also plausible.

---

[11] In briefing, the MCRC defendants admit that "Plaintiffs' communication of their policy regarding obtaining abortions is prima facie discriminatory under these laws . . . . Accordingly, ELCRA presumptively prohibits an employer from asking a prospective employee to confirm that she had never had an abortion." (ECF No. 26, PageID.501).

18

First, consider the broad scope of Title VII—the federal employment discrimination statute. As Right to Life and PRC note, ELCRA mirrors Title VII in many ways. Like ELCRA, Title VII prohibits discrimination in the workplace "because of sex" and other characteristics. And, also like ELCRA, Title VII defines "because of sex" to include "because of . . . pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Now, it's true that, unlike ELCRA, Title VII does not include the phrase "termination of a pregnancy." *See id.* But even so, the Sixth Circuit has found that "the plain language of the statute, the legislative history and the EEOC guidelines clearly indicate that an employer may not discriminate against a woman employee because 'she has exercised her right to have an abortion.' " *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996). So, Title VII, like ELCRA, prohibits employers from discriminating because of "abortion."

But Title VII—ELCRA's analogue—does not simply prohibit discrimination based on the act of getting an abortion, as Defendants' suggest ELCRA does. Rather, the *Turic* court concluded that:

> A woman's right to have an abortion encompasses more than simply the act of having an abortion; *it includes the contemplation of an abortion*, as well. Since an employer cannot take adverse employment action against a female employee for her decision to have an abortion, it follows that the same employer also cannot take adverse employment action against a female employee for merely thinking about what she has a right to do.

85 F.3d at 1214 (emphasis added). Thus, under Title VII, any adverse action taken against an employee for reasons related to abortion is prohibited.

Title VII's protections don't stop there. For example, Title VII also prohibits "associational" discrimination—discrimination against "individuals who, though not members of a protected class, are 'victims of discriminatory animus toward [protected] third persons with whom the individuals associate.' " *Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009)

19

(quoting *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988 (6th Cir. 1999)). Similarly, Title VII prohibits "discrimination based on advocacy"—discrimination against individuals "because of their advocacy on behalf of protected class members." *Id.* at 513; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) So under Title VII, a discrimination claim is viable even when the person who was treated adversely is not a member of the protected class. Given ELCRA's similarities, it is plausible that ELCRA prohibits that kind of adverse treatment too.

True, ELCRA is not Title VII. So the protections provided by each might differ. But recently, Michigan's Attorney General Dana Nessel—a Defendant in this case—argued in other litigation that ELCRA is at least as broad as Title VII. In *Kuilema v. Calvin University*, No. 168943 (Mich. April 22, 2026)—a case involving sexual orientation discrimination under ELCRA—Nessel submitted an amicus brief to the Michigan Supreme Court arguing that ELCRA "unequivocal[ly]" prohibits associational and advocacy-based discrimination, like Title VII. According to Nessel, ELCRA prohibits "discrimination targeting an employee, not for who the employee is, but for *associating* with someone ELCRA was enacted to protect." (ECF No. 49-1, PageID.937 (emphasis added)). And in Nessel's view, an associational discrimination claim under ELCRA would not only "reach[] association with a specific person possessing a protected characteristic" but also "association with a protected class more generally, including conduct connected to a protected group (attending a Pride festival, a Juneteenth celebration, or a religious service) without requiring identification of any specific individual." (*Id.* at PageID.954). If the Michigan Supreme Court were to adopt such a test, ELCRA would prohibit adverse action against

20

employees or prospective employees that show some attenuated association with, or advocacy for, individuals who have gotten abortions.[12]

Ultimately, Defendants may be correct that ELCRA's scope is, in fact, narrow. But for standing purposes, only "arguable" proscription is required. And the foregoing evidence suggests that Plaintiffs' broad reading of ELCRA's "termination of a pregnancy" provision is, at the very least, plausible. *See Yellen*, 54 F.4th at 337.

Under this broad interpretation, Plaintiffs have engaged in conduct, and intend to engage in conduct, that ELCRA arguably proscribes. Right to Life alleges that it has refused to hire someone who had formerly worked for Planned Parenthood in an advocacy role. It also alleges to have refused to hire someone who described their views as "pro-choice." So it has already arguably violated ELCRA by "refusing to hire" individuals because they have advocated for members of the protected class—women who get, or want to get, abortions. Right to Life and PRC also intend to continue to forgo hiring anyone who advocates for abortion, associates with people who have gotten an abortion, or exhibits pro-choice viewpoints. Accordingly, by refusing to employ any of those kinds of individuals, and by notifying the public of that practice, Plaintiffs arguably violate ELCRA's Employment and Notice provisions.

### b.  Benefits Clause

Next consider ELCRA's Benefits clause. ELCRA prohibits employers from "discriminat[ing] against an individual on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system." MCL §

---

[12] Attorney General Nessel's position in *Kuilema* stands in stark contrast to the Defendants' position here. Whereas the Defendants argue for a narrow interpretation of ELCRA here, Nessel argues for an expansive interpretation in another forum. That Michigan officials have reached opposite conclusions about ELCRA's scope highlights ELCRA's ambiguity and underscores the facial plausibility of competing constructions, at least one of which arguably covers Plaintiffs' conduct.

21

37.2202(1)(c). MCRC has declared that this provision prohibits an employer from excluding "contraceptives from a health plan that covers other prescription drugs and services." (ECF No. 1-22, PageID.196). And Defendants concede that under this interpretive ruling, the "Benefits Clause . . . prohibits an employer who offers comprehensive health benefits from providing less inclusive coverage on the basis of sex, including by explicitly excluding coverage for termination of a pregnancy." (ECF No. 26, PageID.502).

Here, Right to Life alleges that it does not include abortion-related care in its otherwise comprehensive health care packages. And PRC alleges that it intends to remove the abortion coverage that it currently provides (by mistake) from its otherwise comprehensive health care package. So based on MCRC's own construction of ELCRA, both Plaintiffs "arguably" violate, or intend to arguably violate, ELCRA's Benefits clause.

c.    Accommodations Clause and Accommodation Publication Clause

Finally, consider the Accommodations and Accommodations Publication Clause. ELCRA prohibits "places of public accommodation"—which are any "business, or an *educational* . . . *health* . . . facility, or institution of any kind . . .  whose goods, services, facilities, privileges, advantages, or accommodations . . . made available to the public"—from denying any "individual the full and equal enjoyment" of its "goods, services, facilities, privileges, advantages . . . because of religion, . . . sex, [or] sexual orientation." MCL § 37.2301(a). PRC, alone, argues that these provisions prohibit it from using only volunteers who agree with its positions on abortion, religion, marriage, and sexual orientation, and from notifying the public that it intends to do so.

The first issue is whether ELCRA's accommodation clause "arguably" applies to an organization that offers volunteer opportunities. Although an employer that offers volunteer services may not be the prototypical "public accommodator," MCRC has previously construed the clause to cover such practices. For example, in *MDRC v. McClaren Regional Medical Center*,

22

MCRC determined that a hospital that offered volunteer services was a public accommodator. (ECF No. 1-23, PageID.209). The claimant—a quadriplegic—applied for several volunteer positions with the hospital. The hospital allegedly refused to offer her a volunteer position because of her disability. So MCRC brought a charge against a hospital, alleging that the claimant "was discriminated against by" the hospital because it "denied her the full use and equal enjoyment of a place of public accommodation on the basis of her disability." (*Id.* at PageID.208). Thus, under Defendants' own construction of the statute, a volunteer services provider is arguably a place of public accommodation that may not discriminate against volunteers who want to use its services.[13]

ELCRA's text allows for this plausible interpretation. The Accommodations Clause is broad—it covers "institutions of any kind" that extend its "facilities" or "advantages" to the public. MCL § 37.2301(a). PRC is arguably an "institution" that opens its "facilities" to volunteers and offers volunteer services as one of its "advantages." *Id.* At this point, then, it seems, at the very least, "plausible" that the accommodations clause applies to PRC's use of volunteers.

Because ELCRA's Accommodation Clause arguably applies to PRC's volunteer program, PRC may not refuse volunteer opportunities to anyone "because of religion, . . . sex, [or] sexual orientation." MCL § 37.2301(a). But PRC arguably does that. PRC will not accept volunteers unless they "affirm" that PRC's positions on religion, marriage, sexual orientation, and abortion. In effect, PRC discriminates against non-Christians and non-straight individuals—people who do not align with its religious beliefs—and against people who have had an abortion, or advocate for

---

[13] Defendants say that this charge is irrelevant because it was later dismissed against the Plaintiff. But it was not dismissed because the Hospital was not a place of public accommodation; it was dismissed on the merits of the claim. This case is simply useful to show that ELCRA's place of public accommodation language may cover PRC's practices.

those who do,[14] by declining its "facilities" and "advantages" to them. *Id.* And it intends to publish statements that inform the public of those practices. That conduct, at the very least, arguably violates ELCRA's Accommodations and Accommodations Publications Clause.

Accordingly, the five ELCRA provisions that Plaintiffs challenge arguably prohibit all of Plaintiffs' intended conduct.

### 2.  Whether Plaintiffs Face a Credible Threat of Enforcement

Because all of Plaintiffs' conduct is arguably proscribed by ELCRA, they have standing if they have alleged a credible threat of enforcement. Analyzing whether a "threat" of enforcement is "credible" is a fact-intensive inquiry. *See Christian Healthcare Centers, Inc. v. Nessel (CHC)*, 117 F.4th 826, 851 (6th Cir. 2024); *Driehaus*, 573 U.S. at 164-65. In the First Amendment context, "the first and most important factor is whether the challenged action chills speech." *Fischer v. Thomas (Fischer I)*, 52 F.4th 303, 308 (6th Cir. 2022); *Cath. Charities of Jackson, Lenawee, & Hillsdale Ctys. v. Whitmer*, 162 F.4th 686, 691 (6th Cir. 2025). Here, both Plaintiffs allege a chill— they would like to update their job descriptions and other materials to make their employment policies more explicit, but they have declined to do so because they believe it would violate ELCRA. This chill is "proof by omission" that Plaintiffs face a credible threat of enforcement from Defendants because Plaintiffs "want to speak on a topic, but do not." *Catholic Charities*, 162 F.4th at 691. So with an alleged chill on speech present, the scale tips in favor of standing from the beginning. *See id*.

---

[14] Although ELCRA's public accommodation section does not define "sex" to include "termination of a pregnancy," it is still plausible that ELCRA's prohibition against "sex" discrimination extends to discrimination based on abortion. *Cf. Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (finding Title VII's prohibition on sex discrimination prohibits discrimination based on abortion, even though Title VII did not include explicit "termination of a pregnancy" language).

Still, the Sixth Circuit has emphasized that chilled speech, alone, is generally insufficient to establish an injury in the pre-enforcement context. *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). Rather, a credible threat of enforcement exists "where plaintiffs allege a subjective chill *and* point to some combination" of specific factors. *Id.* (emphasis added). Those factors include:

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action . . . . and (4) a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.

*Id.* (citation modified). These factors, however, are not "exhaustive." *CHC*, 117 F.4th at 848. The severity of a statute's penalties, for example, may also inform whether enforcement is credible. *See Catholic Charities*, 162 F.4th at 691; *Ream v. United States Dep't of The Treasury*, 174 F.4th 480, 486 (6th Cir. 2026). And courts may consider whether enforcement-related administrative proceedings themselves are burdensome, because those extra burdens compound the harm that enforcement brings. *See Driehaus*, 573 U.S. at 166. Moreover, a plaintiff need not satisfy every factor to establish standing. *CHC*, 117 F.4th at 848; *Dutton v. Shaffer*, 171 F.4th 858, 873 (6th Cir. 2026); *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that plaintiffs "don't have to satisfy all the factors" for standing). It is up to the Court, then, to determine, based on all the circumstances, whether Plaintiffs plausibly allege a credible threat of enforcement.

*CHC*'s application of this multi-factor analysis controls this case. *CHC*, like this case, involved a pre-enforcement First Amendment challenge to the *same* ELCRA provisions at issue here—the Employment, Notice, Accommodations, and Accommodations Publication clauses. 117 F.4th at 848. And it was filed against the *same* Defendants at issue here—the executive director of MDCR, the MCRC members, and Attorney General Nessel. There, the court found that the two

25

plaintiffs—a medical service ministry and a catholic school, each of which required employees to affirm the organizations' beliefs on religion, sexual orientation, and gender transition—alleged a credible enforcement threat under the *McKay* factors and thus established standing against *every* Defendant.

As to the first two factors—history of enforcement and warning letters—the court noted that there was "no past enforcement" of ELCRA against either plaintiff, and no warning letters sent to either of them. 117 F.4th at 849-50. But even so, the Court concluded that the plaintiffs' "general" allegations "regarding the past enforcement of ELCRA" increased "the credibility of enforcement" because it showed that Michigan actively enforces and prosecutes violations of ELCRA. *Id.* at 849. So the first factor favored standing. The third factor—whether an attribute of the challenged statute makes enforcement more likely—also strongly favored standing because ELCRA permits any "person" who is "aggrieved by unlawful discrimination" to file a complaint. *Id.* at 850. Per the court, broad citizen-complaint provisions, like ELCRA's, make enforcement more likely. *Id.* (citing *Driehaus*, 573 U.S. at 164). And under the circumstances in *CHC*, it was "plausible" that a person would file a complaint based on the two plaintiffs' practices. *Id.* at 853, 855. Finally, as to the fourth factor—whether the state has disavowed enforcement—the court found that because the defendants had "not disavowed enforcement against the specific conduct that the Plaintiffs allege they want to undertake," enforcement was credible. *Id.* at 851. The state's decision to not disavow enforcement under the circumstances in *CHC* made enforcement even more credible because "refusing to disavow is less understandable" where there is not "a single additional fact that would be required to adjudicate the present action," as was the case there. *Id.* at 850-51.

Analyzing those factors, three of which weighed in favor of standing, the court found that the threat of enforcement against the two plaintiffs was credible, and as such, both plaintiffs had standing to sue.

Here, the analysis is identical.

a.  History of Enforcement and Warning Letters

Start with whether there was "a history of past enforcement" of the statute "against the plaintiffs or *others*," and whether any warning letters were sent. *CHC*, 823 F.3d at 869 (emphasis added). Here, as in *CHC*, both Plaintiffs allege "general facts" that show, on the whole, that Michigan actively enforces ELCRA. *Id.* Michigan receives and certifies thousands of employment discrimination complaints every year. (ECF No. 1, PageID.60); *cf. Russell v. Lunderan-Grimes*, 784 F.3d 1037, 1049 (6th Cir. 2014) (referencing "frequent" complaints). Michigan investigates many of those complaints. (ECF No. 26-2, PageID.517). And every year, Michigan levies charges against violating entities. (*See id.*). All this suggests that when an employer engages in arguably discriminatory practices, like Right to Life and PRC, Michigan often receives a complaint about that activity, investigates the allegations, and then levies charges if it determines that a violation occurred. So because Michigan vigilantly polices discrimination prohibited by ELCRA, enforcement is more credible.

Defendants correctly point out that ELCRA has never been enforced against either of the Plaintiffs. Nor have any warning letters been sent. But *CHC*—which also involved Plaintiffs without targeted enforcement actions—already rejected similar arguments and explained why this showing is not required for standing. 117 F.4th at 849. Evidence of enforcement against "others" is enough. *Id.* And here, Michigan actively enforces ELCRA against other employers with

27

discriminatory practices. So the lack of targeted prior enforcement does not automatically weigh against a credible threat of enforcement.

The Defendants also try, and fail, to distinguish *CHC*. True, in *CHC*, the plaintiffs offered some evidence of past complaints targeting discrimination based on sexual orientation and gender identity—the discrimination provision at issue—whereas here, not a single complaint has alleged discrimination under the "termination of a pregnancy" provision.[15] But that distinction is immaterial. For one, Michigan amended the relevant ELCRA employment provisions less than three years before Right to Life and PRC initiated this lawsuit. Because the challenged provisions have not been in force for long, a lack of enforcement history under those specific provisions is understandable. *See CHC*, 117 F.4th at 849-50. More fundamentally, Right to Life and PRC are not required to "show that the statute has been enforced previously against the precise conduct" that they intend "to undertake." *CHC*, 117 F.4th at 849; *see Block v. Canepa*, 74 F.4th 400, 410-11 (6th Cir. 2023). The Plaintiffs allege that Michigan actively polices sex discrimination under ELCRA, which is what discrimination based on the "termination of a pregnancy" amounts to. There is no reason to think that if discrimination based on "termination of a pregnancy" occurs, Michigan would be less likely to enforce ELCRA.

But even if the Defendants were correct that this first factor weighs against standing, that does not automatically mean that a threat of enforcement lacks credibility. Rather, when other factors—like whether the state has failed to disavow enforcement, or whether a statue contains a broad enforcement mechanism—weigh in favor of enforcement, the Sixth Circuit often finds standing, even when the plaintiff provides no evidence of enforcement history. For example, in

---

[15] This argument fails to recognize that Plaintiffs' accommodations' clause challenge targets ELCRA's prohibition on discrimination based on sexual orientation and gender identify—the provisions at issue in *CHC*.

*Ream,* the court found pre-enforcement standing to challenge the constitutionality of a home-distillery ban that had apparently not resulted in *any* conviction in over 50 years. 174 F.4th at 486; *id.* at 491 (Mathis, J., dissenting). And in *Catholic Charities*, the court found pre-enforcement standing to challenge the constitutionality of Michigan's newly enacted conversion therapy ban without even considering whether the law had ever been enforced against anyone. *See* 162 F.4th at 691. Unlike those cases, Michigan actively enforces ELCRA. So a credible threat of enforcement exists if other factors are present.

> b.    Whether an Attribute of ELCRA Makes Enforcement More Likely

Next is whether there is an attribute of the statute that makes enforcement more likely. *McKay*, 823 F.3d at 868-69. As the Defendants acknowledge, this factor also weighs in favor of standing. (*See* ECF No. 26, PageID.489). As *CHC* found, ELCRA allows any "person" who is "aggrieved by unlawful discrimination" to file a complaint, and in turn, "start" ELCRA's enforcement process. *CHC*, 117 F.4th at 849-50; MICH. ADMIN. CODE. R. 37.4(1). Statutory mechanisms that "allow any person to file a complaint," like ELCRA's, "make enforcement more likely because the law's initiation is not limited to a prosecutor or an agency." *Id.* at 850 (quoting internal quotations omitted); *cf. Driehaus*, 573 U.S. at 164 (finding credible threat of enforcement where law allowed "any person" with "knowledge of the purported violation to file a complaint").

So, as the Sixth Circuit already found, ELCRA's citizen-complaint provision is a "key-statutory aspect" that makes "enforcement more credible."[16] *CHC*, 117 F.4th at 851.[17]

Defendants think that another statutory attribute of ELCRA—the BFOQ exemption process—impacts the credibility analysis. In their view, the existence of this exemption system, alone, makes enforcement less credible. And they think that before Right to Life and PRC can show a credible threat of enforcement, they first must apply for an exemption.

Again, *CHC* shows otherwise. *CHC* assessed whether enforcement under the same ELCRA enforcement scheme was credible. Yet the court did not find that the BFOQ scheme negated the credibility of enforcement. Nor did *CHC* find that the plaintiffs must apply for the BFOQ before filing suit. Rather, the court concluded that "without knowing what facts would be presented to support a BFOQ application regarding a specific position, let alone how the Commission would evaluate those facts," it could not "conclude that ELCRA's BFOQ exemption categorically removes Plaintiffs from the scope of its employment regulations." *CHC*, 117 F.4th at 847-48. So too here. Defendants have never indicated that they would grant Plaintiffs an BFOQ exemption if

---

[16] Defendants say that this provision does not favor enforcement because "[o]bviously, persons 'aggrieved' by Plaintiffs' conduct is a very small subset of 'any member of the public.' " (ECF No. 26, PageID.489). But this is not as "obvious" as the Defendants suggests. For one, Michigan does not have any clear standards to help "determine whether a person was 'aggrieved by unlawful discrimination' such that she could submit a complaint." *CHC*, 117 F.4th at 854. So determining whether someone is "aggrieved" by the statute is a discretionary decision that allows the state to apply the term broadly. In fact, Defendants have suggested that they might process a complaint from someone who merely "see[s] something that may discriminate against someone." (ECF No. 1, PageID.59; ECF No. 1-19, PageID.149). "Aggrieved" person, then, could include many different people, including the Attorney General.

[17] Here, as in *CHC*, it is "plausible" that the Plaintiffs "would face a complaint." 117 F.4th at 853. Both intend to arguably violate ELCRA by stating in job applications and other postings that they will not hire candidates who disagree with, or act inconsistently with, their pro-life mission. Put simply, they intend to inform the public that they will not hire people who advocate for, or obtain, abortions. Although intuitively, a complaint arising from these facts may seem improbable, the "factual circumstances" at this time "do not otherwise indicate that a complaint is unlikely." *Id.* In fact, both Plaintiffs allege that they have refused to hire applicants who have exhibited indication of pro-choice advocacy or viewpoints, which arguably violates ELCRA. So under *CHC*'s rationale, a complaint is plausible, making enforcement more credible.

30

they applied for one. Nor have Defendants offered any indication of how the Commission "would evaluate [the] facts." *Id.* Rather, Defendants have *not* disavowed enforcing ELCRA against the Plaintiffs, even though Plaintiffs' have meticulously described their organizational structure and employment positions. So without any reason to think that the Defendants would grant a BFOQ to either Plaintiff, the Court cannot conclude that the BFOQ process diminishes the credibility of enforcement here.[18]

For all those reasons, ELCRA's statutory attributes increase the credibility of ELCRA's enforcement. So this factor also favors standing.

c.    Whether Defendants Have Disavowed Enforcement

The last factor—whether the government has disavowed enforcement—weighs heavily in favor of standing. The parties agree that *none* of the Defendants—the MDRC and MCRC officials, and Attorney General Nessel—has disavowed enforcing ELCRA against Right to Life or PRC. As *CHC* found, when the government does not disavow enforcement "against a particular plaintiff" with respect to the plaintiff's specific conduct, enforcement is more credible. *CHC*, 117 F.4th at 850. Along those same lines, "refusing to disavow is less understandable—and enforcement more

---

[18] Defendants BFOQ arguments fail for other reasons. For one, the BFOQ process involves rigorous procedures that may pose a burden on Right to Life and PRC. As part of the exemption process, the Commission may "investigate any matter deemed relevant to an application," and the applicant must provide "all records, documents, data, or other information" that the commission requests. MICH. ADMIN. CODE R. 37.25(2). The moving party must also submit a legal brief in support of their position for an exemption. Because of this, the Plaintiffs allege that they would need to "hire a lawyer" to complete the application, given its specific requirements. (ECF No. 1, PageID.61). This intensive process could cause some burden, and even harm, to the Plaintiffs. *See Driehaus,* 573 U.S. at 166 (considering administratively burdensome procedures in the standing analysis). Moreover, even assuming Plaintiffs were to qualify for an exemption (which Defendants' position here does not indicate), BFOQ exemptions are not absolute. They are valid for no more than 5 years. MICH. ADMIN. CODE R. 37.25(4). The Commission may also revoke an exemption that it already granted. *Id.* at 37.25(3), (5). So a BFOQ exemption does not eliminate enforcement. Finally, if the Commission were to determine that Plaintiffs do not deserve a BFOQ exemption, it can initiate a complaint from that process. (ECF No. 1, PageID.63). Right to Life and PRC could trigger enforcement simply by applying for the BFOQ process, which would defeat the purpose of a pre-enforcement lawsuit. So for all those reasons, Plaintiffs need not apply for the BFOQ to establish standing.

credible—where there is not 'a single additional fact that would be required to adjudicate the present action.' " *Id.* (quoting *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023)). Here, as in *CHC*, both Right to Life and PRC have described, in detail, their abortion-related policies, their employment requirements, and the specific positions for which they want to begin hiring. So it's difficult to imagine what else MCRC would need to "adjudicate" this action. *Id.* Moreover, ELCRA provides that a Plaintiff need not apply for a BFOQ to receive one. *See* MCL § 37.2208; (ECF No. 56, PageID.1201 (showing Defendants' confirmation at oral argument that "the BFOQ is not something you have to apply for")). So if the Defendants did not intend to enforce the statute against the Defendants, they could seemingly grant a BFOQ exemption to the Plaintiffs *sua sponte*.[19] But up to this point, they have not done so.

The Defendants' lack of disavowal, when viewed in the context of their other positions taken during litigation, is puzzling. MDRC's and MCRC's legal theory in this case centers on their argument that ELCRA does not prohibit the Plaintiffs' desired conduct. Yet they also have not disavowed enforcing ELCRA against Right to Life and PRC. If Plaintiffs' conduct is not prohibited by ELCRA, as those Defendants claim, why refuse to commit to not enforcing the statute against them? *Cf. CHC*, 117 F.4th at 858 (Murphy, J., concurring) (describing similar contradictory positions). Maybe Defendants believe that at least *some* of the Plaintiffs' proposed conduct is prohibited by ELCRA, and thus, subject to enforcement. Defendants often hedge their position on this throughout briefing. (*See, e.g.*, ECF No. 26, PageID.479 ("The *bulk* of Plaintiffs' alleged conduct does not violate ELCRA" (emphasis added))). So not disavowing might suggest that

---

[19] Defendants argue that it is impossible for them to disavow enforcement. (ECF No. 26, PageID.490). But they made similar argument in *CHC*. 117 F.4th at 850 ("Defendants have not disavowed enforcement . . . contending that disavowal is impossible . . . ."). And yet the *CHC* court still found that Defendants' failure to disavow enforcement . . . mak[es] enforcement more credible." *Id.* at 851. So here too, Defendants' arguments do not affect this analysis.

Defendants would enforce ELCRA against Plaintiffs, if the circumstances arose. Maybe Defendants' refusal to disavow indicates that they would not grant a BFOQ to Right to Life or PRC, if the organizations applied. Or maybe Defendants have not disavowed enforcement simply to accommodate the Attorney General, who has exclaimed her intent to aggressively enforce Michigan laws that protect abortion rights. (*See* ECF No. 1, PageID.60).

Whatever Defendants' reason may be, their decision to not disavow enforcement seals the case for pre-enforcement review standing. Courts routinely emphasize the importance of a state's decision to not disavow enforcement. In *Chiles v. Salazar*, the Supreme Court found a credible threat of enforcement in the context of a First Amendment challenge based solely on the fact that the state "expressly declined to disavow enforcement against" the plaintiff. 146 S. Ct. 1010, 1119 n.* (2026). Likewise, in *Green Party of Tennessee v. Hargett*, the Sixth Circuit found a credible threat of enforcement where the defendants did "not explicitly disavow[] enforcing" the statute, even though they "have not enforced or threatened to enforce" it against anyone. 791 F.3d 684, 696 (6th Cir. 2015). So here too, the Defendants' lack of a disavowal weighs heavily in favor of standing.

d.   Other Factors Weigh in Favor of Standing

Additional factors in this case also favor standing. First, ELCRA's penalties are severe. Under ELCRA, violators may be forced to pay damages, hire or reinstate employees, submit to cease-and-desist orders, or surrender their licenses. *See* MCL § 37.2605. Severe penalties, like these, increase the likelihood of chilled speech—the most important factor in the credibility of enforcement analysis. *Cf. Catholic Charities*, 162 F.4th at 691 (noting that the law threatens the plaintiff "with the loss of their licenses, and with fines up to $250,000," making chilled speech

33

more likely). So, especially when combined with the state's disavowal, this additional circumstance favors standing. *See id.*

Second, ELCRA's enforcement process, once initiated, is "burdensome." *See Driehaus*, 573 U.S. at 165. Under ELCRA's procedures, Michigan thoroughly vets discrimination complaints. Michigan's investigation process involves intrusive discovery procedures. *See* MICH. ADMIN. CODE R. 37.4 to 37.16. And investigations commonly last up to nineteen months. (ECF No. 1, PageID.60). ELCRA's procedures would therefore force Right to Life and PRC to "divert significant time and resources to hire legal counsel" and respond to discovery requests. *Driehaus*, 573 U.S. at 165. ELCRA's intrusive procedures, then, also favor standing.

\* \* \*

Overall, these factors show a plausibly credible threat of enforcement. Michigan actively polices ELCRA violations—it fields and investigates thousands of complaints per year, and it files multiple charges per year. Moreover, enforcement is made easier under the statute because any "person" who is "aggrieved" by discrimination can file a complaint. And although Defendants argue that ELCRA does not prohibit "most" of Plaintiffs' conduct, they still have not disavowed enforcement ELCRA against them. So at this point, Right to Life and PRC cannot be sure whether Michigan would penalize their desired activities. Finally, these factors are compounded by ELCRA's burdensome enforcement process—from complaint to charge—which causes related harm. And violations can result in a variety of penalties, further chilling the Plaintiff's speech.

These factors mirror *CHC*, where the Sixth Circuit found standing. Likewise, the Sixth Circuit has found a credible threat of enforcement under similar, or even less credible, circumstances. *See, e.g.*, *Catholic Charities*, 162 F.4th 686 (finding standing where speech was chilled, no disavowal of enforcement, and anyone can initiate a complaint); *Green Party of*

34

*Tennessee*, 791 F.3d 684 (finding standing after noting that although "defendants have not enforced or threatened to enforce this statute . . . they also have not explicitly disavowed enforcing it in the future"); *Ream*, 174 F.4th at 485-86 (finding standing where the government declined to disavow enforcement and where the statute provided for severe penalties). So here too, Right to Life and PRC have alleged a plausibly credible threat of enforcement under ELCRA.[20] And because they have alleged a credible threat of enforcement, they have standing to pursue their constitutional claims.

### B.  Defendant Attorney General Nessel's Unique Standing Arguments Also Fail

Attorney General Nessel raises a slightly different standing argument. She thinks that the Plaintiffs do not have standing against her because, in her view, she doesn't have authority to enforce ELCRA and Plaintiffs cannot therefore identify any injury that would be "fairly traceable" to her conduct. (ECF No. 30, PageID.608). But again, *CHC* shows otherwise. There, the plaintiffs not only sued MCRC and MDCR to prevent ELCRA's enforcement against them—they sued Attorney General Nessel as well. And after its review, the Court found standing against every

---

[20] The Court has one final note about Defendants' standing position. At bottom, Defendants appeal to common sense: enforcement is not credible here, because how many people who have gotten abortions, or advocate for abortion, would apply to work at Right to Life or PRC—pro-life organizations—in the first place? This appeal to common sense may seem tempting. But courts, especially at the pleading stage, do not take this approach. Many First Amendment pre-enforcement cases routinely arise in similar contexts. Why would a trans person want to work for a Catholic school or medical facility that actively advocates against gender transition and refuses to provide those services? *Cf. CHC*, 117 F.4th 826 (finding standing to challenge ELCRA). Why would a same-sex couple want a wedding website from a wedding website business run by someone that rejects same-sex marriage and only designs websites for straight couples? *Cf. 303 Creative LLC v. Elenis,* 600 U.S. 570 (2023) (finding pre-enforcement standing). But even so, courts find a credible threat of enforcement under those circumstances. Either way, Defendants appeal to common sense fails because Right to Life's and PRC's pleadings rebut the Defendants' position—both organizations include verified claims that they have already declined to hire individuals who either formerly advocated for abortion access, or who still hold to that view. So at this stage, Defendants' appeal to commonsense fails under both established caselaw and the verified facts of record in this case.

Defendant, including Attorney General Nessel. Because *CHC* involved challenges to the same ELCRA provisions at issue here, the analysis in this case is no different.

Nessel tries to distinguish *CHC* on the grounds that *CHC*'s standing analysis focused almost entirely on the MCRC defendants rather than her. But this argument is unconvincing. *CHC* found standing, including a credible threat of enforcement, against each Defendant, including the Attorney General. In *CHC*, the Attorney General argued on appeal that the plaintiffs did not have standing against her because "she does not enforce ELCRA." Br. for Defs.-Appellees, *CHC*, 117 F.4th 826 (No. 23-1769), 2023 WL 8644426, at *26, 32. By holding that the plaintiffs had standing to sue her under ELCRA, the Sixth Circuit necessarily rejected that argument. The Sixth Circuit's decision not to single out the argument expressly simply demonstrates that the same standing analysis applied to every Defendants, including Attorney General Nessel. If the court thought the standing analysis applied differently to her, it would have said so. Indeed, in the same opinion, the court concluded that the plaintiffs lacked standing to sue the Attorney General under another Michigan statute, the EAA, but permitted the Plaintiffs to proceed against the Attorney General under ELCRA. This Court must do the same.

Even without the benefit of *CHC*'s holding, this Court respectfully disagrees with the Attorney General's view of her limited enforcement authority. She may not have the same level of enforcement responsibility as the MRCR and MDCR Defendants, but she still assists in the enforcement process. Essentially, the Attorney General acts as the state's attorney throughout the proceedings. *See* MCL § 37.2602(b) (noting that the "attorney general shall appear for and represent the department or the commission in a court having jurisdiction of a matter under this act"). The Attorney General can enforce discovery orders and can represent the Department during the trial-like hearings. She may also enforce MCRC's final orders and settlement agreements. *See*

36

MCL § 37.2604. And if the final order is challenged, she may defend MCRC on appeal. So there are many ways in which Attorney General Nessel contributes to the harm that Plaintiffs would suffer from ELCRA's enforcement proceedings, which is all that is needed to trace constitutional harm to her. And for that reason, an injunction that prevents her from taking those enforcement measures would "redress" the harm and satisfy Article III standing.

Finally, as Plaintiffs point out, Attorney General Nessel has repeatedly signaled her intention to defend abortion rights in the state.  (*See, e.g.*, ECF No. 1, PageID.60). This suggests that if an enforcement opportunity arose against either Plaintiff for abortion-related discrimination, Attorney General Nessel would make the most of her enforcement authority to ensure that Plaintiffs are held accountable. The Attorney General's robust efforts to protect abortion rights throughout the state underscores Plaintiffs' demonstration of traceable and redressable harm from the Attorney General.

Plaintiffs have standing against every Defendant, including Attorney General Nessel.

### C.  Immunity

Each Defendant also argues that they are immune from this *Ex Parte Young* lawsuit. These arguments merit little additional discussion.

The MCRC and MDRC Defendants first argue that the *Ex Parte Young* exception does not apply here. But that argument fails because MCRC and MDRC are ELCRA's primary enforcers. So each Defendant has more than "some connection" with a law's "enforcement" such that they can be sued under *Ex Parte Young*. 209 U.S. 123, 157-58 (1908); *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022). The MCRC defendants also argues that they enjoy "quasi-judicial immunity." (ECF No. 26, PageID.506). But even assuming such immunity would apply to MRCR members, the doctrine does not prevent *Ex Parte Young* actions against

state officials in their official capacities. *See Denton v. Bedinghaus*, 40 F. App'x 974, 979 (6th Cir. 2002) ("[I]mmunity defenses apply to individual capacity suits . . . Thus, quasi-judicial immunity does not bar plaintiffs' official capacity claims."); *Williams v. Parikh*, 708 F. Supp. 3d 1345 (S.D. Ohio 2023) (finding that judicial immunity does not bar a suit "for prospective equitable relief"). The doctrine only protects against individual capacity claims for monetary relief. This, however, is an *Ex Parte Young* lawsuit that seeks only prospective relief against state officials in their official capacity. So quasi-judicial immunity does not apply.

Attorney General Nessel's immunity arguments are also unpersuasive. True, she may not have as much enforcement authority under ELCRA as the MCRC or MDRC defendants. But, as the standing analysis shows, she has "some connection" to ELCRA's enforcement. She can act as MDCR's attorney and represent it throughout the complaint review process. She enforces discovery and final orders. And she may defend MCRC's final orders on appeal. So she can take various kinds of "legal or administrative actions against the plaintiff's interests" such that *Ex Parte Young* applies. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021 (6th Cir. 2022) (quoting *Doe v. DeWine*, 910 F.3d 842 (6th Cir. 2018)). Moreover, "[i]t would be a perverse reading of *Young* to say that, although [a plaintiff] might have an Article III injury before the Attorney General" commences prosecution, "the Eleventh Amendment would nonetheless simultaneously bar [a court] from enjoining the Attorney General's initiating a prosecution." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015). "Rather, at the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy this element of *Ex Parte Young*." *Id.* The Court has already concluded that Plaintiffs' have standing to sue Nessel. For those same reasons, then, *Ex Parte Young* applies.

38

Accordingly, Defendants are not immune from this *Ex Parte Young* suit.

### D.  Certification Is Needed to Resolve Unsettled Questions Regarding ELCRA's Scope

Without any procedural barriers standing in the way of Plaintiffs' constitutional claims, the Court may turn to merits-related issues. But before doing so, the Court must address a threshold problem—how to treat unsettled questions of state law that permeate this case. As the Court's standing analysis previewed, the parties vigorously dispute the meaning and scope of every ELCRA provision that the Plaintiffs challenge. Defendants argue that ELCRA is narrow; in their view, the statute only prohibits discrimination against employees whose "medical history includes an abortion." (ECF No. 26, PageID.472). And because of a narrow construction, Defendants argue Plaintiffs' conduct is not prohibited by the statute and should be dismissed under Rule 12(b)(6). Plaintiffs, on the other hand, argue that ELCRA is broad. In their view, the statute not only prohibits adverse action based on the employee's decision to terminate a pregnancy but rather extends as far as protecting employees that "advocat[e] on behalf of someone else's right to" terminate a pregnancy. (ECF No. 40, PageID.704). Effectively, then, the statute would prohibit them from taking any adverse action against anyone who expresses pro-choice beliefs.

Normally, the Court would chart a course through thorny state law questions. But this controversy is different. In this case, unlike others, Plaintiffs' constitutional claims either hinge on, or are materially affected by, ELCRA's scope. And further compounding this problem is that even if this federal court were to interpret ELCRA narrowly to avoid treading on Plaintiff's intended activity, it may not be able to offer any effective relief. So for the following reasons, the Court finds that at this early stage in litigation, the most prudent course is to certify all these ELCRA-related questions to the Michigan Supreme Court. The Michigan Supreme Court, rather than this federal court, is the best place to litigate these state law issues.

1. *The Michigan Supreme Court Is a More Appropriate Forum for These State Law Questions*

Start first with some background, which illuminates why this Court is not well-suited to answer these ELCRA questions. Right to Life and PRC argue that ELCRA, as applied to their circumstances, violates their First and Fourteenth Amendment Rights. But Defendants—instead of contesting the Plaintiffs' constitutional argument—argue that ELCRA does not, in fact, prohibit Plaintiffs' conduct. So they move for a Rule 12(b)(6) failure to state a claim dismissal on that basis. Under this type of defense, the "plaintiffs' constitutional claims would seemingly fail not because their constitutional theories lack merit but because the relevant statute does not reach their conduct." *CHC*, 117 F.4th at 859 (Murphy, J., concurring); *see, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). So the court could "simply dismiss" the plaintiff's challenge for failing to state a claim. *Fischer v. Thomas (Fischer II)*, 176 F.4th 470, 476 (6th Cir. 2026); *see, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15, 39 (2010) (dismissing First Amendment freedom of association claim "because the statute does not penalize" what the plaintiffs argued it did).

When state officials choose to defend a lawsuit on statutory grounds, as the Defendants do here, a threshold "order-of-operations" question arises: Should the court decide whether a state law prohibits "the conduct at issue *before* asking whether applying that law would violate the Constitution?" *Fischer II*, 176 F.4th at 475; *CHC*, 117 F.4th at 859 (Murphy, J., concurring). In *Fischer II*, the Sixth Circuit suggested that the answer is "yes." There, the court instructed that when the parties dispute whether a state law prohibits the petitioner's conduct, "[p]rinciples of constitutional avoidance indicate" that a court should dispose of the petitioner's "challenge by interpreting a state law rather than reaching a constitutional question." *Fischer II*, 176 F.4th at 475-76. So courts should "hesitate" before addressing the constitutionality of a state statute if

40

construction of the statute could render the constitutional claims moot. *Id.* at 476. Applying those instructions here, the first step in the Court's analysis—before getting to downstream merits questions—would be to determine whether ELCRA prohibits Right to Life's and PRC's conduct. If Defendants are correct that it doesn't, Plaintiffs might well "prevail" on state law grounds but would not receive constitutional protection.

But as *Fischer II* also recognizes, federal courts are in an awkward position to make this determination of state law. If the Court were to agree with the Defendants' that ELCRA does not prohibit Plaintiffs' conduct, the Court could consider three potential remedies. *Fischer II*, 176 F.4th at 476.  The Court could enter an injunction enjoining Defendants from enforcing ELCRA against Plaintiffs' non-prohibited conduct. *See id.* The Court could also issue a declaratory judgment that declares ELCRA does not prohibit Plaintiffs' conduct. *See id.* Or the Court could simply dismiss the Plaintiffs' as-applied challenges for failing to state a claim. *See id.*

But when a state law, rather than a federal law, is at issue, each of those remedies is either unavailable or unsatisfying. *See id.* An injunction would not suffice because sovereign immunity "prohibits federal courts from ordering state officials to follow state law. *Id.*; *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (establishing this rule). So that's strike one. Sovereign immunity would likewise prohibit the Court from entering a declaratory judgment because that would also amount to an impermissible attempt to "instruct[] state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106; *see In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 782 (6th Cir. 2017) (per curiam) (applying *Pennhurst* to declaratory judgments); *Gmeiner v. Kent*, 807 F. Supp. 3d 768, 776 (W.D. Mich. 2025) (same). So that's strike two. And although the Court could dismiss the as-applied challenges, which would avoid sovereign immunity concerns, dismissal would not prevent the state from attempting to

41

enforce "the statute against the challenger in state court." *Fischer II*, 176 F.4th at 476-77. A federal court's interpretation of state law is not binding. *See Lakeland Reg'l Health Sys. v. Walgreens Health Initiatives, Inc.,* 604 F. Supp. 2d 983, 990 (W.D. Mich. 2009); *Cont'l Motors Corp. v. Muskegon Twp.,* 365 Mich. 191, 194 (1961). It would be "up to the state court" to decide whether to adopt the federal court's reasoning or apply estoppel doctrines, like issue preclusion. *See Fischer II*, 176 F.4th at 477. Simply dismissing the case, then, allows for future enforcement of the statute, which would "defeat the purpose of a pre-enforcement challenge." *Id.* at 477. So that's strike three—every potential remedy is out. If no remedy will suffice, what is the Court to do?

*Fischer II* may not have answered these questions. *See id.* at 478 ("[R]egardless of how these questions should come out, we don't need to resolve them here."). But in the Court's view, certifying those state law questions to the Michigan Supreme Court may solve these problems. Here, certification gives the Michigan Supreme Court a chance to provide an authoritative interpretation of the statute. If the state court were to say that ELCRA prohibits Plaintiffs' conduct, the Court could proceed to the merits analysis with certainty, rather than "the mere assumption," *CHC*, 117 F.4th at 859 (Murphy, J., concurring), that their conduct is unlawful. On the other hand, if the Michigan Supreme Court were to say that ELCRA does not prohibit Plaintiffs' conduct, Plaintiffs would receive enforceable relief. Even if this Court would be unable to enter an injunction or declaratory judgment that instructs state officials to follow state law, the Court could dismiss Plaintiffs' constitutional claims with the confidence that the state could not enforce ELCRA against the Plaintiffs based on a binding determination of state law by the Michigan Supreme Court. *See Fischer II*, 176 F.4th at 477.

In this specific case, then, certification is the most appropriate answer to *Fischer II*'s "order of operations" problem.

### 2. *Certification Is the Recommended Course in This Case*

#### a.  ECLRA's Scope Is Unsettled

Aside from those practical considerations, certification is also recommended in this case as a matter of established law and practice. Certification "is most appropriate when the question is new and state law is unsettled." *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995); *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). Indeed, in Michigan, the certification process "exists to resolve unsettled questions of state law." *In re Certified Question from United States Dist. Ct. for E. Dist. of Michigan*, 21 N.W.3d 918, 921 (Mich. 2025) (Cavanagh, C.J. concurring). So Michigan law provides that when "a federal court . . . considers a question that Michigan law may resolve" but "is *not* controlled by Michigan Supreme Court precedent," the federal court may certify that question to the Michigan Supreme Court. M.C.R. 7.308(A)(2)(a) (emphasis added); *see also* L. Civ. R. 83.1.

Here, every relevant ELCRA question is both new and unsettled. Take ELCRA's employment provisions. Michigan amended these provisions to add the "termination of a pregnancy" language only three years ago. Because these amendments are new, the Michigan Supreme Court has not yet analyzed this provision. Consequently, the parties have vigorously disputed their scope and meaning. As described in the Court's standing analysis, Right to Life and PRC posit that ELCRA is broad. In their view, ELCRA prohibits them from refusing to hire individuals who advocate for abortion (so those with pro-choice beliefs) or even associate with those who do. They point to Title VII—ELCRA's federal analogue—which prohibits associational and advocacy-based discrimination. And they also point to positions taken in other litigation by Attorney General Nessel—a Defendant here—where she argues that ELCRA also prohibits associational discrimination claims. So Plaintiffs offer one plausible interpretation of ELCRA: that

it prohibits discrimination against a person based on advocacy for, or association with, women who have terminated a pregnancy.

Still, this interpretation hinges significantly on Title VII and its accompanying caselaw—a federal statute not at issue in this case. It is possible that Michigan may not have meant for ELCRA to apply as broadly. Defendants point out, for example, that the language of ELCRA provides that employers may not treat "an individual *affected* by pregnancy, childbirth, the termination of a pregnancy, or a related medical condition differently for any employment-related purpose. MCL § 37.2201(1)(d) (emphasis added). In the defense view, the word "affected" limits application of the "termination of a pregnancy" to those who have, in fact, terminated a pregnancy. This narrow interpretation also aligns with statements made by Michigan state representatives that passed the amendments. (*See, e.g.*, ECF No. 1, PageID.41). On the other hand, every parent knows that pregnancy impacts an entire family, not just a gestating mother, suggesting that "affected by" is broad enough to cover many people who do not personally carry children in their wombs. And the Attorney General has also argued that ELCRA covers associational discrimination in other cases.

Because each of these interpretations is plausible, the Court cannot see a " 'reasonably clear and principled course' to resolving this case without certification." *United States v. Cervenak*, 135 F.4th 311, 329 (6th Cir. 2025) (en banc) (quoting *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009)). Even Michigan's own state officials do not agree on what ELCRA's employment provisions cover. *Compare* (ECF No. 36, PageID.493 (MCRC Defendants' brief arguing that ELCRA's "termination of a pregnancy" clause prohibits discrimination based only on "abortion as part of a person's medical history"), *with* (ECF No. 49-1, PageID.937, 954 (Attorney General Nessel's brief in *Kuilema* arguing that ELCRA prohibits both association and advocacy based discrimination claims)). So with all this uncertainty, the Michigan Supreme Court,

rather than a federal court, should be the body to conclusively settle these Employment Clause questions.

The scope of the Benefits Clause is also unsettled. Right to Life and PRC say that ELCRA's prohibition against discrimination against an employee "on the basis of sex with respect to . . . a benefit plan or system" requires each organization to offer abortion-related care as part of their health care plans. *See* MCL § 37.2202(1)(c). MCRC has previously declared that this provision prohibits an employer from excluding "contraceptives from a health plan that covers other prescription drugs and services." (ECF No. 1-22, PageID.196). But, as Defendants confirmed at oral argument, MCRC's interpretation of ELCRA is not binding. (ECF No. 56, PageID.1002-03). The Michigan Supreme Court has the final say. So MCRC's declaratory ruling is not settled law. Moreover, the Benefit Clause's text does not unambiguously support MCRC's prior ruling. Rather, based on a plain reading of the text, the Benefits Clause may simply mean that employers must offer the same benefits packages to everyone. And if that is the case, then ELCRA would not prohibit Right to Life's and PRC's activities because both organizations offer the same health care package to all their employees, regardless of their sex. As with the employment clauses, then, the Michigan Supreme Court, rather than a federal court, should be the body to conclusively settle this question.

Finally, the Accommodations and Accommodations Publication Clause are also unsettled on the relevant issues. First, Michigan law does not conclusively say whether an employer, who also offers volunteer opportunities, counts as a place of public accommodation with regard to its volunteer practices. The only evidence PRC provides to show that it does is a charge brought by MCRC against similar practices. That, along with the broad text, may be enough to support a plausible construction. But the Michigan Supreme has never applied it in such a way. And, as the

45

Defendants point out, volunteers are akin to employees. (ECF No. 26, PageID.503). So it may be that ELCRA's Accommodation Clause was not meant to extend to such practices. Second, Michigan law also does not appear to be settled as to whether ELCRA's Accommodations Clause prevents public accommodators from discriminating based on "termination of a pregnancy," like ELCRA's employment clause. It may be that although ELCRA's Accommodation Clause does not define "sex" to include "termination of a pregnancy," its protections still extend to that trait. *Cf. Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (finding Title VII's prohibition on sex discrimination prohibits discrimination based on abortion, even though Title VII did not include explicit "termination of a pregnancy" language). But again, the Michigan Supreme Court is the only body that can conclusively settle these questions.

Accordingly, because all these ELCRA questions remain "unsettled," certifying them to the Michigan Supreme Court is a recommended measure under both Michigan law and Sixth Circuit precedent. *See* M.C.R. 7.308(A)(2)(a); *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995).

### b. Plaintiffs' Constitutional Questions Hinge on ECLRA's Meaning

Certification is appropriate here for other reasons. For one, certification is also recommended where the merits analysis may hinge on, or is affected by, the meaning of state law. *See Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 410-11 (6th Cir. 2008); *see also* L. Civ. R. 83.1. It could be that resolution of the state law question could dispose of a case entirely. *See id.* It could also be that "construction" of an "unconstrued state statute" would "materially change the nature of the problem." *In re Nat'l Prescription Opiate Litig.*, 82 F.4th 455, 461 (6th Cir. 2023) (quoting *Bellotti v. Baird*, 428 U.S. 132, 147 (1976)). Or it could simply be that resolution of the state law issue would "define . . . the constitutional question presented."

46

*Planned Parenthood*, 531 F.3d at 411 (quoting *Bellotti*, 428 U.S. at 148). In any of those scenarios, certification is a prudent approach.

Here, resolution of the state law questions may determine the outcome of some of Right to Life's and PRC's constitutional claims. For example, if the Michigan Supreme Court construed the Benefits Clause narrowly, then ELCRA would not prohibit the Plaintiffs' choice to exclude abortion-related coverage for all employees. So any constitutional claim based on the Benefits Clause could be dismissed. Likewise, if the Michigan Supreme Court determined that an employer that also offered volunteer opportunities did not qualify as a public accommodator, then ELCRA's Accommodation or Accommodations Publication Clause would not prohibit PRC's volunteer-related conduct. So any of PRC's constitutional claims based on those provisions could also be dismissed.

At the very least, ELCRA's construction would "materially change the nature of," and help to "define," some of Plaintiffs' constitutional claims. Consider Plaintiffs' expressive association claims. First Amendment expressive association claims require the Court to analyze whether the presence of a certain member in an expressive group "would significantly burden" the group's expression, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000), or whether it would threaten "the very mission of the organization." *CompassCare v. Hochul*, 125 F.4th 49, 61 (2d Cir. 2025). That analysis would likely differ based on whether ELCRA prohibited Right to Life and PRC from discriminating against individuals who advocated for abortions—i.e. pro-choice activists—or whether ELCRA merely prohibited Right to Life and PRC from discriminating against those who have terminated a pregnancy. Pro-choice activists who advocate against Right to Life's and PRC's mission would pose a different, and likely greater threat, to Right to Life's and PRC's pro-life mission than someone who has received an abortion but does not spread that message to the public.

47

*Cf. Dale*, 530 U.S. at 653 (emphasizing that plaintiff burdened the group's expressive association not only because he was gay but because he was also a "gay rights activist"). So ELCRA's interpretation "materially" changes this constitutional problem. And it would further help "define" the expressive associational issues by focusing the Court's analysis on the precise discriminatory conduct in which Right to Life and PRC may not engage.

Right to Life's and PRC's arguments against certification are unavailing. They primarily argue that certification is unnecessary here because Defendants have admitted that ELCRA proscribes at least some of their proposed conduct. But Defendants' position is not as clear as Plaintiffs suggest. True, Defendants appear to concede, at times, that ELCRA covers some of Plaintiffs' conduct. But they also argue throughout their briefing that the Plaintiffs "fail to state a claim" under ELCRA based exclusively on state law grounds—meaning ELCRA does not prohibit Plaintiffs' conduct if Defendants are correct in their argument. Defendants make no argument on the constitutional issues themselves.

Even assuming the parties agree that ELCRA prohibits at least *some* of Plaintiffs' conduct, Plaintiffs miss the broader point. As previously explained, certification is most appropriate where state law is "unsettled." Plaintiffs do not argue that ELCRA's meaning is settled. Certification is also recommended not only where the interpretation would dispose of the problem but also when the interpretation could "materially change the nature of the problem." *Planned Parenthood*, 531 F.3d 406 (quoting *Bellotti,* 428 U.S. at 146–47). Here, the success of some of Plaintiffs' constitutional challenges—like the expressive association claim—might hinge on whether ELCRA is as broad as they say. So ELCRA's interpretation would materially change the analysis. And certification would also help "define precisely" the Plaintiffs' constitutional claims. *Id.*

48

Certification is therefore justified here, regardless of whether ELCRA prohibits at least some of Plaintiffs' conduct.

For all those reasons, certifying questions regarding ELCRA's scope and applicability to the Michigan Supreme Court makes sense before proceeding further with this case on the merits. The answers to those unsettled questions will either resolve, clarify, or define the constitutional issues for the Court. And if certain claims should be dismissed on state law grounds, Plaintiffs will receive enforceable relief on those points—something this Court cannot provide on its own. Accordingly, the Court intends to certify the following questions to the Michigan Supreme Court in a separate order:

1. Do ELCRA's Employment Clauses (MCL 37.2202) prohibit employers, like Right to Life and PRC, from declining to recruit, hire, employ, or retain any of the following individuals: (a) those who have had an abortion; (b) those who advocate for abortion; (c) those who associate with people who have received an abortion; or (d) those who express pro-choice viewpoints?

2. Does ELCRA's Notice Clause (MCL 37.2206(1)) prohibit an employer from publishing statements that indicate a preference against candidates who fall into any of the categories specified in Question 1?

3. Does ELCRA's Benefits Clause (MCL 37.2202(1)(c)) prohibit employers, like Right to Life and PRC, from refusing to cover abortion-related services and drugs in their health care packages, even if the employer offers the same health care packages to all employees?

4. Does ELCRA's Accommodations Clause (MCL 37.2301) prohibit an employer that offers volunteer opportunities, like PRC, from discriminating against individuals that want to volunteer for the employer?

5. If the answer to Question 4 is "yes," does ELCRA's Accommodations Clause (MCL 37.2301) prohibit a public accommodator from declining its accommodations to any of the following individuals: (a) those who have had an abortion; (b) those who advocate for abortion; (c) those who associate with people who have received an abortion; or (d) those who express pro-choice viewpoints?

Before the Court submits these questions, however, the parties should have an opportunity to comment on them. *Cf. Midwest Inst. of Health v. Whitmer*, No. 1:20-cv-414, ECF No. 41, PageID.2087 (W.D. Mich. June 12, 2020) (allowing parties to propose certification questions). Accordingly, the parties may submit supplemental briefing within 14 days from the date of this order that addresses the nature, scope, and clarity of the Court's proposed certification questions. The Court emphasizes that the parties should *not* use this an opportunity to relitigate the propriety of certification. Rather, this is an opportunity for the parties to help the Court craft clear questions that capture the essence of the statutory disputes in this case.

Once the Court receives and reviews the parties' responses, the Court will enter an official certificate. *See* M.C.R 7.308(A)(2)(b). The Court will evaluate the vitality of Plaintiffs' constitutional claims after it receives the Michigan Supreme Court's response to the questions that the Court submits. It may be that none, some, or all of Plaintiff's constitutional claims may be dismissed. Either way, certification is the most appropriate next step.

### E.  Plaintiffs' Motion for a Preliminary Injunction

That leaves Plaintiffs' Motion for a Preliminary Injunction. Because the certification process necessarily involves some "delay," *Lehman Bros.*, 416 U.S. at 394 (Rehnquist, J., concurring), the Court will not wait for the Michigan Supreme Court's answer before determining whether a preliminary injunction is appropriate here. If Plaintiffs are likely to succeed on the merits of their claim and suffer irreparable harm, then any additional delay will only compound any injury that they face. So if appropriate, a preliminary injunction would preserve "the status quo" until the Court receives an answer to those questions, and in turn, evaluates whether any of Right to Life's or PRC's claims survive under the Michigan Supreme Court's ELCRA construction. *Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 435 (6th Cir. 2016).

To get a preliminary injunction, Right to Life and PRC must show (1) they're likely to succeed on the merits, (2) they're likely to suffer "irreparable harm" without a preliminary injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Fischer v. Thomas (Fischer I)*, 78 F.4th 864 (6th Cir. 2023); *D.T. v. Sumner Cnty. Schs.,* 942 F.3d 324, 326 (6th Cir. 2019). Courts must balance these factors. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). However, the "first factor—whether the movant is likely to succeed on the merits—is generally the most important." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024). And the irreparable harm requirement is "indispensable." *D.T.,* 942 F.3d at 327.

### 1.  *Likelihood of Success on the Merits*

The Court must begin this analysis by emphasizing that *none* of the Defendants have responded to the merits of Plaintiffs' First Amendment arguments.[21] Instead, Defendants rest on their procedural standing and immunity arguments. This strategic decision complicates matters for the Court. For one, this decision makes assessing Plaintiffs' claims more difficult, because the Court is left with only Right to Life's and PRC's interpretation of constitutional caselaw. More fundamentally, it is not the Court's role to make a party's legal arguments for them. *See TE Connectivity Corp. v. Sumitomo Elec. Wiring Sys., Inc.*, 644 F. Supp. 3d 393, 399 (E.D. Mich. 2022); *Grant v. United States*, No. 1:22-CV-186, 2023 WL 6304911, at *4 (W.D. Mich. Sept. 28, 2023). For that reason, the Court could find that the Defendants "have effectively stipulated" to Right to Life and PRC's "characterization of the law for purposes of the preliminary injunction motion for 'merits' issues other than" their standing and immunity arguments. *See Darren*

---

[21] Defendant Nessel notes that "she does not address the legal merits of the Plaintiffs' claims and leaves the MDCR and Commission to this task in the event this Court must reach the merits at this stage." (ECF No. 28, PageID.568). The MDCR and MCRC officials, however, also did not address the merits.

*Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1183 (D. Colo. 2023) (finding likelihood of success on the merits where the defendants "presented no merits arguments other than the standing and ripeness arguments"). So the Court need not analyze Plaintiffs' constitutional claims before concluding that they are likely to succeed on the merits here. *See id.*

Even so, the Court believes that at least some discussion of the merits would be beneficial here. Notwithstanding the state's choice to defend on procedural arguments rather than the constitutional merits, the circumstances indicate that no matter how the Michigan Supreme Court answers the Court's questions, Right to Life and PRC will likely receive a favorable outcome from this litigation on at least some of their claims.

a.   <u>If the Michigan Supreme Court Concludes that ELCRA Covers All of Plaintiffs' Conduct, They Are Likely to Succeed on the Merits of Their Expressive Association Claim</u>

If the Michigan Supreme Court agrees with Plaintiffs that ELCRA prohibits discrimination against individuals based on their advocacy for, or association with, women who get abortions, then the Plaintiffs are likely to succeed on the merits of at least one of their constitutional claims. Take their First Amendment Expressive Association claims. Both Right to Life and PRC argue that every challenged provision—the Employment, Notice, Benefits, Accommodations, and Accommodations Publication Clauses—violates their First Amendment right to freedom of expressive association. In the Court's view, if Right to Life and PRC must employ, or accept as volunteers, anyone that "advocates" for abortion, and if they must also provide abortion-related care as part of their health insurance plans, ELCRA likely violates their expressive association rights.

The First Amendment implicitly protects the "right to associate" with others "for the purpose of engaging in" certain "activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States*

*Jaycees,* 468 U.S. 609, 618 (1984). This right exists to prevent the "majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). One way the government may violate a group's "right to associate" is by forcing the group to "accept certain members" that "may impair" the group's ability to express its views. *Dale*, 530 U.S. at 648. So the right to associate "presupposes a freedom not to associate." *Roberts*, 468 U.S. at 623. Even so, the freedom to associate "is not absolute." *Dale*, 530 U.S. at 648. This freedom succumbs to "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

In *Dale*, the Supreme Court considered whether New Jersey's antidiscrimination law violated the Boy Scouts of America's right to association. 530 U.S. 640. There, the Boy Scouts attempted to expel a headmaster after learning that he was gay and a gay-rights activist. In the Boy Scouts's view, those qualities did not align with the organization's position on homosexuality. The headmaster then sued the Boy Scouts for discrimination. In response, the Boy Scouts argued that New Jersey's law violated the First Amendment as applied to them.

In evaluating this claim, the Supreme Court established a three-part right to association test. First, courts must determine whether the "group engages in expressive association." 530 U.S. at 648. In so doing, the court "gives deference" to the group's "assertions regarding the nature of its expression." *Id.* at 653. If the group engages in expressive association, the court must then determine whether the presence of a certain member "would significantly burden" the group's expression. *Id.* at 653. And third, if the law significantly burdens expression, the court then must assess whether the law "runs afoul" with the First Amendment by balancing the group's interest with the government's interest. *Id.* at 656-61. In essence, the third element requires courts to apply

53

a form of strict scrutiny. *See id.* Applying this test, the Supreme Court held that the First Amendment protected the Boy Scouts's decision to expel Dale because his presence "significantly" undermined the group's position on sexual orientation, and the state's interest in applying the law to the Boy Scouts did "not justify such a severe intrusion." *Id.* at 659.

Plaintiffs presume that the *Dale* test will apply to their employment practices. But the Supreme Court has never addressed whether the "right to associate" extends to the employment context. *See CompassCare v. Hochul*, 125 F.4th 49, 59-62 (2d Cir. 2025). In fact, the only time the Supreme Court considered a freedom of association argument in the employment context, it rejected that defense. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). To date, the Supreme Court has only ever found a right to expressive association in the context of voluntary associations. *See, e.g.*, *Dale*, 530 U.S. at 649-50 (Boy Scouts); *Roberts*, 468 U.S. at 612-13 (civic association); *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 8-9 (1988) (certain private clubs).

In the Court's view, the traditional right to association analysis likely "does not apply neatly to employers." *CompassCare*, 125 F.4th at 59-62. The Second Circuit recently discussed why. *See id.* Unlike in voluntary associations, "[e]mployment relationships are contractual, with work exchanged for pay." *Id.* at 59. Because employees "rely on their jobs for their livelihoods" terminating, or refusing to hire someone, "can have significantly greater impact" on a person "than exclusion from a voluntary association." *Id.* Moreover, employers, unlike voluntary associations, are "heavily regulated and closely scrutinized at both the state and federal levels." *Id.*; *see also W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 393 (1937) (emphasizing that states have "wide . . . discretion" to regulate employment conditions). So unbridled application of the expressive association defense in employment cases could provide every employer a "shield" from otherwise valid laws. *CompassCare*, 125 F.4th at 59-60.

Because employers are unlike voluntary organizations, courts have taken different approaches when analyzing the right to association in the employer context. Some courts have declined to extend the right to association to employers and have, in turn, dismissed association claims for that reason. *See, e.g*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1209 (S.D. Ind. 2020). Other courts have presumed that employer status does not affect the traditional three-part right to association analysis laid out in *Dale*. *See Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) (applying *Dale*-test in employment setting). And other courts have developed heightened employer-specific right-to-association tests. *See CompassCare*, 125 F.4th 49.

At this point, the Court need not make any final calls regarding which of these approaches prevails. However, based on the Court's preliminary review, the third approach—applying a heightened test for employers—will likely apply. As *CompassCare* recognized, a "mission-based organization," whose sole goal is to advocate for a specific cause, "could plausibly allege that the compelled retention of a specific employee would impair its ability to express its message." *Id.* at 60-61. A categorical ban on expressive association claims in the employment context would not account for that fact. But at the same time, if courts allowed employers to claim a particular type of expression—even when the employer is not formed for that purpose, like the Boy Scouts in *Dale*—*any* employer could claim that it expresses its beliefs through its business activities, and that the retention of certain employees burdens that expression. *Id.* at 60. That would effectively erode antidiscrimination laws to point where they lose all potency. So a heightened test preserves the validity of antidiscrimination laws while also recognizing that certain employers exist to expound a particular point of view.

Under an employer-specific expressive association test, Plaintiffs' "must adequately allege (and eventually prove) that the" the state law at issue "threatens 'the very mission of its organization.' " *Id.* at 61 (quoting *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023)). The employer may not invoke the right to association protection by merely stating that the employer holds a particular viewpoint, like the Boy Scouts in *Dale*. Rather, the right to expressive association is only implicated "when the employment decision at issue 'goes to the structure and identity of the association as an association.' " *Id.* That requirement allows certain "mission-based" employers that operate like—and, in fact, often have stronger expressive views than—voluntary associations to state expressive association claims where the circumstances indicate that an employee could impair the group.

Further, Plaintiffs must also describe how the state law threatens their mission "in the context of a specific employment decision." *Id.* As such, the court would assess "(1) the responsibilities of the position at issue . . . and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *Id.* This requirement reflects that not every employment position is the same—a non-public-facing employee with differing views, for example, would likely not "impede the organization's ability . . . to disseminate its preferred views" whereas a public-facing employee—like a CEO or COO—with opposing view almost certainly would. *Id.*

Here, even under the heightened *CompassCare* test, Right to Life and PRC are likely to succeed on this claim, especially in light of Defendants' silence on this point. To start, both Right to Life and PRC have shown that they are likely "mission-based organization[s]" that advocate for a specific cause. *Id.* at 60-61. Both entities allege that they are nonprofit organizations dedicated to advocating against abortion. Right to Life says that it "exists" to "protect . . . human life," and

to further that goal, it advocates for pro-life legislation and shares its pro-life mission through various platforms.  (ECF No. 1, PageID.6-8). Similarly, because PRC believes that every abortion "claims an innocent life," it does not offer abortion-related drugs and services as part of its pregnancy related services; rather, it advises women seeking its services that they should "decline to have an abortion." Each entity's mission-statement reflects that both organizations seek to advance their moral positions on abortion in society. And Defendants do not argue that Plaintiffs are not expressive, mission-based organizations. So both Plaintiffs are likely to satisfy *Dale*'s first prong, even with *CompassCare*'s gloss.

Next, Right to Life and PRC are also likely to show that the application of each of ELCRA's five relevant provisions—the Employment, Notice, Benefits, Accommodations, and Accommodations Publications Clause—either "substantially burden" their expression or "threaten the very mission" of their organizations. *See Dale*, 600 U.S. at 653; *CompassCare*, 125 F.4th at 59-62.

First consider their employment practices. Right to Life and PRC are likely to show that hiring people who advocate for, or associate with, women who terminate a pregnancy would "threaten the very mission" of their organizations. *See CompassCare*, 125 F.4th at 61. And they do so "in the context of a specific employment decision." *Id.* Both Right to Life and PRC thoroughly describe their respective employment positions, many of which are public facing and require the employee to spread the organization's message to others. (ECF No. 1, PageID.13-14, 32).  Right to Life and PRC also provide information regarding the current positions that they would like to fill—leadership positions, such as PRC's COO, that spread the organizations' pro-life message to others. If Right to Life and PRC cannot lawfully advertise for and fill these public-facing positions with pro-life advocates—who profess a viewpoint in sync with each organization's core values—

57

then ELCRA's antidiscrimination provision could "threaten the very mission" for which Right to Life and PRC exist. In essence, the presence of pro-choice advocates in those public-facing provisions would eliminate Plaintiffs' "choice not to propound a point of view contrary to" their pro-life "beliefs." *Dale*, 600 U.S. at 654.

Another case from the Second Circuit, *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), illustrates these points. *Slattery*, like this case, involved a First Amendment expressive association challenge to a New York law that prohibited employers from discriminating against employees "because of . . . the employee's or dependent's reproductive health decision making." *Id.* at 283-84. And, like this case, the plaintiff was a pro-life nonprofit organization that operated pregnancy centers throughout the state. The court found that because the statute "forces" the pro-life employer to "employ individuals" who "may believe the opposite" of the organization's "very mission," New York's law "imposes severe burdens" on the pro-life group's right to expressive association. *Id.* at 288. Thus, because the employee's presence would severely burden the organization's pro-life message, strict scrutiny applied. *Id.*

So too here. As such, ELCRA's Employment Clauses likely "threaten" Right to Life and PRC's pro-life mission.

Next consider ELCRA's Accommodations Clause. Because the Accommodations Clause applies only to PRC's volunteer practices, rather than its employment practices, the less stringent *Dale* test would likely apply. And here, PRC has shown that accepting volunteers who do not accept its religious and moral positions—including non-Christians and non-straight individuals—likely imposes a "substantial burden" on its speech. PRC is a Chrisitan ministry that "seeks to share" its religious message with "members of the public." (ECF No. 1, PageID.21). PRC also opposes gay marriage. (ECF No. 1-11, PageID.106). If PRC was forced to accept volunteers that

58

do not agree with these religious and moral positions, ELCRA would again interfere with the organization's "choice not to propound a point of view contrary to" its religious "beliefs." *Dale*, 600 U.S. at 654. Their presence would likely dilute PRC's message and burden the expressive activity in which it wishes to engage. So like the Employment Clauses, ELCRA's Accommodations Clauses also likely substantially burden PRC's expressive activity.

The Benefits Clause analysis is simply an extension of these principles. Both Right to Life and PRC exist to advocate against abortion. But, if the Michigan Supreme Court agrees with MCRC's position, the Benefits Clause would force both organizations to offer abortion-related services as part of their health care plans. In the Court's view, compelling Right to Life and PRC to provide benefits that are fundamentally at odds with its mission would damage the association bond that holds the two groups together—the collective belief that abortion is wrong.

Consider a few analogies. What if Weight Watchers—an organization devoted to helping people lose weight by changing their habits—were forced to provide weight loss drugs like Ozempic? Would that benefit not compromise the organization's mission? What if Christian Scientists—a group that believes in spiritual healing over medical treatment—were forced to provide health insurance? Would that also not comprise the group's anti-healthcare mission? Or what if Not Dead Yet—an advocacy group that opposes assisted suicide and euthanasia—were eventually forced to provide euthanasia or assisted suicide services as part of its health care packages? Would that also not compromise the group's anti-euthanasia mission?

This is not to say that any organization may claim that providing a particular benefit conflicts with its belief. To the contrary, most groups do not fit this bill. But where, as here, a group is forced to provide a benefit that is antithetical to the group's mission—the sole reason for which

the group exists—the benefit threatens the group's expressive activity.[22] Thus, Plaintiffs have shown that ELCRA's Benefits Clause, which would force them to provide abortion-related drugs, also likely "threatens" their pro-life mission.

Finally, ELCRA likely would not pass strict scrutiny under these conditions because the "balancing of interests favors" Right to Life's and PRC's expressive association right. *Slattery*, 61 F.4th at 289-90. "On one side of the scale is the individual's right not to be discriminated against for" their positions on abortion or religion. *Id.* On the other side is Right to Life's and PRC's First Amendment right to expressive association to advocate against those positions. *See id.* If Right to Life and PRC may exclude employees who advocate for abortion, or in PRC's case, employees who are gay or non-Christian, then the right to be free of that kind of discrimination "will be impaired only to the limited extent that a person cannot join" these specific groups. *Id.* On the other hand, if Michigan "could require an association that expressly opposes abortion to accept members" who advocate against that position, it would severely burden the organization's right of expressive association. *Id.* Therefore, because the balancing of interests would likely favor Plaintiffs, ELCRA is likely to "run afoul" with the First Amendment such that it violates the Constitution as applied to the Plaintiffs.

So for all those reasons, if the Michigan Supreme Court agrees with Plaintiffs' interpretation of ELCRA, then Plaintiffs are likely to succeed on the merits of the expressive association claim. [23]

---

[22] It may be that this application of the expressive association analysis will prove too much. But at this stage, the Court need only find that Plaintiffs will *likely* succeed on the merits. And here, where Defendants do not contest Plaintiffs' application of the law, the Court finds that they have met this burden.

[23] Because the Court finds that Right to Life and PRC are likely to succeed on the merits of their First Amendment expressive association claims, which would provide relief against every challenged ELCRA provision, the Court need not address whether Plaintiffs are likely to succeed on their remaining constitutional claims. Again, the Court emphasizes that Defendants have not responded to any of Plaintiffs'

### b. If the Michigan Supreme Court Finds that ELCRA Does Not Apply to Plaintiffs' Conduct, Plaintiffs Still Achieve a Favorable Result

On the other hand, even if the Michigan Supreme Court agrees with Defendants that ELCRA's scope is narrow and does not cover the bulk of Plaintiffs' conduct, Plaintiffs are still likely to achieve a satisfactory result from this litigation. In that scenario, if the Court were to dismiss Plaintiffs' constitutional claims because ELCRA didn't prohibit their conduct, that dismissal would amount to a "real-world win" because Plaintiffs' would know that ELCRA "does not apply to the conduct that they want to undertake." *CHC*, 117 F.4th at 859-60 (Murphy, J., concurring). They would thus have assurance from Michigan's highest court that Michigan officials could not use ELCRA to punish Right to Life's or PRC's practices. So each entity could legally engage in their intended employment practices and would no longer need to chill their speech to avoid violating the law. Thus, Plaintiffs' likely "win" in this scenario too.

At bottom, regardless of the Michigan Supreme Court's interpretation of ELCRA, Plaintiffs are likely to receive the relief they sought from this litigation—the confidence that the 2023 amendments cannot bar Plaintiffs' intended conduct. The only question is whether that confidence comes by way of state law, or the federal constitution. As such, the first, and most important, preliminary injunction factor weighs in favor of granting Plaintiffs' injunction request.

### 2. Other Injunction Factors

The remaining factors also weigh in the Plaintiffs' favor. First, Plaintiffs suffer an irreparable injury. "[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Boddy v. Grech*, 178 F.4th 264, 277 (6th Cir. 2026). Likewise, "the loss of First

---

arguments as to these claims. For the purposes of this preliminary injunction order, then, the Court presumes that Defendants effectively stipulate to Plaintiffs' interpretation of the law, *see Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023), which further reinforces Plaintiffs' likelihood of success on the merits.

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (*per curiam*)). Here, ELCRA likely threatens and impairs Plaintiffs' First Amendment expressive association freedoms, and Plaintiffs' speech is currently chilled. Defendants have not adequately rebutted that presumption. So because Plaintiffs would suffer an irreparable injury without an injunction, the second factor also favors an injunction here.

Entering an injunction is also in the public's interest. "[I]t is always in the public's interest to prevent a violation of an individual's constitutional rights." *Boddy*, 178 F.4th at 277 (internal quotations omitted). The public interest favors an "unbridled marketplace of ideas, especially when those ideas are unpopular or critical." *Id.* Many people may disagree with Right to Life's and PRC's positions on abortion, sexual orientation, and beyond. Even so, each organization represents a unique voice in our Nation's diverse "marketplace of ideas." A preliminary injunction in Plaintiffs' favor not only protects their First Amendment rights, but it also ensures that every mission-based organization, regardless of viewpoint, may choose to associate with individuals and practices that align with the organization's mission.[24]

Therefore, because every preliminary injunction factor favors Right to Life and PRC, the Court grants their motion for a preliminary injunction and enjoins Defendants from enforcing the challenged ELCRA provisions against them.

---

[24] Moreover, an injunction tailored to Right to Life and PRC, specifically, would cause comparatively little harm to third parties. Michigan can still lawfully apply ELCRA to every other employer in Michigan. So on the whole, ELCRA still provides robust protection against discrimination.

CONCLUSION

**ACCORDINGLY, IT IS SO ORDERED** that:

1. The MCRC and MDRC Defendants' Motion to Dismiss (ECF No. 25) is **DENIED**.

2. Attorney General Dana Nessel's Motion to Dismiss (ECF No. 29) is **DENIED**.

3. Right to Life's and PRC's Motion for a Preliminary Injunction (ECF No. 7) is **GRANTED** to the extent provided in the accompanying Preliminary Injunction.

4. The parties may submit supplemental briefing within 14 days from the date of this order that addresses the Court's proposed certification questions.


Date:   July 10, 2026                           /s/ Robert J. Jonker
                                                ROBERT J. JONKER
                                                UNITED STATES DISTRICT JUDGE